# JUDGE SWEET

# 08 CV 02955

CLOSED

### U.S. District Court
### Eastern District of Michigan (Detroit)
### CIVIL DOCKET FOR CASE #: 2:08-x-50179-NGE-DAS
### Internal Use Only

Brand et al v. Tower Automotive, LLC
Assigned to: Honorable Nancy G Edmunds
Referred to: Honorable Donald A Scheer
Cause: No cause code entered

Date Filed: 03/06/2008
Date Terminated: 03/12/2008
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Nathan F Brand**

represented by **Barry D. Adler**
Adler & Stilman, PLLC
30300 Northwestern Highway
3rd Floor
Farmington Hills, MI 48334
248-855-5090
Fax: 248-855-0424
Email: badler@adlerfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dorothea C Brand**

represented by **Barry D. Adler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brand Family Foundation**

represented by **Barry D. Adler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tombstone Limited Partnership**

represented by **Barry D. Adler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Elsa S Ienatsch**

represented by **Barry D. Adler**





*T.....ge ..... 3/..../..... by Else S*
*Ienatsch Living Trust*

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Frederic E Mohs**                    represented by **Barry D. Adler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Paula A Mohs**                    represented by **Barry D. Adler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Tower Automotive, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/06/2008 | 1 | MOTION to Compel Response to Subpoena by plaintiffs (Attachments: # 1 Document Continuation, # 2 Document Continuation, # 3 Document Continuation, # 4 Document Continuation, # 5 Document Continuation, # 6 Document Continuation) (PPau) (Entered: 03/06/2008) |
| 03/06/2008 | 2 | NOTICE of Appearance by Barry D. Adler on behalf of Nathan F Brand, Dorothea C Brand, Brand Family Foundation, Tombstone Limited Partnership, Elsa S Ienatsch, Frederic E Mohs, Paula A Mohs. (PPau) (Entered: 03/06/2008) |
| 03/07/2008 | 3 | ORDER REFERRING MOTION to Magistrate Judge Donald A Scheer: 1 MOTION to Compel filed by Dorothea C Brand. Signed by Honorable Nancy G Edmunds. (CHem) (Entered: 03/07/2008) |
| 03/12/2008 | 4 | ORDER TRANSFERRING CASE to USDC SOUTHERN DISTRICT OF NEW YORK. Signed by Honorable Nancy G Edmunds. (RHut) (Entered: 03/14/2008) |



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN


Nathan F Brand, et al.,

                              Plaintiff(s),

v.                                          Case No. 2:08-x-50179-NGE-DAS
                                            Hon. Nancy G Edmunds
Tower Automotive, LLC,

                              Defendant(s).

_____

### NOTICE OF TRANSFER TO OTHER DISTRICT

TO:  U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

     Enclosed are certified copies of the Order of Transfer and the docket sheet.  The case
record is electronic and can be viewed at our Court's Intranet website via the J-Net.

     Please acknowledge receipt of this record by returning a time-stamped copy of this notice
to:

                    Clerk's Office
                    U.S. District Court for the Eastern District of Michigan
                    231 W. Lafayette Blvd., 5th Floor
                    Detroit, MI
                    48226
                    (313) 234-5005




### Certification

     I hereby certify that this Notice was electronically filed, and the parties and/or counsel of
record were served.

                              DAVID J. WEAVER, CLERK OF COURT


                              By: s/ R. Hutchins
                                  Deputy Clerk

Dated:   March 14, 2008

**333**

Receipt Number
568318

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHAN F. BRAND, DOROTHEA C. BRAND, BRAND
FAMILY FOUNDATION, TOMBSTONE LIMITED
PARTNERSHIP, ELSA S. IENATSCH, TRUSTEE U/A/D
3/23/2000 BY ELSE S. IENATSCH LIVING TRUST,
FREDERIC E. MOHS and PAULA A. MOHS, on behalf of
themselves, and all others similarly situated,

No. _____

Movants,

Case: 2:08-x -50179
Judge: Edmunds, Nancy G
Referral MJ: Scheer, Donald A
Filed: 03-06-2008 At 12:04 PM
PE BRAND, ET AL V TOWER AUTOMOTIVE,
LLC (EW)

v.

TOWER AUTOMOTIVE LLC

Respondent.

| Attorneys for Movants, Lead Plaintiffs in *In re Tower Auto. Sec. Litig.* (S.D.N.Y.) | Attorneys for Respondent Tower Automotive LLC |
|---|---|
| Barry D. Adler (P30557) ADLER STILMAN, PLLC 30300 Northwestern Highway, 3d Floor Farmington Hills, Michigan 48334 Telephone: 248-855-5090 | Michael A. Duffy KIRKLAND & ELLIS LLP 200 East Randolph Drive Chicago, Illinois 60601 Telephone: 312-861-2000 |
| Lee S. Shalov Thomas G. Ciarlone Susan M. Davies SHALOV STONE BONNER & ROCCO LLP 485 Seventh Avenue, Suite 1000 New York, New York 10018 Telephone: 212-239-4340 | |
| Kenneth J. Vianale Julie Prag Vianale VIANALE & VIANALE LLP 2499 Glades road, Suite 112 Boca Raton, Florida 33431 Telephone: 561-392-4750 | |

MOTION OF LEAD PLAINTIFFS IN
*IN RE TOWER AUTOMOTIVE SECURITIES LITIGATION*
TO COMPEL TOWER AUTOMOTIVE LLC TO RESPOND TO SUBPOENA

Movants Lead Plaintiffs in *In re Tower Automotive Securities Litigation*, pending in the United States District Court for the Southern District of New York as Civil Action No. 1:05-civ-01926(RWS), through their undersigned attorneys move pursuant to Rules 26, 30, 34, 37, and 45 of the Federal Rules of Civil Procedure and Rules 7.1, 37.1, and 37.2 of E.D. Mich. LR for an order compelling Respondent Tower Automotive LLC to respond fully to the subpoena served on January 25, 2008 (the "Subpoena") by producing: (1) all documents responsive to the Subpoena that have been withheld hitherto based on a claim of attorney-client privilege, and (2) the data on computer backup tapes of the network drives and e-mail files of Tower Automotive, Inc. that is responsive to the Subpoena or, in the alternative, the backup tapes in their entirety.

In support of this motion, Movants rely upon the accompanying brief and exhibits thereto.

## Certifications Pursuant to Fed.R.Civ.P. 37(2)(A) and E.D. Mich. LR 7.1(a)(2)

On February 1, 2008, February 14, 2008, and February 21, 2008, attorneys for Movants met and conferred by telephone with attorneys for Respondent in a good faith effort to secure the disclosure that is the subject of the instant motion without court intervention. Attorneys for Movants explained the nature and legal basis of the relief requested herein and sought, but did not obtain, Respondent's concurrence thereto.

Respectfully submitted:

Attorneys for Movants, Lead Plaintiffs in
*In re Tower Auto. Sec. Litig.* (S.D.N.Y.)

ADLER STILMAN, PLLC

By:

Barry D. Adler (P30557)
30300 Northwestern Highway, 3d Floor
Farmington Hills, Michigan 48334
Telephone: 248-855-5090

Lee S. Shalov
Thomas G. Ciarlone
Susan M. Davies
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue, Suite 1000
New York, New York 10018
Telephone: 212-239-4340


Kenneth J. Vianale
Julie Prag Vianale
VIANALE & VIANALE LLP
2499 Glades road, Suite 112
Boca Raton, Florida 33431
Telephone: 561-392-4750

Dated: March 5, 2008

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHAN F. BRAND, DOROTHEA C. BRAND, BRAND
FAMILY FOUNDATION, TOMBSTONE LIMITED
PARTNERSHIP, ELSA S. IENATSCH, TRUSTEE U/A/D
3/23/2000 BY ELSE S. IENATSCH LIVING TRUST,
FREDERIC E. MOHS and PAULA A. MOHS, on behalf
of themselves, and all others similarly situated,

No. _____

Movants,

Case: 2:08-x -50179
Judge: Edmunds, Nancy G
Referral MJ: Scheer, Donald A
Filed: 03-06-2008 At 12:04 PM
PE BRAND, ET AL V TOWER AUTOMOTIVE, LLC (EW)

v.

TOWER AUTOMOTIVE LLC,

Respondent.

---

Attorneys for Movants, Lead Plaintiffs in *In re Tower Auto. Sec. Litig.* (S.D.N.Y.)

Barry D. Adler (P30557)
ADLER STILMAN, PLLC
30300 Northwestern Highway, 3d Floor
Farmington Hills, Michigan 48334
Telephone: 248-855-5090

Lee S. Shalov
Thomas G. Ciarlone
Susan M. Davies
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue, Suite 1000
New York, New York 10018
Telephone: 212-239-4340

Kenneth J. Vianale
Julie Prag Vianale
VIANALE & VIANALE LLP
2499 Glades road, Suite 112
Boca Raton, Florida 33431
Telephone: 561-392-4750

Attorneys for Respondent
Tower Automotive LLC

Michael A. Duffy
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: 312-861-2000

---

**BRIEF IN SUPPORT OF MOTION OF LEAD PLAINTIFFS IN**
***IN RE TOWER AUTOMOTIVE SECURITIES LITIGATION***
**TO COMPEL TOWER AUTOMOTIVE LLC TO RESPOND TO SUBPOENA**

## ISSUES PRESENTED

I.  CAN A DEFUNCT CORPORATION, OR THE TRANSFEREE OF SUCH
    DEFUNCT CORPORATION'S ASSETS, WITHHOLD INFORMATION FROM
    DISCOVERY BASED UPON A CLAIM OF ATTORNEY-CLIENT PRIVILEGE?

**Movants' Answer: No.**

II. SHOULD RESPONDENT BE ORDERED TO PRODUCE DATA STORED ON
    BACKUP TAPES OR, IN THE ALTERNATIVE TO PRODUCE THE BACKUP
    TAPES IN THEIR ENTIRETY, TO MOVANTS FOR PURPOSES OF
    DISCOVERY IN A MULTI-MILLION DOLLAR SECURITIES CLASS ACTION?

**Movants' Answer: Yes.**


## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

**As to Issue I:**

*Fausek v. White*, 965 F.2d 126 (6th Cir. 1992)

*Gilliland v. Geramita*, No. 2:05-CV-01059, 2006 WL 2642525 (W.D. Pa. Sept. 14, 2006)

*In re In-Store Advertising Sec. Litig.*, 163 F.R.D. 452 (S.D.N.Y. 1995)

*In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83 (5th Cir. 1976)

*Lewis v. United States*, No. 02-2958B/AN, 2004 WL 3203121 (W.D. Tenn. Dec. 7, 2004)

*Yosemite Inv., Inc. v. Floyd Bell, Inc.*, 943 F. Supp. 822, 883 (S.D. Ohio 1996)


**As to Issue II:**

*Fed. R. Civ. P. 26, 34, 45 and Advisory Committee's Notes to 2006 Amendment*

*Auto Club Family Ins. Co. v. Ahner*, No. 05-5723, 2007 WL 2480322 (E.D. La. Aug. 29, 2007)

# I. INTRODUCTION

Movants seek to enforce a subpoena issued to respondent **Tower Automotive LLC** ("Respondent"), a wholly owned affiliate of Cerberus Capital Management, L.P., and to compel Respondent to produce certain documents and electronically stored information originally belonging to **Tower Automotive, Inc.** ("Tower"), a non-operating, defunct Delaware corporation. The documents and electronically stored information at issue were transferred to Respondent in connection with the sale of substantially all of Tower's assets to Respondent, effective July 31, 2007.

Movants are the Lead Plaintiffs in a consolidated class action pending in the United States District Court for the Southern District of New York as *In re Tower Automotive Securities Litigation*, Civil Action No. 1:05-civ-01926(RWS) (the "S.D.N.Y. Action"). In the S.D.N.Y. Action, Movants assert claims on behalf of shareholders of Tower against eight former officers and directors of Tower, as primary violators of the federal securities laws and as control persons responsible under Section 20(a) of the Securities Exchange Act of 1934 for Tower's violations of the federal securities laws. *See In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327 (S.D.N.Y. 2007); *In re Tower Auto. Sec. Litig.*, No. 05 Civ. 1926(RWS), slip op. (S.D.N.Y. Feb. 7, 2008). Tower was not named as a defendant to the S.D.N.Y. Action because it had filed for bankruptcy court protection before the S.D.N.Y. Action was commenced. *See In re Tower Automotive, Inc. and Post-Consummation Trust*, Case No. 05-10578-alg (S.D.N.Y. Bankr.).

***Tower's business records are indisputably the primary source for information relevant to the claims and defenses in the S.D.N.Y. Action, and Movants have substantial need for discovery of those records in order to prepare their case.*** Movants seek to compel Respondent to provide two categories of discovery from Tower's business records: (1) documents and

electronically stored information withheld from production based upon Tower's purported attorney-client privilege; and (2) electronically stored information maintained on backup tapes of Tower's network drives and e-mail servers.

***Respondent cannot withhold documents and information from discovery based on Tower's attorney-client privilege.*** As a result of Tower's Chapter 11 Bankruptcy Reorganization Plan consummated on July 31, 2007 ("Tower's Reorganization Plan"), Tower is a defunct corporation, without any directors, officers, assets, or operations. As a defunct corporation, Tower cannot assert attorney-client privilege. Under Tower's Reorganization Plan, Respondent received a transfer of substantially all of Tower's assets, but did not assume control over Tower as a corporate entity. Accordingly, Respondent did not acquire the right to assert Tower's attorney-client privilege. Moreover, the transfer of business records reflecting Tower's attorney-client communications to the Respondent waived Tower's attorney-client privilege. Thus, Respondent should be ordered to produce all documents it has withheld from discovery on grounds of Tower's purported attorney-client privilege.

***Respondent has not shown that the electronically stored information maintained on backup tapes of Tower's network drives and e-mail servers is not reasonably accessible.*** Respondent asserts that as a nonparty to the S.D.N.Y. Action it is not required to provide discovery from computer backup tapes. However, Respondent has not provided enough information to enable Movants to evaluate Respondent's assertions concerning the burden and cost of retrieving data from the backup tapes. *See* Fed. R. Civ. P. 26(b)(2) Advisory Committee's Notes to 2006 Amendment. In the first instance, Respondent refused to permit Movants' electronic discovery consultants to obtain such information through informal dialogue with Respondent's information systems personnel. Thereafter – in violation of the Federal Rules

of Civil Procedure – Respondent refused to designate a Rule 30(b)(6) deposition witness for examination regarding Tower's electronically stored information, claiming that Movants' deposition subpoena sought irrelevant information. *Contra* Fed. R. Civ. P. 26(b)(1). Respondent even rejected Movants' offer to have Movants' electronic discovery consultants – at Movants' expense – perform all the work necessary to retrieve the potentially relevant data from the backup tapes in issue. Respondent claimed that this procedure could potentially violate its attorney-client privilege, even though Respondent has no standing to assert privilege for Tower's attorney-client communications.

In short, Respondent has stymied Movants' reasonable efforts to obtain needed discovery. As a result, Movants are left with no alternative but to seek relief in this Court, where it will be Respondent's burden to show that it would be unduly burdensome and costly for Respondent to provide discovery from the backup tapes despite the facts that (1) Movants are willing to perform the work necessary to retrieve information from the backup tapes, (2) Respondent's counsel need not review such retrieved information for attorney-client privilege because no privilege exists; and (3) the backup tapes are potentially a critical source of information relevant to Movants' claims in the S.D.N.Y. Action. Fed. R. Civ. P. 45(d)(1)(D).

## II.    PROCEDURAL BACKGROUND

The procedural background of the instant motion is complicated by the fact that – unaware that Tower was about to transfer possession of its business records (including computerized information systems) to Respondent – Movants initially subpoenaed Tower for documents in June 2007.[1] (Declaration of Susan M. Davies dated March 4, 2008, annexed hereto

---

[1]    Pursuant to the Private Litigation Securities Reform Act of 1995, all discovery in the S.D.N.Y. Actions had been stayed during the pendency of defendants' motions to dismiss. The stay was lifted when the United States District Court for the Southern District of New York sustained Movants' Consolidated Amended Class Action Complaint by an opinion and order dated on April 14, 2007. *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327.

at **Exhibit 13,** at ¶ 3; subpoena for documents served on Tower Automotive, Inc. on or about June 16, 2007, annexed hereto at **Exhibit 2**.)  After negotiations between counsel concerning the scope of that document request, in September and October 2007 Kirkland & Ellis LLP, purporting to act on behalf of Tower, produced documents and a privilege log to Movants. (**Exhibit 13,** at ¶ 4.)  Tower's document production did not include copies of any electronically stored information and, consequently, included very few copies of electronic mail messages.  (*Id.* at ¶ 4.)

During the following months, Kirkland & Ellis LLP exchanged correspondence, and met and conferred, with Movants' counsel concerning Tower's objection to producing electronically stored information.  (*Id.* at ¶ 5; September 7, 2007 letter from Vianale & Vianale LLP to Kirkland & Ellis LLP, annexed hereto at **Exhibit 6**; September 26, 2007 letter from Kirkland & Ellis LLP to Vianale & Vianale LLP, annexed hereto at **Exhibit 7**; November 20, 2007 letter from Vianale & Vianale LLP to Kirkland & Ellis LLP, annexed hereto at **Exhibit 8**; December 21, 2007 letter from Kirkland & Ellis LLP to Vianale & Vianale LLP, annexed hereto at **Exhibit 9;** , January 8, 2008 e-mail from Shalov Stone Bonner & Rocco LLP to Kirkland & Ellis LLP, annexed hereto at **Exhibit 10;** January 15, 2008 letter from Kirkland & Ellis LLP to Shalov Stone Bonner & Rocco LLP, annexed hereto at **Exhibit 11**.)  Ultimately, Tower agreed to produce electronically stored information from a very limited source:  the backup copies that Tower had made of the network drives and "My Documents" hard drive folders of three of the defendants in the S.D.N.Y. Action at the time of their resignations from Tower.[2]  (*See* **Exhibit 9**, at p. 1.)  Aside from this limited production – promised on December 21, 2007 but not received as of the date of filing this motion – Tower refused to produce any other electronically stored

---

[2]   Those three defendants are Tower's former President and CEO Kathleen Ligocki, Tower's former CFO James Mallak, and Tower's former Controller Christopher T. Hatto.

information on the ground that so doing would be unduly burdensome in light of Tower's status as a nonparty to the S.D.N.Y. Action. (*See id.* at p. 2; **Exhibit 11**, at p. 2.)

In response to Movants' counsel's request for information about Tower's computer systems, backup procedures and backup media, Kirkland & Ellis LLP identified other potential sources of electronically stored information, including computer backup tapes containing "year-end snapshots" of Tower's network drives and e-mail servers for 2003, 2004, and 2005. (*See* **Exhibit 6** at pp.2-3; **Exhibit 7** at p. 2.) However, Tower did not provide requested details concerning the nature of these backup tapes, including the type of hardware and software involved, their data capacity, or even the number of backup tapes at issue. (*See* **Exhibit 6** at p. 2; **Exhibit 10-11**.) Instead, Tower simply refused to search the tapes for responsive information, asserting that "[i]t would take an estimated 240 man hours for Tower employees to extract the requested annual backup data" from the network drive tapes, plus substantial attorney time to review recovered data prior to production. (*See* **Exhibit 9** at p. 1. *See also* **Exhibit 11** at p. 1.). With respect to the backup tapes of e-mail data, Tower provided no further details other than that the files "were created by an earlier version of e-mail software that is no longer in use, therefore any recovery of e-mail files from 2005 and preceding years will require Tower to rebuild an environment based on that earlier software." (*See* **Exhibit 11** at p. 1.)

In order to evaluate Tower's claims concerning the burden of retrieving data from the backup tapes – and, if possible, to formulate a proposal for more efficient and cost-effective data retrieval and searching – Movants engaged electronic discovery consultants, DOAR Litigation Consulting. (**Exhibit 13,** at ¶ 6.) However, Movants' consultants were unable to evaluate Tower's generalized claims, or opine concerning the most efficient method of data retrieval, without detailed information concerning the backup tapes themselves and how Tower proposed

to retrieve the data. (*Id.* at ¶ 6.) Movants sought to obtain this information by requesting a meet and confer among counsel, Movants' consultants, and Tower's information systems personnel. (*See id.* at ¶ 6; **Exhibit 10**.) Tower rejected Movants' request, stating that "Tower is under no obligation to open its doors and allow [Movants] unfettered access to our technical staff and electronic data…." (*See* **Exhibit 11**.) Whereupon Movants determined to obtain the necessary information through a Rule 30(b)(6) deposition of a witness knowledgeable about Tower's information systems and electronic information storage. (**Exhibit 13** at ¶ 7; **Exhibit 1**.)

At this time, Movants' counsel reviewed the status of Tower's Chapter 11 bankruptcy proceeding and learned that months earlier (and prior to producing any documents to Movants) Tower had transferred substantially all of its assets, including business records, to Respondent. (*See id.*; **Exhibit 3**; Asset Purchase Agreement by and among Tower Automotive, Inc. and its debtor affiliate signatories and TA Acquisition Company, LLC dated as of May 1, 2007, annexed hereto at **Exhibit 4,** at Section 5.8.) Movants thereupon, on January 25, 2008, served Respondent with a Rule 30(b)(6) deposition subpoena and a document subpoena substantially identical to the document subpoena served on Tower in June 2007. (*See* **Exhibit 1**.) Respondent, represented by Kirkland & Ellis LLP, objected to the subpoena, ultimately refusing to produce a Rule 30(b)(6) witness on grounds that the information sought concerning Tower's computer systems and electronically stored information was not relevant to any claim or defense in the S.D.N.Y. Action, and the deposition would impose an undue burden on Respondent. (January 31, 2008 letter from Kirkland & Ellis LLP to Shalov Stone Bonner & Rocco LLP, annexed hereto at **Exhibit 12**; **Exhibit 13**, at ¶ 9.) Respondent maintained Tower's objection to producing electronically stored information other than the above-described limited production agreed to by Tower. (**Exhibit 13** at ¶ 11.) Respondent rejected Movants' proposal that

Movants' electronic discovery consultants retrieve the data from the backup tapes at issue, because of the possibility that the backup tapes might contain information protected from discovery by the attorney-client privilege. (*Id.* at ¶ 12.) According to Respondent, Tower's attorney-client privilege was transferred to Respondent as part of the transfer of substantially all of Tower's assets. (*Id.* at ¶ 12.)

The scheduled deadline for completion of fact discovery in the S.D.N.Y. Action is May 15, 2008. (*Id.* at ¶ 14.)

**To date, neither Respondent nor Tower has produced any electronically stored information in response to the subpoena.** (*Id.* at ¶ 13.)

# III.   ARGUMENT

## A.   RESPONDENT CANNOT WITHHOLD RELEVANT INFORMATION BASED ON TOWER'S ATTORNEY-CLIENT PRIVILEGE

Tower has had no directors, officers, assets, or business operations since July 31, 2007. (*See* SEC Form 10-Q filed by TA Delaware, Inc. (formerly known as Tower Automotive, Inc.) on November 6, 2007, annexed hereto at **Exhibit 5**, at pp.10, 21.)  Although public records do not indicate that Tower has been formally dissolved, according to Kirkland & Ellis LLP (counsel to Respondent and Tower), Tower is "an entity which no longer exists."  (*See* **Exhibit 12** at p.1.) Under these circumstances, the better view is that Tower is no longer entitled to assert the attorney-client privilege.  *See Gilliland v. Geramita*, No. 2:05-CV-01059, 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006) ("The better rule, in the Court's view, is that there should be a presumption that the attorney-client privilege is no longer viable after a corporate entity ceases to function, unless a party seeking to establish the privilege demonstrates authority [to assert the privilege on behalf of the corporation] and good cause."); *Lewis v. United States*, No. 02-2958B/AN, 2004 WL3203121 (W.D. Tenn. Dec. 7, 2004), at *5 ("The attorney-client privilege cannot be applied to a defunct corporation."), *order aff'd*, 2005 WL1926655 (W.D. Tenn. June 20, 2005).  *See also* Paul R. Rice, *Attorney-Client Privileges in the United States* § 2.5 (2d ed. Updated March 2008) ("Once the corporate entity has ceased to exist, or no longer exists with any officers and directors who have the authority to assert or waive the privilege protection, some courts have concluded that the privilege dies with the entity, unlike the privilege held by an individual, and the lawyer can be compelled to disclose  confidential communications previously protected by the entity's privilege.").

This approach is consistent with the general principle that, because the attorney-client privilege operates to impede the fact-finding process, it must be applied only as necessary to

8

achieve the policy of promoting freedom of consultation between legal advisors and their clients.
*See, e.g., In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996)
("[B]ecause the [attorney-client] privilege operates to reduce the amount of information
discoverable during the course of a lawsuit, it is narrowly construed."). *See generally, Fausek v.
White*, 965 F.2d 126, 132 (6th Cir. 1992) ("When a corporation asserts the privilege in an action
by its shareholders, it is entitled to prevent disclosure of such information only if the policy
underlying the privilege requires withholding evidence when balanced against the rights of
shareholders and the fundamental responsibility of every person to testify."). Permitting
attorney-client privilege to be asserted on behalf of a defunct, non-operating corporation that has
no assets or employees, does not promote the policy considerations underlying the privilege. *See
Gilliland*, 2006 WL 2642525, at *4 ("The possibility that a corporation's management will
hesitate to confide in legal counsel out of concern that such communication may become
unprivileged after the corporation's demise is too remote and hypothetical to outweigh the
countervailing policy considerations supporting discoverability."); *City of Rialto v. U.S.
Department of Defense*, 492 F. Supp. 2d 1193, 1200 (C.D. Cal. 2007) ("A dissolved corporation
does not have the same concerns as a deceased natural person and therefore has less need for the
privilege after dissolution is complete. As there are usually no assets left and no directors, the
protections of the attorney-client privilege are less meaningful to the typical dissolved
corporation."); Rice, *supra*, at § 2.5 ("Since the logic for even extending the attorney-client
privilege to corporate entities is suspect … the termination of the entity's protection [when it
ceases to exist] may be reasonable. Parallels that have been drawn with individual clients are not
apt, and the benefits from a full disclosure of relevant facts should control the resolution of this
question."). Accordingly, Respondent cannot assert attorney-client privilege on behalf of the

now-defunct Tower. *Cf. Gilliland v. Geramita*, 2006 WL 2642525, at *4 ("[C]ounsel has no duty to assert the attorney-client privilege on behalf of a non-operating/ defunct corporation, and, indeed, counsel lacks ability to do so.").

Furthermore, Respondent cannot assert attorney-client privilege on its own behalf as the assignee of Tower's attorney-client privilege. It is hornbook law that "[a] transfer of assets, without more, is not sufficient to effect a transfer of the privileges, rather, control of the entity possessing the privileges must also pass for the privileges to pass." *In re Grand Jury Subpoenas 89-3 and 89-4*, 734 F. Supp. 1207, 1211 n.3 (E.D. Va. 1990) (*quoted in, inter alia, In re In-Store Advertising Sec. Litig.*, 163 F.R.D. 452, 458 (S.D.N.Y. 1995)). *See e.g.,* Rice, *supra,* § 4.41 ("In contrast to [a corporate merger or stock purchase], if one entity (a corporation, for example) acquires only the assets of another entity—the acquired entity thereafter being dissolved—the acquisition is perceived as nothing more than a purchase of assets … and the attorney-client privilege does not transfer. The acquiring entity may not assert the attorney-client privilege of the former owner."); *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 89-90 (5th Cir. 1976) (standing to assert the attorney-client privilege does not change hands with the assignment of assets); *Yosemite Inv., Inc. v. Floyd Bell, Inc.*, 943 F. Supp. 882, 883 (S.D. Ohio 1996) ("[T]he right to assert the attorney-client privilege does not change hands with the bare assignment of assets"); *City of Rialto,* 492 F. Supp. 2d at 1201 ("[T]he mere transfer of assets from one entity to another does not necessarily transfer the attorney-client privilege."); *NCL Corp. v. Lone Star Bldg. Centers (Eastern) Inc.*, 144 B.R. 170, 174 (S.D. Fla. 1992) ("[T]ransfers of assets do not transfer the right to assert the attorney client privilege"); *Federal Deposit Ins. Corp. v. McAtee*, 124 F.R.D. 662, 664 (D. Kan. 1988) ("The transfer of assets from one entity to another does not generally transfer the attorney-client privilege."); *Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 103

(S.D.N.Y. 1986) ("[T]he attorney-client privilege is [not] an incident of the sale of a portion of tangible assets of a corporation and is [not] transferred upon sale.").

"The general rule that the right to assert the attorney-client privilege does not change hands with the bare assignment of [corporate] assets is based on the notion that the right to assert the attorney-client privilege is an incident of control of the corporation and remains with corporate management as the corporation undergoes mergers, takeovers, name changes or even dissolutions." *Yosemite Inv., Inc.*, 943 F. Supp. at 883 (S.D. Ohio 1996) (citing *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 49 (1986)). Respondent acquired "substantially all" of Tower's assets but did not acquire control of Tower as a corporate entity. After the transfer of assets to Respondent, Tower continued to exist, under the new name TA Delaware, Inc., and its remaining assets were transferred to a Post-Consummation Trust for liquidation. (*See* **Exhibit 3** at pp. 29ff, Article VIII; **Exhibit 5** at pp.10, 21.) Under well-established legal principles, therefore, Respondent cannot assert Tower's attorney-client privilege. *Compare Yosemite Inv., Inc.*, 943 F. Supp. at 884, 884 n.2 and n.3 (acquisition of "substantially all of [the] business and assets" of a defunct corporation was neither a "takeover" nor a "*defacto* corporate merger" and transferee could not assert defunct corporation's attorney-client privilege) *with City of Rialto*, 492 F. Supp. 2d at 1201 (acquirer of "'substantially all' of the [dissolved] corporation's assets" *and all of its outstanding shares at the time of dissolution* also acquired its attorney-client privilege).[3]

---

[3]    Although no court in this Circuit has so held, some district courts in other Circuits have found that assignment of most or all of a corporation's assets (or assets and liabilities) constitutes a de facto transfer of corporate control that transfers the attorney-client privilege to the assignee. *See, e.g., Ramada Franchise System v. Hotel of Gainesville Associates*, 988 F. Supp. 1460 (N.D. Ga. 1997) (acquirer of all of bankrupt corporation's assets and its corporate name acquired attorney-client privilege); *Graco Children's Products, Inc. v. Regalo International LLC*, No. CIV. A. 97-6885, 1999 WL 553478 (E.D. Pa. July 29, 1999) (acquirer of all of the assets and liabilities of a particular product line acquired attorney-client privilege); *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760 (E.D. Tex. 2004) (acquirer of one of the bankrupt corporations' business lines acquired attorney-client privilege). To the extent that these cases are not distinguishable (because Respondent

Tower's Reorganization Plan provided for the creation of a Post-Consummation Trust, to which all of the assets not transferred to the Respondent were assigned. (*See* **Exhibit 3** at pp. 29ff, Article VIII.) The Plan expressly provided that "any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Post-Consummation Trust will vest in the Post-Consummation Trust and its representatives." (*See id.* at p.22, Article V.B.1.) By contrast, neither Tower's Reorganization Plan nor the Asset Purchase Agreement includes an analogous provision purporting to assign to the Respondent any attorney-client privilege attached to the business records transferred to the Respondent. (*See* **Exhibit 4** at §§ 1.1, 2.1.) This suggests that, at the time of the asset transfer, Tower and Respondent probably recognized that any attempt to assign Tower's attorney-client privilege to Respondent would be futile, and that the transfer of Tower's business records to Respondent would waive any attorney-client privilege. *See In re In-Store Advertising Sec. Litig.*, 163 F.R.D. 452, 458 (S.D.N.Y. 1995) ("[W]here confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying assets, the privilege is waived as to those communications."); *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, No. 01 C 4366, 2003 WL 21911066, at *1-2 (N.D. Ill. Aug. 7, 2003) (holding that transfer of business records in connection with transfer of corporate assets waived attorney-client privilege notwithstanding provision of asset purchase agreement purporting to transfer attorney-client privilege).[4]

---

did not acquire all of Tower's assets or any of its liabilities), they are not controlling. They are contrary to the established law as applied in this Circuit, *see Yosemite Inv., Inc.*, 943 F. Supp. 883, 884, 884 n.2 and n.3, and inconsistent with the principle that the attorney-client privilege should be narrowly construed because it operates to limit the discoverability of relevant information. *See, e.g., In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d at 254.

[4]  With respect to Tower's "Remaining Assets," Tower's Post-Consummation Trust Plan Administrator is analogous to a trustee in bankruptcy, and may properly assert and waive Tower's attorney-client privilege with respect to transferred business records in accordance with the Supreme Court's decision in *Weintraub*, 471 U.S. 343 (holding that the trustee in bankruptcy has the same power as the management of a solvent corporation,

Accordingly, Respondent cannot withhold information from discovery by asserting Tower's attorney-client privilege either on behalf of Tower or on its own behalf as Tower's assignee.

## B.  RESPONDENT SHOULD BE ORDERED TO PRODUCE RESPONSIVE DATA FROM BACKUP TAPES OR THE BACKUP TAPES THEMSELVES

Respondent has failed to fulfill its obligations under the spirit and letter of the 2006 electronic discovery amendments to the Federal Rules of Civil Procedure.  Even though Respondent is not a party to the S.D.N.Y. Action, the Rules require Respondent to provide discovery of electronically stored information; to substantiate any claim that electronically stored information is not reasonably accessible; to meet and confer regarding the accessibility of electronically stored information; and to designate a Rule 30(b)(6) witness for examination on this issue.  Respondent has ignored all of these obligations.  Even assuming that, in opposition to the instant motion, Respondent is able to demonstrate that the information on the Tower backup tapes is not reasonably accessible, the Court has authority to – and should – nonetheless order Respondent to provide the requested discovery or produce the backup tapes in their entirety.  There is good cause for this Court to so order.   It is undisputed that the Tower backup tapes are a unique source of information relevant to the claims and defenses in the S.D.N.Y. Action; Movants are willing to bear the cost of accessing the data; and (as demonstrated above) no attorney-client privilege of Tower or the Respondent attaches to the data.

Under Rule 45, as amended, nonparties have the same obligation as parties to provide discovery of electronically stored information.  *See Auto Club Family Ins. Co. v. Ahner*, Civil Action No. 05-5723, 2007 WL 2480322, at *3 (E.D. La. Aug. 29, 2007) ("Rule 45 and Rule 34,

---

including the power to waive corporation's attorney-client privilege with respect to prebankruptcy communications).

13

which governs requests for production of documents and tangible things from parties, were amended in tandem in 2006 to provide for *routine discovery of electronically stored information from parties and non-parties*.") (emphasis added); Fed. R. Civ. P. 34(a) Advisory Committee's Notes to 2006 Amendment ("Rule 34(a) is amended to confirm that discovery of electronically stored information stands on equal footing with discovery of paper documents."); *See* Fed. R. Civ. P. 45 Advisory Committee's Notes to 2006 Amendment ("Rule 45(a)(1)(C) is amended to recognize that electronically stored information … can also be sought by subpoena."). Moreover, nonparties who seek to avoid providing discovery of electronically stored information have the same initial burden as parties to "show that the information is not readily accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B) and 45(d)(1)(D). *See also* Fed. R. Civ. P. 45 Advisory Committee's Notes to 2006 Amendment (describing Rule 26(b)(2) and 45(d)(1)(D) as "parallel provision[s]"); *Auto Club Family Ins. Co.*, 2007 WL 2480322, at *6 ("The court is cognizant that [movant] is a non-party with no direct stake in this litigation and that non-parties in particular are entitled to protection from undue burden and expense. However Rules 45(d)(1)(D) and 26(c)(5) impose a burden of proof upon [movant] to show that the requested electronically stored information is unduly burdensome to produce.").

As the Advisory Committee's Notes indicate, in the first instance and without requiring Movants to seek relief from this Court, Respondent should have "*provide[d] enough detail to enable the requesting party to evaluate the burdens and costs of providing the discovery* and the likelihood of finding responsive information on the [Tower backup tapes]." Fed. R. Civ. P. 26(b)(2) Advisory Committee's Notes to 2006 Amendment (emphasis added). Respondent did not provide the necessary details in the first instance, and still has not provided answers to

14

Movants' specific questions concerning the hardware, software, and data capacity of the backup tapes. (*See* **Exhibit 6** and **Exhibit 7; Exhibits 10** and **11.**) Respondent did not provide the necessary details during the mandatory meet and confer process, and rejected Movants' reasonable request to allow Movants' electronic discovery consultants to obtain the necessary details directly from Respondent's information systems personnel (in the presence of counsel). (*See* **Exhibit 13** at ¶ 6; **Exhibit 10**); Fed. R. Civ. P. 26(b)(1) Advisory Committee's Notes to 2006 Amendment ("[T]he parties should discuss the burdens and costs of accessing and retrieving information").

Ultimately, Respondent did not provide the necessary details even in response to a deposition subpoena. (*See* **Exhibit 1; Exhibit 13** at ¶ 9.) Respondent's objections that the deposition topics were not relevant to claims or defenses in the S.D.N.Y. Action and the deposition would unduly burden Respondent (*see* **Exhibit 13** at ¶ 11) are patently invalid. Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding ... the existence, description, nature, custody, condition, and location of any documents or other tangible things"); Fed. R. Civ. P. 26(b)(2) Advisory Committee's Notes to 2006 Amendment ("The requesting party may need discovery to test this assertion [that electronically stored information is not reasonably accessible]. Such discovery might take the form of ... taking depositions of witnesses knowledgeable about the responding party's information systems.").

To date, the only details that Respondent has provided to substantiate its claim that the Tower backup tapes are not reasonably accessible are Respondent's counsel's conclusory assertions that it would take "an estimated 240 man hours" to extract the data from the network drive tapes and an undisclosed amount of time to "rebuild an environment based on" an unspecified version of e-mail software that is no longer in use. (*See* **Exhibit 9** at p. 1;

**Exhibit 11** at p. 1.)  Movants have been unable to evaluate these claims absent information about

the nature of the tapes and the methods Respondent's employees propose to use restore and

extract the data.  (*See* **Exhibit 13** at ¶ 6.)  Presumably, that information will be forthcoming in

Respondents' opposition to the instant motion – at which time it will be too little, too late.

Even assuming that, in answer to the instant motion, Respondent is able to discharge its

evidentiary burden of showing (with information withheld from Movants during the meet and

confer process) that the data on the Tower backup tapes is not reasonably accessible, this Court

may nevertheless order Respondent to provide the requested discovery.  Rule 45(d)(1)(D)

expressly provides that even if:

> the showing is made [that sources of electronically stored information are
> not reasonably accessible], the court may nonetheless order discovery
> from such sources if the requesting party shows good cause, considering
> the limitations of Rule 26(b)(2)(C).  The court may specify conditions for
> the discovery."

Here, there is good cause for this Court to order Respondent either to produce the responsive

data from the Tower backup tapes, or to provide the backup tapes to Movants in their entirety.

Movants are willing to have their electronic discovery consultants perform the work of restoring

and retrieving the data from the backup tapes, thereby entirely relieving Respondent of this

burden and cost.  *See* Fed. R. Civ. P. 26(b)(2) Advisory Committee's Notes to 2006 Amendment

("A requesting party's willingness to share or bear the access costs may be weighed by the court

in determining whether there is good cause.").  Moreover, contrary to Respondent's assertions,

there is no need for Respondent's counsel to review retrieved data for privilege prior to

production to Movants.  As explained above, even if the backup tapes include data reflecting

communications between the now-defunct Tower and its attorneys, attorney-client privilege no

longer attaches.  Thus the burden to Respondent – of simply handing over the Tower backup

16

tapes to Movants' consultants – clearly is outweighed by the likely benefit to be obtained from accessing the data on the tapes. Tower shareholders who are plaintiffs in the S.D.N.Y. Action have lost tens of millions of dollars; at stake are important issues concerning whether defendants made materially misleading statements about Tower's financial condition that caused the plaintiffs' losses; and the backup tapes are likely to include important and useful information, such as electronic mail communications among the defendants, that is not available from any other source. *See* Fed. R. Civ. P. 26(b)(2)(C); Fed. R. Civ. P. 26(b)(2) Advisory Committee Notes to 2006 Amendment (enumerating appropriate considerations for determining good cause).

## IV. CONCLUSION

For the foregoing reasons, Movants respectfully request this Court to order Respondent forthwith to produce: (1) all documents responsive to Movants' subpoena that have been withheld hitherto based on a claim of attorney-client privilege, and (2) the data on the Tower backup tapes that is responsive to Movants' subpoena, or the backup tapes in their entirety.

Respectfully submitted:

Attorneys for Movants, Lead Plaintiffs in
*In re Tower Auto. Sec. Litig.*

ADLER STILMAN, PLLC

By: _____
Barry D. Adler (P30557)
30300 Northwestern Highway, 3d Floor
Farmington Hills, Michigan 48334
Telephone: 248-855-5090

Lee S. Shalov
Thomas G. Ciarlone
Susan M. Davies
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue, Suite 1000
New York, New York 10018
Telephone: 212-239-4340

Kenneth J. Vianale
Julie Prag Vianale
VIANALE & VIANALE LLP
2499 Glades road, Suite 112
Boca Raton, Florida 33431
Telephone: 561-392-4750

Dated: March 5, 2008

## INDEX OF EXHIBITS TO BRIEF IN SUPPORT OF MOTION
## TO COMPEL TOWER AUTOMOTIVE LLC TO RESPOND TO SUBPOENA

| Exhibit No. | Description |
|---|---|
| 1 | Subpoena for deposition and documents served on **Tower Automotive LLC** in *In re Tower Auto. Sec. Litig.*, Civil Action No. 1:05-civ-01926(RWS) on or about January 25, 2008 |
| 2 | Subpoena for documents served on **Tower Automotive, Inc.** in *In re Tower Auto. Sec. Litig.*, Civil Action No. 1:05-civ-01926(RWS) on or about June 16, 2007 |
| 3 | Joint Plan of Reorganization Tower Automotive, Inc. and its Debtor Subsidiaries under Chapter 11 of the Bankruptcy Code dated May 1, 2007 |
| 4 | Asset Purchase Agreement by and among Tower Automotive, Inc. and its debtor affiliate signatories and TA Acquisition company, LLC dated as of May 1, 2007 |
| 5 | SEC Form 10-Q filed by TA Delaware, Inc. (formerly known as Tower Automotive, Inc.) on November 6, 2007 |
| 6 | Letter from Julie Pragg Vianale, Esq. of Vianale & Vianale LLP to Michael A. Duffy, Esq. of Kirkland & Ellis LLP dated September 7, 2007 |
| 7 | Letter from Michael A. Duffy, Esq. of Kirkland & Ellis LLP to Julie Prag Vianale, Esq. of Vianale & Vianale LLP dated September 26, 2007 |
| 8 | Letter from Kenneth J. Vianale, Esq. of Vianale & Vianale LLP to Michael A. Duffy, Esq. of Kirkland & Ellis LLP dated November 20, 2007 |
| 9 | Letter from Michael A. Duffy, Esq. of Kirkland & Ellis LLP to Kenneth J. Vianale, Esq. of Vianale & Vianale LLP December 21, 2007 |
| 10 | Electronic mail message from Susan Davies of Shalov Stone Bonner & Rocco LLP to Daniel C. Moore, Frank Sramek, Michael Duffy and Richard Howell of Kirkland & Ellis LLP dated January 8, 2008 |
| 11 | Letter from Michael A. Duffy, Esq. of Kirkland & Ellis LLP to Susan M. Davies, Esq. of Shalov Stone Bonner & Rocco LLP dated January 15, 2008 |
| 12 | Letter from Michael A. Duffy, Esq. of Kirkland & Ellis LLP to Susan M. Davies, Esq. of Shalov Stone Bonner & Rocco LLP dated January 31, 2008 |
| 13 | Declaration of Susan M. Davies, attorney for Petitioners, dated March 4, 2008 |



OAO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN

**IN RE TOWER AUTOMOTIVE
SECURITIES LITIGATION**

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]    1:05-civ-01926 (RWS)
Pending in U.S. District Court
for the Southern District of New York

TO:    Tower Automotive LLC
         27175 Haggerty Road
         Novi, Michigan 48377

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case concerning the matters specified in **Schedule B** hereto.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Law Offices of Adler Stilman, PLLC 30300 Northwestern Highway, 3d Floor Farmington Hills, Michigan 48334 | February 12, 2008 9:30 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the documents specified in **Schedule A** hereto at the place, date, and time specified below.

| PLACE | DATE AND TIME |
|---|---|
| Law Offices of Adler Stilman, PLLC, 30300 Northwestern Highway, 3d Floor Farmington Hills, Michigan 48334 Attention: Amy Bluhm | February 8, 2008 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* Lee Shalov Attorney for Lead Plaintiffs | January 23, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Lee Shalov, Shalov Stone Bonner & Rocco, LLP, 485 Seventh Avenue, Suite 1000, New York, NY 10018 Tel: (212) 239-4310

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## SCHEDULE A TO JANUARY 23, 2008 SUBPOENA TO TOWER AUTOMOTIVE LLC

With the exception of Paragraphs 1, 6, 15.1-15.6 and 16 of the Definitions and Instructions and Document Requests Nos. 94-96, this Schedule A is identical in substance to the Revised Schedule A transmitted to Michael A. Duffy, Esq., Kirkland & Ellis LLP under cover of Lead Plaintiffs' counsel's letter dated August 24, 2007 after discussions among counsel to resolve differences concerning the scope of Lead Plaintiffs' document requests. Paragraphs 6 and 16 of the Definitions and Instructions have been revised to set forth definitions and instructions incorporated into the August 24, 2007 Schedule A by reference to the Local Rules of the U.S. District Court for the Southern District of New York. You are not required to produce documents already produced in response to the August 24, 2007 Schedule A.

## DEFINITIONS

1.     The words "you" and "your" mean (a) Tower Automotive LLC, TA Delaware, Inc., and Tower Automotive, Inc., (b) corporate predecessors and successors of Tower Automotive LLC, TA Delaware, Inc., and Tower Automotive, Inc., and (c) any directors, officers, employees, agents, representatives or other persons acting, or purporting to act, on behalf of Tower Automotive LLC, TA Delaware, Inc., and Tower Automotive, Inc.

2.     "Date" shall mean the exact date, month and year, if ascertainable, or, if not, the best approximation of the date (based upon relationship with other events).

3.     "Agent" shall mean: any agent, employee, officer, director, attorney, independent contractor or any other person acting at the direction of or on behalf of another.

4.     The term "employee" means any person who at any time during the relevant time period acted or purported to act on behalf of an entity, or another person or persons, including, but

1

not limited to, all present and former officers, directors, executives, partners, principals, managers, staff personnel, accountants, agents, representatives, in-house attorneys, independent contractors, advisors and consultants of such entity.

    5.    The term "third party" or "third parties"refers to individuals or entities other than you who are not a party to this action.

    **6.**    **(a)**    **The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).**

        **(b)**    **The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term.**

        **(c)**    **When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.**

        **(d)**    **When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addresse(s) and recipient(s).**

        **(e)**    **The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party**

2

and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.

(f)    The term "person" is defined as any natural person or any business, legal or governmental entity or association.

(g)    The term "concerning" means relating to, referring to, describing, evidencing or constituting.

(h)    The terms "all" and "each" shall be construed as all and each.

(i)    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

(j)    The use of the singular form of any word includes the plural and vice versa.

7.    "Class Period" refers to the period from December 21, 2000 to and including February 1, 2005.

8.    "SEC" means the United States Securities and Exchange Commission.

9.    "Tower" or the "Debtor" means Tower Automotive, Inc. and each of its subsidiaries, divisions, subdivisions, affiliated companies or persons, predecessors, and includes all present and former directors, officers, employees, representatives, advisors, agents, intermediaries and other persons acting on its behalf.

10.    "OEM" means Original Equipment Manufacturer, and includes General Motors, DaimlerChrysler, Ford Motor Company and all car manufacturers to which Tower supplied products, and each such manufacturers' subsidiaries, divisions, subdivisions, affiliated companies

or persons, predecessors, and includes all present and former directors, officers, employees, representatives, advisors, agents, intermediaries and other persons acting on its behalf.

11.    "General Electric Credit Corporation" means   General Electric Credit Corporation and each of its subsidiaries, divisions, subdivisions, affiliated companies or persons, predecessors, and includes all present and former directors, officers, employees, representatives, advisors, agents, intermediaries and other persons acting on its behalf.

12.    "Early Payment Program" means the   financial arrangement among Tower, General Electric Credit Corporation and the OEMs, whereby Tower received accelerated payment of accounts receivable owed to Tower by the OEMs, as stated in Tower's Form 8-K filed on October 20, 2004 as alleged in paragraph 146 of plaintiffs' Consolidated Amended Class Action Complaint.

13.    "Defendants" means Dugald K. Campbell, Ernie Thomas, Kathleen Ligocki, James A. Mallak, S. A. Johnson, Scott D. Rued, Anthony A. Barone, Christopher T. Hatto, Hidden Creek Industries Inc., and J2R Partners, the defendants in the Securities Litigation.

14.    "Securities Litigation" is the matter entitled *In re Tower Automotive Securities Litigation*, Case No. 1:05-CV-01926 (RWS) (S.D.N.Y.).

15.    "The Three Relevant Issues" means each and every one of the issues as to which the Court sustained the Complaint, to wit: (1) the Early Payment Program, (2) Tower's statements that it had "extract[ed] significant cost savings and synergies" from its acquisitions, and (3) Tower's statements that it had "secured a solution to offset the one time liquidity impact of the [early payment] plan termination," and that "a term sheet ha[d] been negotiated and due diligence ha[d] been completed."

**15.1    "Electronically Stored Information" and "ESI" includes, without limitation, the following:**

4

(a) information that is generated, received, processed, and recorded by computers and other electronic devices including, without limitation, voicemail;

(b) internal or external web sites;

(c) output resulting from the use of any software program, including, without limitation, word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, AOL Instant Messenger™ (or similar programs) or bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside and regardless of whether said electronic data exists in an active file, a deleted file, or file fragment;

(d) activity listings of electronic mail receipts and transmittals; and any and all items stored on computer memories, hard disks, floppy disks, CD-ROM, magnetic tape, microfiche, or on any other media for digital data storage or transmittal, such as, but not limited to, a personal digital assistant, e.g., Palm Pilot, Blackberry, or similar device, and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all documents requested herein.

15.2   "Active ESI" means ESI residing on the direct access or networked storage media that is readily visible to the operating system and application software with which it was created.

15.3   "Legacy ESI" means ESI created or stored by the use of software and hardware that has become obsolete or replaced.

15.4   "Near-Line ESI" means ESI stored in a system that is not a direct part of the network in daily use, but that can be accessed through the network.

15.5   "Off-Line ESI" means ESI stored outside the network in daily use (i.e., in Off-Line Storage) that is only accessible through the off-line storage system, not the network.

15.6   "Off-Line Storage" means ESI maintained or archived on removable disc or magnetic tape used for making disaster-recovery copies of records for which retrieval is unlikely.

## INSTRUCTIONS

16.   If you object to fully identifying a document or communication because of a privilege, you must nevertheless provide the information required under Federal Rule of Civil Procedure 26(b)(5) at the time of responding to this subpoena and, in addition (a) identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; and (b) provide the following information, unless divulgence of such information would cause disclosure of the allegedly privileged information:   (i) the type of document, e.g., letter or memorandum; (ii) the the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document for a subpoena duces tecum including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and where not apparent, the relationship of author, addressees, and recipients to each other.

17.   If the documents requested herein have been lost or destroyed, the documents lost

6

or destroyed shall be identified by author, date and subject matter.

18.    You are under a continuous obligation to supplement your responses to the requests for inspection of documents.

## RELEVANT TIME PERIOD

19.    Unless otherwise specified in any request, these requests seek documents that were (1) created or dated during the period from January 1, 2000 to the date of this document request and, (2) refer or relate, in whole or part, to the period of time from January 1, 2000 to February 1, 2005, inclusive, even though prepared, generated or received outside the relevant time period.

## DOCUMENT REQUESTS

### A.    General

1.    Minutes of all meetings of the Tower Board of Directors concerning or discussing the Three Relevant Issues.

2.    Minutes of all meetings of the Audit Committee of the Tower Board of Directors concerning or discussing the Three Relevant Issues.

3.    All audio recordings and written recordings or transcripts of Tower's analyst conference calls concerning or discussing the Three Relevant Issues. This request includes all recordings, written and aural, including transcripts, summaries, tapes, cd's, and digests.

4.    All analyst reports concerning Tower and its business concerning or discussing the Three Relevant Issues.

5.    All communications you sent to or received from analysts, including correspondence, reports, drafts and e-mails, concerning the Three Relevant Issues.

6.    Drafts and non-final versions of all Tower filings with the SEC, including 10-K's 10-Q's and 8-K's, concerning or discussing the Three Relevant Issues.

7.    Copies of the "glossy" versions of Tower's Annual Reports that were mailed to

Tower Shareholders concerning or discussing the Three Relevant Issues.

8.     All correspondence sent to or received from the SEC concerning (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts receivable owed to Tower by OEM's, (3) the amount of receivables subject to the Early Payment Program or any similar program and/or (4) the success or failure of efforts to integrate entities acquired by Tower.

9.     All press releases issued by Tower (including drafts thereof) concerning or discussing the Three Relevant Issues.

**B.     Early Payment/Factoring**

10.    Documents sufficient to establish the terms of all Early Payment Programs, or programs which resulted in the accelerated collection of receivables, that were in effect during the Class Period, including but not limited to terms applicable to invoices concerning the following vehicles:

> Ford - Taurus, Sable, Mustang, Focus, Explorer, Mountaineer, Aviator, Escort, Crown Victoria/Grand, Explorer Sport Trac, Explorer, Marquis, Cougar, Continental, Sport, Econoline, Villager, Lincoln LS, Towncar, Thunderbird,  Windstar, Escape, Expedition,  Navigator, Excursion, Ranger, F-Series LD & HD, Blackwood, Transit, StreetKa, Mondeo, Fiesta, Freestar/Monterey,

> DaimlerChrysler - Concorde, Intrepid, 300M, Neon, Ram Pick-up, Ram Van, Dakota, Stratus, Sebring, Durango,  Voyager, Caravan, Town & Country, Smart, Jeep Wrangler,  Jeep Liberty, Grand Cherokee, PT Cruiser, Pacifica

> Mercedes -  A-Class, C-Class, E-Class, SLK, Atego, Actros,    Sprinter, CLK, Vario

> General Motors - Cadillac, Silverado, Sierra, Astro, Safari,   Blazer, S10-Pickup, Sonoma, SRX, Medium Duty Trucks, Cadilac CTS, Malibu, Cadilac SRX

> Saturn - LS/LW, Saturn VUE

> Opel - Omega, Astra, Agila, Corsa, Vectra, Zafira, Meriva

> Honda - Accord, Civic, Acura EL, Acura Odyssey, Passport,   Acura MDX,

8

TL/CL, Pilot

Mazda - Mazda 626, Atenza, Tribute, B-Series Pickup

Toyota - Avalon, Camry, Solara, Corolla, Sienna, Tacoma, Tundra, Sequoia, Vios, Xiali, Matrix, Vibe, RX330, Crown

Renault - Clio, Twingo, Megane, Kangoo,

Nissan - Sentra, Micra, Quest, Xterra, Frontier, Titan, Pathfinder

Isuzu - Rodeo, Amigo, Axiom

VW - Passat, Golf/Bora, GOL, Polo, Touareg, Kombi, Santana, Transporter/Microbus, Fox, Jetta, Armada

Audi - A3, A4, A6, Cabrio

Skoda - Felicia, Fabia, Octavia

BMW - 1 Series, 3 Series, 5 Series, X5

Fiat - Marea, Punto, Bravo, Brava, Ducato, Palio, Panda, Stilo, Multipla, Uno

Alfa Romeo - 147, 156, 166, GTV, Spider

Lancia - Lybra, Thesis, Y

Porsche - Cayenne

Land Rover - Range Rover

Jaguar - XJ, S-Type

Suzuki - Wagon R

Hyundai - Eqquus, Teracan, Galloper, Starex, Libero, Grace, SantaFe

Kia - Spectra, Rio, Optima, Sportage, Carens, Retona, Enterprise, Potentia, Pregio, Carnival, Frontier, Sorento

Volvo - S40, V50

PSA - Peugeot 206, Citroen C3

Bentley - Continental Coupe

11.    All contracts, contract modifications, and contract revisions concerning all Early Payment Programs, or programs which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period including, but not limited to, contracts involving the following vehicles:

Ford - Taurus, Sable, Mustang, Focus, Explorer, Mountaineer, Aviator, Escort, Crown Victoria/Grand, Explorer Sport Trac, Explorer, Marquis, Cougar, Continental, Sport, Econoline, Villager, Lincoln LS, Towncar, Thunderbird, Windstar, Escape, Expedition, Navigator, Excursion, Ranger, F-Series LD & HD, Blackwood, Transit, StreetKa, Mondeo, Fiesta, Freestar/Monterey,

DaimlerChrysler - Concorde, Intrepid, 300M, Neon, Ram Pick-up, Ram Van, Dakota, Stratus, Sebring, Durango,  Voyager, Caravan, Town & Country, Smart, Jeep Wrangler,  Jeep Liberty, Grand Cherokee, PT Cruiser, Pacifica

Mercedes -  A-Class, C-Class, E-Class, SLK, Atego, Actros,    Sprinter, CLK, Vario

General Motors - Cadillac, Silverado, Sierra, Astro, Safari,   Blazer, S10-Pickup, Sonoma, SRX, Medium Duty Trucks, Cadilac CTS, Malibu, Cadilac SRX

Saturn - LS/LW, Saturn VUE

Opel - Omega, Astra, Agila, Corsa, Vectra, Zafira, Meriva

Honda - Accord, Civic, Acura EL, Acura Odyssey, Passport,   Acura MDX, TL/CL, Pilot

Mazda - Mazda 626, Atenza, Tribute, B-Series Pickup

Toyota - Avalon, Camry, Solara, Corolla, Sienna, Tacoma,   Tundra, Sequoia, Vios, Xiali, Matrix, Vibe, RX330, Crown

Renault - Clio, Twingo, Megane, Kangoo,

Nissan - Sentra, Micra, Quest, Xterra, Frontier, Titan,   Pathfinder

Isuzu - Rodeo, Amigo, Axiom

VW - Passat, Golf/Bora, GOL, Polo, Touareg, Kombi, Santana, Transporter/Microbus, Fox, Jetta, Armada

Audi - A3, A4, A6, Cabrio

Skoda - Felicia, Fabia, Octavia

BMW - 1 Series, 3 Series, 5 Series, X5

Fiat - Marea, Punto, Bravo, Brava, Ducato, Palio, Panda,   Stilo, Multipla, Uno

Alfa Romeo - 147, 156, 166, GTV, Spider

Lancia - Lybra, Thesis, Y

Porsche - Cayenne

Land Rover - Range Rover

Jaguar - XJ, S-Type

Suzuki - Wagon R

Hyundai - Eqquus, Teracan, Galloper, Starex, Libero, Grace, SantaFe

Kia - Spectra, Rio, Optima, Sportage, Carens, Retona, Enterprise, Potentia, Pregio, Carnival, Frontier, Sorento

Volvo - S40, V50

PSA - Peugeot 206, Citroen C3

Bentley - Continental Coupe

12.    All correspondence concerning all Early Payment Programs, or programs which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period.

13.    All analyses or memoranda prepared during the period January 1, 2004 through the end of the Class Period concerning projected cash needs for the Company.

14.    All analyses or memoranda   prepared during the period January 1, 2004 through the end of the Class Period concerning working capital projections by Tower.

15.    All documents provided to Deloitte & Touche LLP and Arthur Andersen LLP, concerning the Early Payment Program, or program which resulted in the accelerated collection of

receivables, and/or accounting for Early Payment Programs, and/or Tower's disclosures as they relate to the Early Payment Programs.

16. All documents received from Deloitte & Touche LLP or Arthur Andersen LLP concerning the Early Payment Program, or program which resulted in the accelerated collection of receivables, and/or accounting for Early Payment Programs, and/or Tower's disclosures as they relate to the Early Payment Programs.

17. All documents describing or discussing Tower's stated accounting policies concerning accounts receivable, cash receipts, billing adjustments, interest expense, factoring of receivables, and early payment arrangements.

18. All documents concerning any and all meetings of the Board of Directors of Tower, including, but not limited to, all materials presented at, prepared for, disseminated at, or prepared after or in connection with, any Board Meetings and all agendas, e-mails, reports, notes taken at, minutes, and all correspondence in connection with any Board Meetings concerning the Three Relevant Issues.

19. All internal memoranda, reports, correspondence, or analyses concerning Tower's liquidity, during the period January 1, 2004 to the end of the class period.

20. All documents, including internal memoranda, concerning the accuracy, adequacy, fairness or completeness of the disclosures contained in any of Tower's public reports, filings, or other statements concerning the Three Relevant Issues.

21. All Company prepared prospective financial documents, including all documents concerning any Tower business or strategic plan, forecasts, budgets or projections, whether prepared for internal use or for public dissemination, during the period January 1, 2004 to the end of the Class Period.

22. All documents during the period January 1, 2004 to the end of the Class Period

(a) analyzing or discussing comparisons of Tower's actual financial results to plans, forecasts, or projections; and/or (b)   explaining any variances in comparison of actual results to plans, forecasts or projections.

23.   All documents dated, prepared, delivered, received, or relating to the Class Period concerning any contemplated, proposed or actual communication or meeting between any Defendant in this Securities Litigation and any prospective or actual securities broker, money manager, stock market professional, financial or securities analyst, market maker, investment banker, brokerage firm, investment firm, investment banking firm, underwriter, financial or investment advisor, public relations firm, securities rating service, business wire service, financial or other publication, news service, journalist, and/or any representative of the news media, during which any of the Three Relevant Issues was referred to or discussed (including, without limitation, any scripts or outlines of responses to analysts inquiries, including any telephone logs or message slips reflecting the making, receipt or return of telephone calls to securities analysts).

24.   All reports, newsletters, statements, articles, summaries and other documents prepared or published by any securities broker, money manager, stock market professional, financial or securities analyst, market maker, investment banker, brokerage firm, investment firm, investment banking firm, underwriter, financial or investment advisor, public relations firm, securities rating service, business wire service, financial or other publication, news service, journalist, and/or any representative of the news media, with respect to Tower concerning the Three Relevant Issues.

25.   All documents concerning any meeting and/or conference call you or any Defendant had with investors and/or securities analysts, including all drafts of scripts, memoranda or other documents used to prepare for Question and Answer portion of the meeting and/or conference call, concerning the Three Relevant Issues.

26.     All communications you or any Defendant had with securities analysts concerning the Three Relevant Issues, including but not limited to documents identifying who met and/or communicated with the analysts, which analysts, all documents provided, all documents created in preparation, all documents reflecting statements made to analysts, all analyst reports and all communications about analyst reports.

27.     All minutes, memoranda, summaries, transcripts, texts, notes, video or audio recordings, computer diskettes, slides and other documents concerning or prepared in connection with or distributed or presented in connection with any conference or symposium at which the Three Relevant Issues were referred to or discussed.

28.     All documents concerning any correspondence or communications between any of the Defendants on the one hand, and any of Tower customers, lenders, banks, financing companies, syndication agents for Tower's lenders, outside auditors, consultants, members of Tower's Board, or any other persons, on the other hand, concerning the Three Relevant Issues.

29.     All documents relied upon by defendant Kathleen Ligocki when she testified that "[t]he company was very tight on cash when I joined [in August 2003]. See Complaint ¶ 135.

30.     All documents relied upon by defendant Kathleen Ligocki when she testified that when she joined Tower "the Company was fragile, we were extremely short of cash...." See Complaint ¶ 135.

31.     All copies of reports, studies, analyses, or internal memoranda, concerning the Early Payment Program, or program which resulted in the accelerated collection of receivables.

32.     All documents concerning any investigation of Tower and/or the Individual Defendants, by the SEC or any other governmental or regulatory agency, including but not limited to, all documents produced to the SEC and/or any other governmental or regulatory agency, copies of all transcripts of any testimony provided, all subpoenas and notices received in connection with

such investigation(s) and responses, as well as all communications between Tower and/or the Individual Defendants, on the one hand, and the SEC and/or such other governmental or regulatory agency(ies), on the other hand.

33.     All documents concerning the timing of the release of information about Tower to the public concerning (1) the Three Relevant Issues and/or (2) the loss of credit facilities.

34.     All documents concerning the withholding of the release of information concerning Tower to the public concerning (1) the Three Relevant Issues and/or (2) the loss of credit facilities.

35.     Documents sufficient to show the extent to which auto manufacturers guaranteed any amounts furnished by General Electric Credit Corporation to Tower pursuant to the Early Payment Program.

36.     All documents relied upon by defendant Kathleen Ligocki when she stated in a February 2, 2005 press release that "the recent termination of early pay programs at certain auto makers has adversely affected our liquidity," (see Complaint ¶ 169) including all analyses or studies of the effect of loss of the Early Payment Program on Tower.

37.     All documents which analyze, discuss or calculate the effect of General Electric Credit Corporation's early payment transactions on Tower's liquidity.

38.     Documents sufficient to identify the individuals responsible for calculating the effect   of Tower's early payment transactions on Tower's financial statements.

39.     All summaries, analyses, or internal memoranda concerning Tower's vulnerability to a severe impact (*i.e.* insolvency or bankruptcy) if the Early Payment Program were to come to an end.

40.     All communications with Tower's lenders, banks, and/or financing companies concerning Tower's attempts to secure a solution to the liquidity programs that arose from the termination of the early payment program, including but not limited to a copy of the term sheet(s)

and due diligence referred to in an October 20, 2004 Form 8-K Tower filed with the SEC.  *See*
Complaint ¶ 146.

41.    All communications with Tower's lenders, banks, financing companies,
syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders,
regarding Tower's compliance with any debt covenants in any of its credit agreements, loan
documents or credit facilities, including but not limited to any requests by Tower for waivers of the
limits of such debt covenants, for the period from January 1, 2004 to the end of the Class Period.
This includes all documents concerning meetings or discussions you had (either in person or by
e-mail).

42.    All communications with Tower's lenders, banks, financing companies,
syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders,
concerning Tower's Early Payment Program or accelerated collection of receivables, including,
but not limited to, (1) the effect of the Early Payment Program on Tower's ability to comply with
its debt covenants and (2) the termination of the Early Payment Program.

43.    All communications with Tower's lenders, banks, financing companies,
syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders,
regarding the securitization of Tower's accounts receivable for the period from January 1, 2004 to
the end of the class period..

44.    All documents concerning any meetings you or any Defendant had with any of
Tower's lenders, banks, financing companies, syndication agents for Tower's lenders, and/or
administrative agents for Tower's lenders, regarding the Early Payment Program, including but
not limited to any handwritten notes, PowerPoint slide presentations, reports, memos or
correspondence.

45.    All memoranda, summaries or analyses concerning the severe impact (*i.e.*

16

insolvency or bankruptcy) which Tower experienced when the Early Payment Programs came to an end.

46.     All documents which refer or relate to Tower's disclosure policy with regard to the Early Payment Program.

47.     All documents which refer or relate to Tower's disclosure policy with regard to its early payment arrangements with Ford Motor Company.

48.     All documents which refer or relate to Tower's disclosure policy with regard to its early payment arrangements with General Motors Corporation.

49.     All documents which refer or relate to Tower's disclosure policy with regard to its early payment arrangements with the DaimlerChrysler.

50.     All summaries, analyses, memoranda, computations or studies concerning or discussing the effect of the Early Payment Program or accelerated collection of receivables on Tower's working capital levels.

51.     Copies of Tower's credit facilities with its lenders during the Class Period, including all amendments and modifications thereto.

52.     All documents concerning or forming the basis for Dugald K. Campbell's statement during the April 22, 2003 conference call regarding the amount of Tower's account receivable acceleration that: "We don't - we don't share that information."    See Complaint ¶ 62.

53.     All documents concerning or forming the basis for defendant James A. Mallak's statement during the July 27, 2004 conference call regarding the balance on Tower's early payment program that: "We really have not given that out.   We are on a -- in North America, on the accelerated programs with most of the OEMs, but we have never really given that amount out." See Complaint ¶ 144.

54.     All documents concerning or forming the basis for defendant James A. Mallak's

statement during the July 27, 2004 conference call that: "We do have some other alternatives that we could pursue to offset that [termination of early payment programs], so we are working on some other initiatives that, if that did come about, where we could-off set that impact to us."   See Complaint ¶ 144.

55.   All summaries, analyses, memoranda, computations or studies concerning the effect of Tower's accelerated collection of receivables on Tower's operating cash flows.

56.   All documents concerning the fact that, as represented in Tower's October 20, 2004 Form 8-K, the early payment plans in which Tower participated were "off-balance sheet payment plans." Complaint ¶ 146.

57.   All documents concerning the fact that, as disclosed in Tower's October 20, 2004 Form 8-K, the early payment plans in which Tower participated were "facilitated by third parties." Complaint ¶ 146.

58.   All documents concerning the fact that, as disclosed in Tower's October 20, 2004 Form 8-K, termination of the Early Payment Programs would have a liquidity impact of Ford $80 Million, General Motors $25 Million, and DaimlerChrysler $35 Million.   See Complaint ¶ 146.

59.   All documents concerning the fact that, as disclosed in Tower's October 20, 2004 Form 8-K, "Tower Automotive has secured a solution to offset the one time liquidity impact of the plan termination," including but not limited to the term sheet(s) and due diligence referred to in the October 20, 2004 8-K.   See Complaint ¶ 146.

60.   All documents concerning the efforts of Rothschild, Inc. to improve Tower's capital structure, de-lever the balance sheet, and/or enhance Tower's liquidity options.

61.   All documents concerning contemplated or considered restatements of any of Tower's previously issued financial statements arising from the Three Relevant Issues.

62.   All modifications of credit terms or credit arrangements between Tower and its

creditors.

63.     A copy of organization charts used by the Company during the Class Period.

64.     All communications between Tower and Deloitte & Touche LLP and/or Arthur Andersen LLP concerning the Three Relevant Issues, including but not limited to all management representation letters supplied by Tower concerning the Three Relevant Issues.

65.     All contracts between Tower and General Electric Credit Corporation regarding the Early Payment Program.

66.     All communications between Tower and General Electric Credit Corporation regarding accelerated payment to Tower of accounts receivable owed to Tower by OEMs or about the Early Payment Program.

67.     Documents sufficient to show the amount of Tower's accounts receivable from all OEMs that were subject to accelerated payment under the Early Payment Program, and/or any and all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEMs otherwise, on a daily basis, during each fiscal quarter of the Class Period.

68.     All communications (including but not limited to correspondence and e-mails), from or to any defendant concerning the Early Payment Program or any and all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEMs.

69.     All communications to or from an OEM concerning the Early Payment Program or any and all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEMs, including all documents advising or warning Tower of the termination of the Early Payment Program.

70.     All documents written by, sent to, or reviewed by any Defendant concerning any

contingency plans or other provisions by Tower in the event that the OEMs or General Electric Credit Corporation terminated the Early Payment Program.

71. All correspondence, analyses, memoranda, board minutes, or board committee minutes concerning the reasons for termination of the Early Payment Program or any or all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEMs.

72. All documents concerning Tower's disclosure in its public filings and statements of information regarding the Early Payment Program, or any other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by the OEM's.

73. All communications to or from the SEC concerning the Early Payment Program or any other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by the OEMs. This request includes copies in Tower's possession of documents sent by or to third-parties, including the OEMs.

74. All documents including, but not limited to, workpapers, correspondence, memoranda and handwritten notes, discussing the impact of Tower's operating results on its compliance with its financing agreements which underlay the Early Payment Program, or any other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by the OEMs.

75. All documents concerning Tower's plans, options, strategies or analyses to maintain liquidity in the event the Early Payment Programs were terminated or modified by the OEMs.

**C.  Integration Efforts**

76. All summaries, analyses, memoranda, computations or studies on which the Company relied in stating that it had extracted significant cost savings and/or synergies through

integration of acquired businesses into Tower's operations.

77.     All documents relied upon by defendant Kathleen Ligocki when she stated during an October 23, 2003 conference call that Tower had been "prevented ... from leveraging economies of scale" and that "[i]nsufficient focus [was] given to post-merger integration, financial discipline and operational excellence."     See Complaint ¶ 39.

78.     All documents relied upon by defendant Kathleen Ligocki when she stated during an October 23, 2003 conference call that Tower had failed to do the "streamlining as it should have as it bought various companies."     See Complaint ¶ 40.

79.     All documents relied upon by defendant Kathleen Ligocki when she stated during an October 23, 2003 conference call that each Tower plant "acted like its own $100 million to $300 million unit," and they "should have been integrated earlier as they were bought."     See Complaint ¶ 40.

80.     All documents relied upon by defendant Kathleen Ligocki when she stated on April 29, 2004 that Tower was still focusing on "the integration of our operations into a greater whole" and that "we've just begun."     Complaint ¶ 44.

81.     All  analyses, memoranda, or reports concerning Tower's success or failure at extracting significant cost savings and synergies from its acquisitions.

82.     All documents and communications concerning policies, plans or strategies with respect to Tower's extraction of  significant cost savings and synergies from its acquisitions.

83.     All documents supporting the statement in Tower's December 21, 2000 S-4/A and its January 9, 2001 424B3  Statement that Tower had  "successfully integrat[ed] multiple acquisition and extract[ed] significant cost savings and synergies."

**D.     <u>Auditors and Financial Reporting</u>**

84.     All documents concerning Tower's year-end audits that refer, relate to or discuss

the Three Relevant Issues.

85.     All documents concerning Tower's quarterly review of its finances for the purpose of preparing its Class Period Form 10-Q's concerning or discussing the Three Relevant Issues, including but not limited to documents concerning the Three Relevant Issues that relate to or provide the basis for the Sarbanes Oxley Certifications attached to each 10-Q.

86.     Documents sufficient to reflect the identity of the persons at Arthur Andersen LLP and Deloitte & Touche LLP who participated in any professional engagement of or provided professional services to Tower.

87.     All communications between Tower and its outside auditors regarding the Three Relevant Issues.

88.     All audit opinions concerning the Three Relevant Issues.

**E.      Miscellaneous**

89.     All documents concerning your policies for the retention or destruction of documents.

90.     All documents which concern the timing and/or the withholding of release to the public by Tower of information regarding the Three Relevant Issues.  This includes but is not limited to correspondence, memoranda and handwritten notes, concerning the accuracy or adequacy of the disclosures made by Tower on these issues in Tower's annual, quarterly or other reports, press releases, registration statements, or other public filings or statements.

91.     All management letters, reports, reviews, analyses, and other documents issued by Tower's auditors or by third parties at Tower's request concerning (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts receivable from OEM's, (3) the amount of receivables subject to the Early Payment Program or any similar program and/or (4) the success or failure of efforts to integrate entities acquired by Tower.

22

92. All documents concerning the sale of Tower stock by J2R Partners, Hidden Creek Industries, Inc., Dugald Campbell, S.A. Johnson, and Scott D. Rued, without regard to any limitation of time otherwise applicable to these requests.

93. All documents concerning disagreements or differences in opinion on accounting or auditing matters concerning the Three Relevant Issues. This request includes documents concerning disagreements between Tower and its outside auditors or consultants, and documents concerning disagreements within Tower, Tower's Board of Directors, and Committees of the Board of Directors.

94. **Documents** sufficient to **identify** **all** **employees** located at **your** corporate headquarters at any time during the **Relevant Time Period**, including but not limited to, for **each** such **employee** **all** job titles and departmental affiliations, **and** the dates during which **each** title and affiliation was held.

95. **All** **documents** **concerning** **your** policies, procedures **and** practices (**and** those of **your** various operating divisions) applicable to computers, computer systems, **ESI** **and** electronic media during the **Relevant Time Period** including, but not limited to:

    (a)      **employees**' management of **ESI** on their desktops, laptops, removable storage media **and** your servers;

    (b)      file-naming **and** file saving locations;

    (c)      storage of **ESI** including without limitation email storage conventions (e.g. limitations on mailbox sizes/storage locations, schedules **and** logs for storage, deleted message storage information);

    (d)      periodic backup **or** archiving of **ESI**, including indexing **and** cataloguing;

    (e)      destruction **or** deletion of **ESI** including schedules for retention **and** destruction **or** deletion;

    (f)      preservation of **ESI** when litigation is threatened **or** pending;

    (g)      rotation **or** recycling of storage media;

    (h)     electronic media deployment, allocation, <u>and</u> maintenance procedures for new <u>employees</u>, current <u>employees</u>, <u>and</u> departing <u>employees</u>;

    (i)     <u>ESI</u> <u>and</u> hardware created, controlled <u>or</u> used by <u>employees</u> upon termination of their employment;

    (j)     disposal <u>or</u> destruction of hardware <u>and</u> removable storage media;

    (k)     security systems for protection of hardware <u>and</u> <u>ESI</u>, including, but not limited to, encryption <u>and</u> password protection;

    (l)     migration of <u>ESI</u> from hardware <u>or</u> software when the use of such hardware <u>or</u> software by <u>you</u> is discontinued;

    (m)    software <u>and</u> hardware upgrades (including patches) including <u>documents</u> sufficient to <u>identify</u> the <u>person</u> who performed such upgrades;

    (n)     use of personal <u>or</u> home computers by <u>employees</u> for work-related activities; <u>and</u>

    (o)     external access to internal systems including but not limited to email data, file server data, database <u>and</u> application data.

96.    Organizational charts for <u>all</u> of <u>your</u> Information Technology <u>or</u> Information Services departments <u>or</u> divisions during the <u>Relevant Time Period</u>.

## SCHEDULE B TO JANUARY 23, 2008 SUBPOENA TO TOWER AUTOMOTIVE LLC

### DEFINITIONS, INSTRUCTIONS, RELEVANT TIME PERIOD

The Definitions, Instructions and Relevant Time Period set forth in Schedule A to the January 23, 2008 Subpoena to Tower Automotive LLC are incorporated herein by reference.

### TOPICS

1.     The location, configuration, hardware, operating systems, application software, vendors, dates of use, and current status of all your active, near-line, offline, disaster recovery and archival ESI and related systems -- including but not limited to email servers, file servers, database servers, document management systems, unified messaging systems, legacy systems, desktops, laptops, backup tapes, and other archival systems -- containing documents and information dated, created, sent or received at any time during the Relevant Time Period.

2.     Your policies, procedures and practices, throughout the Relevant Time Period and within each of your locations or divisions, for:

   a.   employees' management of ESI on their desktops, laptops, removable storage media and your servers;

   b.   file-naming and file saving locations;

   c.   storage of ESI including without limitation email storage conventions (e.g. limitations on mailbox sizes/storage locations, schedules and logs for storage, deleted message storage information);

   d.   periodic backup or archiving of ESI, including indexing and cataloguing;

   e.   destruction or deletion of ESI including schedules for retention and destruction or deletion;

   f.   preservation of ESI when litigation is threatened or pending;

   g.   rotation or recycling of storage media;

    h.   electronic media deployment, allocation, and maintenance procedures for new employees, current employees, and departing employees;

    i.   ESI and hardware created, controlled or used by employees upon termination of their employment;

    j.   disposal or destruction of hardware and removable storage media;

    k.   security systems for protection of hardware and ESI, including, but not limited to, encryption and password protection;

    l.   migration of ESI from hardware or software when the use of such hardware or software by you is discontinued;

    m.   software and hardware upgrades (including patches) including documents sufficient to identify the person who performed such upgrades;

    n.   use of personal or home computers by employees for work-related activities; and

    o.   external access to internal systems including but not limited to email data, file server data, database and application data.

3.      The basis for the estimate – referenced in Michael Duffy's December 21, 2007 letter to Kenneth Vianale and in Michael Duffy's January 15, 2008 letter to Susan Davies – of "240 man hours" to recover data from backup tapes containing annual, year-end "snapshots" of your network drives, including but not limited to:

    a.   for each backup tape at issue:  the manufacturer, type, capacity, volume of ESI stored, hardware and software used (including version numbers), labels, indices, and catalogues; and

    b.   the methodology and protocol proposed to be used, including but not limited to whether the recovery would be performed in-house by your employees or by an external service provider, the hardware and software technology that would be used, and any prior instances where you have used this methodology and protocol to recover data.



**Issued by the**
# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | SUBPOENA IN A CIVIL CASE |
| **TOWER AUTOMOTIVE SECURITIES LITIGATION** | CASE NO.: 05-CIV. 1926 (RWS) |

To: **Tower Automotive, Inc.**
   **c/o John F. Hartmann, Esq.**
   **Kirkland & Ellis LLP**
   **200 East Randolph Dr.**
   **Chicago IL 60601**

☐ **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE | DATE AND TIME |
|---|---|
| | |

☒ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list documents or objects):
**See attached Schedule A**

| PLACE | DATE AND TIME |
|---|---|
| Shalov Stone Bonner & Rocco LLP 485 Seventh Avenue, Suite 1000 New York NY 10018 | July 2, 2007 10:00 a.m. |

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| *Kenneth J. Vianale*, Co-Lead Plaintiff's Counsel | June 15, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Kenneth J. Vianale, Esq.
Vianale & Vianale LLP
2499 Glades Road, Suite 112
Boca Raton FL 33431
Tel.: (561) 392-4750

17945/2
06/15/07 2096198.01

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

_____

# SCHEDULE A TO SUBPOENA FOR PRESERVATION OF DOCUMENTS

## DEFINITIONS

1.      The word "you" means the individual or entity to whom this subpoena and document request is addressed, and any directors, officers, employees, agents, representatives or other persons acting, or purporting to act, on your behalf.

2.      The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" means "including without limitation."

3.      "Date" shall mean the exact date, month and year, if ascertainable, or, if not, the best approximation of the date (based upon relationship with other events).

4.      The term "document" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(a), made applicable hereto by Federal Rule of Bankruptcy Procedure 7034, and includes, without limitation, electronic or computerized files and data compilations. A draft or non-identical copy of any document is a separate document within the meaning of this term. These requests are intended to encompass each and every non-identical copy of the documents requested, as well as all documents which are in your actual or constructive possession, custody, care or control or available by request to you or your agents, accountants or attorneys. These requests are specifically intended to encompass any data or information maintained in any form of computer memory or on computer hard drives or diskettes, including any word processing or spread sheet programs or "E-Mail" systems, or in any other form of electronic or computer-related storage, whether or not you currently have

1

"hard copy" printouts of the same. Without limiting the generality of the foregoing, the term "document" is intended to encompass all correspondence, financial records, corporate records and reports, notes, inter-office and intra-office communications, written communications, circulars, announcements, directories, declarations, evaluations, filings, agreements, contracts, subcontracts, legal instruments, workpapers, work orders, work authorizations, process sheets, records, instructions, notes, notebooks, scrapbooks, diaries, minutes of meetings, calendars, schedules, projections, plans, drawings, specifications, designs, sketches, pictures, photographs, photocopies, charts, graphs, descriptions, motion pictures, videotapes, published or unpublished speeches or articles, press releases, newspapers, magazines, books, recordings, and any other recorded or retrievable information or data (whether on cards, taped, punched or coded, electrostatically or electromagnetically, on computer or otherwise). The term also includes all notes made of any conversations, whether made contemporaneously or after the fact.

     5.    "Agent" shall mean: any agent, employee, officer, director, attorney, independent contractor or any other person acting at the direction of or on behalf of another.

     6.    The term "employee" means any person who at any time during the relevant time period acted or purported to act on behalf of an entity, or another person or persons, including, but not limited to, all present and former officers, directors, executives, partners, principals, managers, staff personnel, accountants, agents, representatives, in-house attorneys, independent contractors, advisors and consultants of such entity.

     7.    "Person" shall mean any individual, corporation, proprietorship, partnership, trust, association or any other entity.

2

8. The words "pertain to" or "pertaining to" mean: relates to, refers to, contains, concerns, describes, embodies, mentions, constitutes, constituting, supports, corroborates, demonstrates, proves, evidences, shows, refutes, disputes, rebuts, controverts or contradicts.

9. A document, communication or correspondence "relating to" a given subject matter means that it concerns, constitutes, contains, embodies, comprises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes or analyzes that subject, including documents, communications or correspondence concerning the contents of other documents, communications or correspondence.

10. The term "third party" or "third parties" refers to individuals or entities other than you who are not a party to this action.

11. The word "identify", when used in reference to a document, means and includes the name and address of the custodian of the document, the location of the document, and a general description of the document, including (1) the type of document (i.e., correspondence, memorandum, facsimile, etc.); (2) the general subject matter of the document; (3) the date of the document; (4) the author of the document; (5) the addressee of the document; and (6) the relationship of the author and addressee to each other.

12. The term "communication" means any and all transmittals of information (in the form of facts, ideas, inquiries or otherwise).

13. "All documents" means every document within the custody, possession or control of the person to whom this request is directed, and his or its attorneys, accountants, insurance carriers, representatives, employees, and/or agents, whether an original or copy, as above

3

defined, known to you and every such document or writing which you can locate or discover by reasonably diligent efforts.

14. "Class Period" refers to the period from December 21, 2000 to and including February 1, 2005.

15. "SEC" means the United States Securities and Exchange Commission.

16. "Tower" or the "Debtor" means Tower Automotive, Inc. and each of its subsidiaries, divisions, subdivisions, affiliated companies or persons, predecessors, and includes all present and former directors, officers, employees, representatives, advisors, agents, intermediaries and other persons acting on its behalf.

17. "OEM" means Original Equipment Manufacturer, and includes General Motors, Daimler Chrysler, Ford Motor Company and all car manufacturers to whom Tower supplied products, and each such manufacturers' subsidiaries, divisions, subdivisions, affiliated companies or persons, predecessors, and includes all present and former directors, officers, employees, representatives, advisors, agents, intermediaries and other persons acting on its behalf.

18. "General Electric Credit Corporation" means General Electric Credit Corporation and each of its subsidiaries, divisions, subdivisions, affiliated companies or persons, predecessors, and includes all present and former directors, officers, employees, representatives, advisors, agents, intermediaries and other persons acting on its behalf.

19. "Early Payment Program" means the financial arrangement among Tower, General Electric Credit Corporation and the OEM's, whereby Tower received accelerated payment of accounts receivable owed to Tower by the OEM's, as stated in Tower's Form 8-K

4

filed on October 20, 2004 as alleged in paragraph 146 of plaintiffs' Consolidated Amended Class Action Complaint.

20.    "Defendants" means Dugald K. Campbell, Ernie Thomas, Kathleen Ligocki, James A. Mallak, S. A. Johnson, Scott D. Rued, Anthony A. Barone, Christopher T. Hatto, Hidden Creek Industries Inc., and J2R Partners, the defendants in the Securities Litigation.

21.    "Securities Litigation" is the matter entitled *In re Tower Automotive Securities Litigation*, Case No. 1:05-CV-01926 (RWS) (S.D.N.Y.).

## INSTRUCTIONS

22.    If you object to fully identifying a document or oral communication because of a privilege, you must nevertheless provide the information required under Federal Rule of Civil Procedure 26(b)(5), made applicable hereto by Federal Rule of Bankruptcy Procedure 7026, unless divulging the information would disclose the privileged information.

23.    If the documents requested herein have been lost or destroyed, the documents lost or destroyed shall be identified by author, date and subject matter.

24.    You are under a continuous obligation to supplement your responses to the requests for inspection of documents.

25.    Unless otherwise specified in any request, these requests seek documents that were (1) created or dated during the period from January 1, 2000 to the date of this subpoena and, (2) refer or relate, in whole or part, to the period of time from January 1, 2000 to February 1, 2005, inclusive.

## DOCUMENT REQUESTS

### A.    General

1. Minutes of all meetings of the Tower Board of Directors.

2. Minutes of all meetings of the Audit Committee of the Tower Board of Directors.

3. All audio recordings and written recordings or transcripts of Tower's analyst conference calls. This request includes all recordings, written and aural, including transcripts, summaries, tapes, cd's, and digests.

4. All analyst reports discussing Tower and its business.

5. All communications sent to or received from analysts, including correspondence, reports, drafts and e-mails, relating to Tower and its business.

6. Drafts and non-final versions of all Tower filings with the SEC, including 10-K's 10-Q's and 8-K's.

7. Copies of the "glossy" versions of Tower's Annual Reports that were mailed to Tower Shareholders.

8. All correspondence sent to or received from the SEC relating to (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts receivable owed to Tower by OEM's, (3) the amount of receivables subject to the Early Payment Program or any similar program and/or (4) the success or failure of efforts to integrate entities acquired by Tower.

9. All press releases issued by Tower (including drafts thereof).

## B. Early Payment/Factoring

10.    All documents which set forth the terms of any Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect during the class period.

11.    All documents which identify any contract that was subject to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the class period including, but not limited to contracts related to any of the following vehicles:

Ford - Taurus, Sable, Mustang, Focus, Explorer, Mountaineer, Aviator, Escort, Crown Victoria/Grand, Explorer Sport Trac, Explorer, Marquis, Cougar, Continental, Sport, Econoline, Villager, Lincoln LS, Towncar, Thunderbird, Windstar, Escape, Expedition, Navigator, Excursion, Ranger, F-Series LD & HD, Blackwood, Transit, StreetKa, Mondeo, Fiesta, Freestar/Monterey,

DaimlerChrysler - Concorde, Intrepid, 300M, Neon, Ram Pick-up, Ram Van, Dakota, Stratus, Sebring, Durango,  Voyager, Caravan, Town & Country, Smart, Jeep Wrangler, Jeep Liberty, Grand Cherokee, PT Cruiser, Pacifica

Mercedes -  A-Class, C-Class, E-Class, SLK, Atego, Actros,   Sprinter, CLK, Vario

General Motors - Cadillac, Silverado, Sierra, Astro, Safari,  Blazer, S10-Pickup, Sonoma, SRX, Medium Duty Trucks, Cadilac CTS, Malibu, Cadilac SRX

Saturn - LS/LW, Saturn VUE

Opel - Omega, Astra, Agila, Corsa, Vectra, Zafira, Meriva

Honda - Accord, Civic, Acura EL, Acura Odyssey, Passport, Acura MDX, TL/CL, Pilot

Mazda - Mazda 626, Atenza, Tribute, B-Series Pickup

Toyota - Avalon, Camry, Solara, Corolla, Sienna, Tacoma, Tundra, Sequoia, Vios, Xiali, Matrix, Vibe, RX330, Crown

Renault - Clio, Twingo, Megane, Kangoo,

Nissan - Sentra, Micra, Quest, Xterra, Frontier, Titan, Pathfinder

Isuzu - Rodeo, Amigo, Axiom

VW - Passat, Golf/Bora, GOL, Polo, Touareg, Kombi, Santana, Transporter/Microbus, Fox, Jetta, Armada

Audi - A3, A4, A6, Cabrio

Skoda - Felicia, Fabia, Octavia

BMW - 1 Series, 3 Series, 5 Series, X5

Fiat - Marea, Punto, Bravo, Brava, Ducato, Palio, Panda, Stilo, Multipla, Uno

Alfa Romeo - 147, 156, 166, GTV, Spider

Lancia - Lybra, Thesis, Y

Porsche - Cayenne

Land Rover - Range Rover

Jaguar - XJ, S-Type

Suzuki - Wagon R

Hyundai - Eqquus, Teracan, Galloper, Starex, Libero, Grace, SantaFe

Kia - Spectra, Rio, Optima, Sportage, Carens, Retona, Enterprise, Potentia, Pregio, Carnival, Frontier, Sorento

Volvo - S40, V50

PSA - Peugeot 206, Citroen C3

Bentley - Continental Coupe

8

12.     All contracts, contract modifications, and contract revisions that refer or relate to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period including, but not limited to, contracts involving the following vehicles:

Ford - Taurus, Sable, Mustang, Focus, Explorer, Mountaineer, Aviator, Escort, Crown Victoria/Grand, Explorer Sport Trac, Explorer, Marquis, Cougar, Continental, Sport, Econoline, Villager, Lincoln LS, Towncar, Thunderbird, Windstar, Escape, Expedition, Navigator, Excursion, Ranger, F-Series LD & HD, Blackwood, Transit, StreetKa, Mondeo, Fiesta, Freestar/Monterey,

DaimlerChrysler - Concorde, Intrepid, 300M, Neon, Ram Pick-up, Ram Van, Dakota, Stratus, Sebring, Durango, Voyager, Caravan, Town & Country, Smart, Jeep Wrangler, Jeep Liberty, Grand Cherokee, PT Cruiser, Pacifica

Mercedes - A-Class, C-Class, E-Class, SLK, Atego, Actros,  Sprinter, CLK, Vario

General Motors - Cadillac, Silverado, Sierra, Astro, Safari,  Blazer, S10-Pickup, Sonoma, SRX, Medium Duty Trucks, Cadilac CTS, Malibu, Cadilac SRX

Saturn - LS/LW, Saturn VUE

Opel - Omega, Astra, Agila, Corsa, Vectra, Zafira, Meriva

Honda - Accord, Civic, Acura EL, Acura Odyssey, Passport,  Acura MDX, TL/CL, Pilot

Mazda - Mazda 626, Atenza, Tribute, B-Series Pickup

Toyota - Avalon, Camry, Solara, Corolla, Sienna, Tacoma,  Tundra, Sequoia, Vios, Xiali, Matrix, Vibe, RX330, Crown

Renault - Clio, Twingo, Megane, Kangoo,

Nissan - Sentra, Micra, Quest, Xterra, Frontier, Titan,  Pathfinder

Isuzu - Rodeo, Amigo, Axiom

VW - Passat, Golf/Bora, GOL, Polo, Touareg, Kombi, Santana, Transporter/Microbus, Fox, Jetta, Armada

Audi - A3, A4, A6, Cabrio

Skoda - Felicia, Fabia, Octavia

BMW - 1 Series, 3 Series, 5 Series, X5

Fiat - Marea, Punto, Bravo, Brava, Ducato, Palio, Panda, Stilo, Multipla, Uno

Alfa Romeo - 147, 156, 166, GTV, Spider

Lancia - Lybra, Thesis, Y

Porsche - Cayenne

Land Rover - Range Rover

Jaguar - XJ, S-Type

Suzuki - Wagon R

Hyundai - Eqquus, Teracan, Galloper, Starex, Libero, Grace, SantaFe

Kia - Spectra, Rio, Optima, Sportage, Carens, Retona, Enterprise, Potentia, Pregio, Carnival, Frontier, Sorento

Volvo - S40, V50

PSA - Peugeot 206, Citroen C3

Bentley - Continental Coupe

13. All correspondence that refers or relates to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the class period.

14. All invoices issued in connection with a contract that was subject to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period.

15.     All documents which evidence a discount to an invoice issued in connection with a contract that was subject to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period.

16.     All documents which evidence a credit issued in connection with a contract that was subject to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period including, but not limited to, credit memos, credit advices, and return merchandise authorizations

17.     All documents which evidence a product return in connection with a contract that was subject to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period.

18.     All documents which evidence an interest charge in connection with a contract that was subject to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period.

19.     All documents which evidence a billing adjustment or allowance in connection with a contract that was subject to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period.

20.     All documents which evidence a write-off of, or an adjustment to, any amount billed in connection with a contract that was subject to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period.

21.    All documents which evidence a payment allowance in connection with a contract that was subject to an Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period.

22.    All documents which evidence a remittance in respect of any invoice that was issued in connection with a contract that was subject to any Early Payment Program, or program which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period including, but not limited to, remittance advices, transmittal advices, check copies, payment reports, and payment or billing reconciliations.

23.    All billing statements issued to customers during the Class Period.

24.    All billing records during the Class Period.

25.    All cash receipts records during the Class Period.

26.    Each and every novation executed during the Class Period.

27.    All documents which refer or relate to interest expense.

28.    All documents which refer or relate to interest charges.

29.    Each and every cash receipts journal for the class period.

30.    Each and every cash sales journal for the class period.

31.    Each and every general ledger for the class period.

32.    Each and every accounts receivable subsidiary ledger for the Class Period.

12

33.    Each and every accounts receivable reconciliation prepared during the Class Period.

34.    Each and every accounts receivable aging report prepared during the Class Period.

35.    All journal entries which refer or relate to amounts invoiced to customers during the Class Period.

36.    All journal entries which refer or relate to money received from customers during the Class Period.

37.    All journal entries which refer or relate to money received from third parties on behalf of customers during the Class Period.

38.    All Early Payment Program confirmation notices, memoranda, receipts or memorializations during the Class Period.

39.    All debit memos, credit memos, transaction reports, statements, or other communications from any party administering or participating in and Early Payment Program, or program which resulted in the accelerated collection of receivables, during the Class Period.

40.    All documents prepared during the Class Period which evidence a cash projection.

41.    All documents prepared during the Class Period which evidence a working capital projection.

42.    All documents received from Deloitte & Touche LLP and Arthur Andersen LLP, which refer or relate to an Early Payment Program, or program which resulted in the accelerated collection of receivables.

43.    Each and every document received from Deloitte & Touche LLP and Arthur Andersen LLP, which refer or relate to your internal controls, your receivables, your cash, your billing, your cash flow, your working capital, your financial statements, your filings with the SEC, your accounting for Early Payment Programs, and/or your disclosures as they relate to any Early Payment Program.

44.    All documents prepared during the Class Period which memorialize discussion concerning your internal controls, your receivables, your cash, your billing, your cash flow, your working capital, your financial statements, your filings with the SEC, your accounting for early payment programs, and/or your disclosures as they relate to any early payment program.

45.    All documents concerning Tower's stated accounting policies concerning accounts receivable, cash receipts, billing adjustments, interest expense, factoring of receivables, and early payment arrangements.

46.    All documents concerning any and all meetings of the Board of Directors of Tower, including, but not limited to, all materials presented at, prepared for, disseminated at, or prepared after or in connection with, any Board Meetings and all agendas, e-mails, reports, notes taken at, minutes, and all correspondence in connection with any Board Meetings.

47.    All documents concerning Tower's earnings announcements during the Class Period.

14

48.     All documents concerning Tower's liquidity including, but not limited to, internal memoranda, reports, correspondence, reports, analyses, or other documents.

49.     All documents, including internal memoranda, concerning the accuracy, adequacy, fairness or completeness of the disclosures contained in any of Tower's public reports, filings, or other statements concerning Tower's past present or projected financial condition or performance.

50.     All Company prepared prospective financial documents, including all documents referring or relating to any Tower business or strategic plan, forecasts, budgets or projections, whether prepared for internal use or for public dissemination, during the Class Period.

51.     All documents concerning any compilations or calculations, on a historical basis, of Tower's sales, revenues, pretax income, net income, profit margins, operating results, interest expense, and costs of sales including, but not limited to: (a) any documents comparing Tower to industry competitors on any or all of these measures, and (b) any comparisons of actual results to plans, forecasts, or projections during the relevant time period; and (c) any documents explaining any variances in comparison of actual results to plans, forecasts or projections.

52.     All documents concerning any meeting with Tower's creditors.

53.     All documents dated, prepared, delivered or received during the Class Period concerning any contemplated, proposed or actual communication or meeting between any Defendant in this Securities Litigation and any prospective or actual securities broker, money

15

manager, stock market professional, financial or securities analyst, market maker, investment banker, brokerage firm, investment firm, investment banking firm, underwriter, financial or investment advisor, public relations firm, securities rating service, business wire service, financial or other publication, news service, journalist, and/or any representative of the news media, during which any early payment program was referred to or discussed (including, without limitation, any scripts or outlines of responses to analysts inquiries, including any telephone logs or message slips reflecting the making, receipt or return of telephone calls to securities analysts).

54.    All reports, newsletters, statements, articles, summaries and other documents prepared or published by any securities broker, money manager, stock market professional, financial or securities analyst, market maker, investment banker, brokerage firm, investment firm, investment banking firm, underwriter, financial or investment advisor, public relations firm, securities rating service, business wire service, financial or other publication, news service, journalist, and/or any representative of the news media, with respect to Tower during the relevant time period.

55.    All documents concerning any meeting and/or conference call with investors and/or securities analysts, including all drafts of scripts, memoranda or other documents used to prepare for Question and Answer portion of the meeting and/or conference call.

56.    All documents and communications with securities analysts concerning Tower, including but not limited to who met and/or communicated with the analysts, which analysts, all documents provided, all documents created in preparation, all documents reflecting statements made to analysts, all analyst reports and all communications about analyst reports.

57. All minutes, memoranda, summaries, transcripts, texts, notes, video or audio recordings, computer diskettes, slides and other documents concerning or prepared in connection with or distributed or presented in connection with any conference or symposium at which any early payment program was referred to or discussed.

58. All documents concerning any correspondence or communications between any of the Defendants on the one hand, and any of Tower's customers, lenders, banks, financing companies, syndication agents for Tower's lenders, outside auditors, consultants, members of Tower's Board, or any other persons, on the other hand, concerning revenue, billing, cash receipts, cash flow, liquidity, and/or accelerated collection of receivables.

59. All documents concerning Tower's internal financial and/or internal accounting controls, including, but not limited to, all documents concerning the Tower's accounting department and any changes to its staff.

60. All documents which evidence the fact that, as Kathleen Ligocki stated, "The company was very tight on cash when I joined [in August 2003].

61. All documents which evidence the fact that, as Kathleen Ligocki stated, in August 2003 "the company was fragile, we were extremely short of cash...."

62. All documents which evidence the fact that, as Kathleen Ligocki stated: "Insufficient focus was given to post merger integration, financial discipline and operating excellence."

17

63.     All documents which evidence the fact that, as Kathleen Ligocki stated, Tower had failed to do the "streamlining as it should have as it bought various companies."

64.     All documents which evidence the fact that each Tower plant acted like its own $100 million to $300 million unit, and they should have been integrated earlier as they were bought.

65.     All copies of reports, studies, analyses, or internal memoranda, concerning any early payment program, or program which resulted in the accelerated collection of receivables.

66.     All documents concerning any investigation of Tower and/or the Individual Defendants, by the SEC or any other governmental or regulatory agency, including but not limited to, all documents produced to the SEC and/or any other governmental or regulatory agency, copies of all transcripts of any testimony provided, all subpoenas and notices received in connection with such investigation(s) and responses, as well as all communications between the Company and/or the Individual Defendants, on the one hand, and the SEC and/or such other governmental or regulatory agency(ies), on the other hand.

67.     All documents concerning any civil proceeding(s) concerning Tower (excluding this action) including, but not limited to, any litigation, dispute, arbitration, demand and/or complaint which alleges that Tower's billing was improper.

68.     All documents which refer or relate to the timing of the release of information to the public.

69. All documents which refer or relate to the withholding of the release of information concerning Tower to the public.

70. All documents which concern or relate to proposed but nonrecorded adjusting journal entries concerning sales, cash, receivables, interest expense, or adjustments to amounts invoiced.

71. All documents which concern the reversal of previously recorded transactions involving sales, cash, receivables, interest expense, or adjustments to amounts invoiced.

72. All documents which refer or relate to any auto manufacturer's guarantee of any amount furnished by General Electric Credit Corporation or any other participant in any early payment program or any program that resulted in the acceleration of cash remittances to Tower.

73. All documents which refer or relate to the fact that "the recent termination of early pay programs at certain auto makers has adversely affected our liquidity."

74. All documents which refer or relate to Tower's transactions with General Electric Credit Corporation.

75. All documents which refer or relate to the impact of General Electric Credit Corporation's early payment transactions on Tower's liquidity.

76. All documents which refer or relate to the impact of Tower's early payment transactions on Tower's financial statements.

77.     All documents which refer or relate to Tower's vulnerability to a severe impact (*i.e.* insolvency or bankruptcy) if the General Electric Credit Corporation early payment transactions were to come to an end.

78.     All communications with Tower's lenders, banks, and/or financing companies, regarding the sale of Tower's accounts receivable.

79.     All communications with Tower's lenders, banks, financing companies, syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders, regarding Tower's compliance with any debt covenants in any of its credit agreements, loan documents or credit facilities, including but not limited to any requests by Tower for waivers of the limits of such debt covenants.

80.     All communications with Tower's lenders, banks, financing companies, syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders, regarding Tower's Early Payment Program or accelerated collection of receivables, including, but not limited to, the termination of the Early Payment Program.

81.     All communications with Tower's lenders, banks, financing companies, syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders, regarding the securitization of Tower's accounts receivable.

82.     All documents evidencing or relating to any meetings you had with any of Tower's lenders, banks, financing companies, syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders, regarding the Early Payment Program, including but not limited to any handwritten notes, PowerPoint slide presentations, reports, memos or correspondence.

83.     All documents evidencing or relating to any meetings or discussions you had
(either in person or by phone or by e-mail) with any of Tower's lenders, banks, financing
companies, syndication agents for Tower's lenders, and/or administrative agents for Tower's
lenders, relating to any request by Tower for waivers of Tower's debt covenants in any of
Tower's agreements with these lenders, banks or financing companies.

84.     All documents which refer or relate to the severe impact (*i.e.* insolvency or
bankruptcy) which Tower experienced when the General Electric Credit Corporation early
payment programs came to an end.

85.     All documents which refer or relate Tower's early payment discounts.

86.     All documents which refer or relate to Tower's disclosure policy with regard to its
early payment arrangements with General Electric Credit Corporation.

87.     All documents which refer or relate to Tower's disclosure policy with regard to its
early payment arrangements with General Motors Corp.

88.     All documents which refer or relate to Tower's disclosure policy with regard to its
early payment arrangements with Ford Motor Company.

89.     All documents which refer or relate to Tower's disclosure policy with regard to its
early payment arrangements with the DaimlerChrysler.

90.     All documents which refer or relate to the statements in Tower's public filings that
accelerated collections of accounts receivable decreased working capital by approximately $42

million as of June 30, 2001, $110 million as of September 30, 2001, and $74.5 million as of December 31, 2001.

91.     All documents which refer or relate to Tower's credit facilities during the Class Period.

92.     All documents which refer or relate to defendant Dugald Campbell's statement during the April 22, 2003 conference call that: "We don't - we don't share that information."

93.     All documents which refer or relate to defendant James Mallak's statement during the July 27, 2004 conference call that: "We really have not given that out. We are on a -- in North America, on the accelerated programs with most of the OEMs, but we have never really given that amount out."

94.     All documents which refer or relate to defendant James Mallak's statement during the July 27, 2004 conference call that: "We do have some other alternatives that we could pursue to offset that [termination of early payment programs], so we are working on some other initiatives that, if that did come about, where we could-off set that impact to us."

95.     All documents which refer or relate to the effect of Tower's accelerated collection of receivables on Tower's operating cash flows.

96.     All documents which refer or relate to the fact that, as represented in Tower's October 20, 2004 Form 8-K, the early payment plans in which Tower participated were "off-balance sheet payment plans."

97. All documents which refer or relate to the fact that, as disclosed in Tower's October 20, 2004 Form 8-K, the early payment plans in which Tower participated were "facilitated by third parties."

98. All documents which refer or relate to the fact that, as disclosed in Tower's October 20, 2004 Form 8-K, termination of the Early Payment Programs would have a liquidity impact of Ford $80 Million, General Motors $25 Million, and DaimlerChrysler $35 Million.

99. All documents which refer or relate to the fact that, as disclosed in Tower's October 20, 2004 Form 8-K, "Tower Automotive has secured a solution to offset the one time liquidity impact of the plan termination."

100. All documents which refer or relate to the efforts of Rothschild, Inc. to improve Tower's capital structure, de-lever the balance sheet, and/or enhance Tower's liquidity options.

101. All documents furnished to creditors in connection with or pursuant to the provisions of debt agreements.

102. All documents which refer or relate to contemplated or considered restatements of any of Tower's previously issued financial statements.

103. All documents which refer or relate to the modification of credit terms or credit arrangements between Tower and its creditors.

104. All documents which refer, relate, or constitute memorializations of disagreements concerning accounting or auditing matters.

105. A copy of organization charts used by the Company during the Class Period.

106. All confirmation letters prepared by Tower for use by Deloitte & Touche LLP and Arthur Andersen LLP in connection with its audits of Tower's financial statements during the Class Period.

107. All contracts between Tower and General Electric Credit Corporation.

108. All communications between Tower and General Electric Credit Corporation regarding accelerated payment to Tower of accounts receivable owed to Tower by OEM's or about the Early Payment Program.

109. All documents showing the amount of Tower's accounts receivable from OEM's that were subject to accelerated payment under the Early Payment Program, and/or any and all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEM's otherwise, during each fiscal quarter of the Class Period.

110. All documents evidencing or relating to Tower's receipt of accelerated payment on accounts receivable owed to Tower by the OEM's.

111. All communications (including but not limited to correspondence and e-mails), from or to any defendant referring or relating to the Early Payment Program or to any and all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEM's.

112. All communications to or from an OEM referring to or discussing the Early Payment Program or any and all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEM's.

113.    All documents relating to any contingency plans or other provisions by Tower in the event that the OEM's or General Electric Credit Corporation terminated the Early Payment Program.

114.    All documents that refer or relate to, or discuss the reasons for termination of the Early Payment Program or any or all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEM's.

115.    All documents that refer, relate to, or discuss Tower's disclosure in its public filings and statements of information regarding the Early Payment Program, or any other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by the OEM's.

116.    All communications to or from the SEC referring or relating to the Early Payment Program or any other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by the OEM's. This request includes copies in Tower's possession of documents sent by or to third-parties, including the OEM's.

117.    All documents including, but not limited to, workpapers, correspondence, memoranda and handwritten notes, discussing the impact of Tower's operating results on its compliance with its financing agreements which underlay the Early Payment Program, or any other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by the OEM's.

118.    All documents evidencing or relating to Tower's plans, options, strategies or analyses to maintain liquidity in the event the Early Payment Programs were terminated or modified by the OEM's

C.      **Integration Efforts**

25

119.     All documents which illustrate the extraction of significant cost savings and/or synergies through integration of acquired businesses into Tower's operations.

120.     All documents which refer or relate to Tower's accretive acquisitions.

121.     All documents which support the October 23, 2003 representation that Tower had been "prevented ... from leveraging economics of scale" and that "[i]nsufficient focus [was] given to post-merger integration, financial discipline and operational excellence."

122.     All documents which support the April 29, 2004 representations by defendant Kathleen Ligocki that Tower was still focusing on "the integration of our operations into a greater whole" and that "we've just begun."

123.     All documents and communications referring or relating to, or discussing the success or failure of efforts to integrate entities acquired by Tower.

124.     All documents and communications pertaining to, constituting or memorializing policies, plans or strategies with respect to integration of entities acquired by Tower.

125.     All documents supporting the statement in Tower's December 21, 2000 S-4/A and its January 9, 2001 424B3 Statement that Tower had "successfully integrat[ed] multiple acquisition and extract[ed] significant cost savings and synergies."

**D.     Auditors and Financial Reporting**

126.     All documents evidencing or regarding Tower's year-end audits that refer, relate to or discuss, (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts receivable from OEM's, and/or (3) the success or failure of efforts to integrate entities acquired by Tower.

127.    All documents evidencing or regarding Tower's quarterly review if its finances for the purpose of preparing its Form 10-Q's, that refer, relate to or discuss, (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts receivable from OEM's, and/or (3) the success or failure of efforts to integrate entities acquired by Tower.

128.    All documentary backup for the Form 10-Q's filed by Tower, including but not limited to back-up supporting the representation in each of Tower's 10-Q's that: "The information furnished in the condensed consolidated financial statements. . .reflects all adjustments which are, in the opinion of management, necessary for a fair presentation of such financial statements" including, but not limited to, documents which evidence: (1) Managements' review of the referenced adjustments, and (2) That management had determined that the financial statements included "all adjustments" necessary for a fair presentation of the results of all interim periods reported.

129.    Documents sufficient to reflect the identity of the persons at Arthur Andersen LLP and Deloitte & Touche LLP who participated in any professional engagement of or provided professional services to Tower.

130.    All communications between Tower and its outside auditors regarding (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts receivable from OEM's, and/or (3) the success or failure of efforts to integrate entities acquired by Tower.

131.    All audit opinions and any backup material to such audit opinions (including audit workpapers) from Tower's outside auditors regarding (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts

receivable from OEM's, and/or (3) the success or failure of efforts to integrate entities acquired by Tower..

### E. Miscellaneous

132. All documents concerning your policies for the retention or destruction of documents.

133. All documents which concern the timing and/or the withholding of release to the public by Tower of information regarding (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts receivable from OEM's, (3) the amount of receivables subject to the Early Payment Program or any similar program and/or (4) the success or failure of efforts to integrate entities acquired by Tower. This includes but is not limited to correspondence, memoranda and handwritten notes, concerning the accuracy or adequacy of the disclosures made by Tower on these issues in Tower's annual, quarterly or other reports, press releases, registration statements, or other public filings or statements.

134. All management letters, reports, reviews, analyses, and other documents issued by Tower's auditors or by third parties at Tower's request concerning (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts receivable from OEM's, (3) the amount of receivables subject to the Early Payment Program or any similar program and/or (4) the success or failure of efforts to integrate entities acquired by Tower.

135. All documents evidencing or relating to the sale of Tower stock by J2R Partners, Hidden Creek Industries, Inc., Dugald Campbell, S.A. Johnson, and Scott D. Rued, without regard to any limitation of time otherwise applicable to these requests.

28

136.    Each chart of accounts used by Tower during the Class Period.

137.    All documents which refer, relate, or constitute memorializations of disagreements or differences in opinion concerning accounting or auditing matters. This request includes documents relating to disagreements between Tower and its outside auditors or consultants, and documents concerning disagreements within Tower and Tower's Board of Directors.



# VIANALE & VIANALE LLP

2499 GLADES ROAD
SUITE 112
BOCA RATON, FLORIDA 33431

KENNETH J. VIANALE*
JULIE PRAG VIANALE*

*ADMITTED TO THE BARS OF
FLORIDA AND NEW YORK

TELEPHONE (561) 392-4750
FACSIMILE (561) 392-4775

www.vianalelaw.com

August 23, 2007

## VIA FAX TO (312) 861-2200 AND REGULAR MAIL

Timothy A. Duffy, Esq.
Daniel C. Moore, Esq.
Kirkland & Ellis LLP
Aon Center
200 East Randolph Dr.
Chicago, IL 60601

   Re: *Tower Automotive Securities Litigation*
     **Subpoena to Tower Automotive, Inc.**

Dear Mssrs. Duffy & Moore:

  I write as a follow up to your discussions with Kenneth Vianale and Lee Shalov regarding the subpoena *duces tecum* lead plaintiffs issued to Tower Automotive, Inc. During those discussions, we agreed to revise the Schedule A in certain respects.

  The Revised Schedule A is attached. Please call my partner Kenneth Vianale or me to discuss the timing for your client's compliance with the subpoena.

        Very truly yours,

        Julie Prag Vianale

cc:  Lee Shalov (by e-mail)
   Robert Kravitz (by e-mail)

## REVISED SCHEDULE A TO SUBPOENA DUCES TECUM TO
## TOWER AUTOMOTIVE INC.

Following discussions with counsel for the Defendants in a good faith effort to resolve

differences regarding Lead Plaintiffs' Subpoena Duces Tecum to Tower Automotive, Inc., lead

plaintiffs hereby revise the Schedule A appended to that subpoena, as follows, and demand a

response forthwith.

## DEFINITIONS

1.      The word "you"and "your" means the individual or entity to whom this document

request is addressed, and any directors, officers, employees, agents, representatives or other persons

acting, or purporting to act, on your behalf.

2.      "Date" shall mean the exact date, month and year, if ascertainable, or, if not, the best

approximation of the date (based upon relationship with other events).

3.      "Agent" shall mean: any agent, employee, officer, director, attorney, independent

contractor or any other person acting at the direction of or on behalf of another.

4.      The term "employee" means any person who at any time during the relevant time

period acted or purported to act on behalf of an entity, or another person or persons, including, but

not limited to, all present and former officers, directors, executives, partners, principals, managers,

staff personnel, accountants, agents, representatives, in-house attorneys, independent contractors,

advisors and consultants of such entity.

5.      The term "third party" or "third parties"refers to individuals or entities other than you

who are not a party to this action.

6.      The following terms shall have the meaning and be construed in accordance with

1

Local Civil Rule 26.3: communication, document, identify (with respect to persons), identify (with respect to documents), parties, person, concerning, all/each, and/or, number.

7.    "Class Period" refers to the period from December 21, 2000 to and including February 1, 2005.

8.    "SEC" means the United States Securities and Exchange Commission.

9.    "Tower" or the "Debtor" means Tower Automotive, Inc. and each of its subsidiaries, divisions, subdivisions, affiliated companies or persons, predecessors, and includes all present and former directors, officers, employees, representatives, advisors, agents, intermediaries and other persons acting on its behalf.

10.    "OEM" means Original Equipment Manufacturer, and includes General Motors, DaimlerChrysler, Ford Motor Company and all car manufacturers to which Tower supplied products, and each such manufacturers' subsidiaries, divisions, subdivisions, affiliated companies or persons, predecessors, and includes all present and former directors, officers, employees, representatives, advisors, agents, intermediaries and other persons acting on its behalf.

11.    "General Electric Credit Corporation" means General Electric Credit Corporation and each of its subsidiaries, divisions, subdivisions, affiliated companies or persons, predecessors, and includes all present and former directors, officers, employees, representatives, advisors, agents, intermediaries and other persons acting on its behalf.

12.    "Early Payment Program" means the financial arrangement among Tower, General Electric Credit Corporation and the OEMs, whereby Tower received accelerated payment of accounts receivable owed to Tower by the OEMs, as stated in Tower's Form 8-K filed on October 20, 2004 as alleged in paragraph 146 of plaintiffs' Consolidated Amended Class Action Complaint.

2

13.    "Defendants" means Dugald K. Campbell, Ernie Thomas, Kathleen Ligocki, James A. Mallak, S. A. Johnson, Scott D. Rued, Anthony A. Barone, Christopher T. Hatto, Hidden Creek Industries Inc., and J2R Partners, the defendants in the Securities Litigation.

14.    "Securities Litigation" is the matter entitled *In re Tower Automotive Securities Litigation*, Case No. 1:05-CV-01926 (RWS) (S.D.N.Y.).

15.    "The Three Relevant Issues" means each and every one of the issues as to which the Court sustained the Complaint, to wit: (1) the Early Payment Program, (2) Tower's statements that it had "extract[ed] significant cost savings and synergies" from its acquisitions, and (3) Tower's statements that it had "secured a solution to offset the one time liquidity impact of the [early payment] plan termination," and that "a term sheet ha[d] been negotiated and due diligence ha[d] been completed."

## INSTRUCTIONS

16.    If you object to fully identifying a document or oral communication because of a privilege, you must nevertheless provide the information required under Federal Rule of Civil Procedure 26(b)(5) and Local Civil Rule 26.2 (Assertion of Claim of Privilege), unless divulging the information would disclose the privileged information.

17.    If the documents requested herein have been lost or destroyed, the documents lost or destroyed shall be identified by author, date and subject matter.

18.    You are under a continuous obligation to supplement your responses to the requests for inspection of documents.

## RELEVANT TIME PERIOD

19.    Unless otherwise specified in any request, these requests seek documents that were

3

(1) created or dated during the period from January 1, 2000 to the date of this document request and, (2) refer or relate, in whole or part, to the period of time from January 1, 2000 to February 1, 2005, inclusive, even though prepared, generated or received outside the relevant time period.

### DOCUMENT REQUESTS

#### A.    General

1.      Minutes of all meetings of the Tower Board of Directors concerning or discussing the Three Relevant Issues.

2.      Minutes of all meetings of the Audit Committee of the Tower Board of Directors concerning or discussing the Three Relevant Issues.

3.      All audio recordings and written recordings or transcripts of Tower's analyst conference calls concerning or discussing the Three Relevant Issues. This request includes all recordings, written and aural, including transcripts, summaries, tapes, cd's, and digests.

4.      All analyst reports concerning Tower and its business concerning or discussing the Three Relevant Issues.

5.      All communications you sent to or received from analysts, including correspondence, reports, drafts and e-mails, concerning the Three Relevant Issues.

6.      Drafts and non-final versions of all Tower filings with the SEC, including 10-K's 10-Q's and 8-K's, concerning or discussing the Three Relevant Issues.

7.      Copies of the "glossy" versions of Tower's Annual Reports that were mailed to Tower Shareholders concerning or discussing the Three Relevant Issues.

8.      All correspondence sent to or received from the SEC concerning (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of

accounts receivable owed to Tower by OEM's, (3) the amount of receivables subject to the Early

Payment Program or any similar program and/or (4) the success or failure of efforts to integrate

entities acquired by Tower.

9.     All press releases issued by Tower (including drafts thereof) concerning or

discussing the Three Relevant Issues.

**B.     Early Payment/Factoring**

10.     Documents sufficient to establish the terms of all Early Payment Programs, or

programs which resulted in the accelerated collection of receivables, that were in effect during

the Class Period, including but not limited to terms applicable to invoices concerning the

following vehicles:

> Ford - Taurus, Sable, Mustang, Focus, Explorer, Mountaineer, Aviator, Escort, Crown Victoria/Grand, Explorer Sport Trac, Explorer, Marquis, Cougar, Continental, Sport, Econoline, Villager, Lincoln LS, Towncar, Thunderbird, Windstar, Escape, Expedition, Navigator, Excursion, Ranger, F-Series LD & HD, Blackwood, Transit, StreetKa, Mondeo, Fiesta, Freestar/Monterey,

> DaimlerChrysler - Concorde, Intrepid, 300M, Neon, Ram Pick-up, Ram Van, Dakota, Stratus, Sebring, Durango, Voyager, Caravan, Town & Country, Smart, Jeep Wrangler, Jeep Liberty, Grand Cherokee, PT Cruiser, Pacifica

> Mercedes - A-Class, C-Class, E-Class, SLK, Atego, Actros, Sprinter, CLK, Vario

> General Motors - Cadillac, Silverado, Sierra, Astro, Safari, Blazer, S10-Pickup, Sonoma, SRX, Medium Duty Trucks, Cadilac CTS, Malibu, Cadilac SRX

> Saturn - LS/LW, Saturn VUE

> Opel - Omega, Astra, Agila, Corsa, Vectra, Zafira, Meriva

> Honda - Accord, Civic, Acura EL, Acura Odyssey, Passport, Acura MDX, TL/CL, Pilot

> Mazda - Mazda 626, Atenza, Tribute, B-Series Pickup

Toyota - Avalon, Camry, Solara, Corolla, Sienna, Tacoma,  Tundra, Sequoia, Vios, Xiali, Matrix, Vibe, RX330, Crown

Renault - Clio, Twingo, Megane, Kangoo,

Nissan - Sentra, Micra, Quest, Xterra, Frontier, Titan,  Pathfinder

Isuzu - Rodeo, Amigo, Axiom

VW - Passat, Golf/Bora, GOL, Polo, Touareg, Kombi, Santana, Transporter/Microbus, Fox, Jetta, Armada

Audi - A3, A4, A6, Cabrio

Skoda - Felicia, Fabia, Octavia

BMW - 1 Series, 3 Series, 5 Series, X5

Fiat - Marea, Punto, Bravo, Brava, Ducato, Palio, Panda,  Stilo, Multipla, Uno

Alfa Romeo - 147, 156, 166, GTV, Spider

Lancia - Lybra, Thesis, Y

Porsche - Cayenne

Land Rover - Range Rover

Jaguar - XJ, S-Type

Suzuki - Wagon R

Hyundai - Eqquus, Teracan, Galloper, Starex, Libero, Grace, SantaFe

Kia - Spectra, Rio, Optima, Sportage, Carens, Retona, Enterprise, Potentia, Pregio, Carnival, Frontier, Sorento

Volvo - S40, V50

PSA - Peugeot 206, Citroen C3

Bentley - Continental Coupe

11.    All contracts, contract modifications, and contract revisions concerning all Early

6

Payment Programs, or programs which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period including, but not limited to, contracts involving the following vehicles:

Ford - Taurus, Sable, Mustang, Focus, Explorer, Mountaineer, Aviator, Escort, Crown Victoria/Grand, Explorer Sport Trac, Explorer, Marquis, Cougar, Continental, Sport, Econoline, Villager, Lincoln LS, Towncar, Thunderbird, Windstar, Escape, Expedition, Navigator, Excursion, Ranger, F-Series LD & HD, Blackwood, Transit, StreetKa, Mondeo, Fiesta, Freestar/Monterey,

DaimlerChrysler - Concorde, Intrepid, 300M, Neon, Ram Pick-up, Ram Van, Dakota, Stratus, Sebring, Durango, Voyager, Caravan, Town & Country, Smart, Jeep Wrangler, Jeep Liberty, Grand Cherokee, PT Cruiser, Pacifica

Mercedes - A-Class, C-Class, E-Class, SLK, Atego, Actros, Sprinter, CLK, Vario

General Motors - Cadillac, Silverado, Sierra, Astro, Safari, Blazer, S10-Pickup, Sonoma, SRX, Medium Duty Trucks, Cadilac CTS, Malibu, Cadilac SRX

Saturn - LS/LW, Saturn VUE

Opel - Omega, Astra, Agila, Corsa, Vectra, Zafira, Meriva

Honda - Accord, Civic, Acura EL, Acura Odyssey, Passport, Acura MDX, TL/CL, Pilot

Mazda - Mazda 626, Atenza, Tribute, B-Series Pickup

Toyota - Avalon, Camry, Solara, Corolla, Sienna, Tacoma, Tundra, Sequoia, Vios, Xiali, Matrix, Vibe, RX330, Crown

Renault - Clio, Twingo, Megane, Kangoo,

Nissan - Sentra, Micra, Quest, Xterra, Frontier, Titan, Pathfinder

Isuzu - Rodeo, Amigo, Axiom

VW - Passat, Golf/Bora, GOL, Polo, Touareg, Kombi, Santana, Transporter/Microbus, Fox, Jetta, Armada

Audi - A3, A4, A6, Cabrio

Skoda - Felicia, Fabia, Octavia

BMW - 1 Series, 3 Series, 5 Series, X5

Fiat - Marea, Punto, Bravo, Brava, Ducato, Palio, Panda, Stilo, Multipla, Uno

Alfa Romeo - 147, 156, 166, GTV, Spider

Lancia - Lybra, Thesis, Y

Porsche - Cayenne

Land Rover - Range Rover

Jaguar - XJ, S-Type

Suzuki - Wagon R

Hyundai - Eqquus, Teracan, Galloper, Starex, Libero, Grace, SantaFe

Kia - Spectra, Rio, Optima, Sportage, Carens, Retona, Enterprise, Potentia, Pregio, Carnival, Frontier, Sorento

Volvo - S40, V50

PSA - Peugeot 206, Citroen C3

Bentley - Continental Coupe

12.    All correspondence concerning all Early Payment Programs, or programs which resulted in the accelerated collection of receivables, that was in effect at any time during the Class Period.

13.    All analyses or memoranda prepared during the period January 1, 2004 through the end of the Class Period concerning projected cash needs for the Company.

14.    All analyses or memoranda prepared during the period January 1, 2004 through the end of the Class Period concerning working capital projections by Tower.

15.    All documents provided to Deloitte & Touche LLP and Arthur Andersen LLP,

concerning the Early Payment Program, or program which resulted in the accelerated collection of receivables, and/or accounting for Early Payment Programs, and/or Tower's disclosures as they relate to the Early Payment Programs.

16.    All documents received from Deloitte & Touche LLP or Arthur Andersen LLP concerning the Early Payment Program, or program which resulted in the accelerated collection of receivables, and/or accounting for Early Payment Programs, and/or Tower's disclosures as they relate to the Early Payment Programs.

17.    All documents describing or discussing Tower's stated accounting policies concerning accounts receivable, cash receipts, billing adjustments, interest expense, factoring of receivables, and early payment arrangements.

18.    All documents concerning any and all meetings of the Board of Directors of Tower, including, but not limited to, all materials presented at, prepared for, disseminated at, or prepared after or in connection with, any Board Meetings and all agendas, e-mails, reports, notes taken at, minutes, and all correspondence in connection with any Board Meetings concerning the Three Relevant Issues.

19.    All internal memoranda, reports, correspondence, or analyses concerning Tower's liquidity, during the period January 1, 2004 to the end of the class period.

20.    All documents, including internal memoranda, concerning the accuracy, adequacy, fairness or completeness of the disclosures contained in any of Tower's public reports, filings, or other statements concerning the Three Relevant Issues.

21.    All Company prepared prospective financial documents, including all documents concerning any Tower business or strategic plan, forecasts, budgets or projections, whether prepared for internal use or for public dissemination, during the period January 1, 2004 to the end

9

of the Class Period.

22.    All documents during the period January 1, 2004 to the end of the Class Period (a) analyzing or discussing comparisons of Tower's actual financial results to plans, forecasts, or projections; and/or (b) explaining any variances in comparison of actual results to plans, forecasts or projections.

23.    All documents dated, prepared, delivered, received, or relating to the Class Period concerning any contemplated, proposed or actual communication or meeting between any Defendant in this Securities Litigation and any prospective or actual securities broker, money manager, stock market professional, financial or securities analyst, market maker, investment banker, brokerage firm, investment firm, investment banking firm, underwriter, financial or investment advisor, public relations firm, securities rating service, business wire service, financial or other publication, news service, journalist, and/or any representative of the news media, during which any of the Three Relevant Issues was referred to or discussed (including, without limitation, any scripts or outlines of responses to analysts inquiries, including any telephone logs or message slips reflecting the making, receipt or return of telephone calls to securities analysts).

24.    All reports, newsletters, statements, articles, summaries and other documents prepared or published by any securities broker, money manager, stock market professional, financial or securities analyst, market maker, investment banker, brokerage firm, investment firm, investment banking firm, underwriter, financial or investment advisor, public relations firm, securities rating service, business wire service, financial or other publication, news service, journalist, and/or any representative of the news media, with respect to Tower concerning the Three Relevant Issues.

25.    All documents concerning any meeting and/or conference call you or any Defendant had with investors and/or securities analysts, including all drafts of scripts, memoranda or other documents used to prepare for Question and Answer portion of the meeting and/or conference call, concerning the Three Relevant Issues.

26.    All communications you or any Defendant had with securities analysts concerning the Three Relevant Issues, including but not limited to documents identifying who met and/or communicated with the analysts, which analysts, all documents provided, all documents created in preparation, all documents reflecting statements made to analysts, all analyst reports and all communications about analyst reports.

27.    All minutes, memoranda, summaries, transcripts, texts, notes, video or audio recordings, computer diskettes, slides and other documents concerning or prepared in connection with or distributed or presented in connection with any conference or symposium at which the Three Relevant Issues were referred to or discussed.

28.    All documents concerning any correspondence or communications between any of the Defendants on the one hand, and any of Tower customers, lenders, banks, financing companies, syndication agents for Tower's lenders, outside auditors, consultants, members of Tower's Board, or any other persons, on the other hand, concerning the Three Relevant Issues.

29.    All documents relied upon by defendant Kathleen Ligocki when she testified that "[t]he company was very tight on cash when I joined [in August 2003]. See Complaint ¶ 135.

30.    All documents relied upon by defendant Kathleen Ligocki when she testified that when she joined Tower "the Company was fragile, we were extremely short of cash...." See Complaint ¶ 135.

31.    All copies of reports, studies, analyses, or internal memoranda, concerning the

11

Early Payment Program, or program which resulted in the accelerated collection of receivables.

     32.     All documents concerning any investigation of Tower and/or the Individual Defendants, by the SEC or any other governmental or regulatory agency, including but not limited to, all documents produced to the SEC and/or any other governmental or regulatory agency, copies of all transcripts of any testimony provided, all subpoenas and notices received in connection with such investigation(s) and responses, as well as all communications between Tower and/or the Individual Defendants, on the one hand, and the SEC and/or such other governmental or regulatory agency(ies), on the other hand.

     33.     All documents concerning the timing of the release of information about Tower to the public concerning (1) the Three Relevant Issues and/or (2) the loss of credit facilities.

     34.     All documents concerning the withholding of the release of information concerning Tower to the public concerning (1) the Three Relevant Issues and/or (2) the loss of credit facilities.

     35.     Documents sufficient to show the extent to which auto manufacturers guaranteed any amounts furnished by General Electric Credit Corporation to Tower pursuant to the Early Payment Program.

     36.     All documents relied upon by defendant Kathleen Ligocki when she stated in a February 2, 2005 press release that "the recent termination of early pay programs at certain auto makers has adversely affected our liquidity," (see Complaint ¶ 169) including all analyses or studies of the effect of loss of the Early Payment Program on Tower.

     37.     All documents which analyze, discuss or calculate the effect of General Electric Credit Corporation's early payment transactions on Tower's liquidity.

     38.     Documents sufficient to identify the individuals responsible for calculating the

effect of Tower's early payment transactions on Tower's financial statements.

39.    All summaries, analyses, or internal memoranda concerning Tower's vulnerability to a severe impact (*i.e.* insolvency or bankruptcy) if the Early Payment Program were to come to an end.

40.    All communications with Tower's lenders, banks, and/or financing companies concerning Tower's attempts to secure a solution to the liquidity programs that arose from the termination of the early payment program, including but not limited to a copy of the term sheet(s) and due diligence referred to in an October 20, 2004 Form 8-K Tower filed with the SEC. *See* Complaint ¶ 146.

41.    All communications with Tower's lenders, banks, financing companies, syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders, regarding Tower's compliance with any debt covenants in any of its credit agreements, loan documents or credit facilities, including but not limited to any requests by Tower for waivers of the limits of such debt covenants, for the period from January 1, 2004 to the end of the Class Period. This includes all documents concerning meetings or discussions you had (either in person or by e-mail).

42.    All communications with Tower's lenders, banks, financing companies, syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders, concerning Tower's Early Payment Program or accelerated collection of receivables, including, but not limited to, (1) the effect of the Early Payment Program on Tower's ability to comply with its debt covenants and (2) the termination of the Early Payment Program.

43.    All communications with Tower's lenders, banks, financing companies, syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders,

regarding the securitization of Tower's accounts receivable for the period from January 1, 2004 to the end of the class period..

44.     All documents concerning any meetings you or any Defendant had with any of Tower's lenders, banks, financing companies, syndication agents for Tower's lenders, and/or administrative agents for Tower's lenders, regarding the Early Payment Program, including but not limited to any handwritten notes, PowerPoint slide presentations, reports, memos or correspondence.

45.     All memoranda, summaries or analyses concerning the severe impact (*i.e.* insolvency or bankruptcy) which Tower experienced when the Early Payment Programs came to an end.

46.     All documents which refer or relate to Tower's disclosure policy with regard to the Early Payment Program.

47.     All documents which refer or relate to Tower's disclosure policy with regard to its early payment arrangements with Ford Motor Company.

48.     All documents which refer or relate to Tower's disclosure policy with regard to its early payment arrangements with General Motors Corporation.

49.     All documents which refer or relate to Tower's disclosure policy with regard to its early payment arrangements with the DaimlerChrysler.

50.     All summaries, analyses, memoranda, computations or studies concerning or discussing the effect of the Early Payment Program or accelerated collection of receivables on Tower's working capital levels.

51.     Copies of Tower's credit facilities with its lenders during the Class Period, including all amendments and modifications thereto.

14

52.     All documents concerning or forming the basis for Dugald K. Campbell's statement during the April 22, 2003 conference call regarding the amount of Tower's account receivable acceleration that: "We don't - we don't share that information." See Complaint ¶ 62.

53.     All documents concerning or forming the basis for defendant James A. Mallak's statement during the July 27, 2004 conference call regarding the balance on Tower's early payment program that: "We really have not given that out. We are on a -- in North America, on the accelerated programs with most of the OEMs, but we have never really given that amount out." See Complaint ¶ 144.

54.     All documents concerning or forming the basis for defendant James A. Mallak's statement during the July 27, 2004 conference call that: "We do have some other alternatives that we could pursue to offset that [termination of early payment programs], so we are working on some other initiatives that, if that did come about, where we could-off set that impact to us." See Complaint ¶ 144.

55.     All summaries, analyses, memoranda, computations or studies concerning the effect of Tower's accelerated collection of receivables on Tower's operating cash flows.

56.     All documents concerning the fact that, as represented in Tower's October 20, 2004 Form 8-K, the early payment plans in which Tower participated were "off-balance sheet payment plans." Complaint ¶ 146.

57.     All documents concerning the fact that, as disclosed in Tower's October 20, 2004 Form 8-K, the early payment plans in which Tower participated were "facilitated by third parties." Complaint ¶ 146.

58.     All documents concerning the fact that, as disclosed in Tower's October 20, 2004 Form 8-K, termination of the Early Payment Programs would have a liquidity impact of Ford $80

Million, General Motors $25 Million, and DaimlerChrysler $35 Million. See Complaint ¶ 146.

59.     All documents concerning the fact that, as disclosed in Tower's October 20, 2004 Form 8-K, "Tower Automotive has secured a solution to offset the one time liquidity impact of the plan termination," including but not limited to the term sheet(s) and due diligence referred to in the October 20, 2004 8-K. See Complaint ¶ 146.

60.     All documents concerning the efforts of Rothschild, Inc. to improve Tower's capital structure, de-lever the balance sheet, and/or enhance Tower's liquidity options.

61.     All documents concerning contemplated or considered restatements of any of Tower's previously issued financial statements arising from the Three Relevant Issues.

62.     All modifications of credit terms or credit arrangements between Tower and its creditors.

63.     A copy of organization charts used by the Company during the Class Period.

64.     All communications between Tower and Deloitte & Touche LLP and/or Arthur Andersen LLP concerning the Three Relevant Issues, including but not limited to all management representation letters supplied by Tower concerning the Three Relevant Issues.

65.     All contracts between Tower and General Electric Credit Corporation regarding the Early Payment Program.

66.     All communications between Tower and General Electric Credit Corporation regarding accelerated payment to Tower of accounts receivable owed to Tower by OEMs or about the Early Payment Program.

67.     Documents sufficient to show the amount of Tower's accounts receivable from all OEMs that were subject to accelerated payment under the Early Payment Program, and/or any and all other financing programs by which Tower received accelerated payment on accounts receivable

owed to Tower by OEMs otherwise, on a daily basis, during each fiscal quarter of the Class Period.

68.     All communications (including but not limited to correspondence and e-mails), from or to any defendant concerning the Early Payment Program or any and all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEMs.

69.     All communications to or from an OEM concerning the Early Payment Program or any and all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEMs, including all documents advising or warning Tower of the termination of the Early Payment Program.

70.     All documents written by, sent to, or reviewed by any Defendant concerning any contingency plans or other provisions by Tower in the event that the OEMs or General Electric Credit Corporation terminated the Early Payment Program.

71.     All correspondence, analyses, memoranda, board minutes, or board committee minutes concerning the reasons for termination of the Early Payment Program or any or all other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by OEMs.

72.     All documents concerning Tower's disclosure in its public filings and statements of information regarding the Early Payment Program, or any other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by the OEM's.

73.     All communications to or from the SEC concerning the Early Payment Program or any other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by the OEMs. This request includes copies in Tower's possession of documents sent by or to third-parties, including the OEMs.

74.     All documents including, but not limited to, workpapers, correspondence, memoranda

17

and handwritten notes, discussing the impact of Tower's operating results on its compliance with its financing agreements which underlay the Early Payment Program, or any other financing programs by which Tower received accelerated payment on accounts receivable owed to Tower by the OEMs.

75.     All documents concerning Tower's plans, options, strategies or analyses to maintain liquidity in the event the Early Payment Programs were terminated or modified by the OEMs.

### C.     Integration Efforts

76.     All summaries, analyses, memoranda, computations or studies on which the Company relied in stating that it had extracted significant cost savings and/or synergies through integration of acquired businesses into Tower's operations.

77.     All documents relied upon by defendant Kathleen Ligocki when she stated during an October 23, 2003 conference call that Tower had been "prevented ... from leveraging economies of scale" and that "[i]nsufficient focus [was] given to post-merger integration, financial discipline and operational excellence."   See Complaint ¶ 39.

78.     All documents relied upon by defendant Kathleen Ligocki when she stated during an October 23, 2003 conference call that Tower had failed to do the "streamlining as it should have as it bought various companies."   See Complaint ¶ 40.

79.     All documents relied upon by defendant Kathleen Ligocki when she stated during an October 23, 2003 conference call that each Tower plant "acted like its own $100 million to $300 million unit," and they "should have been integrated earlier as they were bought."   See Complaint ¶ 40.

80.     All documents relied upon by defendant Kathleen Ligocki when she stated on April 29, 2004 that Tower was still focusing on "the integration of our operations into a greater whole" and that "we've just begun." Complaint ¶ 44.

81.   All analyses, memoranda, or reports concerning Tower's success or failure at extracting significant cost savings and synergies from its acquisitions.

82.   All documents and communications concerning policies, plans or strategies with respect to Tower's extraction of significant cost savings and synergies from its acquisitions.

83.   All documents supporting the statement in Tower's December 21, 2000 S-4/A and its January 9, 2001 424B3 Statement that Tower had "successfully integrat[ed] multiple acquisition and extract[ed] significant cost savings and synergies."

**D.    Auditors and Financial Reporting**

84.   All documents concerning Tower's year-end audits that refer, relate to or discuss the Three Relevant Issues.

85.   All documents concerning Tower's quarterly review of its finances for the purpose of preparing its Class Period Form 10-Q's concerning or discussing the Three Relevant Issues, including but not limited to documents concerning the Three Relevant Issues that relate to or provide the basis for the Sarbanes Oxley Certifications attached to each 10-Q.

86.   Documents sufficient to reflect the identity of the persons at Arthur Andersen LLP and Deloitte & Touche LLP who participated in any professional engagement of or provided professional services to Tower.

87.   All communications between Tower and its outside auditors regarding the Three Relevant Issues.

88.   All audit opinions concerning the Three Relevant Issues.

**E.    Miscellaneous**

89.   All documents concerning your policies for the retention or destruction of documents.

90.   All documents which concern the timing and/or the withholding of release to the public

by Tower of information regarding the Three Relevant Issues. This includes but is not limited to correspondence, memoranda and handwritten notes, concerning the accuracy or adequacy of the disclosures made by Tower on these issues in Tower's annual, quarterly or other reports, press releases, registration statements, or other public filings or statements.

91. All management letters, reports, reviews, analyses, and other documents issued by Tower's auditors or by third parties at Tower's request concerning (1) the Early Payment Program, (2) any other arrangement whereby Tower received accelerated payment of accounts receivable from OEM's, (3) the amount of receivables subject to the Early Payment Program or any similar program and/or (4) the success or failure of efforts to integrate entities acquired by Tower.

92. All documents concerning the sale of Tower stock by J2R Partners, Hidden Creek Industries, Inc., Dugald Campbell, S.A. Johnson, and Scott D. Rued, without regard to any limitation of time otherwise applicable to these requests.

93. All documents concerning disagreements or differences in opinion on accounting or auditing matters concerning the Three Relevant Issues. This request includes documents concerning disagreements between Tower and its outside auditors or consultants, and documents concerning disagreements within Tower, Tower's Board of Directors, and Committees of the Board of Directors.



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————  )
                                                      )   Chapter 11
                                                      )
In re                                                 )
                                                      )   Case No. 05-10578 (ALG)
TOWER AUTOMOTIVE, INC., et al.,[1]                    )   Jointly Administered
                                                      )
——— —————————————————————  )


**JOINT PLAN OF TOWER AUTOMOTIVE, INC. AND ITS
DEBTOR SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

KIRKLAND & ELLIS LLP
Richard M. Cieri (RC-6062)
Lisa G. Laukitis (LG-9248)
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

Attorneys for the Debtors and Debtors in
Possession

KIRKLAND & ELLIS LLP
Anup Sathy P.C. (AS-4915)
Ross M. Kwasteniet (RK-1653)
AON Center
200 East Randolph Drive
Suite 5400
Chicago, Illinois 60601
Telephone:        (312) 861-2000
Facsimile:        (312) 861-2100

Attorneys for the Debtors and Debtors in
Possession

Dated: May 1, 2007

---

[1]    The Debtors are the following entities: Tower Automotive, Inc.; Algoods, USA, Inc.; R.J. Tower Corporation;
Tower Automotive Bardstown, Inc.; Tower Automotive Bowling Green, LLC; Tower Automotive Chicago,
LLC; Tower Automotive Finance, Inc.; Tower Automotive Granite City, LLC; Tower Automotive Granite City
Services, LLC; Tower Automotive International, Inc.; Tower Automotive International Holdings, Inc.; Tower
Automotive International Yorozu Holdings, Inc.; Tower Automotive Lansing, LLC; Tower Automotive
Madison, LLC; Tower Automotive Michigan, LLC; Tower Automotive Milwaukee, LLC; Tower Automotive
Plymouth, Inc.; Tower Automotive Products Company, Inc.; Tower Automotive Receivables Company, Inc.;
Tower Automotive Services and Technology, LLC; Tower Automotive, s.r.o.; Tower Automotive Technology,
Inc.; Tower Automotive Technology Products, Inc.; Tower Automotive Tool, LLC; Tower Services, Inc.; and
Trylon Corporation.

**TABLE OF CONTENTS**

**Page**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND
    DEFINED TERMS ................................................................................................................1
    A.    Rules of Interpretation, Computation of Time and Governing Law ........................1
    B.    Defined Terms ..........................................................................................................1

ARTICLE II. ADMINISTRATIVE AND PRIORITY TAX CLAIMS ............................................15
    A.    Administrative Claims ............................................................................................15
    B.    DIP Facility Claims.................................................................................................16
    C.    Priority Tax Claims .................................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
    INTERESTS......................................................................................................................17
    A.    Summary .................................................................................................................17
    B.    Classification and Treatment of Claims and Equity Interests ...............................17
    C.    Intercompany Claims ..............................................................................................20
    D.    Special Provision Governing Unimpaired Claims .................................................21
    E.    Special Provisions Regarding Subordinated Securities Claims .............................21
    F.    Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims.................21

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ...............................................21
    A.    Voting Classes ........................................................................................................21
    B.    Acceptance by Voting Classes ...............................................................................21
    C.    Presumed Acceptance of Plan ................................................................................22
    D.    Presumed Rejection of Plan ....................................................................................22
    E.    Non-Consensual Confirmation ...............................................................................22

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .............................................22
    A.    Sale of Assets..........................................................................................................22
    B.    Post-Consummation Trust.......................................................................................22
    C.    Unsecured Creditors Trust ......................................................................................23
    D.    Restructuring Transactions .....................................................................................23
    E.    Substantive Consolidation.......................................................................................23
    F.    Cancellation of Notes and Equity Interests ...........................................................23
    G.    Creation of Retained Professional Escrow Account ..............................................24
    H.    Retention by Debtors and Post-Consummation Trust of Other Actions ................24
    I.    Corporate Action.....................................................................................................24
    J.    D&O Tail Coverage Policies ...................................................................................24
    K.    ERISA Settlement Agreement ................................................................................24
    L.    Sources of Cash for Plan Distribution....................................................................24
    M.    Release of Liens......................................................................................................24
    N.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes.............25
    O.    Modification of Retiree Benefits.............................................................................25

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............................25
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ...........25
    B.    Executory Contracts and Unexpired Leases to Be Rejected .................................25
    C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.............26
    D.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to the
        Plan ........................................................................................................................26
    E.    Assumption of D&O Insurance Policies .................................................................26

i

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ....................................................26
    A.    Distributions for Claims Allowed as of the Effective Date.................................26
    B.    Delivery and Distributions and Undeliverable or Unclaimed Distributions ........27
    C.    Timing and Calculation of Amounts to be Distributed .......................................28
    D.    Minimum Distribution .......................................................................................28
    E.    Setoffs ...............................................................................................................28
    F.    Surrender of Cancelled Instruments or Securities ..............................................29

ARTICLE VIII. THE POST-CONSUMMATION TRUST; THE POST-CONSUMMATION TRUST
PLAN ADMINISTRATOR ......................................................................................................29
    A.    Generally............................................................................................................29
    B.    Purpose of the Post Consummation Trust ..........................................................29
    C.    Transfer of Assets to the Post-Consummation Trust ..........................................29
    D.    Distribution; Withholding ..................................................................................30
    E.    Insurance ............................................................................................................30
    F.    Post-Consummation Trust Implementation ........................................................30
    G.    Disputed Claims Reserve ...................................................................................30
    H.    Termination of the Post-Consummation Trust ...................................................30
    I.    Termination of the Post-Consummation Trust Plan Administrator.......................31
    **J.**    **Exculpation; Indemnification** .........................................................................31
    K.    Cooperation with Unsecured Creditors Trust......................................................31

ARTICLE IX. THE UNSECURED CREDITORS TRUST; THE UNSECURED TRUST PLAN
ADMINISTRATOR ..................................................................................................................31
    A.    Generally............................................................................................................31
    B.    Purpose of the Unsecured Creditors Trust ..........................................................31
    C.    Transfer of Assets to the Unsecured Creditors Trust ..........................................32
    D.    Distribution; Withholding ..................................................................................32
    E.    Insurance ............................................................................................................32
    F.    Unsecured Creditors Trust Implementation ........................................................32
    G.    Disputed Claims Reserve ...................................................................................32
    H.    Termination of the Unsecured Creditors Trust....................................................33
    I.    Termination of the Unsecured Creditors Trust Plan Administrator ......................33
    **J.**    **Exculpation; Indemnification** .........................................................................33
    K.    Cooperation with Post-Consummation Trust ......................................................33

ARTICLE X. PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED
CLAIMS OR EQUITY INTERESTS .......................................................................................33
    A.    Resolution of Disputed Claims ..........................................................................33
    B.    Claims Allowance ..............................................................................................34
    C.    Controversy Concerning Impairment .................................................................34

ARTICLE XI. SUBSTANTIVE CONSOLIDATION.................................................................34
    A.    Consolidation of the Chapter 11 Cases ..............................................................34
    B.    Substantive Consolidation Order ........................................................................35
    C.    Reservation of Rights .........................................................................................35

ARTICLE XII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ........................................................................................................................................35
    A.    Conditions Precedent to Confirmation ...............................................................35
    B.    Conditions Precedent to Consummation .............................................................36
    C.    Waiver of Conditions .........................................................................................36
    D.    Effect of Non Occurrence of Conditions to Consummation .................................36

ARTICLE XIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS .................37
    A.    Compromise and Settlement ..............................................................................37

K&F 11752289.17

| | | |
|---|---|---|
| B. | Releases by the Debtors | 37 |
| C. | Third Party Release | 38 |
| D. | Exculpation | 39 |
| E. | Indemnification | 39 |
| F. | Preservation of Rights of Action | 40 |
| **G.** | **INJUNCTION** | 40 |

ARTICLE XIV. RETENTION OF JURISDICTION ........................................................ 42

ARTICLE XV. MISCELLANEOUS PROVISIONS ........................................................ 43
| | | |
|---|---|---|
| A. | Effectuating Documents, Further Transactions and Corporate Action | 43 |
| B. | Dissolution of Committee | 43 |
| C. | Payment of Statutory Fees | 44 |
| D. | Modification of Plan | 44 |
| E. | Revocation of Plan | 44 |
| F. | Successors and Assigns | 44 |
| G. | Reservation of Rights | 44 |
| H. | Section 1146 Exemption | 44 |
| I. | Further Assurances | 45 |
| J. | Severability | 45 |
| K. | Service of Documents | 46 |
| L. | Filing of Additional Documents | 46 |

**JOINT PLAN OF TOWER AUTOMOTIVE, INC. AND ITS
DEBTOR SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, Tower Automotive, Inc. and the other Debtors in the above-captioned cases hereby respectfully propose the following joint Chapter 11 plan:

## ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

*A.      Rules of Interpretation, Computation of Time and Governing Law*

1.      For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be, and (i) the terms of the Plan are not intended to alter the terms of the Purchase Agreement in any way and in the event of any inconsistency between the terms of the Plan and the Purchase Agreement the terms of the Purchase Agreement shall control.

2.      The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

3.      Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of New York, without giving effect to the principles of conflict of laws thereof.

*B.      Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*5.75% Convertible Senior Note Claims*" means all Claims derived from or based upon the 5.75% Convertible Senior Notes and the 5.75% Convertible Senior Note Indenture.

2.      "*5.75% Convertible Senior Note Indenture*" means that certain indenture between Tower Automotive, Inc., and BNY Midwest Trust Company, as trustee, and HSBC Bank USA, National Association, as successor indenture trustee, dated May 24, 2004.

3.     "*5.75% Convertible Senior Notes*" means the 5.75% convertible senior notes due May 15, 2024, issued pursuant to the 5.75% Convertible Senior Note Indenture.

4.     "*6.75% Trust Convertible Subordinated Debenture*" means that certain debenture between Tower Automotive, Inc. and The First National Bank of Chicago, as trustee, and Wells Fargo Bank, N.A., as successor trustee, dated June 9, 1998, pursuant to which Tower Automotive Capital Trust issued the 6.75% Trust Preferred Securities.

5.     "*6.75% Trust Convertible Subordinated Debenture Claims*" means all Claims derived from or based upon the 6.75% Trust Convertible Subordinated Debenture and the 6.75% Trust Preferred Securities.

6.     "*6.75% Trust Preferred Securities*" means the $258.8 million of trust preferred securities issued by Tower Automotive Capital Trust.

7.     "*9.25% Senior Euro Note Claims*" means all Claims derived from or based upon the 9.25% Senior Euro Notes and the 9.25% Senior Euro Note Indenture.

8.     "*9.25% Senior Euro Note Indenture*" means that certain indenture between R.J. Tower, the guarantors named therein, and the United States Trust Company of New York, as trustee, and Bank of New York, as successor trustee, dated July 25, 2000.

9.     "*9.25% Senior Euro Notes*" means those 9.25% senior notes due August 1, 2010, issued pursuant to the 9.25% Senior Euro Note Indenture.

10.     "*12% Senior Note Claims*" means all Claims derived from or based upon the 12% Senior Notes and the 12% Senior Note Indenture.

11.     "*12% Senior Note Indenture*" means that certain indenture among R.J. Tower, Tower, Inc., the subsidiary guarantors named therein and BNY Midwest Trust Company, as trustee, dated June 13, 2003.

12.     "*12% Senior Notes*" means those 12% senior notes due June 1, 2013, issued pursuant to the 12% Senior Note Indenture.

13.     "*Accrued Professional Compensation*" means, at any given moment, all accrued and/or unpaid fees and expenses (including, but not limited to, success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered prior to the Confirmation Date by all Retained Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

14.     "*Acquired Assets*" shall have the meaning set forth in the Purchase Agreement.

15.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the respective Estates and operating the businesses of the Debtors; (b) Allowed Professional Compensation; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930.

16.     "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

17.     "*Allowed Professional Compensation*" means all Accrued Professional Compensation allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

2

18.      "*Allowed ... Claim*" means an Allowed Claim in the particular Class or category specified. Any reference herein to a particular Allowed Claim includes both the secured and unsecured portions of such Claim, as applicable.

19.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors in their Schedules as neither disputed, contingent nor unliquidated and for which the claim amount has not been identified as unknown, and as to which Debtors or other party in interest has not Filed an objection by the Claims Objection Bar Date; (b) a Claim that either is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with Debtors of amount and nature of Claim executed on or after the Confirmation Date and approved by the Bankruptcy Court after notice (including notice to the Purchaser) and a hearing; or (iii) in or pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (d) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been Filed by the applicable bar date or has otherwise been deemed timely Filed under applicable law; (e) a Claim that is allowed pursuant to the terms hereof; or (f) a Disputed Claim as to which a proof of claim has been timely filed and as to which no objection has been filed by the Claims Objection Bar Date.

20.      "*Assumed Contracts*" means those contracts and leases of the Debtors to be assumed and assigned to the Purchaser pursuant to the Purchase Agreement.

21.      "*Assumed Liabilities*" has the meaning set forth in the Purchase Agreement.

22.      "*Auction*" has the meaning set forth in the Marketing Protocol.

23.      "*Ballots*" mean the ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions, and which must be actually received on or before the Voting Deadline.

24.      "*Bankruptcy Code*" means title 1 of the Bankruptcy Reform Act of 1978, as set forth in sections 101 et seq. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code, in each case, as applicable to the Chapter 11 Cases.

25.      "*Bankruptcy Court*" means, collectively, the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

26.      "*Bankruptcy Rules*" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General, Local and Chambers Rules of the Bankruptcy Court.

27.      "*Beneficiaries*" means the Holders of Claims that are to be satisfied under the Plan by post-Effective Date distributions to be made by the Trusts, respectively.

28.      "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

29.      "*Cash*" means legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and Cash Equivalents.

3

30. "*Cash Equivalents*" means equivalents of Cash in the form of readily marketable securities or instruments issued by a Person, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "A" or better, or equivalent rating of any other nationally recognized rating service, or interest bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or capital of not less than one hundred million dollars ($100,000,000) having maturities of not more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

31. "*Causes of Action*" means all actions, causes of action, claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based on whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

32. "*Chapter 5 Claims*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non bankruptcy law, including, without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, 553(b) and 724(a) of the Bankruptcy Code.

33. "*Chapter 11 Cases*" means (i) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (ii) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

34. "*Claim*" means a "claim" (as defined in section 101(a)(5) of the Bankruptcy Code) against a Debtor.

35. "*Claims Objection Bar Date*" means, for each Claim, the later of (a) 365 days after the Effective Date, and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

36. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

37. "*Class 6 Recovery*" means its Pro Rata share of the proceeds of the Post-Consummation Trust Residual Assets.

38. "*Class 7 General Unsecured Creditor*" means each Holder of a General Unsecured Claim against any of the Debtors other than R.J. Tower, and each Holder of a Reclamation Claim.

39. "*Class 7 Recovery*" means its Pro Rata share of the proceeds of the Post-Consummation Trust Residual Assets.

40. "*Committee*" means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases on February 15, 2005, pursuant to section 1102 of the Bankruptcy Code, comprising the Committee Members and as reconstituted from time to time.

41. "*Committee Members*" means the members of the Committee, namely: (i) MST Steel Corporation of Kentucky, (ii) The Bank of New York, as Indenture Trustee, (iii) HSBC Bank USA, National Association, as Indenture Trustee, (iv) Camulos Capital LP, (v) Comau Pico, (vi) Wells Fargo Bank, National Association, as Indenture Trustee, and (vii) Pension Benefit Guaranty Corporation, and any predecessors of such entities.

4

42.     "*Committee Professionals*" means Akin Gump Strauss Hauer & Feld LLP, as legal advisor to the Committee; Houlihan, Lokey, Howard & Zukin, as financial advisor to the Committee; Cervantes, Aguilar-Alvarez y Sainz, S.C. as special Mexican counsel; and Stutman Treister & Glatt, as conflicts counsel.

43.     "*Common Equity Interest*" means any common Equity Interest in a Debtor that existed immediately prior to the Effective Date, including, but not limited to, all issued, unissued, authorized or outstanding shares of common stock, together with any warrants, options or legal, contractual or equitable rights to purchase or acquire such interests at any time.

44.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article XI.A having been: (a) satisfied; or (b) waived pursuant to Article XI.C.

45.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rule 5003 and 9021.

46.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

47.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

48.     "*Consummation*" means the occurrence of the Effective Date.

49.     "*Creditor*" means any Holder of a Claim.

50.     "*Debtor*" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

51.     "*Debtor Release*" means the release given by the Debtors to the Debtor Releasees set forth in Article XIII.B.

52.     "*Debtor Releasees*" means, collectively, (a) all current and former officers, directors and employees of the Debtors and their subsidiaries, (b) all attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents (including those jointly retained with the Committee), affiliates and representatives of the Debtors and their subsidiaries and (c) the Third Party Releasees, their respective predecessors and successors in interest, and all of their respective current and former members (including *ex officio* members), officers, directors, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives.

53.     "*Debtors*" means, collectively, Tower Automotive, Inc.; Algoods, USA, Inc.; R.J. Tower Corporation; Tower Automotive Bardstown, Inc.; Tower Automotive Bowling Green, LLC; Tower Automotive Chicago, LLC; Tower Automotive Finance, Inc.; Tower Automotive Granite City, LLC; Tower Automotive Granite City Services, LLC; Tower Automotive International, Inc.; Tower Automotive International Holdings, Inc.; Tower Automotive International Yorozu Holdings, Inc.; Tower Automotive Lansing, LLC; Tower Automotive Madison, LLC; Tower Automotive Michigan, LLC; Tower Automotive Milwaukee, LLC; Tower Automotive Plymouth, Inc.; Tower Automotive Products Company, Inc.; Tower Automotive Receivables Company, Inc.; Tower Automotive Services and Technology, LLC; Tower Automotive, s.r.o.; Tower Automotive Technology, Inc.; Tower Automotive Technology Products, Inc.; Tower Automotive Tool, LLC; Tower Services, Inc.; and Trylon Corporation.

54.     "*Debtors in Possession*" means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases.

55.     "*DIP Agent*" means JPMorgan Chase Bank, N.A., in its capacity as agent for the DIP Lenders, and any successor agent therefore appointed pursuant to the DIP Loan Credit Agreement.

56. "*DIP Arranger*" means J.P. Morgan Securities Inc., in its capacity as sole lead arranger and sole bookrunner under the DIP Loan Credit Agreement.

57. "*DIP Facility*" means that certain $725 million debtor in possession credit facility entered into pursuant to the DIP Loan Credit Agreement and approved by the Bankruptcy Court pursuant to the Final DIP Order comprised of the DIP Revolver and DIP Term Loan.

58. "*DIP Facility Claims*" means the total amount outstanding (exclusive of reserves against revolving facilities for outstanding letters of credit) under the DIP Facility as of the Effective Date.

59. "*DIP Lenders*" means, collectively, those financial institutions party to the DIP Loan Credit Agreement and all permitted assigns, transferees and successors in interest thereto.

60. "*DIP Loan Credit Agreement*" means that certain *Revolving Credit, Term Loan and Guaranty Agreement*, dated February 2, 2005, among the Debtors, the DIP Lenders, the DIP Arranger and the DIP Agent, as amended, supplemented or modified from time to time.

61. "*DIP Revolver*" means that certain $300 million revolving credit facility component of the DIP Facility.

62. "*DIP Term Loan*" means that $425 million term loan component of the DIP Facility, used by the Debtors to repay, in full, certain prepetition first-lien indebtedness.

63. "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* dated May 1, 2007, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and referenced therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

64. "*Disclosure Statement Order*" means an order of the Bankruptcy Court approving the adequacy of the Disclosure Statement.

65. "*Disputed Claim*" means, (a) if no proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law: (i) a Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but as to which the applicable Debtor or, prior to the Confirmation Date, any other party in interest, has Filed an objection by the Claims Objection Bar Date and such objection has not been withdrawn or denied by a Final Order; or (ii) a Claim that is listed on a Debtor's Schedules as disputed, contingent or unliquidated; or (b) if a proof of Claim or request for payment of an Administrative Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law: (i) a Claim for which no corresponding Claim is listed on a Debtor's Schedules; (ii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as it is listed on the Schedules; (iii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as disputed, contingent or unliquidated; (iv) a Claim for which an objection has been Filed by the applicable Debtor or Trust or any other party in interest, by the Claims Objection Bar Date, and such objection has not been withdrawn or denied by a Final Order; or (v) a Tort Claim.

66. "*Disputed Claims Reserve*" means a reserve for any distributions to be set aside by the Plan Administrators administering the Trusts on account of Disputed Claims.

67. "*Distribution Agent*" means any Entity or Entities chosen by the Post-Consummation Trust or the Unsecured Creditors Trust, respectively, which entities may include, without limitation, Indenture Trustees, to make or to facilitate distributions required by the Plan.

68.      "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder, and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

69.      "*Effective Date*" means the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article XII.B have been (i) satisfied or (ii) waived pursuant to Article XII.C.

70.      "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

71.      "*Equity Interest*" means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including, but not limited to, any Common Equity Interest and any Preferred Equity Interest.

72.      "*ERISA Settlement Agreement*" means that certain settlement agreement attached as an exhibit to the ERISA Settlement Motion.

73.      "*ERISA Settlement Motion*" means that certain Motion for an Order Authorizing a Provisional Payment by the Debtors Under Settlement Agreement with ERISA Plaintiffs, filed by the Debtors in the Chapter 11 Cases, located at Bankruptcy Court docket number 1906.

74.      "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

75.      "*Excluded Assets*" has the meaning set forth in the Purchase Agreement.

76.      "*Exculpated Parties*" means: (a) the Debtors; (b) the Post-Consummation Trust; (c) the Unsecured Creditors Trust; (d) the Debtor Releasees, (e) the Purchaser, (f) the Committee, (g) the Committee Members, (h) the Second Lien Agent, (i) the Second Lien Lenders, (j) the Indenture Trustees and (k) all of the officers, directors, employees, members, managed funds, investment advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals and representatives of each of the foregoing Persons and Entities (whether current or former, and in each case in his, her or its capacity as such); *provided*, *however*, that all Non-Released Parties shall be excluded.

77.      "*Exculpation*" means the exculpation provision set forth in Article XIII.D.

78.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

79.      "*Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for the compensation of a Professional or other Entity for services rendered or expenses incurred in the Chapter 11 Cases.

80.      "*File*" or "*Filed*" means file, filed or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

81.      "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

82.      "*Final DIP Order*" means that certain *Corrected Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362 and 364*, entered by the Bankruptcy Court on March 2, 2005, as that order may be amended from time to time.

7

83.    *"Final Order"* means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing will have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

84.    *"First Lien Lenders"* means, collectively, the financial institutions that are First Lien Lenders as such term is defined in the Prepetition Credit Agreement and all permitted assigns, transferees and successors-in-interest thereto.

85.    *"First Lien Agent"* means Silver Point Capital Fund LP, in its capacity as successor administrative agent to Morgan Stanley Senior Funding, Inc. for the First Lien Lenders under the Prepetition Credit Agreement.

86.    *"General Unsecured Claim"* means any Claim against any Debtor that is not a/an (a) Administrative Claim, (b) DIP Facility Claim, (c) Priority Tax Claim, (d) Other Priority Claim, (e) Other Secured Claim, (f) Second Lien Claim, (g) 5.75% Convertible Senior Note Claim, (h) 6.75% Trust Preferred Securities Claim, (i) 9.25% Senior Euro Note Claim, (j) 12% Senior Note Claim, (k) Intercompany Claim, (l) Subordinated Securities Claims or (m) Equity Interest.

87.    *"Holder"* means a Person or Entity holding an Equity Interest or Claim.

88.    *"Impaired"* means, with respect to any Class of Claims or Equity Interests, any Claims or Equity Interests that are impaired within the meaning of section 1124 of the Bankruptcy Code.

89.    *"Impaired Claim"* means a Claim classified in an Impaired Class.

90.    *"Impaired Class"* means each of Classes 4, 5, 6, 7, 8 and 9, as set forth in Article III.

91.    *"Indemnified Parties"* means, collectively, the Debtors and each of their respective current and former members, officers, directors, employees, and partners.

92.    *"Indenture Trustees"* means, collectively, HSBC Bank USA, National Association as successor trustee pursuant to the 5.75% Convertible Senior Note Indenture, Wells Fargo Bank, N.A., as successor trustee pursuant to 6.75% Trust Convertible Subordinated Debenture, Bank of New York, as successor trustee pursuant to the 9.25% Senior Euro Note Indenture, and BNY Midwest Trust Company, as trustee, pursuant to the 12% Senior Note Indenture.

93.    *"Industrial Revenue Bonds"* means those certain (a) $25,000,000 aggregate principal amount City of Bardstown, Kentucky Taxable Variable Rate Demand Industrial Revenue Bonds, Series 1995 (R.J. Tower Corporation Project) and (b) $20,000,000 aggregate principal amount City of Bardstown, Kentucky Taxable Variable Rate Demand Industrial Revenue Bonds, Series 1994 (R.J. Tower Corporation Project).

94.    *"Intercompany Claims"* means any and all Claims and Equity Interests of a Debtor against and in another Debtor.

95.    *"International Holding Company Debtors"* means Tower Automotive International, Inc., and Tower Automotive International Holdings, Inc.

96.    *"Interests"* has the meaning ascribed to it in the Purchase Agreement.

97.    *"IRB Claims"* means the Debtors' obligations under the Industrial Revenue Bonds.

98.    "*Marketing Protocol*" means that certain Marketing Protocol attached as Exhibit A to the Marketing Protocol Order.

99.    "*Marketing Protocol Order*" means that certain Order: Authorizing Entry into Restructuring Term Sheet with Cerberus Capital Management, L.P. to Acquire Substantially All of the Assets of Tower Automotive; (B) Approving Marketing Protocol; and (C) Approving the Form and Manner of Notices entered by the Bankruptcy Court in the Chapter 11 Cases.

100.    "*Net Sale Proceeds*" means the Sale Proceeds remaining after (a) funding the Unsecured Creditors Trust Assets and (b) paying any Allowed Claims pursuant to the terms of the Plan on the Effective Date.

101.    "*Non-Released Parties*" means Holders of Claims in Voting Classes voting to reject the Plan and those Persons listed in the Plan Supplement.

102.    "*Ordinary Course Professionals Order*" means that certain *Order Authorizing the Debtors to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of the Debtors' Businesses*, entered by the Bankruptcy Court on March 16, 2005.

103.    "*Other Actions*" means any and all Causes of Action that are not Chapter 5 Claims and that are Excluded Assets.

104.    "*Other Administrative Claims*" means any and all Administrative Claims that are not a Working Capital Administrative Claim.

105.    "*Other Priority Claim*" means any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, Other Administrative Claim or Working Capital Administrative Claim.

106.    "*Other Secured Claim*" means the IRB Claims and any and all Secured Claims against the Debtors not specifically described herein, *provided, however*, that Other Secured Claims shall not include the DIP Facility Claims or Second Lien Claims.

107.    "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

108.    "*Petition Date*" means February 2, 2005, the date on which the Debtors commenced the Chapter 11 Cases.

109.    "*Plan*" means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or herewith, as the case may be, and the Plan Supplement, which is incorporated herein by reference.

110.    "*Plan Administrators*" means the Post-Consummation Trust Plan Administrator and the Unsecured Creditors Trust Plan Administrator.

111.    "*Plan Objection Deadline*" means July 6, 2007, at 4:00 p.m. (EST).

112.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to be filed no later than July 2, 2007, as it may thereafter be altered, amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents: (a) the Post-Consummation Trust Agreement; (b) a list of the Other Actions; (c) the Unsecured Creditors Trust Agreement; (d) the list of the Plan Administrators; (e) the then-current Purchase Agreement, including schedules thereto; and (f) the list of Retained Contracts, if any.

9

113.    *"Post-Consummation Indemnity Account"* means a segregated account to be established by the Post-Consummation Trust, containing the Post-Consummation Indemnity Account Assets.

114.    *"Post-Consummation Indemnity Account Assets"* means $2 million payable by Purchaser pursuant to Section 2.1(a)(x) of the Purchase Agreement.

115.    *"Post-Consummation Trust"* means that certain trust to be created on the Effective Date in accordance with the provisions of Article VIII and the Post-Consummation Trust Agreement.

116.    *"Post-Consummation Trust Agreement"* means that certain trust agreement, in form and substance satisfactory to the Debtors and the Committee, that, among other things, (a) establishes and governs the Post-Consummation Trust, and (b) describes the powers, duties and responsibilities of the Post-Consummation Trust Plan Administrator and the liquidation and distribution of proceeds of the Post-Consummation Trust Assets.

117.    *"Post-Consummation Trust Assets"* means all assets held from time to time by the Post-Consummation Trust, including, but not limited to, the Remaining Assets, which include, but are not limited to, (i) Excluded Assets, (ii) Other Actions, (iii) Post-Consummation Trust Priority Account Assets, (iv) Post-Consummation Indemnity Account Assets, (v) the Retained Professionals Escrow Account, and (vi) the Net Sale Proceeds, provided, however, that the Post-Consummation Trust Assets shall not include any Acquired Assets or the Unsecured Creditors Trust Assets, including, without limitation, the Residual Chapter 5 Claims.

118.    *"Post-Consummation Trust Budget"* means the budget, in form and substance satisfactory to the Debtors after consultation with the Committee, for Wind-Down Expenses projected to be paid by the Post-Consummation Trust (including, without limitation, Administrative Claims, Other Secured Claims and Priority Claims under the Plan), which budget will be an exhibit to the Post-Consummation Trust Agreement.

119.    *"Post-Consummation Trust Excluded Assets"* means any Assets that are Excluded Assets but which are not Unsecured Creditors Trust Assets, which may be identified by the Debtors, in consultation with the Committee, at any time before the Effective Date, to be excluded from the Post-Consummation Trust Assets.

120.    *"Post-Consummation Trust Plan Administrator"* means the Person designated by the Debtors, in consultation with the Committee, identified in the Plan Supplement, and retained as of the Effective Date as the employee or fiduciary responsible for implementing the applicable provisions of the Plan and administering the Post-Consummation Trust in accordance with the Plan and the Post-Consummation Trust Agreement, and any successor appointed in accordance with the Post-Consummation Trust Agreement. As appropriate, references to the Post-Consummation Trust Plan Administrator shall include any Distribution Agent appointed by the Post-Consummation Trust Plan Administrator.

121.    *"Post-Consummation Trust Priority Account"* means a segregated account to be established by the Post-Consummation Trust, to be administered by the Post-Consummation Trust Plan Administrator, containing the Post-Consummation Trust Priority Account Assets.

122.    *"Post-Consummation Trust Priority Account Assets"* means up to $70 million subject to the terms of the Purchase Agreement, payable by Purchaser pursuant to, and in accordance with the terms of the Purchase Agreement.

123.    *"Post-Consummation Trust Residual Assets"* means all Post-Consummation Trust Assets remaining after all Post-Consummation Trust Senior Claims have been paid in full.

124.    *"Post-Consummation Trust Senior Claims"* means, collectively, any and all (a) Other Administrative Claims, (b) Priority Tax Claims, (c) Other Priority Claims, (d) Other Secured Claims and (e) Allowed Professional Compensation.

125.    *"Preferred Equity Interest"* means any preferred Equity Interest in a Debtor that existed immediately prior to the Effective Date, including, but not limited to, all issued, unissued, authorized or outstanding

10

shares of preferred stock, together with any warrants, options or legal, contractual or equitable rights to purchase or acquire such interests.

126. *"Prepetition Credit Agreement"* means that certain Credit Agreement, dated as of May 24, 2004 (as amended, supplemented or otherwise modified), among R.J. Tower, the lenders party thereto and the letter of credit issuing bank(s) named therein, and all exhibits, schedules and related agreements, documents and instruments, including, without limitation, (i) that certain Intercreditor Agreement, dated as of May 24, 2004, among R.J. Tower Corporation, Tower Automotive, Inc., Morgan Stanley Senior Funding, Inc. and Standard Federal Bank and (ii) that certain Intercompany Subordination Agreement, dated as of May 24, 2004, among the Subordinated Creditors (as defined therein), any other signatories thereto, R.J. Tower Corporation and Morgan Stanley Senior Funding, Inc. as administrative agent (each as amended, supplemented and otherwise modified).

127. *"Priority Tax Claim"* means any and all Claims of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

128. *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in other Classes entitled to share in the same recovery under the Plan.

129. *"Purchase Agreement"* means that certain Asset Purchase Agreement by and among Tower, Inc. and its Debtor affiliates signatories thereto, and TAC Acquisition, dated May 1, 2007, attached as Exhibit E to the Disclosure Statement, or such other agreement as may be entered into between the Debtors and the Successful Bidder and.

130. *"Purchaser"* means TAC Acquisition Company, LLC or such other Entity, or Entities designated by Cerberus Capital Management, L.P., or such other Entity or Entities as may be designated the Successful Bidder or Successful Bidders at the conclusion of the Auction.

131. *"Reclamation Claim"* shall mean any claim asserted against any of the Debtors purporting to be entitled to priority status pursuant to section 546(c) of the Bankruptcy, whether filed, demanded or stipulated in these Chapter 11 Cases.

132. *"Releasing Parties"* means the DIP Agent, DIP Arranger, DIP Lenders, First Lien Agent, First Lien Lenders, Second Lien Agent, Second Lien Lenders, Committee, Committee Members, and Holders of Claims in Voting Classes who do not vote to reject the Plan, and, to the fullest extent permissible under applicable law, as such may be extended or interpreted subsequent to the Effective Date, Holders of Claims in Voting Classes who reject the Plan (and each of the foregoing being in its individual capacity as such). The Releasing Parties do not include the Non-Released Parties.

133. *"Remaining Assets"* means all Assets that are Excluded Assets but which are not Unsecured Creditors Trust Assets or Post-Consummation Trust Excluded Assets, and that have not been divested or abandoned by the Debtors as of the Effective Date.

134. *"Residual Chapter 5 Claims"* means all Chapter 5 Claims that are identified on Schedule 1.1(a)(ii) to the Purchase Agreement.

135. *"Restructuring Transactions"* means, collectively, those mergers, consolidations, restructurings, dispositions, liquidations or dissolutions that may be required by Section 5.11 of the Purchase Agreement, or that the Debtors and the Post-Consummation Trust Plan Administrator determine to be necessary or appropriate to effectuate the purpose of the Plan.

136. *"Retained Contracts"* means those executory contracts and/or unexpired leases of the Debtors, if any, that will be assumed and assigned to the Post-Consummation Trust, which Retained Contracts shall be set forth in the Plan Supplement.

11

137.     "*Retained Professional*" means a Person or Entity: (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

138.     "*Retained Professionals Escrow Account*" means a segregated account funded and maintained by the Post-Consummation Trust in the amount of the Accrued Professional Compensation, commencing on the Effective Date, solely for the purpose of paying the Allowed Professional Compensation.

139.     "*R.J. Tower*" means R.J. Tower Corporation, a Debtor, organized as a Michigan corporation.

140.     "*R.J. Tower Bondholder Claims*" means the 12% Senior Note Claims and the 9.25% Senior Euro Note Claims.

141.     "*R.J. Tower Bondholder Primary Recovery*" means (a) 100% of the Unsecured Creditors Trust International Attributed Value, and (b) a Pro Rata share of the Unsecured Creditors Trust R.J. Tower Attributed Value.

142.     "*R.J. Tower Bondholder Secondary Recovery*" means a Pro Rata share of the Post-Consummation Trust Residual Assets.

143.     "*R.J. Tower General Unsecured Claim Primary Recovery*" means a Pro Rata share of the Unsecured Creditors Trust R.J. Tower Attributed Value.

144.     "*R.J. Tower General Unsecured Claim Secondary Recovery*" means a Pro Rata share of the Post-Consummation Trust Residual Assets.

145.     "*Sale Order*" means that certain order of the Bankruptcy Court, substantially in the form and substance of that attached to the Purchase Agreement, approving the Sale Transaction to the Purchaser.

146.     "*Sale Proceeds*" means all proceeds of the Sale Transaction.

147.     "*Sale Transaction*" means that certain transaction between the Debtor and the Purchaser as set forth in the Purchase Agreement.

148.     "*Schedules*" mean the schedules of assets and liabilities, schedules of Executory Contracts and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

149.     "*Second 1114 Motion*" means that certain Motion to Further Modify Retiree Benefits Pursuant to 11 U.S.C. § 1114, to the extent filed by the Debtors in these Chapter 11 Cases.

150.     "*Second Lien Agent*" means Silver Point Capital Fund LP, in its capacity as successor administrative agent to Morgan Stanley Senior Funding, Inc., for the Second Lien Lenders under the Prepetition Credit Agreement.

151.     "*Second Lien Agent's Fees*" means the reasonable fees and expenses of the Second Lien Agent, including the Second Lien Professionals' Fees.

152.     "*Second Lien Claim*" means any Claim arising from or based upon the Second Lien Obligations.

153.     "*Second Lien Collateral Account*" means any bank account containing Cash which collateralizes the Second Lien Facility, including the Second Lien Deposit Account (as such term is defined in the Prepetition Credit Agreement).

154.   "*Second Lien Documents*" means (i) the Prepetition Credit Agreement; (ii) that certain *Second Lien Pledge and Security Agreement*, entered into pursuant to the Prepetition Credit Agreement, dated as of May 24, 2004, by and among R.J. Tower as borrower, certain guarantors, various lenders and Morgan Stanley Senior Funding, Inc., as amended, supplemented or otherwise modified from time to time and all exhibits, schedules, instruments, security agreements, mortgages, guaranties, intercreditor agreements and other documents executed in connection therewith; (iii) that certain Subsidiary Guaranty among each Restricted Subsidiary (as defined therein) and any other signatories thereto, Tower Automotive, Inc. and Morgan Stanley Senior Funding, Inc. as administrative agent, dated May 24, 2004 (as amended supplemented or modified); and (iv) that certain Second Lien Patent Security Agreement, Trademark Security Agreement, Second Lien Foreign Pledge Security Agreement, Second Lien Deposit Account Agreement and Second Lien Cash Collateral Account Agreement, each dated May 24, 2004 and each as amended, supplemented and otherwise modified.

155.   "*Second Lien Facility*" means that certain $155 million synthetic letter of credit facility governed by the Second Lien Documents.

156.   "*Second Lien Lenders*" means, collectively, the financial institutions party to the Second Lien Facility, and all permitted assigns, transferees and successors in interest thereto.

157.   "*Second Lien Obligations*" means all obligations, liabilities and indebtedness of every nature of each of the Debtors arising under or in connection with the Second Lien Facility or any of the other Second Lien Documents, including the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees (including success fees), costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and/or from time to time hereafter owing, due or payable, including, without limitation, all interest, fees, costs and expenses accrued or incurred after the Petition Date.

158.   "*Second Lien Professionals' Fees*" means the fees and expenses of Milbank, Tweed, Hadley & McCloy LLP, as legal advisor to the Second Lien Agent, and Perella Weinberg Partners, LP. if Allowed.

159.   "*Secondary Liability Claim*" means a Claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort or other obligation of another Debtor, including any Claim based on: (a) guaranties of collection, payment or performance; (b) indemnity bonds, obligations to indemnify or obligations to hold harmless; (c) performance bonds; (d) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or other transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor relating to the obligations or performance of another Debtor; (e) vicarious liability; (f) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; or (g) any other joint or several liability that any Debtor may have in respect of any obligation that is the basis of a Claim.

160.   "*Secured Claims*" means: (a) Claims that are secured by a lien on property in which the Estates have an interest, which liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code; and (b) Claims which are Allowed under the Plan as a Secured Claim.

161.   "*Subordinated Securities Claims*" means Claims of the type described in, and subject to subordination under, section 510(b) of the Bankruptcy Code, including any and all Claims whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, currently existing or hereafter arising, arising from rescission of a purchase or sale of a security of the Debtors or an affiliate of the Debtors, for damages arising from the purchase, sale or holding of such securities, or for reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

162.   "*Substantive Consolidation Order*" means that order of the Bankruptcy Court approving the substantive consolidation provided herein, which order may be included in the Confirmation Order.

13

163. *"Substantively Consolidated Debtors"* means each of Algoods, USA, Inc.; Tower Automotive Bardstown, Inc.; Tower Automotive Bowling Green, LLC; Tower Automotive Chicago, LLC; Tower Automotive Finance, Inc.; Tower Automotive Granite City, LLC; Tower Automotive Granite City Services, LLC; Tower Automotive International Yorozu Holdings, Inc.; Tower Automotive Lansing, LLC; Tower Automotive Madison, LLC; Tower Automotive Michigan, LLC; Tower Automotive Milwaukee, LLC; Tower Automotive Plymouth, Inc.; Tower Automotive Products Company, Inc.; Tower Automotive Receivables Company, Inc.; Tower Automotive Services and Technology, LLC; Tower Automotive, s.r.o.; Tower Automotive Technology, Inc.; Tower Automotive Technology Products, Inc.; Tower Automotive Tool, LLC; Tower Services, Inc.; and Trylon Corporation.

164. *"Successful Bidder"* has the meaning set forth in the Marketing Protocol.

165. *"Third Party Release"* means the release set forth in Article XIII.C.

166. *"Third Party Releasees"* means, collectively, the DIP Agent, DIP Arranger, DIP Lenders, First Lien Agent, First Lien Lenders, Second Lien Agent, Second Lien Lenders, Purchaser, Indenture Trustees, Committee, Committee Members, Committee Professionals, and each of their respective current and former members (including *ex officio* members), officers, directors, managed funds, investment advisors, agents, financial advisors, attorneys, employees, partners, Affiliates and representatives (each of the foregoing in its individual capacity as such).

167. *"Tort Claim"* means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to protection of human health, safety or the environment.

168. *"Tower, Inc."* means Tower Automotive Inc., a Debtor, organized as a Michigan corporation.

169. *"Tower Automotive Capital Trust"* means that certain Delaware business trust which (a) issued common securities to Tower, Inc., (b) issued the Trust Preferred Securities, and (c) is the Holder of the 6.75% Trust Convertible Subordinated Debenture.

170. *"Trust Related Claims"* means all Claims derived from or based upon (a) the 6.75% Trust Convertible Subordinated Debenture, and (b) the 6.75% Trust Preferred Securities.

171. *"Trusts"* means, collectively, the Post-Consummation Trust and the Unsecured Creditors Trust.

172. *"Unexpired Lease"* means a lease of non-residential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

173. *"Unimpaired Claims"* means Claims in an Unimpaired Class.

174. *"Unimpaired Class"* means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

175. *"Unsecured Creditors Trust"* means that certain trust to be created on the Effective Date in accordance with the provisions of the Unsecured Creditors Trust Agreement.

176. *"Unsecured Creditors Trust Agreement"* means that certain trust agreement, in form and substance satisfactory to the Committee, that, among other things, (a) establishes and governs the Unsecured Creditors Trust, (b) describes the power, duties and responsibilities of the Unsecured Creditors Trust Plan Administrator and (c) the liquidation and distribution of proceeds of Article IX and the Unsecured Creditors Trust Assets.

177. *"Unsecured Creditors Trust Assets"* means (i) the $10 million Unsecureds Claim Payment and the $2 million Unsecureds Funds Payment, each as defined in the Purchase Agreement, that are transferred to the

14

Unsecured Creditor Trust by the Purchaser pursuant to the Purchase Agreement and (ii) the Residual Chapter 5 Claims.

178. *"Unsecured Creditors Trust International Attributed Value"* means 73% of the Unsecured Creditors Trust Assets.

179. *"Unsecured Creditors Trust Plan Administrator"* means the Person designated by the Committee, identified in the Plan Supplement, and retained as of the Effective Date, as the employee or fiduciary responsible for implementing the applicable provisions of the Plan and administering the Unsecured Creditors Trust in accordance with the Plan and the Unsecured Creditors Agreement, and any successor appointed in accordance with the Unsecured Creditors Trust Agreement. As appropriate, references to the Unsecured Creditors Trust Plan Administrator shall include any Distribution Agent appointed by the Unsecured Creditors Trust Plan Administrator.

180. *"Unsecured Creditors Trust R.J. Tower Attributed Value"* means 27% of the Unsecured Creditors Trust Assets.

181. *"Voting Agent"* means Bankruptcy Services, LLC., in its capacity as notice, claims and balloting agent for the Debtors, pursuant to that certain *Final Order Pursuant to 28 U.S.C. § 156(c) and Rules 2002 and 2014(a) of the Federal Rules of Bankruptcy Procedure Authorizing and Approving the Retention of Bankruptcy Services, LLC as Notice, Claims and Balloting Agent to the Debtors and Debtors in Possession*, entered by the Bankruptcy Court on February 8, 2005.

182. *"Voting Classes"* means Classes 4, 5, 6 and 7.

183. *"Voting Deadline"* means July 6, 2007, which is the date by which all Ballots must be received by the Voting Agent in accordance with the Disclosure Statement Order.

184. *"Voting Instructions"* means the instructions for voting on the Plan that are attached to the Ballots.

185. *"Working Capital Administrative Claim"* means a "Working Capital Obligation" as defined in the Purchase Agreement.

186. *"Wind-Down Expenses"* means the costs and expenses necessary to administer and perform the contemplated functions of the Post-Consummation Trust in accordance with the Post-Consummation Trust Budget.

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY TAX CLAIMS

*A.    Administrative Claims*

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Working Capital Administrative Claim will be paid the full unpaid amount of such Claim in Cash by the Purchaser in the ordinary course of business.

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Other Administrative Claim will be paid the full unpaid amount of such Claim in Cash by the Post-Consummation Trust Plan Administrator, out of the Post-Consummation Trust Priority Account (unless otherwise provided in the Plan), (a) on or as soon as practicable after the Effective Date; (b) or if such Claim is Allowed after the Effective Date, on or as soon as practicable after the date such Claim is Allowed; or (c) upon such other terms as may be agreed upon by such Holder and the Post-Consummation Trust Plan Administrator, or otherwise upon an order of the Bankruptcy Court. If the Post-Consummation Trust Priority Account is not sufficient to provide for the payment in full of all Allowed Other Administrative Claims, the Post-Consummation Trust Plan Administrator shall utilize the other assets (or proceeds thereof) of the Post-Consummation Trust (other than assets held in segregated accounts), to the extent necessary, to pay such Allowed Other Administrative Claims in full.

15

Bar Date for Administrative Claims

Except as otherwise provided in this Article II.A, unless previously Filed, requests for payment of Other Administrative Claims must be Filed and served on the Post-Consummation Trust Plan Administrator and the Purchaser, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 60 days after the Effective Date. Holders of Other Administrative Claims that are required to File and serve a request for payment of such Other Administrative Claims and that do not File and serve such a request by the applicable bar date will be forever barred from asserting such Other Administrative Claims against the Debtors, the Post-Consummation Trust or Unsecured Creditors Trust, or their respective property, and such Other Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Post-Consummation Trust Plan Administrator, the Purchaser and the requesting party by the later of (a) 180 days after the Effective Date and (b) 90 days after the Filing of the applicable request for payment of Administrative Claims.

     1.    Professional Compensation

Retained Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Post-Consummation Trust and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 45 days after the Effective Date; provided that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order. Objections to any Fee Claim must be Filed and served on the Post-Consummation Trust Plan Administrator and the requesting party by the later of (i) 75 days after the Effective Date and (ii) 30 days after the Filing of the applicable request for payment of the Fee Claim. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims. Each Holder of an Allowed Fee Claim shall be paid by the Post-Consummation Trust Plan Administrator from the Retained Professional Escrow Account.

The Indenture Trustees may submit detailed invoices to the Debtors or the Trusts, as applicable, for all fees and expenses for which the Indenture Trustees seek reimbursement without the need for further Bankruptcy Court approval. The Debtors or the Trusts, as applicable, upon review of such invoices, may pay those amounts that the Debtors or the Trusts, as applicable, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Trusts, as applicable, deem to be unreasonable. In the event that the Debtors or the Trusts, as applicable, object to all or any portion of an Indenture Trustee's invoice, the Debtors or the Trusts, as applicable, and such Indenture Trustee will endeavor, in good faith, to reach mutual agreement on the amount of such disputed fees and/or expenses. In the event that the Debtors or the Trusts, as applicable, and an Indenture Trustee are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

     2.    Ordinary Course Liabilities

Holders of Working Capital Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business will not be required to File or serve any request for payment of such Working Capital Administrative Claims.

*B.    DIP Facility Claims*

Subject to the provisions of sections 328, 330(a), 331 and 506(b) of the Bankruptcy Code, and pursuant to the terms of the Final DIP Order, the Allowed DIP Facility Claims will be paid in full in Cash on the Effective Date.

C. *Priority Tax Claims*

On the later of the Effective Date or the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive on account of such Claim, Cash in an amount equal to the amount of such Allowed Priority Tax Claim, which amounts shall be payable by the Post-Consummation Trust out of the Post-Consummation Trust Priority Account. If the Post-Consummation Trust Priority Account is not sufficient to provide for the payment in full of all Allowed Priority Tax Claims, the Post-Consummation Trust Plan Administrator shall utilize the other assets (or proceeds thereof) of the Post-Consummation Trust (other than assets held in segregated accounts), to the extent necessary, to pay such Allowed Priority Tax Claims in full.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A. *Summary*

1.      The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

2.      Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Second Lien Claims | Unimpaired | Deemed to Accept |
| 4 | R.J. Tower Bondholder Claims | Impaired | Entitled to Vote |
| 5 | R.J. Tower General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | 5.75% Convertible Senior Note Claims | Impaired | Entitled to Vote |
| 7 | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Trust Related Claims | Impaired | Deemed to Reject |
| 9 | Common Equity Interests | Impaired | Deemed to Reject |

B. *Classification and Treatment of Claims and Equity Interests*

1.      Class 1—Other Priority Claims.

(a)      *Classification*: Class 1 consists of the Other Priority Claims against the Debtors.

(b)      *Treatment*: The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered by the Plan. Unless otherwise agreed to by the Holders of the Allowed Class 1 Other Priority Claim and the Debtors, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on the Effective Date or as soon as practicable thereafter from the Post-Consummation Trust Priority Account. If the Post-Consummation Trust Priority Account is not sufficient to provide for the payment in full

17

of all Allowed Other Priority Claims, the Post-Consummation Trust Plan Administrator shall utilize the other assets (or proceeds thereof) of the Post-Consummation Trust (other than assets held in segregated accounts), to the extent necessary, to pay such Allowed Other Priority Claims in full.

(c) *Voting*: Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan; *provided, however,* that all Class 1 Claims shall be subject to Allowance under the provisions of the Plan, including, but not limited to Article X.

2. Class 2—Other Secured Claims.

(a) *Classification*: Class 2 consists of the Other Secured Claims against the Debtors.

(b) *Treatment*: Each Holder of an Allowed Class 2 Claim shall receive, in full and final satisfaction of such Allowed Class 2 Claim, payment in full in Cash of any such Allowed Other Secured Claim on the Effective Date or as soon practicable thereafter from the Post-Consummation Trust Priority Account. If the Post-Consummation Trust Priority Account is not sufficient to provide for the payment in full of all Allowed Other Secured Claims, the Post-Consummation Trust Plan Administrator shall utilize the other assets (or proceeds thereof) of the Post-Consummation Trust (other than assets held in segregated accounts), to the extent necessary, to pay such Allowed Other Secured Claims in full.

(c) *Voting*: Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan; *provided, however,* that all Class 2 Claims shall be subject to Allowance under the provisions of the Plan, including, but not limited to, Article X.

3. Class 3—Second Lien Claims

(a) *Classification*: Class 3 consists of the Holders of Second Lien Claims against the Debtors.

(b) *Allowance:* Subject to review and verification by the Debtors and the Purchaser, the Second Lien Claims shall be allowed in the full amount set forth in that certain payoff letter to be circulated by the Second Lien Agent pursuant to the Purchase Agreement, without defense, offset, counterclaim or reduction.

(c) *Treatment*: On or as soon as practicable after the Effective Date, all remaining Cash in the Second Lien Collateral Account shall be returned to the Second Lien Agent for the Pro Rata benefit of the Second Lien Lenders, and the Second Lien Facility shall be terminated. Each Holder of an Allowed Class 3 Claim shall receive, in full and final satisfaction of each such Allowed Class 3 Claim, payment in full in Cash from the Purchaser, pursuant to the terms of the Purchase Agreement, of each such Allowed Class 3 Claim on the Effective Date or as soon as practicable thereafter.

(d) *Voting*: Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

4.    Class 4—R.J. Tower Bondholder Claims

    (a)    *Classification*: Class 4 consists of the Holders of R.J. Tower Bondholder Claims against the Debtors.

    (b)    *Treatment*: On or as soon as practicable after the Effective Date each Holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction of its Allowed Class 4 Claim, its Pro Rata share of the R.J. Tower Bondholder Primary Recovery and the R.J. Tower Bondholder Secondary Recovery.

    (c)    *Voting*: Class 4 is Impaired, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

    (d)    *Restriction* on Recovery: The Post-Consummation Trust shall not make distributions to holders of Class 4 Claims until such time as all Post-Consummation Trust Senior Claims payable by the Post-Consummation Trust have been paid in full, or until an appropriate Disputed Claims Reserve has been established for the payment of all such Post-Consummation Trust Senior Claims.

5.    Class 5—R.J. Tower General Unsecured Claims

    (a)    *Classification*: Class 5 consists of the Holders of General Unsecured Claims against R.J. Tower.

    (b)    *Treatment*: On or as soon as practicable after the Effective Date each Holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction of its Allowed Class 5 Claim, its Pro Rata share of the R.J. Tower General Unsecured Claim Primary Recovery and the R.J. Tower General Unsecured Claim Secondary Recovery.

    (c)    *Voting*: Class 5 is Impaired, and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

    (d)    *Restriction* on Recovery: The Post-Consummation Trust shall not make distributions to holders of Class 5 Claims until such time as all Post-Consummation Trust Senior Claims payable by the Post-Consummation Trust have been paid in full, or until an appropriate Disputed Claims Reserve has been established for the payment of all such Post-Consummation Trust Senior Claims.

6.    Class 6— 5.75% Convertible Senior Note Claims

    (a)    *Classification*: Class 6 consists of the Holders of 5.75% Convertible Senior Note Claims against Tower, Inc.

    (b)    *Treatment*: On the Effective Date the Class 6 5.75% Convertible Senior Notes will be cancelled automatically without any further order of the Bankruptcy Court or the Debtors or the Indenture Trustee for the 5.75% Convertible Senior Notes and, as soon as practicable after the Effective Date, each Holder of an Allowed Class 6 5.75% Convertible Senior Note Claim will receive a Pro Rata distribution of the Class 6 Recovery.

    (c)    *Voting*: Class 6 is Impaired, and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

    (d)    *Restriction on Recovery*: The Post-Consummation Trust shall not make distributions to holders of Class 6 Claims until such time as all Post-Consummation Trust Senior Claims

19

payable by the Post-Consummation Trust have been paid in full, or until an appropriate Disputed Claims Reserve has been established for the payment of all such Post-Consummation Trust Senior Claims.

7.  Class 7— Other General Unsecured Claims

   (a)  *Classification*: Class 7 consists of the Holders of Class 7 General Unsecured Claims.

   (b)  *Treatment*: On the Effective Date the Class 7 General Unsecured Claims will be cancelled and, as soon as practicable after the Effective Date, each Holder of an Allowed Class 7 General Unsecured Claim will receive a Pro Rata distribution of the Class 7 Recovery.

   (c)  *Voting*: Class 7 is Impaired, and Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

   (d)  *Restriction on Recovery*: The Post-Consummation Trust shall not make distributions to holders of Class 7 Claims until such time as all Post-Consummation Trust Senior Claims payable by the Post-Consummation Trust have been paid in full, or until an appropriate Disputed Claims Reserve has been established for the payment of all such Post-Consummation Trust Senior Claims.

8.  Class 8— Trust Related Claims

   (a)  *Classification*: Class 8 consists of the Holders of Trust Related Claims against Tower, Inc.

   (b)  *Treatment*: On the Effective Date the 6.75% Trust Preferred Securities will be cancelled and Holders of Class 8 Trust Related Claims will receive no distribution on account of their Claims.

   (c)  *Voting*: Class 8 is Impaired and is conclusively deemed to reject the Plan. Holders of Class 8 Trust Related Claims are not entitled to vote to accept or reject the Plan.

9.  Class 9—Equity Interests

   (a)  *Classification*: Class 9 consists of all Equity Interests in the Debtors.

   (b)  *Treatment*: On the Effective Date, all Class 9 Equity Interests shall be deemed cancelled, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Class 9 Equity Interests.

   (c)  *Voting*: Class 9 is Impaired, and Holders of Class 9 Equity Interests are conclusively deemed to reject the Plan. Holders of Class 9 Equity Interests are therefore not entitled to vote to accept or reject the Plan.

C.  *Intercompany Claims*

   All Intercompany Claims will be cancelled as of the Effective Date, and Holders thereof will not receive a distribution under the Plan in respect of such Claims.

   Pursuant to Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of all issues relating to the validity, enforceability and priority of Intercompany Claims and the substantive consolidation of certain of the Estates. Pursuant to the Plan, and in consideration for the distribution and other benefits under the Plan, upon the Effective Date, all Intercompany Claims shall be extinguished except as otherwise provided in

K&E 11752289.17

Article III.C.  All parties who have held, hold or may hold Claims or Equity Interests in any or all of the Debtors are permanently enjoined from asserting or continuing in any manner any action related to the enforcement of the Intercompany Claims.

Notwithstanding any other provision of this section or the Plan, the Plan shall not affect and shall not be deemed to effect a waiver, cancellation, alteration or impairment of any subordination or related rights or obligations of any Person or Entity.

D.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

E.     *Special Provisions Regarding Subordinated Securities Claims*

All Subordinated Securities Claims will be cancelled as of the Effective Date, and Holders thereof will not receive a distribution under the Plan in respect of such Claims.

F.     *Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims*

The classification and treatment of Allowed Claims under the Plan take into consideration all Allowed Secondary Liability Claims.  On the Effective Date, Allowed Secondary Liability Claims will be treated as follows:

1.     The Allowed Secondary Liability Claims arising from or related to any Debtor's joint or several liability for the obligations under any (a) Allowed Claim that is being reinstated under the Plan or (b) Executory Contract or Unexpired Lease that is being assumed or deemed assumed by another Debtor or under any Executory Contract or Unexpired Lease that is being assumed by and assigned to another Debtor or any other Entity will be reinstated.

2.     Except as provided in Article III.F, Holders of Allowed Secondary Liability Claims will be entitled to only one distribution in respect of such underlying Allowed Claim from the Substantively Consolidated Debtors and only one distribution in respect of such underlying Allowed Claim from the International Holding Company Debtors.  No multiple recovery on account of any Allowed Secondary Liability Claim will be provided or permitted.

## ARTICLE IV.

### ACCEPTANCE OR REJECTION OF THE PLAN

A.     *Voting Classes*

Each Holder of an Allowed Claim in each of the Voting Classes shall be entitled to vote to accept or reject the Plan.

B.     *Acceptance by Voting Classes*

The Voting Classes shall have accepted the Plan if: (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in that Class have voted to accept the Plan; and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in that Class have voted to accept the Plan.

*C.     Presumed Acceptance of Plan*

Classes 1, 2 and 3 are Unimpaired under the Plan, and are therefore presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

*D.     Presumed Rejection of Plan*

Classes 8 and 9 are Impaired and shall receive no distribution and are therefore presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

*E.     Non-Consensual Confirmation*

The Debtors reserve the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 8 and 9. To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code; and/or (b) modify the Plan in accordance with Article XV.D hereof.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.     Sale of Assets*

On the Effective Date the Debtors shall consummate the Sale Transaction and, among other things, the Acquired Assets including the Assumed Contracts, shall be transferred to the Purchaser free and clear of all Claims, Encumbrances (as defined in the Purchase Agreement) and Interests pursuant to the terms of the Purchase Agreement, Sale Order and Confirmation Order.

*B.     Post-Consummation Trust*

1.     Establishment of the Post-Consummation Trust

On the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, will execute the Post-Consummation Trust Agreement and will take all other steps necessary to establish the Post-Consummation Trust pursuant to the Post-Consummation Trust Agreement as further described in Article VIII herein. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors will transfer to the Post-Consummation Trust all of their rights, title and interests in all of the Remaining Assets. In connection with the transfer of the Remaining Assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Post-Consummation Trust will vest in the Post-Consummation Trust and its representatives, and the Debtors and the Post-Consummation Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.

2.     Funding Expenses of the Post-Consummation Trust

As more fully described in the Post-Consummation Trust Agreement, Cash in the Post-Consummation Trust Priority Account will be applied in accordance with the terms of the Post-Consummation Trust Budget, first, to the fees, costs, expenses (each of the foregoing in amounts not to exceed amounts approved pursuant to the Post-Consummation Trust Budget) and liabilities of the Post-Consummation Trust Plan Administrator, second, to satisfy any other administrative and Wind-Down Expenses of the Post-Consummation Trust (each of the foregoing in amounts not to exceed amounts approved pursuant to the Post-Consummation Trust Budget) and, third, to the distributions provided for pursuant to the Plan.

3.    Appointment of the Post-Consummation Trust Plan Administrator

On the Effective Date and in compliance with the provisions of the Plan, the Post-Consummation Trust Plan Administrator will be appointed in accordance with the Post-Consummation Trust Agreement and the Post-Consummation Trust will be administered by the Post-Consummation Trust Plan Administrator in accordance with the Post-Consummation Trust Agreement.

C.    *Unsecured Creditors Trust*

1.    Establishment of the Unsecured Creditors Trust

On the Effective Date, the Committee, on its own behalf and on behalf of the Beneficiaries of the Unsecured Creditors Trust, will execute the Unsecured Creditors Trust Agreement and will take all other steps necessary to establish the Unsecured Creditors Trust pursuant to the Unsecured Creditors Trust Agreement. On the Effective Date, and in accordance with and pursuant to the terms of the Plan and the Purchase Agreement, the Purchaser will transfer to the Unsecured Creditors Trust the Cash portion of the Unsecured Creditors Trust Assets and the Residual Chapter 5 Claims will be deemed to be transferred to the Unsecured Creditors Trust free and clear of all Claims and Interests pursuant to the terms of the Confirmation Order.

D.    *Restructuring Transactions*

1.    Restructuring Transactions Generally

On or after the Confirmation Date, the applicable Debtors and/or Post-Consummation Trust Plan Administrator, or the Purchaser, consistent with Section 5.11 of the Purchase Agreement, may enter into Restructuring Transactions without further order of the Bankruptcy Court.

E.    *Substantive Consolidation*

The Plan is predicated on the substantive consolidation of the Substantively Consolidated Debtors, on the one hand, as well as the substantive consolidation of the International Holding Company Debtors, on the other hand, each for voting and distribution purposes only, all as set forth more fully in Article XI.

F.    *Cancellation of Notes and Equity Interests*

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates, and other documents evidencing the 5.75% Convertible Senior Note Claims, the 6.75% Trust Convertible Subordinated Debenture Claims, the 9.25% Senior Euro Note Claims, the 12% Senior Note Claims, and Equity Interests shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. On the Effective Date, except to the extent otherwise provided herein, any indenture relating to any of the foregoing, including but not limited to the 5.75% Convertible Senior Note Indenture, the 6.75% Trust Convertible Subordinated Debenture, the 9.25% Senior Euro Note Indenture and the 12% Senior Note Indenture shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be discharged. The 5.75% Convertible Senior Note Indenture, the 9.25% Senior Euro Note Indenture and the 12% Senior Note Indenture shall continue in effect solely for the purposes of: (i) allowing Holders of the 5.75% Convertible Senior Note Claims, the 9.25% Senior Euro Note Claims and the 12% Senior Note Claims to receive distributions under the Plan; and (ii) allowing and preserving the rights of the Indenture Trustees under the 5.75% Convertible Senior Note Indenture, the 9.25% Senior Euro Note Indenture and the 12% Senior Note Indenture to (x) make distributions in satisfaction of Allowed 5.75% Convertible Senior Note Claims, the 9.25% Senior Euro Note Claims and the 12% Senior Note Claims, (y) exercise their respective charging liens against any such distributions, and (z) seek compensation and reimbursement for any fees and expenses incurred in making such distributions.

K&E 11752289.17

G.      *Creation of Retained Professional Escrow Account*

On the Effective Date, the Post-Consummation Trust shall establish the Retained Professional Escrow Account and reserve the amounts necessary to ensure the payment of all Accrued Professional Compensation.

H.      *Retention by Debtors and Post-Consummation Trust of Other Actions*

Subject to Article XIII.F, all Other Actions, along with any associated recoveries, proceeds and settlements, shall remain the property of the Debtors' estates and shall be devised to the Post-Consummation Trust, provided, however, no Acquired Assets or Residual Chapter 5 Claims shall be devised to the Post-Consummation Trust.

I.      *Corporate Action*

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan and the Purchase Agreement involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders or the Debtors' boards of directors. On and after the Effective Date, the Post-Consummation Trust is authorized and directed to issue, execute and deliver the agreements, documents, and distributions contemplated by the Plan and the Purchase Agreement in the name of and on behalf of the Debtors.

J.      *D&O Tail Coverage Policies*

To the extent provided under the Purchase Agreement, on the Effective Date the Debtors or the Post-Consummation Trust Plan Administrator will obtain sufficient tail coverage, in an amount consistent with the level of coverage existing prior to the Effective Date, for a period of six years under a directors' and officers' insurance policy for the current and former officers and directors of the Debtors utilizing the Post-Consummation Trust Priority Account.

K.      *ERISA Settlement Agreement*

The Post-Consummation Trust Plan Administrator, after the Effective Date, shall pay $2 million out of the Post-Consummation Trust Indemnity Account pursuant to that the terms of the ERISA Settlement Agreement, it being understood that any refund paid to the Debtors under the ERISA Settlement Agreement up to $2 million shall be returned to the Post-Consummation Indemnity Account.

L.      *Sources of Cash for Plan Distribution*

All Cash necessary for the Debtors, or the Trusts, as the case may be, to make payments pursuant hereto shall be obtained from the Sale Proceeds and the proceeds of the Post-Consummation Trust Assets and the Unsecured Creditors Trust Assets, as the case may be.

M.      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III, all Interests, mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged.

Except as otherwise provided in the Purchase Agreement, on the Effective Date all Acquired Assets shall be transferred to the Purchaser free and clear of all Claims, Encumbrances or Interests pursuant to sections 105, 363, 365, 1123 and 1141(c) of the Bankruptcy Code.

On the Effective Date the Unsecured Creditors Trust Assets shall be transferred to the Unsecured Creditors Trust free and clear of all Claims, Encumbrances or Interests.

24

*N.*    *Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes*

The chief executive officer or chief financial officer of each Debtor will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and the Purchase Agreement. The secretary and any assistant secretary of each Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146 of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax or similar tax: (1) the Sale Transaction; (2) the creation of any mortgage, deed of trust, lien or other security interest; (3) the making or assignment of any lease or sublease; (4) any Restructuring Transaction; or (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale or (e) assignments executed in connection with any Restructuring Transaction pursuant to the Plan.

*O.*    *Modification of Retiree Benefits*

The Plan is predicated on obtaining the relief requested in the Second 1114 Motion, to the extent the Second 1114 Motion is filed, or the approval of the Retiree Benefit Settlements (as defined in the Purchase Agreement).

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

    1.    Assumption and Assignment of Assumed Contracts

The Debtors will assume and assign the Assumed Contracts to the Purchaser pursuant to the terms of the Purchase Agreement. The designation of a contract or lease as an Assumed Contract shall not be deemed an admission that such contract or lease constitutes an Executory Contract or Unexpired Lease.

    2.    Assumption and Assignment of Retained Contracts

The Debtors will assume and assign the Retained Contracts, if any, to the Post-Consummation Trust. The designation of a contract or lease as a Retained Contract shall not be deemed an admission that such contract or lease constitutes an Executory Contract or Unexpired Lease.

    3.    Approval of Assumptions and Assignments

The Confirmation Order and the Sale Order shall constitute orders of the Bankruptcy Court approving the assumptions and assignments described in this Article VI.A, pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date. An order of the Bankruptcy Court entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed or assumed and assigned pursuant to the Plan of: (a) the contract or lease being assumed or assumed and assigned; (b) the cure amount, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (c) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed cure claim.

*B.*    *Executory Contracts and Unexpired Leases to Be Rejected*

On the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court or that is assumed pursuant to Article VI.A, each Executory Contract and Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the

Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

C.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

**All proofs of Claim arising from the rejection (if any) of Executory Contracts or Unexpired Leases must be filed with the Voting Agent within thirty (30) days after the earlier of: (a) the date of entry of an order of the Bankruptcy Court approving any such rejection; and (b) the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which proofs of Claim were not timely Filed within that time period will be forever barred from assertion against the Debtors or their Estates and property, or the Trusts, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article XIII.G.**

D.    *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to the Plan*

Any monetary amounts by which any Executory Contract and Unexpired Lease to be assumed pursuant to the Plan (including pursuant to Article VI.A) or otherwise is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree, with all such amounts to be payable by the Debtors out of the Post-Consummation Trust Priority Account. If the Post-Consummation Trust Priority Account is not sufficient to provide for payment in full of all cure amounts, the Post-Consummation Trust Plan Administrator shall utilize the other assets (or proceeds thereof) of the Post-Consummation Trust (other than assets held in segregated accounts), to the extent necessary, to pay such cure amounts in full. In the event of a dispute regarding: (a) the amount of any cure payments; (b) the ability of the Purchaser or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption; the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption of any Executory Contracts or Unexpired Leases.

E.    *Assumption of D&O Insurance Policies*

As of the Effective Date, the Post-Consummation Trust shall be deemed to have assumed all of the Debtors' directors' and officers' liability insurance policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the foregoing assumption of each of the directors' and officers' liability insurance policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the directors' and officers' liability insurance policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assigned to the Post-Consummation Trust as to which no proof of claim need be Filed.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided herein or as may be ordered by the Bankruptcy Court, all distributions with respect to all Allowed Claims that are not Assumed Liabilities shall be made by the Trusts, as set forth in the Plan. As described in Articles VIII and IX below, the Trusts shall make distributions on the Effective Date or as soon as reasonably practicable thereafter to their respective Beneficiaries, and shall make further distributions to Holders of Claims that subsequently are determined to be Allowed Claims, pursuant to the Plan.

26

*B.*    *Delivery and Distributions and Undeliverable or Unclaimed Distributions*

    1.    <u>Delivery of Distributions in General</u>

    Except as otherwise provided herein, distributions to Holders of Allowed Claims as of the Distribution Record Date shall be made at the address of the Holder of such Claim as indicated on the records of the Debtors or the Trusts, as the case may be, as of the date such distribution is made.  Except as otherwise provided herein, the Trusts shall make distributions to Holders of Allowed Claims at the address for each such Holder indicated on the Debtors' records on the date of any such distribution; *provided, however,* that the manner of such distributions shall be determined at the discretion of the Debtors or Trusts, as the case may be; and *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any proof of Claim filed by that Allowed Claim Holder.

    All distributions to Holders of 5.75% Convertible Senior Note Claims, the 9.25% Senior Euro Note Claims, and the 12% Senior Note Claims shall be governed by the 5.75% Convertible Senior Note Indenture, the 9.25% Senior Euro Note Indenture and the 12% Senior Note Indenture, respectively.  Notwithstanding any provisions in the Plan to contrary, the 5.75% Convertible Senior Note Indenture, the 9.25% Senior Euro Note Indenture and the 12% Senior Note Indenture will continue in effect to the extent necessary to (i) allow the respective Indenture Trustees to receive and make distributions pursuant to the Plan on account of the Allowed Claims of Holders of 5.75% Convertible Senior Note Claims, the 9.25% Senior Euro Note Claims, and the 12% Senior Note Claims, (ii) exercise their respective charging liens against any such distributions, and (iii) seek compensation and reimbursement for any fees and expenses incurred in making such distributions.

    2.    <u>Distributions by Distribution Agent(s)</u>

    The Debtors and the Trusts, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents, to facilitate the solicitation of votes on the Plan and distributions required under the Plan.  As a condition to serving as a Distribution Agent, a Distribution Agent must (i) affirm its obligation to facilitate the prompt distribution of any documents or solicitation materials, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan, and (iii) waive any right or ability to setoff, deduct from, or assert any lien or encumbrance against the distributions required under the Plan that are to be distributed by such Distribution Agent.  In consideration for waiving its rights to setoff, deduct from or assert any lien or encumbrance against such distributions, the Debtors or the Trusts, as applicable, shall pay all reasonable fees and expenses of such Distribution Agent.  The Distribution Agent shall submit detailed invoices to the Debtors or the Trusts, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement without the need for further Bankruptcy Court approval.  The Debtors or the Trusts, as applicable, upon review of such invoices, shall pay those amounts that the Debtors or the Trusts, as applicable, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Trusts, as applicable, deem to be unreasonable.  In the event that the Debtors or the Trusts, as applicable, object to all or any portion of a Distribution Agent's invoice, the Debtors or the Trusts, as applicable, and such Distribution Agent will endeavor, in good faith, to reach mutual agreement on the amount of such disputed fees and/or expenses.  In the event that the Debtors or the Trusts, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

    3.    <u>Undeliverable Distributions</u>

        (a)    Holding of Certain Undeliverable Distributions.

    If any distribution to a Holder of an Allowed Claim is returned to the Trusts as undeliverable, no further distributions shall be made to such Holder unless and until the Trusts are notified in writing of such Holder's then current address.  Undeliverable distributions shall remain in the possession of the Trusts, subject to Article VII.B.3(b), until such time as any such distributions become deliverable.  Undeliverable Cash shall not be entitled to any interest, dividends or other accruals of any kind.  As soon as reasonably practicable, the Trusts shall make all distributions that become deliverable.

(b)     Failure to Claim Undeliverable Distributions.

In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, ninety (90) days after the Effective Date, the Post-Consummation Trust, in consultation with the Unsecured Creditors Trust, will file with the Bankruptcy Court a listing of the Holders of undeliverable distributions. This list will be maintained for as long as the Chapter 11 Cases stay open. Any Holder of an Allowed Claim, irrespective of when a Claim became an Allowed Claim, that does not assert a Claim pursuant hereto for an undeliverable distribution (regardless of when not deliverable) within the later of (i) one year after the Effective Date, and (ii) sixty days after the date such Claim becomes an Allowed Claim shall have its Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Trusts or its respective property. In such cases any Cash held for distribution on account of such Claims shall be property of the Trusts, free of any restrictions thereon. Nothing contained herein shall require the Trusts to attempt to locate any Holder of an Allowed Claim.

4.     Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Trusts shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. For tax purposes, distributions received by Holders in full or partial satisfaction of Allowed Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated unpaid interest that accrued on such Claims.

C.     *Timing and Calculation of Amounts to be Distributed*

On the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim or as soon as practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article X. Except as otherwise provided herein, or as required under applicable law, Holders of Claims shall not be entitled to interest on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

D.     *Minimum Distribution*

Any other provision of the Plan notwithstanding, the Trusts will not be required to make distributions or payments of less than $50 (whether cash or otherwise), and will likewise not be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

If, at any time, only *de minimis* assets remain in the Post-Consummation Trust after Post-Consummation Trust Senior Claims have been paid in full, the Post-Consummation Trust Plan Administrator may, in its sole discretion, distribute such assets to a charity, as set forth in the Post-Consummation Trust Agreement. If, at any time, only *de minimis* assets remain in the Unsecured Creditors Trust, the Unsecured Creditors Trust Plan Administrator may, in its sole discretion, distribute such assets to a charity, as set forth in the Unsecured Creditors Trust Agreement.

E.     *Setoffs*

The Debtors and the Trusts may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Trusts may hold against the Holder of any such Allowed Claim; *provided that* neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Trusts of any such claims, equity interests, rights

28

and Causes of Action that the Debtors or the Trusts may possess against any such Holder, except as specifically provided herein.

F.     *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any distribution on account of its Allowed Claim, each record Holder of a 5.75% Convertible Senior Note Claim, 9.25% Senior Euro Note Claim, or 12% Senior Note Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except to the extent otherwise provided herein. The Indenture Trustees may (but shall not be required to) request registered Holders to surrender their notes for cancellation.

**ARTICLE VIII.**

**THE POST-CONSUMMATION TRUST; THE POST-CONSUMMATION TRUST PLAN ADMINISTRATOR**

A.     *Generally*

The powers, authority, responsibilities and duties of the Post Consummation Trust and the Post-Consummation Trust Plan Administrator are set forth in and will be governed by the Post Consummation Trust Agreement. The Debtors, in consultation with the Committee, will designate the initial Post-Consummation Trust Plan Administrator.

B.     *Purpose of the Post Consummation Trust*

The Post-Consummation Trust will be established for the primary purpose of liquidating its assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Post-Consummation Trust. Upon the transfer of the Post-Consummation Trust Assets, the Debtors will have no reversionary or further interest in or with respect to the Post-Consummation Trust Assets or the Post-Consummation Trust. For all federal income tax purposes, the Beneficiaries of the Post-Consummation Trust will be treated as grantors and owners thereof and it is intended that the Post-Consummation Trust be classified as a liquidating trust under Section 301.7701 4 of the Treasury Regulations and that such trust is owned by the Beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution of an undivided interest in the Post-Consummation Trust Assets and then contributed such interests to the Post-Consummation Trust. Accordingly, the Post-Consummation Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Post-Consummation Trust Assets, make timely distributions to the Beneficiaries pursuant to the Plan and not unduly prolong its duration. The Post-Consummation Trust will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Post-Consummation Trust Agreement. The Post-Consummation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries treated as grantors and owners of the trust.

C.     *Transfer of Assets to the Post-Consummation Trust*

The Debtors and the Post-Consummation Trust Plan Administrator will establish the Post-Consummation Trust on behalf of the Beneficiaries pursuant to the Post-Consummation Trust Agreement, with the Beneficiaries to be treated as the grantors and deemed owners of the Post-Consummation Trust Assets. The Debtors will, as set forth below, transfer, assign and deliver to the Post-Consummation Trust, on behalf of the Beneficiaries, all of their rights, titles and interests in the Post-Consummation Trust Assets, including any claims, rights and Causes of Action that the Debtors may hold against any Entity, but not including any Acquired Assets or Unsecured Creditors Trust Assets, in accordance with the provisions herein, notwithstanding any prohibition of assignability under non-bankruptcy law. The Post-Consummation Trust will agree to accept and hold the Post-Consummation Trust Assets in the Post-Consummation Trust for the benefit of the Beneficiaries, subject to the terms of the Plan and the Post-Consummation Trust Agreement.

29

On the Effective Date, the Debtors will transfer the Post-Consummation Trust Assets to the Post-Consummation Trust for the benefit of the Beneficiaries. Notwithstanding any prohibition of assignability under applicable non bankruptcy law, all the Remaining Assets will vest in the Post-Consummation Trust in accordance with section 1141 of the Bankruptcy Code. Upon the transfer of the Post-Consummation Trust Assets to the Post-Consummation Trust, the Debtors will have no interest in or with respect to such Post-Consummation Trust Assets or the Post-Consummation Trust.

D.     *Distribution; Withholding*

The Post-Consummation Trust will make distributions to the Beneficiaries of the Post-Consummation Trust as provided in the Plan, and pursuant to the Post-Consummation Trust Agreement. The Post-Consummation Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Post-Consummation Trust Plan Administrator's sole discretion, to be required by the Plan, any law, regulation, rule, ruling, directive or other governmental requirement.

E.     *Insurance*

The Post-Consummation Trust will maintain customary insurance coverage for the protection of Persons serving as administrators and overseers of the Post-Consummation Trust on and after the Effective Date.

F.     *Post-Consummation Trust Implementation*

On the Effective Date, the Post-Consummation Trust will be established and become effective for the benefit of the Holders of Allowed Claims entitled to distributions from the Post-Consummation Trust under the Plan. The Post-Consummation Trust Agreement will contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Post-Consummation Trust as a grantor trust and the Beneficiaries as the grantors and owners thereof for federal income tax purposes. All parties (including the Debtors, the Post-Consummation Trust Plan Administrator and the Beneficiaries) will execute any documents or other instruments as necessary to cause title to the Remaining Assets to be transferred to the Post-Consummation Trust.

G.     *Disputed Claims Reserve*

The Post-Consummation Trust Plan Administrator will maintain, in accordance with the Post-Consummation Trust Plan Administrator's powers and responsibilities under the Plan and the Post-Consummation Trust Agreement, a Disputed Claims Reserve. The Post-Consummation Trust Plan Administrator will, in its sole discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the Post-Consummation Trust Agreement, as such Disputed Claims are resolved by Final Order, and such amounts will be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date. The Post-Consummation Trust will pay taxes on the taxable net income or gain allocable to Holders of Disputed Claims on behalf of such Holders and, when such Disputed Claims are ultimately resolved, Holders whose Disputed Claims are determined to be Allowed Claims will receive distributions from the Post-Consummation Trust net of the taxes that the Post-Consummation Trust previously paid on their behalf.

H.     *Termination of the Post-Consummation Trust*

The Post-Consummation Trust will terminate as soon as practicable, but in no event later than the fifth anniversary of the Effective Date; provided that, on or later than the date six months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Post-Consummation Trust for a finite period if such an extension is necessary to liquidate the Post-Consummation Trust Assets or to complete any distribution required under the Plan. Notwithstanding the foregoing, multiple extensions may be obtained so long as (1) Bankruptcy Court approval is obtained no more than six months prior to the expiration of each extended term and (2) the Post-Consummation Trust Plan Administrator receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Post-

Consummation Trust as a grantor trust for federal income tax purposes. If only *de minimis* assets remain after Post-Consummation Trust Senior Claims have been paid in full, the Post-Consummation Trust Plan Administrator, in its sole discretion, may distribute such assets to a charity.

I.     *Termination of the Post-Consummation Trust Plan Administrator*

The duties, responsibilities and powers of the Post-Consummation Trust Plan Administrator will terminate in accordance with the terms of the Post-Consummation Trust Agreement.

**J.     *Exculpation; Indemnification***

**The Post-Consummation Trust Plan Administrator, the Post-Consummation Trust, the professionals of the Post-Consummation Trust and their representatives will be exculpated and indemnified pursuant to the terms of the Post-Consummation Trust Agreement.**

K.     *Cooperation with Unsecured Creditors Trust*

The Post-Consummation Trust and the Post-Consummation Trust Plan Administrator shall reasonably cooperate with the Unsecured Creditors Trust and the Unsecured Creditors Trust Plan Administrator to facilitate the administration of the Trusts, including, but not limited to the sharing of information related to Claims and any Disputed Claims Reserve.

# ARTICLE IX.

# THE UNSECURED CREDITORS TRUST; THE UNSECURED TRUST PLAN ADMINISTRATOR

A.     *Generally*

The powers, authority, responsibilities and duties of the Unsecured Creditors Trust and the Unsecured Creditors Trust Plan Administrator are set forth in and will be governed by the Unsecured Creditors Trust Agreement. The Committee will designate the initial Unsecured Creditors Trust Plan Administrator.

B.     *Purpose of the Unsecured Creditors Trust*

The Unsecured Creditors Trust will be established for the primary purpose of liquidating its assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Unsecured Creditors Trust. Upon the transfer by the Debtors and the Purchaser, respectively, of the Unsecured Creditors Trust Assets, the Debtors and Purchaser will have no reversionary or further interest in or with respect to the Unsecured Creditors Trust Assets or the Unsecured Creditors Trust. For all federal income tax purposes, the Beneficiaries of the Unsecured Creditors Trust will be treated as grantors and owners thereof and it is intended that the Unsecured Creditors Trust be classified as a liquidating trust under Section 301.7701 4 of the Treasury Regulations and that such trust is owned by the Beneficiaries of the Unsecured Creditors Trust. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries of the Unsecured Creditors Trust be treated as if they had received a distribution of an undivided interest in the Unsecured Creditors Trust Assets and then contributed such interests to the Unsecured Creditors Trust. Accordingly, the Unsecured Creditors Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Unsecured Creditors Trust Assets, make timely distributions to the Beneficiaries of the Unsecured Creditors Trust pursuant to the Plan and the Unsecured Creditors Trust Agreement and not unduly prolong its duration. The Unsecured Creditors Trust will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Unsecured Creditors Trust Agreement. The Unsecured Creditors Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries of the Unsecured Creditors Trust treated as grantors and owners of the trust.

C.     *Transfer of Assets to the Unsecured Creditors Trust*

The Unsecured Creditors Trust Plan Administrator will establish the Unsecured Creditors Trust on behalf of its Beneficiaries pursuant to the Unsecured Creditors Trust Agreement, with the Beneficiaries of the Unsecured Creditors Trust to be treated as the grantors and deemed owners of the Unsecured Creditors Trust Assets. On the Effective Date, the Purchaser will transfer the $10 million Unsecureds Claim Payment and the $2 million Unsecureds Funds Payment, each as defined in the Purchase Agreement, to the Unsecured Creditors Trust for the benefit of the Beneficiaries of the Unsecured Creditors Trust. The Debtors will, as set forth below, transfer, assign and deliver to the Unsecured Creditors Trust, on behalf of the Beneficiaries of the Unsecured Creditors Trust, the Residual Chapter 5 Claims as set forth in the Purchase Agreement, in accordance with the provisions herein, notwithstanding any prohibition of assignability under non-bankruptcy law. The Unsecured Creditors Trust will agree to accept and hold the Unsecured Creditors Trust Assets in the Unsecured Creditors Trust for the benefit of the Beneficiaries of the Unsecured Creditors Trust, subject to the terms of the Plan and the Unsecured Creditors Trust Agreement.

D.     *Distribution; Withholding*

The Unsecured Creditors Trust will make distributions to the Beneficiaries of the Unsecured Creditors Trust pursuant to the Unsecured Creditors Trust Agreement. The Unsecured Creditors Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Unsecured Creditors Trust Plan Administrator's sole discretion, to be required by the Unsecured Creditors Trust Agreement, any law, regulation, rule, ruling, directive or other governmental requirement.

E.     *Insurance*

The Unsecured Creditors Trust will maintain customary insurance coverage, if appropriate and available, for the protection of Persons serving as administrators and overseers of the Unsecured Creditors Trust on and after the Effective Date.

F.     *Unsecured Creditors Trust Implementation*

On the Effective Date, the Unsecured Creditors Trust will be established and become effective for the benefit of the Beneficiaries of the Unsecured Creditors Trust entitled to distributions from the Unsecured Creditors Trust under the Unsecured Creditors Trust Agreement. The Unsecured Creditors Trust Agreement will contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Unsecured Creditors Trust as a grantor trust and the Beneficiaries of the Unsecured Creditors Trust as the grantors and owners thereof for federal income tax purposes.

G.     *Disputed Claims Reserve*

The Unsecured Creditors Trust Plan Administrator will maintain, in accordance with the Unsecured Creditors Trust Plan Administrator's powers and responsibilities under the Plan and the Unsecured Creditors Trust Agreement, a Disputed Claims Reserve. The Unsecured Creditors Trust Plan Administrator will, in its sole discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the Unsecured Creditors Trust Agreement, as such Disputed Claims are resolved by Final Order, and such amounts will be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date. The Unsecured Creditors Trust will pay taxes on the taxable net income or gain allocable to Holders of Disputed Claims on behalf of such Holders and, when such Disputed Claims are ultimately resolved, Holders whose Disputed Claims are determined to be Allowed Claims will receive distributions from the Unsecured Creditors Trust net of the taxes that the Unsecured Creditors Trust previously paid on their behalf.

32

*H.     Termination of the Unsecured Creditors Trust*

The Unsecured Creditors Trust will terminate as soon as practicable, but in no event later than the fifth anniversary of the Effective Date; provided that, on or later than the date six months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Unsecured Creditors Trust for a finite period if such an extension is necessary to liquidate the Unsecured Creditors Trust Assets or to complete any distribution required under the Unsecured Creditors Trust Agreement. Notwithstanding the foregoing, multiple extensions may be obtained so long as (1) Bankruptcy Court approval is obtained no more than six months prior to the expiration of each extended term and (2) the Unsecured Creditors Trust Plan Administrator receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Unsecured Creditors Trust as a grantor trust for federal income tax purposes.

*I.     Termination of the Unsecured Creditors Trust Plan Administrator*

The duties, responsibilities and powers of the Unsecured Creditors Trust Plan Administrator will terminate in accordance with the terms of the Unsecured Creditors Trust Agreement.

**J.     Exculpation; Indemnification**

**The Unsecured Creditors Trust Plan Administrator, the Unsecured Creditors Trust, the professionals of the Unsecured Creditors Trust and their representatives will be exculpated and indemnified pursuant to the terms of the Unsecured Creditors Trust Agreement.**

*K.     Cooperation with Post-Consummation Trust*

The Unsecured Creditors Trust and the Unsecured Creditors Trust Plan Administrator shall reasonably cooperate with the Post-Consummation Trust and the Post-Consummation Trust Plan Administrator to facilitate the administration of the Trusts, including, but not limited to the sharing of information related to Claims and any Disputed Claims Reserve.

## ARTICLE X.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

*A.     Resolution of Disputed Claims*

1.     Prosecution of Claims Objections

Except as set forth in the Purchase Agreement, the Debtors, prior to the Effective Date, and thereafter the Trusts with respect to Claims filed by Beneficiaries of the respective Trusts, shall have the exclusive authority to file objections on or before the Claims Objection Bar Date, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether classified or otherwise. From and after the Effective Date, the Trusts may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; provided, however, in the event the Purchaser objects to any Claim in accordance with the terms of the Purchase Agreement, the Post-Consummation Trust may not settle or compromise the Disputed Claim without (a) the written consent of the Purchaser or (b) order of the Bankruptcy Court. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date. Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim.

2.     Claims Estimation

Before the Effective Date, the Debtors, and after the Effective Date, the Trusts with respect to Claims filed by Beneficiaries of the respective Trusts, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the

33

Debtors or the Trusts have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the relevant Trust may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

       3.     Payments and Distributions on Disputed Claims, In General

Notwithstanding any provision herein to the contrary, except as otherwise agreed by the Plan Administrators in their respective sole discretion, no partial payments and no partial distributions will be made with respect to a Disputed Claim until the resolution of any such disputes by settlement or Final Order. On the date or, if such date is not a Business Day, on the next successive Business Day that is 20 calendar days after the end of the calendar quarter in which a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim will receive all payments and distributions to which that Holder is then entitled under the Plan. Notwithstanding the foregoing, any Holder of both an Allowed Claim and a Disputed Claim in the same Class of Claims will not receive payment or distribution in satisfaction of any such Allowed Claim, except as otherwise agreed by the Plan Administrators in their respective sole discretion or ordered by the Bankruptcy Court, until all such Disputed Claims are resolved by settlement or Final Order. In the event that there are Claims that require adjudication or other resolution, the Debtors and Post-Consummation Trust reserve the right to, or shall upon an order of the Bankruptcy Court, establish appropriate reserves for potential payment of any such Claims.

*B.*     *Claims Allowance*

Except as expressly provided herein or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Trusts will have and shall retain after the Effective Date any and all rights and defenses that the Debtors had with respect to any Claim as of the Petition Date. All Claims of any Person or Entity subject to section 502(d) of the Bankruptcy Code shall be deemed disallowed as of the Effective Date unless and until such Person or Entity pays in full the amount that it owes such Debtor.

*C.*     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or any Class of Claims are Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine any such controversy before the Confirmation Date.

## ARTICLE XI.

## SUBSTANTIVE CONSOLIDATION

*A.*     *Consolidation of the Chapter 11 Cases*

The Plan contemplates and will effect the substantive consolidation of the Substantively Consolidated Debtors into a single Entity solely for the purposes of voting and distributions under the Plan and the substantive consolidation of the International Holding Company Debtors into a single Entity solely for the purposes of voting and distributions under the Plan. Accordingly, on the Effective Date: (1) no distributions will be made under the Plan on account of the Intercompany Claims, other than Allowed Intercompany Claims as set forth in the Plan Supplement; (2) the guarantees of certain Debtors of obligations of other Debtors, including those obligations

arising under the Second Lien Facility, the 9.25% Senior Note Indenture and the 12% Senior Note Indenture, will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any Debtor with another Debtor will be deemed to be one obligation of the Substantively Consolidated Debtors and/or the International Holding Company Debtors, as appropriate; (3) each and every Claim against a Substantively Consolidated Debtor will be deemed asserted against the consolidated Estates of all of the Substantively Consolidated Debtors, will be deemed one Claim against and obligation of the deemed consolidated Substantively Consolidated Debtors and their Estates and will be treated in the same Class regardless of the Substantively Consolidated Debtor, and (4) each and every Claim against an International Holding Company Debtor will be deemed asserted against the consolidated Estates of all of the International Holding Company Debtors, will be deemed one Claim against and obligation of the deemed consolidated International Holding Company Debtors and their Estates and will be treated in the same Class regardless of the International Holding Company Debtor. Notwithstanding the substantive consolidation herein, substantive consolidation will not affect the obligation of each and every Debtor under 28 U.S.C. § 1930(a)(6) until a particular case is closed, converted or dismissed.

B.      *Substantive Consolidation Order*

        The Plan will serve as a motion seeking entry of an order substantively consolidating the Debtors' Chapter 11 Cases as set forth herein. Unless an objection to substantive consolidation is made in writing by any Creditor affected by the Plan as herein provided on or before the Plan Objection Deadline, an order substantively consolidating the Debtors' Chapter 11 Cases, including as part of the Confirmation Order, may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto will be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide with the Confirmation Hearing.

C.      *Reservation of Rights*

        The Debtors reserve the right at any time up to the conclusion of the Confirmation Hearing to withdraw their request for substantive consolidation, to seek Confirmation of the Plan as if there were no substantive consolidation, and to seek Confirmation of the Plan with respect to one or more Debtors even if Confirmation with respect to other Debtors is denied.

## ARTICLE XII.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation*

        It shall be a condition to Confirmation hereof that all provisions, terms and conditions hereof are approved in the Confirmation Order. In addition, the following conditions shall have been satisfied or waived pursuant to the provisions of Article XII.C:

        1.      The Plan, the Sale Order and the proposed Confirmation Order shall be in a form and substance reasonably acceptable to the Debtors and the Purchaser; provided that the Debtors or the Purchaser may seek an expedited hearing before the Bankruptcy Court to address any objection to any of the foregoing.

        2.      The proposed Confirmation Order shall be in a form and substance reasonably acceptable to the Committee, any modification of the Plan shall be in a form and substance reasonably acceptable to the Committee, and any material modification to the Sale Order shall be reasonably acceptable to the Committee, provided that the Debtors or the Purchaser may seek an expedited hearing before the Bankruptcy Court to address any objection by the Committee to any of the foregoing.

        3.      The Plan Supplement, which shall be reasonably acceptable to the Debtors, the Purchaser and the Committee, shall have been filed, provided that if any party objects to the Plan Supplement, the Debtors, the Purchaser or the Committee may seek an expedited hearing before the Bankruptcy Court to address such objection.

*B.      Conditions Precedent to Consummation*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XII.C:

1.      The Confirmation Order confirming the Plan, as the Plan may have been modified, shall have been entered and become a Final Order in a form and substance reasonably satisfactory to the Debtors, the Purchaser and the Committee, provided that if any party objects to the Confirmation Order, the Debtors, the Purchaser or the Committee may seek an expedited hearing before the Bankruptcy Court to address such objection.   The Confirmation Order shall provide that:

the Debtors, the Committee, the Purchaser and the Trusts are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan;

the provisions of the Confirmation Order are nonseverable and mutually dependent; and

the Sale Order is incorporated as part of the Confirmation Order.

2.      All documents and agreements necessary to implement the Plan shall have been, as applicable to each such document and agreement: (a) tendered for delivery; (b) all conditions precedent thereto shall have been satisfied; and (c) shall have been effected or executed; which documents and agreements shall include, but not be limited to the Purchase Agreement, the Post-Consummation Trust Agreement and the Unsecured Creditors Trust Agreement.

3.      All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable laws.

4.      All conditions precedent to the obligations of the Purchaser in the Purchase Agreement shall have been satisfied or waived in accordance with the terms thereof.

5.      The Sale Order shall have been entered and become a Final Order.

6.      The amounts payable by Purchaser in accordance with the Purchase Agreement to the Trusts shall have been paid.

7.      The Closing Date (as defined in the Purchase Agreement) of the Sale Transaction shall have occurred.

*C.      Waiver of Conditions*

The Debtors, in their discretion, and with the consent of (i) the Committee (which consent shall not be unreasonably withheld), and (ii) the Purchaser, may, at any time, waive any of the conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article XII without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  The Purchaser, at any time, may waive any of the conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article XII without notice, leave or order of the Bankruptcy Court or any formal action.

*D.      Effect of Non Occurrence of Conditions to Consummation*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any

36

other parties in interest; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other parties in interest in any respect.

## ARTICLE XIII.

### SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

*A.     Compromise and Settlement*

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and their respective distributions and treatments hereunder take into account for and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, substantive consolidation or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant hereto, including for substantive consolidation purposes. The Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan, including all issues pertaining to claims for substantive consolidation (which are settled by the distributions in the Plan) are (1) in the best interests of the Debtors and their Estates, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. In addition, the allowance, classification and treatment of Allowed Claims take into account any causes of action, claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist: (1) between the Debtors and the Releasing Parties; and (2) as between the Releasing Parties (to the extent set forth in the Third Party Release). As of the Effective Date, any and all such causes of action, claims and counterclaims are settled, compromised and released pursuant hereto. The Confirmation Order will approve all such releases of contractual, legal and equitable subordination rights, causes of action, claims and counterclaims against each such Releasing Party that are satisfied, compromised and settled pursuant hereto. Nothing in Article XIII.A will compromise or settle in any way whatsoever, any Claims or Causes of Action that the Debtors or the Trusts may have against the Non-Released Parties.

*B.     Releases by the Debtors*

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE AND IMMEDIATELY PRIOR TO THE TRANSFER OF THE RESPECTIVE TRUSTS' ASSETS TO SUCH TRUSTS (SUCH THAT THE TRUSTS WILL NOT RECEIVE ANY CLAIM RELEASED HEREUNDER), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES, INCLUDING, BUT NOT LIMITED TO: (A) THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT TO THE PLAN OR OTHERWISE; AND (B) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS AND DIRECTORS IN FACILITATING THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, AND IN VIEW OF THE INDEMNIFICATION PURSUANT TO ARTICLE XIII.E OF THIS PLAN OF DEBTORS' FORMER OFFICERS AND DIRECTORS AS INDEMNIFIED PARTIES, EACH OF THE DEBTORS SHALL PROVIDE A FULL DISCHARGE AND RELEASE TO THE DEBTOR RELEASEES (AND EACH SUCH DEBTOR RELEASEE SO RELEASED SHALL BE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS) AND EACH SUCH DEBTOR RELEASEE'S RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS OR THE TRUSTS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR**

37

COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER PERSON OR ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN; *PROVIDED, HOWEVER,* THAT THE FOREGOING DEBTOR RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE FROM ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR PLAN SUPPLEMENT.

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, THE DEBTORS SHALL NOT HAVE RELEASED NOR BE DEEMED TO HAVE RELEASED BY OPERATION OF THIS ARTICLE XIII.B OR OTHERWISE ANY CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, INTERESTS, REMEDIES, LIABILITIES OR CAUSES OF ACTION THAT THEY OR THE TRUSTS MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, *AND FURTHER*, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO THE DEBTORS OR TRUSTS ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR RESPECTIVE PROPERTY.

*C.     Third Party Release*

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE, EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL PROVIDE A FULL DISCHARGE AND RELEASE (AND EACH PERSON OR ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO THE DEBTOR RELEASEES, AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN; *PROVIDED, HOWEVER,* THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY OF THE DEBTOR RELEASEES FROM ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR PLAN SUPPLEMENT, OR RELEASE THE PURCHASER FROM ITS OBLIGATIONS UNDER THE PURCHASE AGREEMENT, THE SALE ORDER AND THE PLAN.

THE THIRD PARTY RELEASE SHALL HAVE NO EFFECT ON THE CLAIMS OF RELEASEES TREATED UNDER THE PLAN, TO THE EXTENT OF ALLOWANCE OF CLAIMS AND SATISFACTION OF CLAIMS PURSUANT TO THE PLAN.

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, THE RELEASING PARTIES SHALL NOT HAVE RELEASED NOR DEEMED TO HAVE RELEASED BY OPERATION OF THIS ARTICLE XIII.C OR OTHERWISE ANY CLAIMS OR CAUSES OF ACTION

38

**THAT THEY, THE DEBTORS OR THE TRUSTS MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES.**

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, *AND FURTHER*, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE THIRD PARTY RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED BY THE THIRD PARTY RELEASE AGAINST ANY OF THE THIRD PARTY RELEASEES OR THEIR PROPERTY.

D.    *Exculpation*

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any prepetition or postpetition act taken or omitted to be taken in connection with or related to formulating, negotiating, preparing, disseminating, implementing, administering the Plan or otherwise, the Plan Supplement, the Disclosure Statement, the Post-Consummation Trust Agreement, the Unsecured Creditors Trust Agreement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or confirming or consummating the Plan; *provided, however*, that the foregoing provisions of this Article XIII.D shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; *provided still further*, that the foregoing Exculpation shall not apply to any acts or omissions expressly set forth in and preserved by the Plan or Plan Supplement.

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall not include the Non-Released Parties, and the Plan shall not exculpate nor be deemed to have exculpated any of the Non-Released Parties for any acts they have taken, whether in contemplation of the restructuring of the Debtors, in confirming or consummating the Plan, or otherwise.

E.    *Indemnification*

Only to the extent of available funds in the Post-Consummation Indemnity Account, on and from the Effective Date, and effective as of the Effective Date, the Post-Consummation Trust shall indemnify and hold harmless, except as provided in the Plan Supplement, each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such parties arising from or related in any way to any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those arising from or related in any way to: (a) any acquisition by any such party of any indebtedness of the Debtors; (b) any action or omission of any such party with respect to any such indebtedness of the Debtors (including without limitation any action or omission of any such party with respect to the acquisition, holding, voting or disposition of any such investment); (c) any action or omission of any such party in such party's capacity as an officer, director, employee or agent of, or advisor to any Debtor; (d) any disclosure made or not made by any Person to any current or former Holder of any such indebtedness of the Debtors; (e) any consideration paid to any such party by any of the Debtors in respect of any investment by any such party in any indebtedness of the Debtors

39

or in respect of any services provided by any such party to any Debtor; and (f) any action taken or not taken in connection with the Post-Consummation Trust Agreement, the Chapter 11 Cases, or the Plan. In the event that any such party becomes involved in any action, proceeding or investigation brought by or against any Person, as a result of matters to which the foregoing indemnity may relate, the Post-Consummation Trust will promptly reimburse any such party for its reasonable legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof; *provided, however*, that, notwithstanding anything herein to the contrary, the Plan shall not indemnify nor be deemed to have indemnified any of the Non-Released Parties, whether for any matter to which this Article XIII.E pertains or otherwise, and provided further that the obligations of the Post-Consummation Trust with respect to this Article XII.E shall be limited to the funds in the Post-Consummation Indemnity Account.

F.      *Preservation of Rights of Action*

   1.      Maintenance of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date the Post-Consummation Trust shall retain all rights to commence and pursue, as appropriate, any and all Other Actions, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases and all actions set forth in the Plan Supplement.

Except as otherwise provided in the Plan, Purchase Agreement or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any claims, rights, and Causes of Action, and which such claims, rights and Causes of Action are Excluded Assets and are not Residual Chapter 5 Claims, that the Debtors may hold against any Entity shall vest upon the Effective Date in the Post-Consummation Trust. The Post-Consummation Trust, through its authorized agents and representatives, shall retain and may exclusively enforce any and all Other Actions. After the Effective Date, the Post-Consummation Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all Other Actions, without the consent or approval of any third party and without any further order of the Bankruptcy Court.

   2.      Preservation of All Causes of Action Not Expressly Sold, Settled or Released

Unless a Claim or Cause of Action against a Holder or other Person or Entity is acquired by Purchaser (and is an Excluded Asset) pursuant to the Purchase Agreement, or is a Residual Chapter 5 Claim, or is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Sale Order and the Confirmation Order), subject to the terms of the Purchase Agreement, the Debtors expressly reserve such Claim or Cause of Action for later adjudication by the Debtors or the Post-Consummation Trust (including, without limitation, claims and Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the Debtor Release contained in Article XIII.B) or any other Final Order (including the Confirmation Order). In addition, the Debtors and Post-Consummation Trust expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, unless such claims are acquired by Purchaser pursuant to the Purchase Agreement, or are a Residual Chapter 5 Claim.

G.      **_INJUNCTION_**

   1.      **FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE DEBTORS, THE PURCHASER, THE COMMITTEE, THE COMMITTEE MEMBERS, INDENTURE**

TRUSTEES OR THE TRUSTS, THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

2.    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, THE PURCHASE AGREEMENT OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PURCHASER, THE DEBTORS, THE DEBTORS IN POSSESSION, THE DEBTORS' ESTATES, THE TRUSTS, THE COMMITTEE, THE COMMITTEE MEMBERS, INDENTURE TRUSTEES, ANY OF THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE.

3.    THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS IN THE PLAN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS OR PROPERTIES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS SHALL BE SATISFIED AND RELEASED IN FULL.

4.    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, THE PURCHASE AGREEMENT OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PARTIES AND ENTITIES ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, ON ACCOUNT OF ANY CLAIM OR EQUITY INTEREST SATISFIED AND RELEASED HEREBY, FROM:

(a)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY DEBTOR, THE PURCHASER, THE TRUSTS, THE COMMITTEE, THE COMMITTEE MEMBERS, THE INDENTURE TRUSTEES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), OR ANY OF THEIR SUCCESSORS AND ASSIGNS, OR ANY OF THEIR ASSETS AND PROPERTIES;

(b)    ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY DEBTOR, THE PURCHASER, THE TRUSTS, THE COMMITTEE, THE COMMITTEE MEMBERS, INDENTURE TRUSTEES AND ANY OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR RESPECTIVE ASSETS AND PROPERTIES;

(c)     CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST ANY DEBTOR, THE PURCHASER, THE TRUSTS, THE INDENTURE TRUSTEES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), OR THE PROPERTY OR ESTATE OF ANY OF THE FOREGOING; OR

(d)     ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM ANY DEBTOR, THE PURCHASER, THE TRUSTS OR AGAINST THE PROPERTY OR ESTATE OF ANY DEBTOR, THE PURCHASER OR THE TRUSTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), EXCEPT TO THE EXTENT A RIGHT TO SETOFF, RECOUPMENT OR SUBROGATION IS ASSERTED WITH RESPECT TO A TIMELY FILED PROOF OF CLAIM.

5.     BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM RECEIVING DISTRIBUTIONS PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE INJUNCTIONS SET FORTH IN THIS ARTICLE XIII.G.

## ARTICLE XIV.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Persons and Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as legally permissible, including, but not limited to, jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2.     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.     resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XV.D adding Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Post-Consummation Trust after the Effective Date, *provided*, *however*, that the Post-Consummation Trust shall reserve the right to commence actions in all appropriate jurisdictions;

6. enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Sale Transaction, the Post-Consummation Trust Agreement and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement, Post-Consummation Trust Agreement or the Disclosure Statement;

7. resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Sale Order, the Plan, or any Person's or Entity's obligations incurred in connection with the Plan;

8. issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

9. enforce Article XIII.A, Article XIII.B, Article XIII.C, Article XIII.D, and Article XIII.E;

10. enforce the injunction set forth in Article XIII.G;

11. resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article XIII, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

12. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13. resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Sale Order, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14. enter an order and/or Final Decree concluding the Chapter 11 Cases.

## ARTICLE XV.

## MISCELLANEOUS PROVISIONS

A. *Effectuating Documents, Further Transactions and Corporate Action*

The Debtors, the Purchaser, the Committee and the Trusts are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions hereof pursuant hereto.

Prior to, on or after the Effective Date (as appropriate), all matters provided for hereunder that would otherwise require approval of the shareholders or directors of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable state law without any requirement of further action by the shareholders, directors, managers or partners of the Debtors.

B. *Dissolution of Committee*

Effective no later than thirty (30) days after the Effective Date if no appeal of the Confirmation Order is then pending, and so long as the Trusts have been established, the Committee shall dissolve with respect to the Debtors and its respective members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to the Chapter 11 Cases; *provided*, *however*, that the Committee and their respective Retained Professionals shall be retained with respect to (i) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (ii) motions seeking the enforcement of the provisions of the Plan and the transactions contemplated hereunder or the Confirmation Order and (iii) pending appeals.

43

C.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code after the Effective Date, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid prior to the closing of the Chapter 11 Cases on the earlier of when due or the Effective Date, or as soon thereafter as practicable.

D.    *Modification of Plan*

Effective as of the date hereof, and subject to the limitations contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Post-Consummation Trust, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  Any such modification shall be made subject to the reasonable consent of the Purchaser and the Committee, provided that if any party objects to such modification, the Debtors, the Purchaser or the Committee may seek an expedited hearing before the Bankruptcy Court to address such objection.

E.    *Revocation of Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

F.    *Successors and Assigns*

The rights, benefits and obligations of any Person or Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

G.    *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Person with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) any Debtor with respect to the Holders of Claims or Equity Interests or other parties in interest; or (b) any Holder of a Claim or other party in interest prior to the Effective Date.

H.    *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant to the Plan, including, but not limited to the Sale Transaction, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

I.      *Further Assurances*

The Debtors, Trusts, all Holders of Claims receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

J.      *Severability*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term of provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; provided, however, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtors, the Purchaser and the Committee, provided that the Debtors, the Purchaser or the Committee may seek an expedited hearing before the Bankruptcy Court to address any objection to any of the foregoing. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

K&E 11752289.17

K.     *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid to:

Tower Automotive Inc.
27275 Haggerty Road
Novi, Michigan 48377
Attn: Legal Department

**with copies to**:

Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois 60601
Attn: Anup Sathy P.C. and Ross Kwasteniet

Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York  10022
Attn:  Ira S. Dizengoff and Mary Reidy Masella

Lowenstein Sandler P.C.
65 Livingston Avenue
Roseland, New Jersey 07068-1791
Attn: Robert Minion and Paul Kizel

L.     *Filing of Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

46

Dated  May 1, 2007

Respectfully submitted,

TOWER AUTOMOTIVE, INC.

By:   /s/ Kathleen Ligocki
Its:   President and Chief Executive Officer

ALGOODS, USA, INC.

By:   /s/ Kathleen Ligocki
Its:   President

R.J. TOWER CORPORATION

By:   /s/ Kathleen Ligocki
Its:   President

TOWER AUTOMOTIVE BARDSTOWN, INC.

By:   /s/ Kathleen Ligocki
Its:   President

TOWER AUTOMOTIVE BOWLING GREEN, LLC

By:   /s/ Kathleen Ligocki
Its:   President

TOWER AUTOMOTIVE CHICAGO, LLC

By:   /s/ Kathleen Ligocki
Its:   President

TOWER AUTOMOTIVE FINANCE, INC.

By:   /s/ Kathleen Ligocki
Its:   President

TOWER AUTOMOTIVE GRANITE CITY, LLC

By:   /s/ Kathleen Ligocki
Its:   President

TOWER AUTOMOTIVE GRANITE CITY SERVICES, LLC

By:   /s/ Kathleen Ligocki
Its:   President

TOWER AUTOMOTIVE INTERNATIONAL, INC.

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE INTERNATIONAL HOLDINGS, INC.

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE INTERNATIONAL YOROZU HOLDINGS, INC.

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE LANSING, LLC

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE MADISON, LLC

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE MICHIGAN, LLC

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE MILWAUKEE, LLC

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE PLYMOUTH, INC.

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE PRODUCTS COMPANY, INC.

By:    /s/ Kathleen Ligocki
Its:    President

TOWER AUTOMOTIVE RECEIVABLES COMPANY,
INC.

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE SERVICES AND
TECHNOLOGY, LLC

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE TECHNOLOGY, INC.

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE TECHNOLOGY PRODUCTS,
INC.

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE TOOL, LLC

By:    /s/ Kathleen Ligocki
Its:    President


TOWER SERVICES, INC.

By:    /s/ Kathleen Ligocki
Its:    President


TRYLON CORPORATION

By:    /s/ Kathleen Ligocki
Its:    President


TOWER AUTOMOTIVE, s.r.o.,

By:    /s/ Gerrit Kotterman
Its:    Managing Director



EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among,

TOWER AUTOMOTIVE, INC.,
a debtor-in-possession

and its

DEBTOR AFFILIATE SIGNATORIES HERETO,

and

TA ACQUISITION COMPANY, LLC

Dated as of May 1, 2007

# TABLE OF CONTENTS

Page

ARTICLE 1.  DEFINITIONS....................................................................................................1

    Section 1.1.    Certain Defined Terms..............................................................1
    Section 1.2.    Other Defined Terms. ..............................................................17

ARTICLE 2.  PURCHASE AND SALE ..................................................................................18

    Section 2.1.    Transfer of Acquired Assets and Assumption of Assumed Liabilities....18
    Section 2.2.    Right to Contest Claims..........................................................22
    Section 2.3.    Excluded Liabilities. ...............................................................22
    Section 2.4.    Allocation of Purchase Price....................................................23
    Section 2.5.    Deposit. ...............................................................................23
    Section 2.6.    Closing. ...............................................................................23
    Section 2.7.    Letters of Credit. ....................................................................23
    Section 2.8.    Closing Deliveries by Seller. ..................................................24
    Section 2.9.    Closing Deliveries by Purchaser. .............................................25

ARTICLE 3.  REPRESENTATIONS AND WARRANTIES OF THE COMPANY .................25

    Section 3.1.    Organization..........................................................................25
    Section 3.2.    Bank Accounts; Letters of Credit. ............................................26
    Section 3.3.    Affiliate Transactions..............................................................27
    Section 3.4.    Insurance. .............................................................................27
    Section 3.5.    Accounts Receivable, Inventory and Accounts Payable.................28
    Section 3.6.    Export Control Laws...............................................................28
    Section 3.7.    Certain Payments. ..................................................................29
    Section 3.8.    Authority; Enforceability.........................................................29
    Section 3.9.    No Conflicts or Violations; Consents.........................................29
    Section 3.10.    Title to Assets and Location of Assets.......................................30
    Section 3.11.    Financial Information...............................................................30
    Section 3.12.    No Undisclosed Liabilities.......................................................31
    Section 3.13.    Absence of Certain Changes or Events.......................................31
    Section 3.14.    Contracts. .............................................................................32
    Section 3.15.    Suppliers. .............................................................................34
    Section 3.16.    Compliance with Law .............................................................34
    Section 3.17.    Litigation..............................................................................35
    Section 3.18.    Employee Compensation and Benefit Plans; ERISA. ...................35
    Section 3.19.    Labor and Employment Matters. ..............................................38
    Section 3.20.    Properties. ............................................................................41
    Section 3.21.    Intellectual Property................................................................42
    Section 3.22.    Environmental Laws................................................................42
    Section 3.23.    Brokers.................................................................................43

Section 3.24.   Tax Matters. ...............................................................43
Section 3.25.   Disclosure. ...............................................................44
Section 3.26.   No Other Representations or Warranties. ............................44

ARTICLE 4.   REPRESENTATIONS AND WARRANTIES OF PURCHASER ......................45

Section 4.1.   Organization. .............................................................45
Section 4.2.   Authority; Enforceability. ..............................................45
Section 4.3.   Non-Contravention. ......................................................45
Section 4.4.   Governmental Consents. ..................................................45
Section 4.5.   Financing. ................................................................46
Section 4.6.   Brokers. ..................................................................46
Section 4.7.   Acquired Assets "AS IS"; Purchaser's Acknowledgment Regarding Same.
               .........................................................................46

ARTICLE 5.   ADDITIONAL AGREEMENTS ........................................................47

Section 5.1.   Conduct of Business Prior to the Closing. ..............................47
Section 5.2.   Access to Information. ...................................................52
Section 5.3.   Superior Offers. .........................................................53
Section 5.4.   Bankruptcy Court Orders. .................................................53
Section 5.5.   Notice of Filings. .......................................................53
Section 5.6.   Further Action; Reasonable Best Efforts. ...............................53
Section 5.7.   Public Announcements. ....................................................55
Section 5.8.   Availability of Business Records; Cooperation Following the Closing. .55
Section 5.9.   Financing Assistance. ....................................................56
Section 5.10.  Further Assurances. .......................................................56
Section 5.11.  Reorganizations. ..........................................................57
Section 5.12.  Transfer Taxes. ...........................................................58
Section 5.13.  Name Change. ..............................................................58
Section 5.14.  Certain Contract Matters. ................................................59
Section 5.15.  Certain Tax Matters. ......................................................59
Section 5.16.  Assumed Contracts and Cure Amounts. ......................................59

ARTICLE 6.   EMPLOYEE MATTERS .............................................................60

Section 6.1.   Employee Matters. .........................................................60
Section 6.2.   Management Incentive Plan. ...............................................62

ARTICLE 7.   CONDITIONS TO CLOSING ........................................................62

Section 7.1.   Mutual Conditions to Closing. ............................................62
Section 7.2.   Conditions to Obligations of Purchaser. .................................63
Section 7.3.   Conditions to Obligations of Seller. ....................................64

ARTICLE 8.   TERMINATION, AMENDMENT AND WAIVER ............................................65

Section 8.1.   Termination. ..............................................................65

| | | |
|---|---|---|
| Section 8.2. | Effect of Termination | 67 |
| Section 8.3. | Amendment | 68 |
| Section 8.4. | Waiver | 68 |

ARTICLE 9. GENERAL PROVISIONS ....................................................................69

| | | |
|---|---|---|
| Section 9.1. | Non-Survival of Representations, Warranties and Agreements. | 69 |
| Section 9.2. | Materiality; Company Disclosure Schedule. | 69 |
| Section 9.3. | Notices. | 69 |
| Section 9.4. | Severability. | 70 |
| Section 9.5. | Entire Agreement. | 71 |
| Section 9.6. | Assignment. | 71 |
| Section 9.7. | No Third Party Beneficiaries. | 71 |
| Section 9.8. | Governing Law. | 71 |
| Section 9.9. | Jurisdiction. | 72 |
| Section 9.10. | Waiver of Jury Trial. | 72 |
| Section 9.11. | Counterparts; Electronic Transmission. | 72 |
| Section 9.12. | Interpretation. | 73 |
| Section 9.13. | Expenses. | 73 |
| Section 9.14. | Currency. | 73 |
| Section 9.15. | Preparation of this Agreement. | 73 |
| Section 9.16. | Releases | 74 |

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Form of Assignment and Assumption Agreement |
| Exhibit B | - | Form of Bill of Sale |
| Exhibit C | - | Marketing Protocol Order |
| Exhibit D | - | Escrow Agreement |
| Exhibit E | - | Form of Plan |
| Exhibit F | - | Form of Sale Order |

**SCHEDULES**

| | | |
|---|---|---|
| Schedule 1.1(a)(i) | - | Chapter 5 Claims |
| Schedule 1.1(a)(ii) | - | Excluded Chapter 5 Claims |
| Schedule 1.1(a)(iii) | - | Seller's Budget |
| Schedule 1.1(a)(iv) | - | Excluded Foreign Entity |
| Schedule 1.1(a)(v) | - | Additional Excluded Assets |
| Schedule 1.1(a)(vi) | - | Knowledge Officers |
| Schedule 1.1(a)(vii) | - | Retiree Benefits Settlements |
| Schedule 1.1(a)(viii) | - | Pre-petition Secured Tax Obligations |
| Schedule 1.1(a)(ix) | - | Allowed Priority Tax Obligations - Taxes |
| Schedule 3.1(b) | - | Organization (Domestic) |
| Schedule 3.1(b) | - | Organization (Foreign) |
| Schedule 3.1(c) | - | Options |
| Schedule 3.2(a) | - | Bank Accounts |
| Schedule 3.2(b) | - | Letters of Credit |
| Schedule 3.3 | - | Affiliate Transactions |
| Schedule 3.4 | - | Insurance |
| Schedule 3.5(c) | - | Accounts Payable |
| Schedule 3.6 | - | Export Control Laws |
| Schedule 3.7 | - | Certain Payments |
| Schedule 3.8 | | Authority |
| Schedule 3.9 | - | Conflicts and Consents |
| Schedule 3.10 | - | Encumbrances on Foreign Assets |
| Schedule 3.11(a) | - | Financial Information |
| Schedule 3.12 | - | Undisclosed Liabilities |
| Schedule 3.13 | - | Absence of Certain Changes or Events |
| Schedule 3.14(a) | - | Contracts |
| Schedule 3.14 (b) | - | Accommodation Agreements |
| Schedule 3.14(c) | - | Outstanding Balances |
| Schedule 3.14(d) | - | Exceptions to Validity of Contracts |
| Schedule 3.14(e) | - | Violation and Default |
| Schedule 3.14(f) | - | Foreign Indebtedness |
| Schedule 3.14(g) | - | Foreign Unrestricted Cash Balances |
| Schedule 3.14(h) | - | Non-Foreign Indebtedness |
| Schedule 3.14(i) | - | Non-Foreign Unrestricted Cash Balances |

| | | |
|---|---|---|
| Schedule 3.15(a) | - | Top Ten Suppliers |
| Schedule 3.15(b) | - | Changes in Supplier Relationships |
| Schedule 3.16 | - | Compliance with Law |
| Schedule 3.17 | - | Litigation |
| Schedule 3.18(a) | - | Employee Plans |
| Schedule 3.18(b) | - | Assumed Plans |
| Schedule 3.18(d) | - | Changes to Employee Plans |
| Schedule 3.18(e) | - | Continuing Pension Benefits |
| Schedule 3.19(a) | - | Labor and Employment Matters |
| Schedule 3.19(b) | - | Plant Closings and Layoffs |
| Schedule 3.19(c) | - | Open U.S. Facilities Collective Bargaining Agreements and Relationships |
| Schedule 3.20(a) | - | Owned Real Property |
| Schedule 3.20(b) | - | Leased Real Property |
| Schedule 3.20(c) | - | Title Policies and Holders of Encumbrances |
| Schedule 3.21(a) | - | Intellectual Property |
| Schedule 3.22 | - | Environmental Laws |
| Schedule 3.23 | - | Brokers |
| Schedule 3.24 | - | Tax |
| Schedule 5.1(a)(x) | - | Consents |
| Schedule 5.1(b) | - | Conduct Prior to Closing (restrictions) |
| Schedule 5.2(a)(i) | | Contact Group |
| Schedule 5.5 | - | Notice of Filing |
| Schedule 5.16 | - | Assumed Contracts |
| Schedule 7.2(f) | - | Required Consents |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of May 1, 2007 (this "**Agreement**"), by and among Tower Automotive, Inc., a Delaware corporation, a debtor-in-possession (the "**Company**"), the debtor affiliates of the Company that are signatories to this Agreement (the Company and, such debtor affiliates are referred to collectively herein as "**Seller**"), and TA Acquisition Company, LLC, a Delaware limited liability company ("**Purchaser**"). Seller and Purchaser, each a "**Party**" and, collectively, the "**Parties**."

## WITNESSETH:

WHEREAS, on February 2, 2005, each of the Persons included within the definition of Seller filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are jointly administered under Case No. 05-10578 (ALG) (the "**Bankruptcy Case**"); and

WHEREAS, Seller wishes to sell to Purchaser and Purchaser wishes to purchase from Seller substantially all of the assets of Seller and to assume from Seller certain Liabilities, pursuant to the terms and conditions set forth in this Agreement in accordance with sections 105, 363, 365, 1123(a)(5)(D) and 1141(c) of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants, representations and warranties herein contained, and such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1.

## DEFINITIONS

Section 1.1.   Certain Defined Terms.

As used in this Agreement, the following terms shall have the following meanings:

"**Acquired Assets**" means, except for the Excluded Assets,

(a)   all of the property and assets of Seller including, but not limited to: all property, real and personal; all assets, whether tangible or intangible; all cash and cash equivalents; all accounts receivable; all intercompany receivables including all claims against Foreign Entities; all deposits relating to any Assumed Contracts; all prepaid expenses relating to Acquired Assets or Assumed Contracts; all inventory; all rights in patents, trademarks, copyrights and all other Intellectual Property (including all computer software or systems) owned, controlled or licensed (subject to any rights therein previously granted by Seller to a third party), all rights to payment from the licensees of Intellectual Property pursuant to section 365(n) of the Bankruptcy Code; all Chapter 5 claims (the "**Chapter 5 Claims**") (including, but not limited to, those set forth on Schedule 1.1(a)(i)) other than those set forth on Schedule 1.1(a)(ii)

attached hereto); all other claims of any kind other than (i) claims in respect of Excluded Assets and (ii) claims directly related to Excluded Liabilities which (A) are not Liabilities to customers, suppliers or other business relations with whom Purchaser does business after the Closing and (B) which are identified to Purchaser in advance of any action being taken to collect on such claims and as to which Purchaser does not object to such claim being asserted in its reasonable discretion, all Business Records; all beneficial tax attributes, if any, to the extent transferable by applicable law; all of the stock, limited liability interests, partnership interests, joint venture interests or any other equity interests held by any of the Tower Group entities (whether a majority or a minority interest and including, but not limited to, the capital stock or equity interests of the Foreign Entities (including, without limitation, all interests in Metalsa), but not the capital stock of Seller), and all good will;

(b)     the following to the extent they relate to any Acquired Asset, Assumed Contract, Assumed Liability or any claim or allegation that Purchaser is liable or responsible for a Liability of Seller, whether or not Purchaser has assumed such Seller Liability: claims, credits, security or other deposits, including recoverable deposits, prepayments, prepaid assets, prepaid expenses, prepaid rent, deferred charges, refunds or claims for refunds, causes of action (including, but not limited to, any recovery with respect to litigation involving Metalsa), defenses, counterclaims, crossclaims, third party claims, rights of recovery, rights of setoff and rights of recoupment, insurance proceeds and all rights under historical or current insurance policies of any member of the Tower Group, and, in each case, security interests relating thereto, as applicable, as of the Closing Date;

(c)     all the assets that are reflected on the Balance Sheet provided such assets have not been disposed of by the Tower Group in the ordinary course of business or pursuant to an Order of the Bankruptcy Court, and all assets acquired by the Tower Group in the ordinary course of business or pursuant to an Order of the Bankruptcy Court after the Balance Sheet Date; and

(d)     all trusts, insurance contracts, accounts and funding arrangements relating to any Assumed Plans.

For avoidance of doubt, notwithstanding anything herein to the contrary, no property, asset, right, title or interest of Seller included in the definition of Excluded Asset shall be an Acquired Asset.

"**Acquisition Proposal**" means any proposal or offer (i) for a merger or other business combination involving the Tower Group, (ii) to acquire in any manner, directly or indirectly, an equity interest in the Tower Group or any voting securities of the Tower Group, (iii) to acquire any portion of the assets of the Tower Group, other than in the ordinary course of business or (iv) in respect of any plan of reorganization other than the Plan.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract or otherwise.

"**Affiliated Group**" means any affiliated group within the meaning of Code §1504(a) or any similar group defined under a similar provision of state, local or foreign Law.

"**Allowed**" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by Seller in its Schedules as neither disputed, contingent nor unliquidated and for which the claim amount has not been identified as unknown, and as to which Seller or other party in interest has not filed an objection with the Bankruptcy Court by the Claims Objection Bar Date; (b) a Claim that either is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with Seller of amount and nature of Claim executed on or after the Confirmation Date; or (iii) in or pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (d) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been Filed by the applicable bar date or has otherwise been deemed timely Filed under applicable law; (e) a Claim that is allowed pursuant to the terms hereof; or (f) a Disputed Claim as to which a proof of claim has been timely filed and as to which no objection has been filed by the Claims Objection Bar Date. Each capitalized term used in this definition that is not otherwise defined herein, shall have the respective meaning assigned to such term in the Plan.

"**Allowed Priority Claims**" means any claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code.

"**Allowed Secured Claims**" has the meaning set forth in the Plan.

"**Alternative Transaction**" means a transaction that involves a sale of a material portion of the Acquired Assets, a Chapter 11 plan or a Chapter 7 liquidation.

"**Ancillary Agreements**" means the Escrow Agreement, the Assignment and Assumption Agreement, the Bill of Sale and the Intellectual Property Assignments.

"**Antitrust Law**" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other federal, state and foreign, statutes, rules, regulations, Orders, decrees, administrative and judicial doctrines and other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Assignment and Assumption Agreement**" means an assignment and assumption agreement in the form and substance of Exhibit A attached hereto.

"**Assumed Contracts**" means those of Seller's Collective Bargaining Agreements identified on Schedule 3.19(c), the Change in Control Agreements, the KERP Agreements and subject to Section 5.16 herein any other contract expressly set forth on Schedule 5.16 attached hereto.

"**Assumed Liabilities**" means, and is limited to:

(a) The following post-petition Liabilities of Seller expressly set forth in this definition:

(i) all Working Capital Obligations;

(ii) all benefit obligations pursuant to the Consolidated Pension Plan and the other Assumed Plans;

(iii) all contingent Liabilities payable pursuant to the terms of the Change in Control Agreements;

(iv) the KERP Liability;

(v) all Liabilities pursuant to Assumed Contracts arising after the Closing. For avoidance of doubt, such obligations shall not include any amounts necessary to satisfy the Cure Amounts pursuant to Bankruptcy Code section 365 in connection with the assignment and assumption of the Assumed Contracts;

(vi) all statutory environmental Liabilities which (A) arise under Environmental Laws, (B) are associated with real property acquired by Purchaser or its Affiliates hereunder, (C) are enforced by a Governmental Entity and (D) are not "claims" as defined in section 101(5) of the Bankruptcy Code;

(vii) the current balance due with respect to the Marsh Financing, provided all benefits of such insurance policies are received by or are available to Purchaser, as contemplated in the definition of Acquired Assets;

(viii) if no amount is paid by Purchaser for the IRB Payment pursuant to Section 2.1(a)(iii), all Seller's Liabilities pursuant to the Industrial Revenue Bonds; and

(ix) the Retiree Benefits Settlements (to the extent provided therein).

(b) pre- and post-petition workers compensation claims.

(c) Notwithstanding anything set forth to the contrary in this Agreement, Assumed Liabilities shall not include any amounts included in the categories constituting the Capped Payments.

"Assumed Plans" means the Consolidated Pension Plan and the other Employee Plans expressly set forth on Schedule 3.18(b) attached hereto.

"Assumed Plan Documents and Records" shall mean any and all written records, documents and communications of, or relating to, any Assumed Plan, including without limitation any and all correspondence, governmental filings, reports, financial statements, trust statements, plan documents, trust documents, amendments, summary plan descriptions, participant and benefit data, benefit statements, administrative forms, administrative manuals,

domestic relations orders, minutes of any administrator or fiduciary, fiduciary liability insurance policies, vendor contracts, and investment advisor, management and trust agreements.

"**Auction**" means the auction that may be conducted by Seller pursuant to the Marketing Protocol Order.

"**Bankruptcy Case Claim**" means, individually or collectively, the Allowed Secured Claims, the Bankruptcy Related Administrative Claims, the Allowed Priority Claims, and the Cure Amounts.

"**Bankruptcy Related Administrative Claims**" means all Allowed administrative claims relating to:

(a)     all professional fees, whether or not related to the Bankruptcy Case, but not including the advisor fees referred to in clause (b) of this definition;

(b)     Allowed advisor fees to (i) Lazard Freres & Co., LLC as provided in its engagement letter with Seller as approved by Order of the Bankruptcy Court, dated June 15, 2005, a true and complete copy of which was provided to Purchaser, and (ii) to Houlihan Lokey Howard & Zukin, Inc. as provided in its engagement letter with the Official Committee of Unsecured Creditors as approved by Order of the Bankruptcy Court, dated June 14, 2005, a true and complete copy of which was provided to Purchaser;

(c)     the KERP Liability;

(d)     the non-1114 related settlement payment due to the Milwaukee Unions in the amount of Three Million Five Hundred Thousand Dollars ($3,500,000) as set forth in Article III.G of that certain Agreement between Seller and the Milwaukee Unions under 11 U.S.C. §§ 1113 and 1114, and, approved by that certain Order Approving Settlement Agreement With The Milwaukee Unions, dated May 22, 2006 (Bankruptcy Court Docket Number 1492); and

(e)     (i) Goldman Sachs (DR Lease rejection claim), (ii) Watershed Capital Partners claim, (iii) United Furniture Workers claim; (iv) reclamation claims; and (v) other administrative claims not included in the Working Capital Obligations.

Notwithstanding the foregoing, no Bankruptcy Related Administrative Claim shall be included in or deemed a part of the Working Capital Obligations.

"**Bill of Sale**" means the bill of sale in the form and substance of Exhibit B attached hereto.

"**Budget**" means that certain budget of Seller, dated January 11, 2007 as attached hereto as Schedule 1.1(a)(iii).

"**Budgeted Exchange Rates**" means 0.80 Euro = 1.00 US Dollar, 2.45 Brazilian Real = 1.00 US Dollar, 1,000 Korean Won = 1.00 US Dollar and 7.88 Chinese RMB = 1.00 US Dollar.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"**Business Records**" means all books, records, ledgers and files or other similar information used or held for use in the operation or conduct of business by the Tower Group, including, without limitation, price lists, customer lists, vendor lists, mailing lists, warranty information, catalogs, sales promotion literature, advertising materials, brochures, records of operation, standard forms of documents, manuals of operations or business procedures, research materials, Tax Returns (except Purchaser shall only be entitled to a copy of income Tax Returns), contracts, instruments, filings, administrative and pricing manuals, records, Claim records, sales records, underwriting records, financial records, compliance records, insurance policies, and Tax records (except Purchaser shall only be entitled to a copy of Tax records), personnel records, corporate minute books, Assumed Plan Documents and Records and other materials to the extent relating, directly or indirectly, to the Acquired Assets, the Assumed Contracts or the Assumed Liabilities, or the assets, the businesses or the Liabilities of any Foreign Entity, whether or not in the possession of the Tower Group or their respective representatives, stored in hardcopy form or on magnetic, optical or other media, other than in respect of the Excluded Assets.

"**Capped Payments Bar Date**" means the date that is thirty six (36) months after the Closing Date; provided, however that Seller or the Post-Consummation Trust, as the case may be, may, with either (i) agreement of Purchaser or (ii) upon Order of the Bankruptcy Court following application for good cause shown, extend the Capped Payments Bar Date for a period of time not to exceed an additional twenty four (24) months.

"**Change in Control**" has the meaning set forth in those certain Change in Control Agreements by and between each of the CIC Employees and the Company.

"**Change in Control Agreements**" means the agreements entered into between Seller and each of the CIC Employees identified as Change in Control Agreements on Schedule 3.14(a).

"**CIC Employees**" means the following individuals: Kathleen Ligocki, James Mallak, D. William Pumphrey, E. Renee Franklin, Kathy Johnston, Paul Radkoski, Jeffrey Kersten, James Bernard, Craig Corrington, Orrie Jones, Susan Nutson, Benson Woo, David Ro, Gyula Meleghy, Vincent Pairet, Gerrit Kotterman, Susan Talbot and Hans Grosse.

"**Claims**" means any and all actions, causes of action, suits, damages, losses, expenses, fees, charges, costs, complaints, obligations, promises, controversies, rights, demands, debts, Encumbrances, taxes, lis pendens and claims whatsoever, whether known or unknown, suspected or claimed, whether at law or in equity, and whether contingent or not contingent, which any Person may now possess, own or hold or has at any time heretofore owned or held against Seller, including any claim as defined in section 101(5) of the Bankruptcy Code.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Collective Bargaining Agreement**" means any labor agreement, collective bargaining agreement or any other labor related agreement or arrangement with any labor union, organization or association that pertains to any employees of the Tower Group.

"**Company Subsidiaries**" means the Subsidiaries of the Company, including, without limitation, those which are included in the definition of Seller.

"**Confidentiality Agreement**" means that certain confidentiality agreement, dated May 15, 2006, between Cerberus Capital Management, L.P. and the Company.

"**Confirmation Order**" means an Order confirming the Plan in form and substance as may be approved by Purchaser in its reasonable discretion.

"**Consolidated Pension Plan**" means the Tower Automotive Consolidated Pension Plan (plan number 016).

"**Cure Amounts**" means all amounts and other consideration that pursuant to section 365 of the Bankruptcy Code, as of the Closing Date, shall be required to cure any defaults on the part of Seller pursuant to Assumed Contracts or that will be otherwise due to nondebtor parties pursuant to Assumed Contracts, as a prerequisite to the assignment and assumption of such Assumed Contracts pursuant to section 365 of the Bankruptcy Code.

"**DIP Lenders**" means, collectively, those financial institutions party to the DIP Loan Credit Agreement and all permitted assigns, transferees and successors-in-interest thereto.

"**DIP Loan**" means collectively the DIP Revolver and the DIP Term Loan.

"**DIP Loan Credit Agreement**" means that certain Revolving Credit, Term Loan and Guaranty Agreement, dated February 2, 2005, among Seller, the DIP Lenders and certain other parties thereto, as amended, supplemented or modified from time to time.

"**DIP Revolver**" means that certain $300,000,000 revolving credit facility component of the DIP Loan Credit Agreement.

"**DIP Term Loan**" means that certain $425,000,000 term loan component of the DIP Loan Credit Agreement, used by Sellers to repay, in full, certain prepetition first-lien indebtedness.

"**Encumbrance**" means any lien, pledge, security interest, interest, right of first refusal or conditional sale agreement.

"**Environmental Law**" means any applicable federal, state, county, municipal and local statutes, Laws, regulations, ordinances and regulations and all judicial or administrative decisions and Orders, that relate to the protection of worker safety and health from environmental hazards, pollution, and Regulated Substances or the assessment, investigation, remediation, restoration or protection of natural resources or the environment, including, without limitation, the quality of the ambient air, soil (both surface and subsurface), sediments, surface

water or groundwater, whether currently existing as of the date of this Agreement or hereafter adopted prior to the Closing Date.

"**Environmental Permits**" means all permits, licenses, registrations and other authorizations required under applicable Environmental Laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Escrow Agent**" means Wells Fargo Bank, National Association.

"**Escrow Agreement**" means the escrow agreement attached hereto as Exhibit D.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Excluded Assets**" means (i) any and all rights of any Seller pursuant to this Agreement and the Ancillary Agreements, (ii) (A) the Chapter 5 Claims set forth on Schedule 1.1(a)(ii) attached hereto, including any cash proceeds from any settlements thereof received by Seller prior to the Closing and (B) (i) claims in respect of Excluded Assets and (ii) claims directly related to Excluded Liabilities which (I) are not Liabilities to customers, suppliers or other business relations with whom the Purchaser does business after the Closing and (II) which are identified to Purchaser in advance of any action being taken to collect on such claims and as to which Purchaser does not object to such claim being asserted in its reasonable discretion, (iii) any asset or contract which Purchaser identifies in writing to Seller by June 22, 2007; provided, that for avoidance of doubt, the exclusion of any such asset or contract shall not reduce or otherwise affect the amount of the Purchase Price, (iv) any nonmaterial asset or contract which Purchaser identifies in writing to Seller from June 23, 2007 until the date that is at least ten (10) Business Days prior to the Closing; provided, that for avoidance of doubt, the exclusion of any such asset or contract shall not reduce or otherwise affect the amount of the Purchase Price, (v) any equity interests in any of the Sellers, (vi) any Foreign Entity identified on Schedule 1.1(a)(iv) or as hereafter determined by Purchaser (provided however that any Foreign Entity which Purchaser wishes to exclude must be identified in writing to Seller by June 22, 2007), (vii) the assets identified on Schedule 1.1(a)(v), and (viii) all beneficial tax attributes to the extent not transferable by applicable law and Seller's United States federal net operating loss carryforwards. For purposes of clause (iv) of this definition only, "nonmaterial asset" does not include (X) any land or buildings, structures, fixtures or other improvements located thereon, or (Y) any asset or group of related assets for which Seller could reasonably be expected to incur fees, expenses or other Liability, net of any proceeds received, in excess of Five Hundred Thousand Dollars ($500,000) to dispose of any single or group of related assets. Notwithstanding any other provision of this definition, any asset excluded pursuant to any of clauses (iii), (vi) or (vii) shall not be an Acquired Asset. Nothing contained in this definition shall affect or impair any right of Purchaser to reject contracts under Section 5.16 hereof. The designation of certain assets as "nonmaterial" for purposes of the notice provisions of this definition shall not affect the determination of materiality for any other purpose. Notwithstanding the foregoing, Purchaser shall have the right at any time prior to Closing, in its

sole discretion, to designate any asset that it had identified as an Excluded Asset pursuant to clauses (iii), (iv), (vi) or (vii) of this definition as an Acquired Asset.

"**Excluded Liabilities**" means any Liabilities of Seller other than Assumed Liabilities, including, without limitation, (a) Liabilities directly associated with the Excluded Assets, (b) any Indebtedness of Seller (other than the Industrial Revenue Bonds if the Purchaser elects to assume such Liability), (c) pre-petition Liabilities, Liabilities accruing pre-petition and Liabilities otherwise not expressly assumed by Purchaser hereunder including, without limitation, environmental liabilities, all other post employment benefits including, but not limited to, healthcare and life insurance, and obligations in respect of retirees other than Retiree Benefits Settlements, (d) all Liabilities, if any, associated with Tower Automotive Capital Trust, Seller's variable interest entity, (e) any Liability expunged by Order of the Bankruptcy Court, (f) any Liability associated with any proceeding, litigation or investigation respecting Seller, except as may be expressly assumed hereunder, and (g) indemnification agreements with Persons who are not Governmental Authorities with respect to Liabilities under any Environmental Law including, without limitation, pursuant to that certain Asset Purchase Agreement, dated as of January 27, 1997, among A.O. Smith Corporation, A.O. Smith Enterprises Ltd., Tower Automotive Acquisition, Inc., Tower Automotive, Inc. and R.J. Tower Corporation and any claims related thereto.

"**Final Order**" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for *writ of certiorari* has expired and no such appeal, motion or petition is pending.

"**FIRPTA**" means the Foreign Investment in Real Property Tax Act of 1980, as amended, and the rules and regulations promulgated thereunder.

"**Foreign Entity**" means any entity within the Tower Group which was incorporated, formed, existed or exists pursuant to the Laws of a country other than the United States.

"**Foreign Financial Indebtedness**" means, with respect to the Foreign Entities, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, or upon which interest payments are customarily made, (c) all obligations (including, without limitation, earnout obligations) of such Person issued or assumed as the deferred purchase price of property or services purchased by such Person (other than trade debt incurred in the ordinary course of business and due within six (6) months of the incurrence thereof) which would appear as liabilities on a balance sheet of such Person in accordance with GAAP, (d) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (e) all guaranty obligations of such Person with respect to Indebtedness of another Person, (f) the principal portion of all obligations of such Person pursuant to capital leases, (g) all reimbursement obligations in respect of the maximum amount of all letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (h) all

preferred capital stock issued by such Person and, which by the terms thereof, could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, redemption or other acceleration, (i) the Indebtedness of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer (other than Metalsa), and (j) factoring, receivables financing or securitziations (whether or not on the balance sheet, and whether or not recourse); provided, however, Foreign Financial Indebtedness shall not include any intercompany payables.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any United States federal, state or local or any foreign government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, judicial or arbitral body.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Indebtedness**" means, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, or upon which interest payments are customarily made, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business), (d) all obligations (including, without limitation, earnout obligations) of such Person issued or assumed as the deferred purchase price of property or services purchased by such Person (other than trade debt incurred in the ordinary course of business and due within six (6) months of the incurrence thereof) which would appear as liabilities on a balance sheet of such Person in accordance with GAAP, (e) all obligations of such Person under take-or-pay or similar arrangements, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all guaranty obligations of such Person with respect to Indebtedness of another Person, (h) the principal portion of all obligations of such Person pursuant to capital leases, (i) all obligations of such Person under hedging agreements, excluding any portion thereof which would be accounted for as interest expense under GAAP, (j) the maximum amount of all letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (k) all preferred capital stock issued by such Person and which by the terms thereof could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, redemption or other acceleration, (l) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product, (m) the Indebtedness of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer (other than Metalsa) and (n) factoring, receivables financing or securitziations (whether or not on the balance sheet, and whether or not recourse); provided, however, Indebtedness shall not include any intercompany payables, operating leases or the Marsh Financing.

"**Industrial Revenue Bonds**" means those certain (a) $25,000,000 aggregate principal amount City of Bardstown, Kentucky Taxable Variable Rate Demand Industrial Revenue Bonds, Series 1995 (R.J. Tower Corporation Project) and (b) $20,000,000 aggregate principal amount City of Bardstown, Kentucky Taxable Variable Rate Demand Industrial Revenue Bonds, Series 1994 (R.J. Tower Corporation Project).

"**Intellectual Property**" means any and all United States or foreign intellectual property, including (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, provisionals, continuations-in-part, divisions, extensions and reexaminations thereof, (ii) trademarks, service marks, logos, trade names, corporate names and trade dress, including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (iii) copyrights and copyrightable works and all applications, registrations and renewals in connection therewith, (iv) registrations for Internet domain names, (v) trade secrets and confidential business information, including inventions, ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, designs, drawings and specifications, (vi) moral rights and rights of attribution, and (vii) computer software, including databases and related documentation.

"**Interests**" means all encumbrances, including mechanics', materialmen's and other consensual and nonconsensual encumbrances and statutory encumbrances, security interests and Claims, including, but not limited to, any "claim" as defined in section 101(5) or "lien" as defined in section 101(37) of the Bankruptcy Code, Liabilities, reclamation claims, mortgages, deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan agreements, instruments, contracts, leases, licenses, options, rights of first refusal, offsets, recoupment, rights of recovery, judgments, Orders and decrees of any court or foreign or domestic Governmental Authority, claims for reimbursement, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, licenses, options, rights of recovery, products liability, alter-ego, environmental, successor liability, tax and other liabilities, causes of action or other encumbrances or restrictions on or conditions to transfer or assignment of any kind, including, without limitation to the generality of the foregoing, restrictions or conditions on or to the transfer, assignment or renewal of licenses, permits, registrations, and authorizations or approvals of or with respect to any Governmental Authority, to the fullest extent of the law, in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, Allowed or disallowed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the commencement of the Bankruptcy Case, whether imposed by agreement, understanding, Law, equity or otherwise.

"**IRS**" means the United States Internal Revenue Service.

"**KERP Liability**" means all amounts payable, up to a maximum of Five Million Eight Hundred Thousand Dollars ($5,800,000), at or after the Closing under the "Retention Program" approved by that certain Order, dated March 30, 2005, Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code, Approving and Authorizing (I) Seller's Annual Incentive Plan With Respect to Certain Senior Executives; (II) a Key Employee Retention Program; and (III) Certain of Seller's Prepetition Severance Obligations. Seller has furnished to Purchaser true

and complete copies of the agreements entered into with employees of Seller under the Key Employee Retention Program, including all transition bonus agreements (referred to collectively, as the "**KERP Agreements**") prior to the execution and delivery of this Agreement.

"**Knowledge**" means,

(i)    with respect to Purchaser, the actual knowledge on the date hereof of the executive officers of Purchaser upon due inquiry and investigation; and

(ii)    with respect to Seller, the actual knowledge on the date hereof of the officers, directors, and certain key employees of the Tower Group set forth on Schedule 1.1(a)(vi) attached hereto who are primarily responsible for the relevant area as to which the representation in which "Knowledge" is used, upon due inquiry and investigation.

"**Law**" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code or other requirement of law of a Governmental Authority or any Order.

"**Liability**" and "**Liabilities**" means, as to any Person, all Indebtedness, claims of any kind or nature, including contingent or unliquidated claims or any other claims falling within the definition set forth in section 101(5) of the Bankruptcy Code, Interests, commitments, responsibilities and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records, including Taxes.

"**Marketing Protocol Order**" means that Order of the Bankruptcy Court attached hereto as Exhibit C.

"**Marsh Financing**" means loans made for the sole purpose of financing Seller's insurance premiums paid for the balance of the current year.

"**Material Adverse Effect**" means any change, effect, event, occurrence, development, circumstance or state of facts materially adverse to the business, properties, operations, financial condition or results of operations of the Acquired Assets (including the Foreign Entities and their respective businesses), the Assumed Contracts and the Assumed Liabilities of the Tower Group, taken as a whole or which materially impair the ability of Seller to perform its obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the transactions contemplated by this Agreement; provided, however, that the following shall be excluded from any determinations as to whether a Material Adverse Effect has occurred: any change, effect, event, occurrence, development, circumstance or state of facts in general economic or political conditions, conditions in the United States or worldwide capital markets and any act of terrorism or any outbreak of hostilities or war.

"**Net Foreign Financial Indebtedness**" means an amount, calculated pursuant to GAAP and using Budgeted Exchange Rates, equal to:

(i)    the average daily balance for the thirty (30) calendar days immediately preceding the Closing Date of the Foreign Financial Indebtedness; less

(ii)    the average daily balance for the thirty (30) calendar days immediately preceding the Closing Date of the unrestricted cash on hand of the Foreign Entities. For avoidance of doubt, any restricted cash shall not be deducted for the purposes of clause (ii) of this definition of Net Foreign Financial Indebtedness, which such restricted cash shall include, without limitation, the restricted cash related to that certain Lease Agreement (and related agreements) by and between Tower Automotive, Belgium B.V.B.A. and ABB Credit AB, dated as of December 21, 2001, as amended.

"**Order**" means any decree, order, injunction, rule, judgment, consent of, or by any Governmental Authority.

"**Partial Acquisition**" means a transaction pursuant to which Seller agrees to sell or otherwise transfer less than all of the Acquired Assets.

"**Permitted Encumbrances**" means:

(i)    tax liens with respect to Taxes not yet due and payable or post-petition Taxes being contested in good faith;

(ii)    interests or title of a third party under or to any Assumed Contract, including as to any Leased Real Property, any Encumbrance, Claim, or Interest affecting the interest of the lessor thereof as it relates to such lessor's interest in the Leased Real Property;

(iii)    nonexclusive licenses of Intellectual Property owned by the Tower Group that have been granted by the Tower Group in the ordinary course of business and any restrictions on conditions to the transfer, assignment or renewal of any licenses of Intellectual Property owned by third parties and licensed to the Tower Group, provided such restrictions were entered into in the ordinary course of business;

(iv)    easements, covenants, conditions, rights-of-way, restrictions and other similar charges and Encumbrances, Claims, or Interests not interfering with the ordinary conduct of the business or operations conducted on the particular site;

(v)    zoning, entitlement, conservation restriction and other land use and environmental regulations or building codes which are imposed by Governmental Authorities; provided, that none of the foregoing in this clause (v) would have a material adverse effect upon the continued use of the property to which they relate in the conduct of the business or operations as currently conducted thereon;

(vi)    such other imperfections or irregularities in title, charges, easements, survey exceptions, leases, subleases, license agreements and other occupancy agreements, reciprocal easement agreements, restrictions and other customary Encumbrances, Claims, and Interests on title to real property; provided, that none of the foregoing in this clause (vi) would have a material adverse effect upon the continued use of the property to which they relate in the conduct of the business or operations currently conducted thereon; and

(vii)    such other imperfections or irregularities in title disclosed to Purchaser on title reports and identified on Schedule 3.20(c) attached hereto; provided, that none of the foregoing in this clause (vii) would have a material adverse effect upon the continued use of the property to which they relate in the conduct of the business or operations currently conducted thereon.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, Governmental Authority, joint venture, limited liability company or other entity formed, incorporated or existing pursuant to any Law.

"**Plan**" means the joint Chapter 11 plan of Seller substantially in the form and substance of Exhibit E attached hereto, with such changes as may be approved by Purchaser in its reasonable discretion.

"**Post-Consummation Trust**" has the meaning set forth in the Plan.

"**Purchase Price**" shall mean the sum of the DIP Payment, the Second Lien Payment, the IRB Payment, the Unsecureds Claim Payment, the Unsecureds Fund Payment, the Allowed Secured Claims Payment, the Allowed Administrative Claims Payment, the Allowed Priority Claims Payment, the Cure Amounts Payment, the Indemnification Payment, the Tail Payment and the Escrow Fee Payment.

"**Regulated Substance(s)**" means any substance, material, compound, pollutant or waste regulated under any Environmental Law including, without limitation, radiation, noise, odors, asbestos, PCBs, petroleum and petroleum containing materials.

"**Retiree Benefits Settlements**" means the settlements respecting certain "retiree benefits" (within the meaning set forth in section 1114 (a) of the Bankruptcy Code) the material terms of which are reflected on Schedule 1.1(a)(vii), which shall be memorialized in settlement agreements in form and substance reasonably acceptable to Purchaser, as approved by the Bankruptcy Court; provided, however that any deviation from the terms set forth on Schedule 1.1(a)(vii) shall require Purchaser's approval in its absolute and sole discretion.

"**Sale Order**" means an Order substantially in the form and substance of Exhibit F attached hereto with such changes as may be approved by Purchaser in its reasonable discretion.

"**SEC**" means the United States Securities and Exchange Commission.

"**Second Lien Loan**" means that certain Second Lien Pledge and Security Agreement, dated as of May 24, 2004, by and among R.J. Tower Corporation as borrower, certain guarantors, various lenders and Silver Point Capital Fund LP, as amended, supplemented or otherwise modified from time to time and all instruments, security agreements, guaranties, intercreditor agreements and other documents executed in connection therewith including that certain $155,000,000 synthetic letter of credit facility governed by the Second Lien Loan.

"**Second Lien Noteholders**" means, collectively, the financial institutions party to that certain $155,000,000 synthetic letter of credit facility governed by the Second Lien Loan, and all permitted assigns, transferees and successors-in-interest thereto.

"**SEC Reports**" means, collectively, the Company's (i) Quarterly Reports on Form 10-Q for the quarterly periods ended September 30, 2006, June 30, 2006 and March 31, 2006 filed with the SEC on February 27, 2007, September 15, 2006 and August 4, 2006 respectively and (ii) Annual Report on Form 10-K for the year ended December 31, 2005 filed with the SEC on June 27, 2006.

"**Seller Employee**" means each employee of the Seller employed in the United States.

"**Subsidiaries**" of a Person means, entities (i) the accounts of which would be consolidated with those of Seller in Seller's consolidated financial statements if such financial statements were prepared in accordance with GAAP, or (ii) of which securities, membership interests or other equity ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests or more than 50% of the profits or losses of which are owned, controlled or held by Seller or one or more direct or indirect Subsidiaries.

"**Tax**" or "**Taxes**" means any federal, state, provincial, local, territorial or foreign income, gross receipts, license, excise, capital, capital gains, payroll, wage, employment, excise, import, severance, stamp, occupation, premium, windfall profits, environmental, including Taxes pursuant to Code §59A, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, *ad valorem*, registration, value added, goods and services, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax Liability of any other Person.

"**Tax Return**" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Title Policy**" means, one or more owner's title insurance policies issued by a reputable title insurance company selected by Purchaser and licensed to transact business in the state or jurisdiction in which each Owned Real Property or Leased Real Property is located which policies insure title to a fee simple interest in each Owned Real Property and a leasehold interest in each Leased Real Property, in an amount reasonably satisfactory to Purchaser, and with extended coverage over the general exceptions therein, free of all Encumbrances except Permitted Encumbrances. The Title Policy shall be dated as of the Closing Date and insure title to each Owned Real Property and Leased Real Property and all recorded easements benefiting such parcels and contain such endorsements as Purchaser may reasonably request, in each such circumstance where the endorsement is available.

"**Tower Group**" means collectively, the Company and the Company's Subsidiaries, and a member of the Tower Group refers to any member thereof.

"**Transfer Taxes**" means all sales, value added, goods and services, excise, multi-stage, retail sales, use and land transfer taxes, stamp duties, stamp duty reserve tax, stamp duty land tax and any other similar taxes, duties, assessments or governmental charges, together with all interest, penalties and additions imposed with respect to such amounts. For avoidance of doubt, Transfer Taxes do not include any Taxes on income, capital gains or other profits, and nothing in this Agreement shall obligate Purchaser to pay any income, capital gains or other profits Taxes arising as a result of the transactions contemplated by this Agreement.

"**Treasury Regulations**" or "**Treas. Regs.**" means the regulations promulgated under the Code by the United States Department of the Treasury or the IRS, including temporary regulations.

"**Unsecured Creditors Trust**" has the meaning set forth in the Plan.

"**Working Capital Obligations**" means

(a)     all current Liabilities of Seller, other than any Liability included in the definition of the Purchase Price and used in the calculation of the Purchase Price paid to, or on behalf of, Seller by Purchaser at the Closing and thereafter;

(i)     which are ordinary and customary;

(ii)     which are related to the Acquired Assets;

(iii)     which would be accrued by Seller as current Liabilities in accordance with GAAP applied on a consistent basis with Seller's historical accounting practices; and

(iv)     which relate to Seller's operations occurring after February 2, 2005.

(b)     Working Capital Obligations (i) to the extent they are postpetition and satisfy <u>clauses (a)(i), (a)(ii), (a)(iii) and (a)(iv)</u> of this definition include, but are not limited to, (A) accounts and trade payables, (B) accrued Taxes of every kind or nature including federal, state, sales and property Taxes and Transfer Taxes, but not any capital gain, income or other Taxes arising from the transactions contemplated hereby; and with respect to Transfer Taxes arising from or related to the transactions contemplated hereby, Working Capital Obligations (and Purchaser's liability with respect to Transfer Taxes) shall be limited to, and shall not exceed, an amount up to Seven Hundred Fifty Thousand Dollars ($750,000), (C) accrued expenses and (D) accrued compensation related items including sick pay, vacation pay, holiday pay and paid time off obligations, and (ii) shall exclude Indebtedness and professional fees. The Parties also acknowledge that (X) pre-petition secured Tax obligations, including all of the Tax obligations listed on <u>Schedule 1.1(a)(viii)</u>, to the extent Allowed, whether or not they are pre-petition, and (Y) the Tax obligations that are Allowed Priority Claims other than Tax claims Allowed under section 507(a)(2) of the Bankruptcy Code and section 503(b) of the Bankruptcy

Code, including those listed on Schedule 1.1(a)(ix), to the extent Allowed, are not Working Capital Obligations.

(c)     Notwithstanding anything set forth to the contrary in this Agreement, Working Capital Obligations shall not include any Bankruptcy Related Administrative Claims nor any amount included within the categories making up the Capped Payments included in the Purchase Price Cap.

Section 1.2.    Other Defined Terms.

The following terms have the meanings defined for such terms in the Sections set forth below:

| Term | Reference |
| --- | --- |
| $ or Dollars | Section 9.14 |
| 2006 Audited Statements | Section 3.11(c) |
| 365 Motions | Section 5.16 |
| Agreement | Preamble |
| Allowed Administrative Claims Payment | Section 2.1(a)(vii) |
| Allowed Priority Claims Payment | Section 2.1(a)(viii) |
| Allowed Secured Claims Payment | Section 2.1(a)(vi) |
| Assumed Contract List | Section 5.16 |
| Balance Sheet | Section 3.11(a)(i) |
| Balance Sheet Date | Section 3.11(a)(i) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Capped Payments | Section 2.1(b) |
| Change in Control Agreements | Section 3.18(f) |
| Chapter 11 Cases | Section 5.13 |
| Chapter 5 Claims | Section 1.1 |
| Closing | Section 2.6 |
| Closing Date | Section 2.6 |
| COBRA | Section 3.18(g) |
| Company | Preamble |
| Company Disclosure Schedule | Article 3 |
| Cure Amount Payment | Section 2.1(a)(ix) |
| Deposit | Section 2.5 |
| DIP Payment | Section 2.1(a)(i) |
| DOJ | Section 5.6(b) |
| DOL | Section 3.18(c)(vii) |
| EEOC | Section 3.19(a)(xi) |
| Electronic Copy | Section 9.11(b) |
| Employee Plan(s) | Section 3.18(a)(iii) |
| Escrow Fee Payment | Section 2.1(a)(xii) |
| Financial Statements | Section 3.11(a) |
| FIRPTA Affidavit | Section 2.8(g) |

-17-

| Term | Reference |
|------|-----------|
| FTC | Section 5.6(b) |
| Hired Employees | Section 6.1(b) |
| Indemnification Payment | Section 2.1(a)(x) |
| Intellectual Property Assignments | Section 2.8(c) |
| IRB Payment | Section 2.1(a)(iii) |
| Leased Real Property | Section 3.20(b) |
| Listed Intellectual Property | Section 3.21(b) |
| Management Incentive Plan | Section 6.2 |
| Metalsa | Section 5.1(b)(xiii) |
| Name Change Filings | Section 5.13 |
| Monthly Representation Report | Section 5.1(a)(v) |
| Notice Group | Section 5.2(a)(i) |
| Owned Real Property | Section 3.20(a) |
| Party(ies) | Preamble |
| Purchase Price Balance | Section 2.1(e) |
| Purchase Price Cap | Section 2.1(b) |
| Purchaser | Preamble |
| Real Property Lease | Section 3.20(b) |
| Reorganizations | Section 5.11 |
| Second Lien Fee Claim | Section 2.1(a)(ii) |
| Second Lien Payment | Section 2.1(a)(ii) |
| Seller | Preamble |
| Seller Certificate | Section 7.2(c) |
| Senior Management | Section 6.2 |
| Subsequent Purchase Price Payment | Section 2.1(e) |
| Subsequent Purchase Price Payment Notice | Section 2.1(e) |
| Supplier(s) | Section 3.15 |
| Tail Payment | Section 2.1(a)(xi) |
| Tail Policy | Section 2.1(a)(xi) |
| Tax-Qualified Plan | Section 3.18(h) |
| Termination Date | Section 8.1(c) |
| Unsecureds Claim Payment | Section 2.1(a)(iv) |
| Unsecureds Funds Payment | Section 2.1(a)(v) |
| WARN Act | Section 3.19(a)(i) |

## ARTICLE 2.

## PURCHASE AND SALE

Section 2.1. Transfer of Acquired Assets and Assumption of Assumed Liabilities.

(a)    On the terms and conditions contained in, and subject to the terms of, this Agreement, the Sale Order and the Confirmation Order, at the Closing Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase from Seller all of

-18-

Seller's right, title and interest, as of the Closing, in and to the Acquired Assets and Assumed Contracts, free and clear of any Claims, Interests or Encumbrances other than Permitted Encumbrances. In consideration for the sale and transfer of the Acquired Assets, Purchaser shall assume, pay, perform and discharge when due the Assumed Liabilities and shall pay to or on behalf of Seller as set forth herein, the sum of:

(i)      the amount of cash advised by JP Morgan Chase Bank, N.A., in its capacity as agent for the DIP Lenders, in a payoff letter delivered to Seller (but subject to Purchaser's verification) prior to the Closing, as necessary to repay in full and otherwise satisfy in full all Liabilities of Seller pursuant to the DIP Loan Credit Agreement as of the Closing Date (Seller and Purchaser shall jointly instruct Escrow Agent to pay the Deposit at the Closing as part of the amount due pursuant to this Section 2.1(a)(i) and pursuant to the payoff instructions set forth in the payoff letter delivered by JP Morgan Chase Bank, N.A. to Seller at the Closing) (collectively, the "**DIP Payment**"); plus

(ii)      the amount of cash advised by Silver Point Capital Fund LP, as agent for the Second Lien Noteholders, in a payoff letter delivered to Seller (but subject to Purchaser's verification) prior to the Closing as necessary to repay in full and otherwise satisfy in full all Liabilities of Seller pursuant to the Second Lien Loan as of the Closing Date; provided, however, notwithstanding the foregoing, subject to Section 2.2 of this Agreement, the amount paid pursuant to this Section 2.1(a)(ii) on account of all nonlegal professional fees owed in respect of the Second Lien Loan shall not exceed Four Million Dollars ($4,000,000) (the "**Second Lien Fee Claim**") in the aggregate (collectively, the "**Second Lien Payment**"); plus

(iii)      the amount of cash advised by JP Morgan Trust Company, N.A. or its successors, in a payoff letter delivered to Seller (but subject to Purchaser's verification) prior to the Closing Date, as necessary to repay in full and otherwise satisfy in full all Liabilities of Seller pursuant to the Industrial Revenue Bonds; provided, however, if (A) Purchaser is permitted to assume the Industrial Revenue Bonds pursuant to the terms of the Industrial Revenue Bonds, (B) at least ten (10) Business Days prior to the Closing, Purchaser provides Seller written notice of its intention to assume the Industrial Revenue Bonds, (C) prior to the Closing, Purchaser satisfies all requirements necessary to allow Purchaser to assume such Industrial Revenue Bonds including replacing any letters of credit securing the Industrial Revenue Bonds, if required by the Industrial Revenue Bond holders, and (D) at the Closing, Purchaser effectively assumes all of Seller's Liability under the Industrial Revenue Bonds, then no amount shall be payable to Seller pursuant to this Section 2.1(a)(iii) (the "**IRB Payment**"); plus

(iv)      Ten Million Dollars ($10,000,000), which amount shall be paid to the Unsecured Creditors Trust for distribution by the Unsecured Creditors Trust pursuant to the Plan, (the "**Unsecureds Claim Payment**"); plus

(v)      Two Million Dollars ($2,000,000), which amount shall be paid pursuant to the Plan to the Unsecured Creditors Trust to fund the costs associated with administering the Unsecured Creditors Trust, including the prosecution of the avoidance

claims or causes of action set forth on Schedule 1.1(a)(ii) attached hereto (the "**Unsecureds Funds Payment**"); plus

(vi)    the amount of cash necessary to repay in full and otherwise satisfy in full the Allowed Secured Claims, other than claims pursuant to the DIP Loan Credit Agreement, the Second Lien Loan and the Industrial Revenue Bonds (the "**Allowed Secured Claims Payment**"); plus

(vii)    the amount of cash necessary to repay in full and otherwise satisfy in full the Bankruptcy Related Administrative Claims (the "**Allowed Administrative Claims Payment**"); plus

(viii)    the amount of cash necessary to repay in full and otherwise satisfy in full all Allowed Priority Claims (the "**Allowed Priority Claims Payment**"); plus

(ix)    the amount of cash necessary to pay in full and otherwise satisfy in full the Cure Amounts (the "**Cure Amount Payment**"); plus

(x)    Two Million Dollars ($2,000,000), which amount is intended to be used by Seller pursuant to the Plan to reserve against directors' and officers' indemnification claims against Seller (the "**Indemnification Payment**"); plus

(xi)    an amount up to, but not exceeding, Four Million Dollars ($4,000,000) paid (or to be paid simultaneously with the Closing) (the "**Tail Payment**") to Seller to obtain and fully pay for a "tail" insurance policy or policies with a claims period of at least six (6) years from the Closing Date from an insurance carrier or insurance carriers with approximately equivalent credit rating as Seller's current insurance carrier (the "**Tail Policy**"), which Tail Policy shall be from an insurer, contain terms and provisions and otherwise be satisfactory to Purchaser in its reasonable discretion, with respect to directors' and officers' liability insurance in an amount and scope substantially as favorable as Seller's existing policies with respect to matters existing or occurring at or prior to the Closing Date; plus

(xii)    Three Thousand Dollars ($3,000) for fees pursuant to the Escrow Agreement (the "**Escrow Fee Payment**").

(b)    Notwithstanding the actual aggregate amount of the Allowed Secured Claims Payment, the Allowed Administrative Claim Payment, the Allowed Priority Claim Payment, the Cure Amount Payment, the Indemnification Payment, and the Tail Payment (all such payments collectively referred to as the "**Capped Payments**"), under no circumstances shall Purchaser be required to pay more than Seventy Million Dollars ($70,000,000) (the "**Purchase Price Cap**") in respect of such Capped Payments.

(c)    At the Closing, Purchaser shall cause to be paid, (W) to Seller or, at Purchaser's election, directly to the DIP Lenders, the Second Lien Loan lenders and the Industrial Revenue Bond holders, as the case may be, on behalf of Seller, by wire transfer of immediately available funds, the DIP Payment, the Second Lien Payment and the IRB Payment (if necessary), (X) to the Unsecured Creditors Trust, the Unsecureds Claim Payment and the

Unsecureds Funds Payment, (Y) to Seller (or if established the Post-Consummation Trust) Thirty Five Million Dollars ($35,000,000) on account of the Capped Payments for payment pursuant to the Plan and (Z) to Seller the Escrow Fee Payment.

(d)     Seller or the Post-Consummation Trust, as the case may be, shall have the right, subject to the provisions of the Plan, beginning thirty (30) days after the Closing Date and continuing until the Capped Payments Bar Date, to request, by delivering Subsequent Purchase Price Payment Notices, that Purchaser deliver Subsequent Purchase Price Payments, up to the Purchase Price Balance, in an amount necessary for Seller or the Post-Consummation Trust, as the case may be, to maintain a balance of Ten Million Dollars ($10,000,000) on account of the Capped Payments; provided, however, that other than in respect of the last Subsequent Purchase Price Payment Notice, no Subsequent Purchase Price Payment Notice may be for an amount less than Two Million Dollars ($2,000,000) irrespective of whether such minimum request amount would cause Seller or the Post-Consummation Trust, as the case may be, to then maintain a balance of less than Ten Million Dollars ($10,000,000) on account of the Capped Payments for any period of time. The first such Subsequent Purchase Price Payment Notice shall require five (5) calendar days advance notice and all other Subsequent Purchase Price Payment Notices shall require fifteen (15) calendar days advance notice.

(e)     For the purposes of this Agreement, a "**Subsequent Purchase Price Payment Notice**" shall be a written notice executed by an authorized representative of Seller or the Post-Consummation Trust, as the case may be, and shall include (i) a request for payment of a specific dollar amount, (ii) an itemized summary by claim of all payments of amounts on account of Allowed claims within the categories of Capped Payments since the date of the last Subsequent Purchase Price Payment Notice and (iii) a statement as to the amount then on deposit with Seller or the Post-Consummation Trust, as the case may be. Each payment made by Purchaser to Seller or the Post-Consummation Trust, as the case may be, pursuant to the terms of Section 2.1(d) shall be deemed a "**Subsequent Purchase Price Payment**", and such payments shall be paid by wire transfer of immediately available funds. For the purposes of this Agreement, at any point in time the "**Purchase Price Balance**" shall mean the amount of cash equal to Thirty Five Million Dollars ($35,000,000), less the sum of all Subsequent Purchase Price Payments. Notwithstanding anything set forth herein, aggregate payments pursuant to Section 2.1(c)(y) and Sections 2.1(d) and (e) may not exceed the Purchase Price Cap, and under no circumstances shall Purchaser be required or requested to pay more than Seventy Million Dollars ($70,000,000) toward the Capped Payments.

(f)     Seller or the Post-Consummation Trust, as the case may be, shall notify Purchaser a reasonable time prior to making any Capped Payments.

(g)     In the event Seller or the Post-Consummation Trust, as the case may be, receives any amount from Purchaser in respect of Capped Payments pursuant to Section 2.1(c)(y) and (y) and Sections 2.1(d) and (e), which amounts are no longer required for the payment of Capped Payments, Seller or the Post-Consummation Trust, as the case may be, shall promptly return all such amounts to Purchaser together with all interest accrued thereon. Similarly, not later than the fifth (5th) Business Day following the Capped Payments Bar Date, Seller or the Post-Consummation Trust, as the case may be, shall promptly return all such amounts then being held by Seller or the Post-Confirmation Trust, as the case may be, to

Purchaser by wire transfer of immediately available funds to an account designated by Purchaser. Seller or the Post-Consummation Trust, as the case may be, shall, upon Purchaser's reasonable request provide such information as Purchaser may request, from time to time, respecting the amount paid in respect of the Capped Payments, the balance still held by or on behalf of Seller or the Post-Consummation Trust, as the case may be, or the amounts yet to be paid to holders of claims within the categories of Capped Payments. Seller or the Post-Consummation Trust, as the case may be, shall notify Purchaser at such time as there are no further pending claims within the categories of Capped Payments.

(h)     Upon Purchaser's sale of all or substantially all of its assets prior to the satisfaction or termination of its obligations herein respecting Capped Payments, Purchaser shall either cause the buyer in such transaction to assume the Purchaser's obligations under Sections 2.1(d) through (g), pay to Seller or the Post-Consummation Trust, as the case may be, an amount equal to the Purchase Price Balance, or provide reasonably adequate assurance of such payment with a letter of credit, but any such payment shall not be deemed a waiver of any of Purchaser's rights under Sections 2.1(d), (e), (f) or (g) including, without limitation, the right potentially to receive back amounts pursuant to Section 2.1(g).

(i)     Provided the Sale Order is entered by the Bankruptcy Court and subject to the terms thereof, Seller shall sell, transfer, assign, convey and deliver to Purchaser all of Seller's right, title and interest in, to and under the Acquired Assets and Assumed Contracts free and clear of all Claims, Interests or Encumbrances (other than Permitted Encumbrances).

Section 2.2.     Right to Contest Claims.

Purchaser may object and contest any filed or submitted Bankruptcy Case Claims and Second Lien Fee Claim pursuant to, among other sections, sections 105, 363 and 365 of the Bankruptcy Code (except no objection may be made to the KERP (subject to the dollar limitation provided herein), the Indemnification Payment, the Three Million Five Hundred Thousand Dollar ($3,500,000) payment due in respect of the amounts owed to the Milwaukee unions as described in the definition of Bankruptcy Related Administrative Claim clause (d) or with respect to the fees owed to the professionals identified in an e-mail, dated May 1, 2007, sent from Seller's counsel to Purchaser's counsel and received at 2:47 A.M., ET, whose fees are all subject to the approval of the Bankruptcy Court (which e-mail indicated the name of the professional, the party represented, and the nature of the services performed)). Purchaser shall have no obligation to pay any Capped Payment or any portion of the Second Lien Fee Claim unless and until such claim is Allowed by the Bankruptcy Court.

Section 2.3.     Excluded Liabilities.

Except for the assumption of the Assumed Liabilities, Purchaser does not, and shall not, assume or pay any Excluded Liabilities. For avoidance of doubt, the Tower Group will not discharge or otherwise satisfy any Liabilities (including the Indebtedness) of the Foreign Entities in connection with the transactions contemplated hereby, and following the Closing, the Foreign Entities shall have all the Liabilities of the Foreign Entities immediately prior to the Closing.

Section 2.4.    Allocation of Purchase Price.

Purchaser shall prepare an allocation of the Purchase Price, and all other capitalized costs, among the Acquired Assets in accordance with Code §1060 and the Treasury Regulations thereunder, and any similar provision of state, provincial, local, territorial or foreign law, as appropriate. Purchaser shall deliver such allocation to Seller as promptly as practicable after the Closing Date. Promptly following receipt thereof, Seller may discuss with Purchaser and Purchaser shall consider, in good faith, any potential changes to such allocation that would result in a material decrease in state or local income Tax Liability of Seller while not resulting in a meaningful current or future increase in the income Tax Liability of Purchaser. Thereafter, Purchaser shall deliver a final allocation to Seller, which final allocation shall be binding upon Seller. Purchaser and Seller and their respective Affiliates shall report, act and file Tax Returns, including, but not limited to IRS Form 8594, in all respects and for all purposes consistent with such final allocation prepared by Purchaser. Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as Purchaser may reasonably request to prepare such allocation. Neither Purchaser nor Seller shall take any position, whether in audits, Tax Returns or otherwise, that is inconsistent with such final allocation unless required to do so by applicable law.

Section 2.5.    Deposit.

Not later than the date that is three (3) Business Days next following the date hereof, Purchaser shall deposit with the Escrow Agent, pursuant to the terms of the Escrow Agreement, Twenty Five Million Dollars ($25,000,000) by wire transfer of immediately available funds (collectively, with any accrued interest thereon, the "**Deposit**"), which Deposit shall be held and released in accordance with the provisions of the Escrow Agreement and the other provisions contained herein. Provided that the transactions contemplated hereby are consummated, the Deposit shall be paid to the DIP Lenders at the Closing as more fully set forth in Section 2.1(a)(i) of this Agreement.

Section 2.6.    Closing.

Upon the terms and subject to the conditions of this Agreement, the consummation of the transactions contemplated by this Agreement shall take place at a closing (the "**Closing**") to be held at the offices of Kirkland & Ellis LLP, 153 East 53rd Street, New York, New York at 9:00 a.m., Eastern Standard Time, on July 31, 2007 or if mutually agreed upon in writing by Purchaser and Seller the second (2nd) Business Day following, but not including, the date on which the last of the conditions set forth in Article 7 are satisfied or waived, other than those conditions that by their nature are to be satisfied at the Closing, but subject to fulfillment or waiver of such conditions, or at such other place or at such other time or on such other date as the Parties may mutually agree upon in writing. The day on which the Closing takes place shall be deemed the "**Closing Date**."

Section 2.7.    Letters of Credit.

Subject to Section 2.1(a)(iii), at the Closing, Purchaser will cause to be posted letters of credit in substitution for the letters of credit identified in Schedule 3.2(b) attached

hereto. To the extent the Industrial Revenue Bonds are repaid and not assumed, Purchaser shall have no obligation to replace the letters of credit in respect of the Industrial Revenue Bonds.

Section 2.8. <u>Closing Deliveries by Seller.</u>

At the Closing, Seller shall deliver to Purchaser:

(a)    one or more Assignment and Assumption Agreements duly executed by Seller in favor of Purchaser and/or one or more of its assignees as requested by Purchaser;

(b)    one or more Bills of Sale duly executed by Seller in favor of Purchaser and/or one or more of its assignees as requested by Purchaser;

(c)    one or more assignments of the registrations and applications for registration of the Listed Intellectual Property, for recording in the United States Patent and Trademark Office or the United States Copyright Office or similar office in a foreign jurisdiction, if any, as reasonably requested by Purchaser in writing at least five (5) Business Days prior to the Closing (collectively, the "**Intellectual Property Assignments**");

(d)    the certificates representing all of the issued and outstanding shares of capital stock or other similar instruments representing the equity that constitutes a portion of the Acquired Assets of a Tower Group entity being acquired hereunder; except for each Seller entity, duly endorsed in blank or accompanied by duly executed stock powers, with appropriate transfer stamps, if any, or notarial certificate affixed thereto;

(e)    notarial or other deeds of transfer, or other similar instruments, to effect the transfer, sale or assignment of the stock, limited liability company interests, partnership interests or any other equity interests of Foreign Entities being acquired hereunder, if reasonably requested by Purchaser in writing at least twenty (20) calendar days prior to the Closing;

(f)    the Seller Certificate required to be delivered pursuant to <u>Section 7.2(c)</u>;

(g)    any other document reasonably requested by Purchaser in writing at least five (5) Business Days prior to the Closing and necessary to effectuate the transfer of the Acquired Assets or the Assumed Contracts from Seller to Purchaser, including, without limitation, Transfer Tax returns, vehicle titles, licenses, Environmental Permits (to the extent transferable), duly executed real estate deeds and other similar or collateral documents for each of Seller's Owned Real Property in form acceptable for recording in the jurisdiction where the respective Owned Real Property is located and an affidavit in form and substance required under the Treasury Regulations issued pursuant to Code §1445 stating that no Seller entity is a "Foreign Person" as defined in Code §1445 (the "**FIRPTA Affidavit**");

(h)    any customary affidavits, undertakings and title clearance documents reasonably requested by Purchaser in writing at least twenty (20) calendar days prior to the Closing and necessary for Purchaser to obtain the Title Policy; provided that none of the

foregoing shall require the payment of money, the placement of any funds in escrow, or the pledge of any other collateral by Seller;

(i)     the Name Change Filings as more fully set forth in Section 5.13 of this Agreement; and

(j)     the Sale Order and the Confirmation Order entered by the Bankruptcy Court.

Section 2.9.     Closing Deliveries by Purchaser.

At the Closing, Purchaser shall deliver to or on behalf of Seller:

(a)     the portion of the Purchase Price to be delivered at Closing as provided herein;

(b)     the Assignment and Assumption Agreement duly executed by Purchaser;

(c)     the Bill of Sale duly executed by Purchaser;

(d)     the Intellectual Property Assignments duly executed by Purchaser;

(e)     Purchaser Certificate required to be delivered pursuant to Section 7.3(d) of this Agreement;

(f)     certified copies of the resolutions of Purchaser's board of directors (or similar governing body) authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby; and

(g)     subject to Section 2.1(a)(iii), evidence reasonably satisfactory to Seller that Purchaser has posted any letters of credit required pursuant to Section 2.7 hereof.

## ARTICLE 3.

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth on the disclosure schedules delivered by Seller to Purchaser on or prior to the execution of this Agreement (each a "**Schedule**" and together, the "**Company Disclosure Schedule**"), the Company hereby represents and warrants to Purchaser that:

Section 3.1.     Organization.

(a)     Each of the Company and the Company Subsidiaries is duly organized, validly existing and in good standing under the Laws of its respective jurisdiction and organization and has, subject to the necessary authority from the Bankruptcy Court, the requisite corporate or similar power and authority to own or lease its properties and to carry on its

business as presently conducted and is duly qualified to do business and is in good standing, where such concept exists, as a foreign corporation in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary, except where the failure to be so organized, qualified or in good standing or have such power or authority would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     The entities set forth on Schedule 3.1(b) are the only Subsidiaries of the Company. Schedule 3.1(b) sets forth (i) the name and jurisdiction of incorporation of each Foreign Entity, (ii) if applicable, the total number of shares of each class of capital stock of each Foreign Entity authorized and the number of shares outstanding and the number of shares owned by the Tower Group and the specific Tower Group entity which is the owner and (iii) a complete list of the directors and officers of each Foreign Entity. All of the issued and outstanding shares of capital stock or similar instrument representing the equity interest of each Foreign Entity has been duly and validly authorized and issued and are fully paid, non-assessable and free of preemptive rights. None of the outstanding shares of capital stock of such Foreign Entity has been issued in violation of the preemptive rights of any stockholder of such entity. The shares of capital stock or similar instruments of such entity were issued in material compliance with all applicable Laws.

(c)     Except as set forth in Schedule 3.1(c), there are no existing agreements, subscriptions, options, warrants, calls, commitments, trusts, voting or otherwise, or rights of any kind whatsoever granting to any Person any interest in or the right to purchase or otherwise acquire from any Foreign Entity or from any Seller in respect of any Foreign Entity, at any time, or upon the occurrence of any stated event, any shares of capital stock of or equity interest in any such Foreign Entity, whether or not presently issued or outstanding, nor are there any outstanding shares of capital stock of or equity interests in any such Foreign Entity or any other entity which are convertible into or exchangeable for other shares of capital stock of or equity interests in any Foreign Entity nor are there any agreements, subscriptions, options, warrants, calls, commitments or rights of any kind granting to any Person any interest in or the right to purchase or otherwise acquire from any such member of the Tower Group or any other Person any shares of capital stock or equity interests so convertible or exchangeable, nor are there any proxies, agreements or understandings with respect to the voting of the shares of capital stock of or equity interests in any Foreign Entity.

(d)     Seller has made available or delivered to Purchaser true and complete copies of the organizational documents of each member of the Tower Group.

Section 3.2.    Bank Accounts; Letters of Credit.

(a)     Schedule 3.2(a) lists substantially all current material bank accounts, lock boxes and safe deposit boxes relating to the business and operations of each Foreign Entity (with such Schedule to be amended a reasonable time prior to Closing to list all such accounts), including the name of the bank or other institution where such account or box is located and the name of each authorized signatory thereto.

(b)     Schedule 3.2(b) sets forth all outstanding letters of credit issued by financial institutions for the account of the Tower Group, setting forth, in each case, the financial institution issuing such letter of credit, the maximum amount available under such letter of credit, the terms, including the expiration date, of such letter of credit and the party or parties in whose favor such letter of credit was issued.

Section 3.3.     Affiliate Transactions.

Except (a) for matters described in the Company's Annual Report on Form 10-K for the year ended December 31, 2005 filed with the SEC and (b) for compensation paid or payable by the Tower Group to bona fide employees of the Tower Group in the ordinary course of business and consistent with past practice, no current or former officer or director of the Tower Group nor any of their respective relatives or spouses, is now, or has been during the last two (2) years, (X) a party to any transaction or contract with the Tower Group or any of their respective employees or Affiliates, (Y) the direct or indirect owner of a material interest in any Person which is a present or potential competitor, supplier or customer of the Tower Group (other than non-affiliated holdings in publicly-held companies) or (Z) a recipient of any material benefit or material payment from the Tower Group. Except as set forth on Schedule 3.3 or in respect of any obligation to indemnify any officer or director of the Tower Group pursuant to any certificate of incorporation, by-law or similar document, or in any employment agreement identified in the Schedules to this Agreement, the Tower Group is not a guarantor or otherwise directly or indirectly liable for any actual or potential Liability of any of its officers, directors or employees other than members of the Tower Group.

Section 3.4.     Insurance.

To Seller's Knowledge, Schedule 3.4 sets forth a list and brief description of the material policies of insurance currently maintained, owned or held by the Tower Group. Each member of the Tower Group has complied in all material respects with each such insurance policy to which it is a party and has not failed to give any notice or present any claim thereunder in a due and timely manner. Except as disclosed in Schedule 3.4, the full policy limits (subject to deductibles provided in such policies) are available and unimpaired under each such policy and, to Seller's Knowledge, no insurer under any of such policies has a basis to void such policy on grounds of nondisclosure on the part of any member of the Tower Group thereunder. Each such policy is in full force and effect and to Seller's Knowledge, will not in any way be affected by, or terminate or lapse by reason of, the transactions contemplated by this Agreement. All premiums with respect to such policies have been paid in full and on time (it being understood that the premiums for the current year have been financed under the Marsh Financing and that regular payments remain due on the financed premiums, but that all such payments due prior to the date hereof have been paid when due). No reservation of rights letters with respect to Acquired Assets, Assumed Liabilities or other matters for which Purchaser may have responsibility after the Closing have been issued by any insurance carrier. A reasonable time prior to the Auction, Seller shall use commercially reasonable efforts to supplement Schedule 3.4 to provide information with respect to all insurance policies currently maintained including nature of coverage, limits, deductibles, and premiums, and all insurance policies maintained, owned or held by the Tower Group within the past two (2) years.

(b) Schedule 3.4 also shows a good faith estimate of the Seller's workers compensation claims and the letters of credit securing such claims. The letters of credit securing the Seller's workers compensation Liabilities exceed such good faith estimate.

Section 3.5.    Accounts Receivable, Inventory and Accounts Payable.

(a)    Except as set forth in the Financial Statements, to Seller's Knowledge, all accounts receivable of the Tower Group:

(i)    have arisen from bona fide transactions by the Tower Group in the ordinary course of its business and represent and will represent bona fide claims against debtors for sales and other charges.

(b)    Except as set forth in the Financial Statements, to Seller's Knowledge, the inventories of the Tower Group are:

(i)    properly included in all material respects in the Financial Statements in accordance with GAAP; and

(ii)    are of such quality as to be useable and salable in all material respects in the ordinary course of business.

(c)    Except as set forth in Schedule 3.5(c), the Tower Group has no accounts payable that are more than ninety (90) days past due.

Section 3.6.    Export Control Laws.

Except as set forth on Schedule 3.6 attached hereto, since January 1, 2005, to Seller's Knowledge, each member of the Tower Group has conducted its export transactions material compliance with the Export Administration Act and implementing Export Administration Regulations except as would not reasonably be expected to result in Liability to Purchaser in excess of Two Million Dollars ($2,000,000). Without limiting the foregoing, since January 1, 2005, to Seller's Knowledge, except as would not reasonably be expected to result in Liability to Purchaser in excess of Two Million Dollars ($2,000,000):

(a)    Each member of the Tower Group has obtained all material export licenses and other material approvals required for its exports of products, software and technologies from the United States and in case of a Foreign Entity, from the state where such Foreign Entity is incorporated or has its domicile or registered seat or principal place of business;

(b)    Each member of the Tower Group is in material compliance with the terms of all applicable material export licenses or other approvals;

(c)    There are no pending or threatened Claims against any member of the Tower Group with respect to such material export licenses or other material approvals;

(d)     There are no actions, conditions or circumstances pertaining to the Tower Group's export transactions that may reasonably be anticipated to give rise to any future Claims; and

(e)     To Seller's Knowledge, no consents or approvals for the transfer of export licenses to Purchaser are required, or such consents and approvals can be obtained expeditiously without material cost.

Section 3.7.     Certain Payments.

Except as set forth on Schedule 3.7 attached hereto, since January 1, 2005, to Seller's Knowledge, no member of the Tower Group, any officer, any director of the Tower Group, or, to Seller's Knowledge, any employee, agent or other Person acting on behalf of the Tower Group has, directly or indirectly, given or agreed to unlawfully give any material amount of money by way of gift, contribution or rebate, or given or agreed to give any bribe, payoff, influence payment, kickback or similar benefit, other than legal price concessions to customers in the ordinary course of business, to any customer, supplier, employee or agent of a customer or supplier, or official or employee of any Governmental Authority or other Person who was, is, or may be in a position to help or hinder the business of the Tower Group, or assist in connection with any actual or proposed transaction.

Section 3.8.     Authority; Enforceability.

Subject to the Bankruptcy Court's entry of the Sale Order, Seller has all necessary corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. Subject to the Bankruptcy Court's entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the Ancillary Agreements and the consummation by Seller of the transactions contemplated hereby and thereby, has been duly and validly authorized by all necessary corporate action on the part of Seller and no other corporate proceedings on the part of Seller are necessary to authorize this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby. This Agreement has been duly executed and delivered by Seller and, subject to the Bankruptcy Court's entry of the Sale Order, assuming due authorization, execution and delivery of this Agreement by Purchaser, constitutes a legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its terms.

Section 3.9.     No Conflicts or Violations; Consents.

(a)     Except as set forth in Schedule 3.9 and assuming entry of the Sale Order, neither the execution, delivery or performance by Seller of this Agreement, nor the consummation of the transactions contemplated hereby and thereby shall:

(i)     conflict with, or result in a breach or a violation of, any provision of the certificate of incorporation or bylaws or other organizational documents of any member of the Tower Group; and

-29-

(ii)     constitute, with or without notice or the passage of time or both, a breach, violation or default, create any material Liability or any Encumbrance, other than Permitted Encumbrances, (A) under any Law applicable to or binding on any member of the Tower Group or any of their respective properties or assets, or (B) under any joint venture, operating, partnership or shareholder agreement with respect to any Foreign Entity, or (C) give rise to any right of termination, modification, cancellation, suspension, limitation or revocation under any license or permit or Governmental Authority filing to which any member of the Tower Group is subject or by which any of their respective properties or assets, including the Acquired Assets or Assumed Contracts, is bound, except in the case of those breaches, violations, defaults or rights of termination, modification, cancellation, prepayment, suspension, revocation or acceleration that are excused by or are unenforceable as a result of the Bankruptcy Case or the applicability of the Bankruptcy Code, but only to the extent such excuse, lack of enforceability or application of the Bankruptcy Code will continue to apply in favor of Purchaser following the Closing.

Section 3.10.   Title to Assets and Location of Assets.

Except as set forth on Schedule 3.10, Seller has good and marketable title to each of the Acquired Assets owned by such Seller, free and clear of any Claims, Interests or Encumbrances other than Permitted Encumbrances and Encumbrances which are (a) in favor of Persons to be listed no later than May 18, 2007 on Schedule 3.10 (with name, address and telephone number) and (b) that will be released or otherwise removed upon the Closing if the Sale Order is entered by the Bankruptcy Court. The Foreign Entities have good and marketable title, to their respective assets owned by such Foreign Entities, to Seller's Knowledge, free and clear of any Claims, Interests or Encumbrances, other than Permitted Encumbrances.

Section 3.11.   Financial Information.

(a)     Schedule 3.11(a) attached hereto contains copies of the following financial statements of the Tower Group (collectively, the "**Financial Statements**"):

(i)     the historical unaudited consolidated balance sheet (the "**Balance Sheet**") as of December 31, 2006 (the "**Balance Sheet Date**");

(ii)     the historical unaudited consolidated statements of cash flow and operating income for the year ended on the Balance Sheet Date; and

(iii)     the historical audited consolidated balance sheet as of December 31, 2005 and (iv) the audited consolidated statements of cash flow and operating income for the fiscal year ended December 31, 2005.

(b)     The Financial Statements, subject, in the case of unaudited financial statements, to year end audit adjustments and the absence of full footnote disclosure:

(i)     present fairly in all material respects the consolidated financial condition and results of operations of the Tower Group as of the dates thereof or for the periods covered thereby;

(ii)    have been prepared in all material respects in accordance with GAAP applied on a consistent basis for the periods involved, except as may be indicated in the notes thereto; and

(iii)    have been prepared in all material respects in accordance with Regulation S-X as promulgated pursuant to the Exchange Act.

(c)    As more fully set forth in Section 8.1(g)(vii) of this Agreement, Seller's 2006 Audited Financial Statements (the "**2006 Audited Statements**") shall be delivered prior to the Closing. The 2006 Audited Statements, when delivered to Purchaser shall (i) present fairly in all material respects the consolidated financial condition and results of operations of the Tower Group as of the dates thereof or for the periods covered thereby and (ii) have been prepared in all material respects in accordance with GAAP applied on a consistent basis for the periods involved, except as may be indicated in the notes thereto, and in accordance with Regulation S-X.

(d)    To Seller's Knowledge, on the date of their filing, no SEC Report (i) contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and (ii) failed to comply in all material respects with the applicable requirements of the Exchange Act.

Section 3.12.    No Undisclosed Liabilities.

To Seller's Knowledge, except as disclosed on Schedule 3.12 attached hereto, no member of the Tower Group has any Liabilities or obligations, except Liabilities that (i) are accrued or reserved against in the Financial Statements or are reflected in the notes thereto, (ii) are incurred pursuant to the transactions contemplated by this Agreement, (iii) have been discharged or paid in full prior to the date of this Agreement in the ordinary course of business, (iv) were incurred in the ordinary course of business since the Balance Sheet Date, or (v) are not individually in excess of Two Million Dollars ($2,000,000) or in excess of Five Million Dollars ($5,000,000) in the aggregate.

Section 3.13.    Absence of Certain Changes or Events.

Since the Balance Sheet Date, and except as contemplated by this Agreement, the Tower Group has conducted its business in the ordinary course consistent with past practice. Without limiting the generality of the foregoing, except as set forth in Schedule 3.13 attached hereto, since the Balance Sheet Date, the Tower Group has not:

(a)    suffered any material damage, destruction or casualty loss, whether or not covered by insurance, or condemnation taking;

(b)    entered into any material employment or consulting contract or commitment, whether oral or written, which is not terminable within ninety (90) days after written notice, or material compensation arrangement or employee benefit plan, or changed or committed to change, including any change pursuant to any bonus, pension, profit-sharing or other plan, commitment, policy or arrangement, the compensation payable or to become payable

to any of its officers, directors, employees, agents or consultants, who, in each case, are paid in the aggregate over Five Hundred Thousand Dollars ($500,000) per annum, or made any pension, retirement, profit-sharing, bonus or other employee welfare or benefit payment or contribution other than payments or contributions required by the governing documents of the foregoing or terminated any officer or other senior employee;

(c)     other than pursuant to the transactions contemplated hereby or otherwise relating to the Bankruptcy Case, canceled any debts or waived any rights other than in the ordinary course of business;

(d)     sold, transferred or otherwise disposed of any of its material properties or assets, except in the ordinary course of business;

(e)     terminated or suffered the termination of any material contract other than in the ordinary course of business; or

(f)     agreed in writing to take any action set forth in this <u>Section 3.13</u>.

Section 3.14.  <u>Contracts.</u>

(a)     Except as set forth on <u>Schedule 3.14(a)</u> attached hereto (or with respect to the KERP Liability, as separately disclosed to Purchaser), no member of the Tower Group is a party to:

(i)     any employment, consulting, independent contractor, retention, change in control, stay bonus, or severance contract involving either annual consideration of more than Five Hundred Thousand Dollars ($500,000) or payments which when aggregated with annual consideration would exceed Five Hundred Thousand Dollars ($500,000);

(ii)     any Change in Control Agreements;

(iii)     any contract approved by the Bankruptcy Court or involving consideration that is reasonably likely during the twelve (12) month period following the Closing to require payments or have anticipated receipts in excess of Two Million Dollars ($2,000,000), and excluding those purchase orders entered into in the ordinary course of business;

(iv)     any contract that provides for a right of first offer, right of first refusal, right of last offer, or exclusivity in favor of any party with respect to the Acquired Assets or the Assumed Contracts other than the Tower Group;

(v)     any joint venture or partnership contract;

(vi)     any noncompete or nonsolicitation or similar contract that materially restricts the conduct of business of the Tower Group in any geographic area;

(vii)     any contract for the purchase or sale of any business under which the Tower Group has any continuing performance or indemnification obligations;

-32-

(viii)  to Seller's Knowledge, other than licenses of commercially available off-the-shelf shrinkwrap or click-wrap software, material agreements relating to the licensing of any Intellectual Property to or from third parties;

(ix)  any contract that is a requirements contract for the providing of any goods or services to the Tower Group; or

(x)  any other contract the absence of which would result in a Material Adverse Effect.

(b)  Seller has entered into accommodations with certain of its customers as set forth on Schedule 3.14(b) attached hereto.

(c)  As of the date which is three (3) Business Days prior to the date hereof, the outstanding balance of each of (i) the DIP Loan Credit Agreement, (ii) the Second Lien Loan, and (iii) the Industrial Revenue Bonds are as set forth on Schedule 3.14(c) attached hereto.

(d)  Subject to the Bankruptcy Court's entry of the Sale Order, to Seller's Knowledge, all of the Assumed Contracts required to be set forth on Schedule 3.14(a) and the contracts of the Foreign Entities required to be set forth on Schedule 3.14(a) are valid, binding and enforceable in accordance with their respective terms, except as designated on Schedule 3.14(d) attached hereto and, with respect to those contracts of the Foreign Entities required to be set forth on Schedule 3.14(a), except as such enforceability may be limited by (i) applicable insolvency, bankruptcy, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) applicable equitable principles (whether considered in a proceeding at law or in equity).

(e)  Except for those defaults that will be cured if the Sale Order is entered by the Bankruptcy Court, or that need not be cured under the Bankruptcy Code to permit the assignment and assumption of the Assumed Contracts required to be set forth on Schedule 3.14(a) (i) the Tower Group is not, and, to Seller's Knowledge, other than as set forth in Schedule 3.14(e), no other party is, in violation, breach of or default under the Assumed Contracts required to be set forth on Schedule 3.14(a) and the contracts of the Foreign Entities required to be set forth on Schedule 3.14(a), (ii) the Tower Group has, to Seller's Knowledge, not received any written notice or claim of default under the Assumed Contracts or the contracts of the Foreign Entities required to be set forth on Schedule 3.14(a), and (iii) to Seller's Knowledge, no event has occurred that, with or without notice or lapse of time or both, would result in a breach or a default under the Assumed Contracts and the contracts of the Foreign Entities required to be set forth on Schedule 3.14(a).

(f)  Schedule 3.14(f) attached hereto contains a true, accurate and complete itemized statement, as of the date which is five (5) Business Days prior to the date hereof, of all Foreign Financial Indebtedness, and to Seller's Knowledge, all other Indebtedness in excess of Two Million Dollars ($2,000,000) of the Foreign Entities translated to United States Dollars using the Budgeted Exchange Rates.

(g)     Schedule 3.14(g) attached hereto contains a true, accurate and complete itemized statement, as of the date which is five (5) Business Days prior to the date hereof, of all material unrestricted cash balances of the Foreign Entities translated to United States Dollars using the Budgeted Exchange Rates.

(h)     Schedule 3.14(h) attached hereto contains a true, accurate and complete itemized statement as to the date which is five (5) Business Days prior to the date hereof, of all Indebtedness of the Tower Group, with the exception of the Foreign Entities, and excluding any pre-petition unsecured Indebtedness.

(i)     Schedule 3.14(i) attached hereto contains a true, accurate and complete itemized statement, as of the date which is five (5) Business Days prior to the date hereof, of all material unrestricted cash balances of the Tower Group with the exception of the Foreign Entities.

Section 3.15.  Suppliers.

Schedule 3.15(a) attached hereto sets forth a list of the ten (10) largest suppliers (the "**Suppliers**") of the Tower Group in terms of purchases during the fiscal year ended December 31, 2006.  Except as set forth on Schedule 3.15(b) and other than with respect to notifications which have since been resolved, to Seller's Knowledge, no Supplier has notified or otherwise indicated to the Tower Group that it will stop, or decrease the rate of, or, other than publicly announced generally applicable price increases, materially increase the cost of, its supply of materials, products or services used by the Tower Group, and no Supplier has, during 2007, ceased, materially decreased the rate of or materially raised the cost of, any such materials, products or services.

Section 3.16.  Compliance with Law.  Except as to matters which would not reasonably be expected to result in Liability to Purchaser in excess of Five Million Dollars ($5,000,000) in the aggregate:

(a)     Except as set forth on Schedule 3.16 attached hereto or as would not reasonably be expected to result in Liability to Purchaser, to Seller's Knowledge, the Tower Group is not in violation, in any material respect, of any Law or Order relating to the operation of its business and ownership of the Acquired Assets.

(b)     Except as set forth on Schedule 3.16, to Seller's Knowledge, the Tower Group is, and has been since the Balance Sheet Date, in material compliance with, all permits, licenses, authorizations, exemptions, Orders, consents, approvals and franchises from Governmental Authorities required to conduct their respective business as now being conducted.

(c)     Except as set forth on Schedule 3.16, to Seller's Knowledge, no material investigation or review by any Governmental Authority with respect to the Acquired Assets or the Assumed Liabilities is or was pending, or threatened, against the Tower Group, nor has any Governmental Authority indicated in writing an intention to conduct the same.

Section 3.17.  Litigation.

Schedule 3.17 attached hereto, sets forth each instance in which the Tower Group is (i) to Seller's Knowledge, subject to any outstanding judgment, injunction, Order, decree, ruling or settlement agreement for which Purchaser will be bound following the Closing or pursuant to which Purchaser could reasonably be expected to have Liability in excess of Two Million Dollars ($2,000,000) in any individual case or (ii) is a party or, to Seller's Knowledge, is threatened to be made a party to any action, suit, proceeding, hearing or investigation of, in or before any Governmental Authority or before any arbitrator.  Except as disclosed in Schedule 3.17 attached hereto or as would not reasonably be expected to result in Liability to Purchaser in excess of Two Million Dollars ($2,000,000) in any individual case, there are no lawsuits or arbitrations pending or, to Seller's Knowledge, threatened against the Tower Group or which the Tower Group intends to initiate.

Section 3.18.  Employee Compensation and Benefit Plans; ERISA.

(a)  Schedule 3.18(a) attached hereto sets forth a correct and complete list of:

(i)  all employee welfare benefit plans (as defined in Section 3(1) of ERISA);

(ii)  all employee pension benefit plans (as defined in Section 3(2) of ERISA); and

(iii)  all other employee benefit plans, programs, policies or arrangements, including and any deferred compensation plan, incentive plan, bonus plan or arrangement, stock option plan, stock purchase plan, stock award plan or other equity-based plan, retention arrangement (other than included in the KERP Liability), severance pay plan, dependent care plan, sick leave, disability, death benefit, group insurance, hospitalization, dental, life, any fund, trust or arrangement providing health benefits including multiemployer welfare arrangements, a multiple employer welfare fund or arrangement, cafeteria plan, employee assistance program, scholarship program, vacation policy, employee loan, or other similar plan or arrangement, funded or unfunded, or actual or contingent that is maintained by the Tower Group for the benefit of current employees or consultants, and/or their respective dependents or beneficiaries, of the Tower Group.

Each plan, program, policy, agreement or arrangement listed on Schedule 3.18(a) is referred to herein as an "**Employee Plan**" and collectively shall be referred to as the "**Employee Plans**").

(b)  Schedule 3.18(b) attached hereto sets forth a list of those Employee Plans that are Assumed Plans.

(c)  Seller has provided or made available to Purchaser a true, correct and complete copy, where applicable, of:

-35-

(i)　　each Employee Plan (or, where a material Employee Plan has not been reduced to writing, a summary of all material terms of such Employee Plan);

(ii)　　each trust, account or funding agreement, and each insurance contract, with respect to each such Employee Plan;

(iii)　　the three (3) most recently filed annual reports on IRS Form 5500 with respect to each Employee Plan;

(iv)　　the most recently received IRS determination letter for each Employee Plan;

(v)　　the three (3) most recently prepared actuarial reports and financial statements in connection with each Employee Plan;

(vi)　　the most recent summary plan description, any summaries of material modification regarding material changes to an Employee Plan, any employee handbooks and any material written communications by the Tower Group to any employee, participant or beneficiary concerning the extent of the benefits provided under any Employee Plan;

(vii)　　for the last three (3) years, all material correspondence with the IRS, United States Department of Labor (the "**DOL**") and any other Governmental Authority regarding an Employee Plan;

(viii)　　to the extent in Seller's possession or reasonably accessible to Seller, all contracts with third-party administrators, actuaries, investment managers, consultants and other independent contractors that relate to any Employee Plan; and

(ix)　　to the extent in Seller's possession or reasonably accessible to Seller, any other documents in respect of any Employee Plan reasonably requested by Purchaser.

(d)　　Except as set forth on Schedule 3.18(d), the Tower Group does not have any plan or commitment to establish any new Employee Plan or to modify any Employee Plan in any material respect.

(e)　　The Tower Group does not have any obligation to make contributions to a multiemployer plan, within the meaning of Section 3(37) or 4001(a)(3) of ERISA. No "accumulated funding deficiency" as defined in Section 302 of ERISA or Section 412 of the Code, whether or not waived, exists with respect to any Assumed Plan subject to Section 302 of ERISA or Section 412 of the Code and the Tower Group is not, and does not expect to be, subject with respect to any Assumed Plan to (i) any requirement to post security pursuant to Section 412(f) of the Code or (ii) any perfected lien pursuant to Title IV of ERISA or Section 412(n) of the Code. Except as set forth on Schedule 3.18(e), no benefits have accrued under any Assumed Plan that is subject to Section 412 of the Code or Title IV of ERISA since December 31, 2006.

(f)     Except for the Change in Control Agreements and ordinary course benefits payable or due to employees upon a termination of employment, no Employee Plan exists that would reasonably be expected to result in the payment to any current employee or consultant of the Tower Group of any money or other property, or accelerate, or provide any other rights or benefits to any current employee or consultant of the Tower Group as a result of the consummation of the transactions contemplated by this Agreement, whether alone or in connection with any other event.

(g)     Each Assumed Plan has been maintained and operated in all material respects in compliance with its terms and applicable Law, including ERISA, the Code and the Health Insurance Portability and Accountability Act of 1996. With respect to each Assumed Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the IRS, the DOL or any other Governmental Authority, or to the participants or beneficiaries of such Employee Plan have been filed or furnished on a timely basis in all material respects. Seller has provided Purchaser with a current list (completed using its best efforts to do so) of individuals who are eligible for continued health coverage under an Employee Plan pursuant to the provisions of Section 4980B of the Code and Sections 601 through 608, inclusive, of ERISA (which provisions are hereinafter referred to collectively as **"COBRA"** coverage). Seller shall use its best efforts to update such list from time to time prior to the Closing as reasonably requested by Purchaser. Except as provided by the Change in Control Agreements, as required by COBRA (or any similar state or foreign Law) or pursuant to the Retiree Benefits Settlements or as may be provided by the Consolidated Pension Plan, no Assumed Plan has or includes an obligation to provide health or welfare benefits to any individual following termination of employment.

(h)     Each Assumed Plan that is intended to be qualified within the meaning of Section 401(a) of the Code (a **"Tax-Qualified Plan"**) is so qualified and has received a favorable determination letter from the IRS to the effect that such Plan satisfies the requirements of Section 401(a) of the Code taking into account all changes in qualification requirements under Section 401(a) of the Code for which the "applicable remedial amendment," within the meaning of Treasury Regulation § 1.401(b)-1, has expired. The related trust with respect to each Tax-Qualified Plan is exempt from taxation under Section 501(a) of the Code. Each Tax-Qualified Plan has been timely amended to comply with the Economic Growth and Tax Relief Reconciliation Act of 2001 and all subsequent applicable Laws for which amendments are required to preserve the tax-qualified status of such Employee Plan, and, to the Seller's Knowledge, there are no facts or circumstances that could cause the loss of such qualification or the imposition of any Liability, penalty or tax under ERISA, the Code or any other applicable Law.

(i)     With respect to any Assumed Plan, except for claims filed in connection with the Seller's bankruptcy proceedings, (i) no actions, claims or proceedings, other than routine claims for benefits in the ordinary course, are pending or, to the Seller's Knowledge, threatened, (ii) to the Seller's Knowledge no facts or circumstances exist that could give rise to any such actions, claims or proceedings and (iii) no administrative investigation, audit or other administrative proceeding by the DOL, the IRS or other Governmental Authority, including any voluntary compliance submission through the IRS's Employee Plans Compliance Resolution

System or the DOL's Voluntary Fiduciary Correction Program, is pending, in progress or to the Seller's Knowledge threatened.

(j)     Neither the Tower Group, nor, to the Seller's Knowledge, any other "party in interest" or "disqualified person" with respect to any Assumed Plan, has engaged in a nonexempt "prohibited transaction," within the meaning of Section 406 of ERISA or Section 4975 of the Code.   To the Seller's Knowledge, no fiduciary has any Liability for breach of fiduciary duty or any other failure to act or comply with the requirements of ERISA, the Code or any other applicable Laws in connection with the administration, management or investment of the assets of any Assumed Plan.

(k)     All contributions required to be made with respect to the Consolidated Pension Plan and its predecessors have been timely made or reflected on the Financial Statements of the Tower Group in accordance with GAAP.  All premiums with respect to all insurance policies or contracts maintained with respect to each Assumed Plan have been timely made, subject to the Marsh Financing, and no such premiums are delinquent.

Section 3.19.   <u>Labor and Employment Matters.</u>

(a)     With the exception of the matters listed on <u>Schedule 3.19(a)</u>:

(i)     except as would not reasonably be expected to result in Liability to Purchaser in excess of Two Million Dollars ($2,000,000) in the aggregate, the Tower Group is in material compliance with all applicable Laws, regulations, and orders regarding employees, independent contractors, labor and employment practices, terms and conditions of employment, and wages and hours, including but not limited to the National Labor Relations Act, as amended, the Labor Management Relations Act of 1947, as amended, the Fair Labor Standards Act, as amended, the Equal Pay Act of 1963, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Immigration Reform and Control Act of 1986, as amended, the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended, the Civil Rights Act of 1991, as amended, the Occupational Safety and Health Act of 1970, as amended, the Employee Retirement Income Security Act of 1974, as amended, the Sarbanes-Oxley Act of 2002, as amended, the Rehabilitation Act of 1973, as amended, Executive Order 11246, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, the Uniform Services Employment and Reemployment Rights Act of 1994, as amended, the Drug Free Workplace Act of 1986, as amended, the Walsh Healey Government Contracts Act, as amended, the Service Contract Labor Standards Act, as amended, the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "**WARN Act**"), the Americans With Disabilities Act of 1990, the Family and Medical Leave Act of 1993, as amended, and the Employee Polygraph Protection Act of 1988, as amended;

(ii)     no labor organization has advised the Tower Group, since January 1, 2002, that such labor organization represents any employee of the Tower Group, and no employee of the Tower Group is represented in his or her capacity as an employee by any labor organization;

(iii)     since January 1, 2002, the Tower Group has not recognized any labor organization nor has any labor organization been elected or certified as the collective bargaining agent of any employee of the Tower Group, nor has Seller entered into any Collective Bargaining Agreement or union contract recognizing any labor organization as a bargaining agent of any employee, and no Collective Bargaining Agreement or other agreement exists or has existed between the Tower Group and any labor organization;

(iv)     to Seller's Knowledge, no petition concerning representation has been filed with the National Labor Relations Board, and no written demand for recognition has been made by any labor organization, concerning any employee of the Tower Group, since January 1, 2002;

(v)     the National Labor Relations Board has not advised Seller, since January 1, 2002, that any labor organization has filed a petition with the National Labor Relations Board seeking to represent any employee of the Tower Group;

(vi)     to Seller's Knowledge, no other question of representation pursuant to the National Labor Relations Act, as amended, exists respecting any employee of the Tower Group;

(vii)     to the Seller's Knowledge, no material unfair labor practice charge or complaint against the Tower Group has been received by Seller, and no such charge or complaint is pending or to Seller's Knowledge threatened before the National Labor Relations Board;

(viii)     to Seller's Knowledge, there is no labor dispute, strike, picketing, handbilling, work slowdown, work stoppage, job action, corporate campaign, or lockout pending or threatened against or affecting the Tower Group;

(ix)     to Seller's Knowledge, no material grievance or complaint regarding labor practices or conditions or any arbitration proceedings arising out of or under any contract or Collective Bargaining Agreement is pending or threatened;

(x)     the Tower Group has not experienced any strike, picketing, handbilling, work slowdown, work stoppage, job action, corporate campaign, or lockout since January 1, 2002;

(xi)     to Seller's Knowledge, no material charge or complaint of employment discrimination or unlawful retaliation against the Tower Group is pending or threatened before the U.S. Equal Employment Opportunity Commission ("**EEOC**"), or any other Governmental Authority;

(xii)     no material charge or complaint against the Tower Group is pending or to Seller's Knowledge threatened for payment of wages or other benefits under the Fair Labor Standards Act, as amended, or under any similar Law;

(xiii)   no material charge or complaint against the Tower Group is pending or to Seller's Knowledge threatened before the Occupational Safety and Health Administration or any other Governmental Authority;

(xiv)   no material complaint or action against the Tower Group by any current or former employee of the Tower Group, including, but not limited to, a complaint or action alleging breach of an employment contract, wrongful discharge, or breach of a duty of good faith and fair dealing in the employment relationship, is pending before any Governmental Authority;

(xv)   there are no pending Claims against the Tower Group for workers' compensation, unemployment insurance, or disability benefits under any Laws outside the ordinary course of business;

(xvi)   the Tower Group has timely filed Form EEO-1 with the EEOC each year since January 1, 2005;

(xvii)   the Tower Group maintains a Form I-9 with copies of identification documents, in material compliance with applicable Laws, for each employee for whom such a Form I-9 must be maintained;

(xviii)   no material charge or complaint against the Tower Group is pending or to Seller's Knowledge threatened under the Immigration Reform and Control Act of 1986;

(xix)   to Seller's Knowledge, no union organizing or decertification campaign is in progress with respect to any employee of the Tower Group;

(xx)   to Seller's Knowledge, no Governmental Authority responsible for the enforcement of labor or employment Laws has, since January 1, 2005, conducted or to Seller's Knowledge threatened in writing to conduct an investigation of or affecting the Tower Group and to Seller's Knowledge no such investigation is pending;

(xxi)   since January 1, 2005, the Tower Group has had employment practices liability insurance coverage or similar insurance coverage, and has made no claims under any such insurance; and

(xxii)   the Tower Group has a written hazard communication program which is in compliance with applicable Laws.

(b)   Except as set forth on Schedule 3.19(b), there has been no "mass layoff" or "plant closing" as defined by the WARN Act by the Tower Group since January 1, 2005.

(c)   With the exception of the Collective Bargaining Agreements or collective bargaining relationships for current and ongoing operations in the United States of America, set forth on Schedule 3.19(c), no Collective Bargaining Agreement or collective bargaining relationship exists or to Seller's Knowledge has existed between the Tower Group

and any labor organization at any Tower Group facility in the United States of America that has not been closed or is not currently being closed. The Purchaser shall not assume any Collective Bargaining Agreement or collective bargaining relationship in the United States of America that is not listed on Schedule 3.19(c).

Section 3.20. <u>Properties.</u>

(a) Schedule 3.20(a) attached hereto contains a true and complete list of all real property owned by the Tower Group (collectively, the "**Owned Real Property**") and for each parcel of Owned Real Property, contains a correct street address and the record owner of such Owned Real Property. Copies of title reports or policies obtained by the Tower Group with respect to each Owned Real Property in the possession of the Tower Group are set forth on Schedule 3.20(c).

(b) Schedule 3.20(b) attached hereto contains a true and complete list of all real property leased, subleased, licensed or otherwise occupied, whether as landlord, sublandlord, tenant, subtenant or pursuant to other occupancy arrangements, by the Tower Group (collectively, the "**Leased Real Property**"), and for each Leased Real Property, identifies the street address and the landlord of such Leased Real Property. True and complete copies of all agreements pertaining to the Leased Real Property (each a "**Real Property Lease**") that have not been terminated or expired as of the date hereof have been made available to Purchaser.

(c) The Tower Group has good title to all Owned Real Property and valid leasehold estates in all Leased Real Property, free and clear of all Claims, Interests or Encumbrances, except Permitted Encumbrances and Encumbrances which are: (i) in favor of Persons to be listed on Schedule 3.10 and (ii) that will be released or otherwise removed upon the Closing if the Sale Order is entered by the Bankruptcy Court.

(d) Except for Permitted Encumbrances and as otherwise set forth on the attached Schedule 3.20(a) or Schedule 3.20(b), none of the Owned Real Properties and none of the Leased Real Properties is subject to any lease, sublease, license or other agreement granting to any other Person any right to the use, occupancy or enjoyment of such Owned Real Property or Leased Real Property, as the case may be, or any part thereof.

(e) Each Real Property Lease is in full force and effect and is valid and enforceable in accordance with its terms, except as such enforceability may be limited by any applicable insolvency, bankruptcy, reorganization, moratorium or other similar laws affecting creditors' rights generally, and to Seller's Knowledge there is no default under any Real Property Lease either by a member of the Tower Group or by any other party thereto, and no event has occurred that, with the lapse of time or the giving of notice or both, would constitute a default by the Tower Group thereunder.

(f) There does not exist any pending or, to Seller's Knowledge, threatened condemnation or eminent domain proceedings that affect any Owned Real Property or Leased Real Property, and the Tower Group has not received any written notice of the intention of any Governmental Authority or other Person to take or use any Owned Real Property or Leased Real Property.

Section 3.21.  Intellectual Property.

(a)    Except as set forth on Schedule 3.21(a) attached hereto, to the Seller's Knowledge, the Tower Group owns, or has the right to use pursuant to a valid license or otherwise, all Intellectual Property required to operate their respective businesses as presently conducted;

(b)    Schedule 3.21(b) attached hereto lists all patent and patent applications, and registrations and applications for registration, of the Intellectual Property owned by the Company or the Company Subsidiaries that is included in the Acquired Assets ("**Listed Intellectual Property**");

(c)    Except as set forth on Schedule 3.21(c) attached hereto, the Listed Intellectual Property (i) to Seller's Knowledge, is valid and enforceable in all material respects, (ii) is not the subject of any pending litigation or opposition action, (iii) is not the subject of any outstanding Order, judgment or decree adversely affecting the rights of Tower Group thereto, and (iv) to Seller's Knowledge, is not being infringed or misappropriated by any third parties; and

(d)    As of the date hereof, the Tower Group has not received (i) any Claims in writing alleging that the Tower Group has violated or infringed, in any material respect, the Intellectual Property of any third parties, (ii) any Claims challenging the validity or enforceability of any Listed Intellectual Property or (iii) a written notice from a third party asking that the Tower Group consider the applicability of such third party's Intellectual Property to their respective businesses.

Section 3.22.  Environmental Laws.

Except as would not reasonably be expected to result in Liability to Purchaser in excess of Two Million Dollars ($2,000,000) or as set forth on Schedule 3.22 attached hereto or in the environmental assessment reports made available to Purchaser as set forth on Schedule 3.22, with respect to the Acquired Assets:

(a)    the Tower Group is in material compliance with all applicable Environmental Laws, and possesses and is in material compliance with all applicable Environmental Permits required under such Laws to operate the Acquired Assets as the Tower Group presently operates;

(b)    to Seller's Knowledge, there are no Regulated Substances on, at, under or migrating from any of the Owned Real Property or Leased Real Property, or any other third party property, under circumstances that would be expected to result in Liability of the Tower Group under any applicable Environmental Law; and

(c)    the Tower Group has not received any written notification from any Governmental Authority or third party alleging that it has violated or has Liability under any Environmental Law, except for matters that have been settled or resolved with the appropriate Governmental Authority, third party or otherwise.

-42-

Section 3.23.  <u>Brokers.</u>

Except as set forth on <u>Schedule 3.23</u>, no agent, broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission from Seller in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Tower Group.

Section 3.24.  <u>Tax Matters.</u>

(a)     Except as set forth on <u>Schedule 3.24</u> attached hereto, the Tower Group has timely filed all income and other material Tax Returns that it was required to file. Except as set forth on <u>Schedule 3.24</u> attached hereto, all such Tax Returns disclose all Taxes required to be paid for the periods covered thereby and were prepared in material compliance with all applicable material Laws and regulations.  All Taxes owed by the Tower Group, whether or not shown or required to be shown on any Tax Return, have been paid.  Except as set forth on <u>Schedule 3.24</u> attached hereto, no Claim ever has been made by an authority in a jurisdiction where the Tower Group does not file Tax Returns that the Tower Group is or may be subject to taxation by that jurisdiction.

(b)     The Tower Group has withheld and paid all material Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(c)     No director or officer, or employee responsible for Tax matters, of the Tower Group expects any authority to assess any additional material Taxes for any period for which Tax Returns have been filed.  There is no dispute or claim concerning any material Tax Liability of the Tower Group either (X) claimed or raised by any authority in writing or (Y) as to which any of the directors and officers, and employees responsible for Tax matters, of the Tower Group has Knowledge based upon personal contact with any agent of such authority.

(d)     Seller has made available to Purchaser correct and complete copies of all income Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by the Tower Group since January 1, 2004.

(e)     Except as set forth on <u>Schedule 3.24</u> attached hereto, the Tower Group has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(f)     The unpaid Taxes of the Tower Group (i) did not, as of the Balance Sheet Date, exceed the reserve for Tax Liability, rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income, set forth on the Balance Sheet or in the notes thereto, and (ii) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Tower Group in filing their Tax Returns.

(g)     No Seller entity is a "foreign person" within the meaning of Code §1445.  The Tower Group has disclosed on its federal income Tax Returns all positions taken

-43-

therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code §6662. The Tower Group is not a Party to any Tax allocation or sharing agreement. The Tower Group (i) is not a member of an Affiliated Group filing a consolidated federal income Tax Return (other than a group the common parent of which was the Company) or (ii) has no material Liability for the Taxes of any Person, other than the Tower Group, under Treas. Reg. § 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

(h)     The Tower Group has not in the last two (2) years, distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or Code §361.

Section 3.25.  Disclosure.

No representation, statement, or information made or furnished by Seller to Purchaser or any of Purchaser's representatives, including those contained in this Agreement and the various Disclosure Schedules attached hereto and the other information and statements referred to herein and previously furnished by Seller, contains or shall contain any knowingly untrue statement of a material fact or omits or shall omit any material fact necessary to make the information contained therein not misleading.

Section 3.26.  No Other Representations or Warranties.

(a)     Except for the representations and warranties contained in this Article 3, Purchaser acknowledges that neither Seller nor any other Person on behalf of Seller makes any other express or implied representation or warranty with respect to the Tower Group (including without limitation representations and warranties as to the condition of the Acquired Assets) with respect to any other information provided to Purchaser. Neither Seller nor any other Person will have or be subject to any Liability or indemnification obligation to Purchaser or any other Person resulting from the distribution to Purchaser, or use by Purchaser of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser in certain "data rooms", confidential information memoranda or management presentations in expectation of the transactions contemplated by this Agreement.

(b)     In connection with investigation by Purchaser of the Tower Group, Purchaser has received or may receive from the Tower Group certain projections, forward-looking statements and other forecasts and certain business plan information. Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Purchaser shall have no claim against anyone with respect thereto. Accordingly, Purchaser acknowledges that the Company makes no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## ARTICLE 4.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

Section 4.1.  Organization.

Purchaser is duly organized, validly existing and in good standing pursuant to the Laws of the jurisdiction of its organization, and has all requisite power and authority to own its properties and assets and to conduct its business as now conducted.

Section 4.2.  Authority; Enforceability.

Purchaser has the requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder.  The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the performance by Purchaser of its obligations hereunder and thereunder have been duly authorized by all necessary actions on the part of Purchaser, and no other proceedings on the part of Purchaser are necessary to authorize such execution, delivery and performance. This Agreement has been duly executed and delivered by Purchaser and constitutes a legal, valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

Section 4.3.  Non-Contravention.

The execution, delivery and performance of this Agreement and the Ancillary Agreements by Purchaser does not and will not (a) conflict with or violate its certificate of incorporation, bylaws or similar documents, (b) assuming that all consents, approvals and authorizations contemplated by clauses (a), (b) and (c) of Section 4.4 have been obtained and all filings described in such clauses have been made, conflict with or violate any Law applicable to Purchaser or by which its properties are bound or (c) result in any breach or violation of or constitute a default (or an event which with notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of any material agreement of other material instrument to which Purchaser is a party of by which Purchaser or any of its respective assets are bound.

Section 4.4.  Governmental Consents.

The execution, delivery and performance of this Agreement and the Ancillary Agreements by Purchaser and the consummation by Purchaser of the transactions contemplated hereby and thereby do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Authority, except as required under or pursuant to (a) the HSR Act, (b) the applicable requirements of antitrust or other competition laws of other jurisdictions or investment laws relating to foreign ownership including, without limitation, with respect to the Foreign Entities and (c) any other consent, approval, authorization,

permit, action, filing or notification the failure of which to make or obtain would not prevent or materially delay the consummation of the transactions contemplated hereby.

        Section 4.5.    <u>Financing.</u>

        At the Closing, Purchaser will have available to it unconditional and irrevocable equity and debt commitments from financing sources in an aggregate amount that exceeds the sum of the Purchase Price and the estimated transaction expenses arising from the transactions contemplated hereby.

        Section 4.6.    <u>Brokers.</u>

        No agent, broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser for which Seller could have Liability or otherwise be obligated.

        Section 4.7.    <u>Acquired Assets "AS IS"; Purchaser's Acknowledgment Regarding Same.</u>

        Purchaser agrees, warrants, and represents that, except as set forth in this Agreement:

        (a)    Purchaser is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Purchaser's own investigation of the Acquired Assets, and

        (b)    Neither Seller nor any real estate broker, agent, officer, employee, servant, attorney, or representative of Seller has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets, any part of the Acquired Assets, relating to the financial performance of the Acquired Assets or the business of Seller, or the physical condition of the Acquired Assets.  Purchaser further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by the Company, Seller and Purchaser after good-faith arms-length negotiation in light of Purchaser's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS" except as set forth in this Agreement.  Purchaser agrees, warrants, and represents that, except as set forth in this Agreement, Purchaser has relied, and shall rely, solely upon Purchaser's own investigation of all such matters, and that Purchaser assumes all risks with respect thereto.  EXCEPT AS SET FORTH IN THIS AGREEMENT, THE COMPANY AND SELLER MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, NOR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE ACQUIRED ASSETS.

**ARTICLE 5.**

**ADDITIONAL AGREEMENTS**

Section 5.1.     Conduct of Business Prior to the Closing.

(a)     Seller covenants and agrees that, during the period from the date hereof until the Closing Date, except as contemplated by this Agreement, in the ordinary course of business consistent with past practice, contemplated by the Budget delivered by Seller to Purchaser, as set forth in Schedule 1.1(a)(iii) attached hereto, as required by Law or as otherwise required, authorized or restricted pursuant to an Order of the Bankruptcy Court as of the date hereof, or unless Purchaser shall otherwise consent in writing, such consent not to be unreasonably withheld or delayed:

(i)     the business of the Tower Group shall be conducted in the ordinary course of business consistent with past practice including, without limitation, with respect to its payment of accounts payables and collection of accounts receivable;

(ii)     the Tower Group shall use its reasonable best efforts to preserve its present relationships with customers and employees, liaisons, licensees, distributors, wholesalers, franchisees, material suppliers and other Persons with which it has significant business relations or are otherwise material to the business of the Tower Group;

(iii)     the Tower Group shall comply in all material respects with applicable Laws;

(iv)     the Tower Group shall use commercially reasonable efforts to preserve and maintain, in all material respects and consistent with past practice, the material Acquired Assets and the material assets and businesses of the Foreign Entities in the condition in which they existed on the date hereof, ordinary wear and tear excepted, other than assets no longer used or useful in the Tower Group's business;

(v)     the Tower Group shall maintain its Business Records in the ordinary course of business and in accordance with GAAP or, in the case of a Foreign Entity, in accordance with generally accepted accounting principles of the jurisdiction of organization of such Foreign Entity and in a manner sufficient to permit reconciliation to GAAP within thirty (30) calendar days from the last day of each calendar month and to deliver to Purchaser consolidated with respect to the Company Subsidiaries statements of income for the calendar month then ended, and the related balance sheets of the Tower Group as of the end of such calendar month, in each case prepared in accordance with GAAP (other than the absence of footnote disclosures and subject to year end audit adjustments and other than financial statements of Foreign Entities not regularly prepared in accordance with GAAP, which financial statements shall be prepared in accordance with the generally accepted accounting principles of the jurisdiction of organization of such Foreign Entity) and accompanied by a certificate of the Chief Financial Officer of the Company on behalf of the Company and not in his personal capacity stating that such financial statements fairly present in all material respects the consolidated financial condition and results of operations of the Tower Group as of such date and that the

-47-

other information accompanied thereto is true, accurate and correct in all material respects (the "**Monthly Representation Report**");

           (vi)     the 2006 Audited Statements shall be completed and delivered to Purchaser in final form by July 5, 2007;

           (vii)    concurrently with the delivery thereof to the applicable lessor, trustee, holder or lender under the DIP Loan Credit Agreement, the Second Lien Loan Agreement and the Industrial Revenue Bond loan agreement, Seller shall deliver to Purchaser copies of all statements, reports, certificates, financial statements and other information required to be delivered pursuant thereto;

           (viii)   such daily, weekly and monthly financial reports as Seller has been providing to Purchaser or its Affiliates, prepared in good faith and in a manner and methodology consistent with current practice in all material respects (including notice to Purchaser in writing substantially every day of the amount of the DIP Loan net of Seller's domestic entities' unrestricted cash);

           (ix)    collect all accounts receivables and pay all accounts payables in the ordinary course and consistent with past practices;

           (x)     take all commercially reasonable actions requested by Purchaser to receive or obtain the consent of each party to any Assumed Contract to the assignment of any Assumed Contract to Purchaser (including, without limitation, those agreements set forth on Schedule 5.1(a)(x)) or to obtain the waiver of any change in control provision to the extent contained in any contract to which a Foreign Entity is a party, to the extent upon consummation of the transactions contemplated hereby other than such Assumed Contracts pursuant to which such party's consent will be unnecessary if the Orders of the Bankruptcy Court contemplated hereby are entered by the Bankruptcy Code. Nothing in this Agreement shall obligate any Seller to incur any expense, cost or other Liability for such consent; and

           (xi)    to the maximum extent permitted by applicable Law, furnish Purchaser such information concerning employees of the Tower Group as Purchaser may reasonably request from time to time.

           (b)     Between the date of this Agreement and the Closing Date, except as otherwise contemplated by this Agreement, and except as otherwise provided herein, in the ordinary course of business, contemplated by the Budget, as set forth in Schedule 5.1(b) attached hereto, as required by Law, or as otherwise required, authorized or restricted pursuant to an Order of the Bankruptcy Court entered prior to the date hereof, no member of the Tower Group shall without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed:

           (i)     amend or otherwise change its certificate of incorporation or by-laws or other comparable organizational instruments;

(ii)    amend, terminate, modify or renew any Assumed Contract or contracts of the Foreign Entities, other than in the ordinary course of business or as otherwise required by Law;

(iii)    enter into any material transaction or agreement (including joint venture, partnership or other similar agreements or Collective Bargaining Agreements), other than those material transactions or agreements entered into in the ordinary course of business or as otherwise required by Law;

(iv)    sell, convey, transfer, assign or encumber, other than for Permitted Encumbrances or assuming entry of the Sale Order by the Bankruptcy Court as will not effect receipt by Purchaser of the Acquired Assets and Assumed Contracts free and clear of all Claims, Interests or Encumbrances (other than Permitted Encumbrances), any of the Acquired Assets except for nonmaterial assets sold, abandoned or transferred in the ordinary course of business;

(v)    repatriate any funds from any of the Foreign Entities or lend or invest any additional amount in any Foreign Entity or utilize any funds of any Foreign Entity to repay amounts due to the DIP Lenders; provided, however, that to the fullest extent permitted by applicable Law and such as not to constitute a default under an agreement to which it is a party, Seller shall use its reasonable best efforts, (A) prior to Closing, to repatriate all funds in Algoods, Inc., subject to the resolution of tax liens, and Tower Automotive s.r.o., and (B) be permitted to take the actions identified on Schedule 5.1(b), and with respect clauses (A) and (B) of this subsection (v), Seller shall be permitted to utilize any funds repatriated thereof to repay amounts due to the DIP Lenders;

(vi)    take any affirmative steps to close any facility;

(vii)    except as will not be in place or in force immediately following the Closing or that will not require Purchaser to expend any amount, issue, deliver, sell, pledge, dispose of or encumber any shares of capital stock of any class of any Foreign Entity, or any options, warrants, convertible securities or other rights of any kind to acquire any shares of capital stock of any Foreign Entity, or any other ownership interest, of any Foreign Entity;

(viii)    except (A) to the extent required under any Employee Plan, (B) in the ordinary course of business, (C) as required by applicable Law, or (D) as required pursuant to any Collective Bargaining Agreement or other existing agreement, increase the compensation or fringe benefits of any of its directors, officers or employees, or establish, adopt, enter into or amend or terminate any Employee Plan;

(ix)    except as will not be in place or in force immediately following the Closing, lease, license, mortgage, hypothecate, pledge, sell, sublease, grant any material easement affecting and/or transfer any interest in any Owned Real Property or any improvements thereon or on any Leased Real Property, or materially amend, extend or terminate any leasehold interest in any Leased Real Property;

(x)     other than pursuant to existing agreements, irrespective of whether or not in the ordinary course of business, (A) incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any Person, or make any loans or advances, except for refinancings of existing indebtedness for borrowed money except as permitted in clause (C) below; or (B) amend, modify or supplement the terms and conditions of the DIP Loan Credit Agreement, the Second Lien Loan, the Industrial Revenue Bonds or any Foreign Financial Indebtedness or (C) permit any Foreign Entity to incur any Foreign Financial Indebtedness other than working capital borrowing under facilities in effect on the date hereof or refinancings of existing credit facilities that expire prior to the Closing as expressly set forth on Schedule 5.1(b), but only on then existing market terms and with a principal and facility size not in excess of the principal and facility size of such expiring facilities and provided further that not less than five (5) Business Days prior to entering into any such replacement facility (or as much time as is reasonably practicable under the circumstances if five (5) business days notice is not reasonably practicable) Purchaser is provided with a complete copy of the commitment letter or term sheet and any material agreement related thereto;

(xi)     authorize or incur any capital expenditure which, over the lifetime of the particular project, is reasonably projected to cost in excess of Two Million Five Hundred Thousand Dollars ($2,500,000), other than as expressly set forth in the Budget; provided, however that the foregoing restriction shall not apply to the extent (and only to the extent) that Seller reasonably determines that it is required to incur any emergency capital expenditures in excess of Two Million Five Hundred Thousand Dollars ($2,500,000) to avoid the shutdown of a facility or disruption of customer production;

(xii)     open, provide or otherwise arrange for any letter of credit in addition to the ones set forth on Schedule 3.2(b), other than to replace letters of credit that are expiring by their terms with new letters of credit that have substantially the same terms and conditions and that collateralize the same obligation of the expiring letter of credit;

(xiii)     settle or dismiss any material action threatened against, relating to or involving the Tower Group in connection with any business, asset or property of the Tower Group (including, without limitation, any action relating to any Metalsa S. de R.L. de C.V. ("**Metalsa**") litigation and dispute), other than in the ordinary course of business but not, in any individual case, in excess of One Million Dollars ($1,000,000);

(xiv)     terminate (other than at the expiration of a term not subject to renewal at the option of the Tower Group), release, assign any rights under or discharge any other party thereunder of any of their obligations under any Assumed Contract required to be set forth on Schedule 3.14(a) or contracts of the Foreign Entities required to be set forth on Schedule 3.14(a), and, not amend any of the terms and conditions of any Assumed Contract required to be set forth on Schedule 3.14(a) or contracts of the Foreign Entities required to be set forth on Schedule 3.14(a), in each case except in the ordinary course of business;

(xv)     except with respect to any contract that Purchaser has designated not to assume hereunder pursuant to Section 5.16, fail to use reasonable commercial efforts to timely comply in all material respects with all material monetary and nonmonetary

Liabilities under each material contract (including Assumed Contracts) or, in the case of the Foreign Entities, the contracts to which they are a party, as in effect on the date hereof, and not file any notice or otherwise seek to assume or reject any contract (including Assumed Contracts);

(xvi)   form or establish any new Subsidiaries or Affiliates;

(xvii)   (A) change payroll periods in respect of any employee of the Tower Group other than in the ordinary course of business, or (B) hire any Person who would be an officer of a Tower Group;

(xviii)   knowingly fail to use commercially reasonable efforts to obtain and renew all material permits or licenses held by or in connection with the business of the Tower Group;

(xix)   terminate, other than at the expiration of a term not subject to renewal at the option of the Tower Group, cancel or amend, or cause the termination, cancellation or amendment of, any insurance coverage (and any surety bonds, letters of credit, cash collateral or other deposits related thereto required to be maintained with respect to such coverage) maintained by it or them with respect to the business of the Tower Group which is not replaced by a comparable insurance coverage;

(xx)   enter into any new Collective Bargaining Agreements or amend or modify any existing Collective Bargaining Agreements, in each case, applicable to employees of the Tower Group without first informing Purchaser of all of the material terms and provisions thereof;

(xxi)   other than in the ordinary course of business, enter into any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate floor agreement, interest rate exchange agreement, currency exchange agreement, forward contract, repurchase and reverse repurchase contract, or any other agreement or arrangement designed to protect against fluctuations in interest rates or currency values, including any arrangement whereby, directly or indirectly, the party thereto has the right to receive periodic payments calculated by applying either a fixed or floating rate of interest on a stated notional amount in exchange for periodic payments made by such party calculated by applying a fixed or floating rate of interest on the same notional amount or otherwise (other than interest rate protection agreements entered into in connection with or required pursuant to the DIP Loan Credit Agreement);

(xxii)   fail to make all payments due prior to the Closing under the DIP Loan Credit Agreement, the Second Lien Loan or the Industrial Revenue Bonds;

(xxiii)   fail to make any pension or other payment to or for the benefit of employees when due;

(xxiv)   knowingly or intentionally violate any material Laws;

(xxv)   take any action to settle any Chapter 5 Claim that constitutes a portion of the Acquired Assets; or

(xxvi)  agree, whether in writing or otherwise, to do any of the
foregoing.

Section 5.2.    Access to Information.

(a)    During the period from the execution of this Agreement through
the earlier of, the termination of this Agreement pursuant to its terms and the Closing, the
Company shall, and shall cause each Company Subsidiary to, subject to reasonable restrictions
imposed from time to time upon advice of counsel respecting any applicable confidentiality
agreement with any Person (provided that Seller shall use its reasonable best efforts to obtain
waivers under such agreements or implement requisite procedures to enable the provision of
reasonable access without violating such agreement), afford representatives of Purchaser and its
financing sources access, during normal business hours, to all properties, offices, books,
contracts, commitments and records and such financial (including all working papers) and
operating data of the Tower Group, in order to conduct visual inspection thereof and meetings
with various employees or representatives of the Tower Group, and will furnish, within a
reasonable time, to Purchaser, its representatives and its financing sources all information
(including extracts and copies of books, records, contracts and other documents) concerning the
operations and business of the Tower Group, including access to its personnel, as Purchaser, its
representatives or its financing sources may reasonably request, and that is in the possession and
control of the Tower Group.  In conducting any inspection of any properties of the Tower Group,
neither Purchaser nor any of their representatives shall:

(i)    contact or have any discussions with any of the Company's
or Company Subsidiary's employees, agents, or representatives other than those individuals set
forth on Schedule 5.2(a)(i) attached hereto, unless in each case Purchaser receives the consent
(which shall not be unreasonably withheld or delayed) of one of Kathleen Ligocki, James
Mallak, E. Renee Franklin or Jeffrey Kersten or Lazard Freres & Co., LLC (the "**Notice
Group**") prior to any such contact or discussion or one of the Notice Group participates in such
contact or discussions;

(ii)    substantially interfere with the business of the Tower
Group;

(iii)    damage any property or any portion thereof; or

(iv)    perform any invasive and substantial environmental
investigation of the Tower Group's properties without the Seller's prior written or oral consent,
which such consent shall not be unreasonably withheld.  The Company shall be entitled to have
representatives present at all times during any such inspection.  Notwithstanding the foregoing,
the Tower Group shall not be required to provide access to or to disclose information where such
access or disclosure would jeopardize the attorney-client privilege of the Tower Group or
contravene any Law or binding agreement entered into prior to the date of this Agreement.  The
relevant Parties will make appropriate substitute disclosure arrangements under circumstances in
which the restrictions of the preceding sentence apply.

(b)     All information obtained pursuant to this <u>Section 5.2</u> shall continue to be governed by the Confidentiality Agreement, which the Parties agree shall not survive the Closing; <u>provided, however,</u> if any of the terms of this Agreement conflict with any of the terms of the Confidentiality Agreement, the terms of this Agreement shall control.

(c)     The Tower Group shall permit Purchaser reasonable access to have informal communications with the Tower Group's customers, but formal communications and meetings primarily related to the Tower Group shall take place only with at least three (3) day's prior notice to the Notice Group and Seller shall have the right to participate in or attend such formal communication or meeting.

Section 5.3.   <u>Superior Offers.</u>

Seller shall notify Purchaser in accordance with the Marketing Protocol Order with respect to any Acquisition Proposal and otherwise cooperate in assuring that Purchaser receives the benefits contemplated by the Marketing Protocol Order.

Section 5.4.   <u>Bankruptcy Court Orders.</u>

Purchaser agrees to cooperate with Seller in providing any information and evidence that may reasonably be required to demonstrate to the Bankruptcy Court's satisfaction (i) adequate assurance of future performance of all Assumed Contracts and (ii) a finding that Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

Section 5.5.   <u>Notice of Filings.</u>

Seller shall give notice to Purchaser at least four (4) business hours prior to Seller filing any material pleading in the Bankruptcy Case that is related to or affects Seller, the Acquired Assets, customer agreements, any Bankruptcy Case Claims or the transactions contemplated pursuant to this Agreement, by providing a copy or substantially complete draft of such pleading and all exhibits thereto to Purchaser's counsel by email, to the email address set forth on <u>Schedule 5.5</u> attached hereto.

Section 5.6.   <u>Further Action; Reasonable Best Efforts.</u>

(a)     Subject to the terms and conditions of this Agreement, each Party will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement. In furtherance and not in limitation of the foregoing, each Party hereto agrees to make an appropriate filing of a Notification and Report Form pursuant to the HSR Act and to make other required filings pursuant to other Antitrust Laws with respect to the transactions contemplated hereby and thereby as promptly as reasonably practicable and to supply as promptly as reasonably practicable any additional information and documentary material that may be requested pursuant to the HSR Act or any other Antitrust Laws and to take all other reasonable actions necessary, proper or advisable to cause the expiration or termination of the applicable waiting periods under the HSR Act and any

other applicable Antitrust Laws as soon as reasonably practicable. Purchaser shall bear the sole responsibility for the fees associated with all filings under the HSR Act.

(b)     Subject to all applicable confidentiality requirements and all applicable Laws, Purchaser, on the one hand, and Seller, on the other hand, shall, in connection with the efforts referenced in Section 5.6(a) to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under the HSR Act or any other Antitrust Law, use its reasonable efforts to (i) cooperate in all respects with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep the other Party informed of any communication received by such Party from, or given by such Party to, the Federal Trade Commission (the "**FTC**"), the Antitrust Division of the Department of Justice (the "**DOJ**") or any other U.S. or foreign Governmental Authority and of any communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby and thereby; and (iii) permit the other Party to review any communication given by it to, and consult with each other in advance of any meeting or conference with, the FTC, the DOJ or any such other Governmental Authority or, in connection with any proceeding by a private party, with any other person, and to the extent permitted by the FTC, the DOJ or such other applicable Governmental Authority or other person, give the other Party the opportunity to attend and participate in such meetings and conferences; provided, however, that no Party hereto shall be required to provide any other Party with copies of confidential documents or information included in its filings and submissions under the HSR Act, and provided, further, that a Party hereto may request entry into a joint defense agreement as a condition to providing any such materials and that, upon receipt of that request, the Parties shall work in good faith to enter into a joint defense agreement to create and preserve attorney-client privilege in a form and substance mutually acceptable to the Parties.

(c)     Notwithstanding the covenants of the Parties contained elsewhere in this Section 5.6 or in Section 5.10, if any objections are asserted with respect to the transactions contemplated by this Agreement under any Antitrust Law or if any suit is instituted (or threatened to be instituted) by the FTC, the DOJ or any other applicable Governmental Authority or any private party challenging any of the transactions contemplated hereby and thereby as violative of any Antitrust Law or which would otherwise prohibit or materially impair or materially delay the consummation of the transactions contemplated hereby and thereby, each of Purchaser and the Company shall use its reasonable commercial efforts to resolve any such objections or suits so as to permit consummation of the transactions contemplated by this Agreement; provided, however, that neither Purchaser nor any of its Affiliates shall be required to (i) divest, hold separate (including by trust or otherwise) or otherwise dispose of, sell, assign or transfer any of their respective businesses, assets, investments, securities or rights of any kind or nature or (ii) defend, contest or resist any action or proceeding or seek to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement.

(d)     Notwithstanding the foregoing or any other provision of this Agreement, nothing in this Section 5.6 shall limit a party's right to terminate this Agreement

pursuant to <u>Section 8.1(b)</u> so long as such party has up to then complied in all material respects with its obligations under this <u>Section 5.6</u>.

Section 5.7.    <u>Public Announcements.</u>

Each of Seller and Purchaser agrees that no public release or announcement concerning the transactions contemplated by this Agreement shall be issued by any Party without the prior written consent of the Company and Purchaser (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by Law, the rules or regulations of any applicable United States securities exchange, or with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, in which case the Party required to make the release or announcement shall use its reasonable best efforts to allow each other Party reasonable time, and in no event less than one (1) Business Day, to comment on such release or announcement in advance of such issuance, it being understood that the final form and content of any such release or announcement, to the extent so required, shall be at the final discretion of the disclosing Party. Notwithstanding the prior sentence, Purchaser agrees and acknowledges that Seller may file this Agreement with the Bankruptcy Court promptly after the date hereof and that any action Seller and its representatives take in good faith in connection with soliciting bids and preparing bidders for the Auction shall not be a violation of this <u>Section 5.7</u>.

Section 5.8.    <u>Availability of Business Records; Cooperation Following the Closing.</u>

After the Closing Date, Purchaser shall provide to Seller, the Unsecured Creditors Trust and the Post-Consummation Trust (after reasonable notice and during normal business hours and without charge to Seller, the Unsecured Creditors Trust and the Post-Consummation Trust, as applicable) access to all books, records, contracts and other documents relating to periods prior to the Closing and shall preserve such books, records, contracts and other documents until the date which is six (6) years after the Closing Date. Such access shall include access to any computerized information systems that contain data regarding the Acquired Assets. With respect to any litigation and Claims that are not Assumed Liabilities, Purchaser shall render all reasonable assistance that Seller, the Unsecured Creditors Trust and the Post-Confirmation Trust may request in defending such litigation or claim and shall make available to Seller, the Unsecured Creditors Trust and the Post-Confirmation Trust personnel most knowledgeable about the matter in question provided that such assistance does not materially interfere with the duties and responsibilities of Purchaser's personnel. Following the Closing, Purchaser will reasonably make available to Seller, the Unsecured Creditors Trust and the Post-Confirmation Trust without charge its employees for purposes of managing and discharging the Excluded Assets and its Liabilities, provided that the availability of Purchaser's employee(s) or consultant(s) does not cause a material disruption to management and operation of Purchaser's business. If after the Closing any party shall receive any payment or revenue that belongs to another party pursuant to this Agreement, such party shall promptly remit or cause to be remitted the same to the party entitled to the payment, as applicable, without set-off or deduction of any kind or nature.

Section 5.9.  Financing Assistance.

The Tower Group shall use commercially reasonable efforts to assist and cooperate with Purchaser and its financing sources, including by making its employees and representatives reasonably available to Purchaser and its financing sources, and shall provide such assistance as Purchaser may reasonably request in connection therewith, including, without limitation:

(a)  meeting by telephone conferences or if reasonably requested by Purchaser in person with financing sources to discuss and answer questions concerning the Tower Group's business and allowing such financing sources, and such financing source's representatives, to visit various Tower Group's facilities; and

(b)  executing and delivering such customary and reasonable perfection certificates as Purchaser's financing sources may request.

The providing of such assistance shall not substantially interfere with the management, business or operation of the Tower Group. The Tower Group shall not be required to provide access to or to disclose information where such access or disclosure would reasonably be expected to jeopardize the attorney-client privilege of the Tower Group or contravene any Law or binding agreement entered into prior to the date of this Agreement. The relevant Parties will make appropriate substitute disclosure arrangements under circumstances in which the restrictions of the preceding sentence apply.

Section 5.10.  Further Assurances.

(a)  Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable, the transactions contemplated by this Agreement in accordance with the terms hereof and to bring about the satisfaction of all other conditions to the other Party's obligations hereunder; provided, however, that nothing in this Agreement shall obligate Seller or Purchaser, or any of their respective Affiliates, to waive or modify any of the terms and conditions of this Agreement or any documents contemplated hereby, except as expressly set forth herein.

(b)  Seller shall give notice to Purchaser as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect, or other matter that resulted in, or that would be reasonably likely to result in:

(i)  any representation or warranty set forth in Article 3 being or becoming untrue or inaccurate in any material respect with respect to Seller as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case as of such date);

(ii)  the failure by Seller to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Seller under this Agreement; or

(iii)     any change, effect, event, occurrence, state of facts or development of which it becomes aware that would result in or would reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(c)     Purchaser shall give notice to Seller as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect, or other matter that resulted in, or that would be reasonably likely to result in:

(i)     any representation or warranty set forth in Article 4 being or becoming untrue or inaccurate in any material respect with respect to Purchaser as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case as of such date); or

(ii)     failure by Purchaser to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Purchaser under this Agreement, provided, however, that no such notification shall affect or cure a breach of any of the representations, warranties, covenants or agreements of the parties or the conditions to the obligations of the Parties under this Agreement.

Section 5.11.  Reorganizations.

If and when all the conditions set forth in Article 7 have been satisfied (other than those conditions which are to be satisfied simultaneously with, or immediately prior to, the Closing), then Seller shall undertake such lawful sales, assignments, mergers, reorganizations or similar transactions of its entities or assets (collectively, the "**Reorganizations**") as reasonably requested by Purchaser and which cannot be undertaken by Purchaser simultaneously with or following the Closing without depriving Purchaser of the material benefits it expects to receive from the Reorganizations; provided, that, Seller shall have no obligation to consummate the Reorganizations if the Reorganizations would have a materially detrimental effect (as determined in the reasonable good faith discretion of Seller) upon Seller or its employees, officers, directors, shareholders or holders of claims against the Seller.  It is further agreed that the Reorganizations shall be undertaken as close to the Closing Date as possible.  Purchaser shall indemnify and hold Seller, its employees, officers, directors, shareholders or holders of claims against the Seller harmless for all Liabilities (including, without limitation, foreign taxes or other taxes) incurred by any of them in connection with such Reorganizations and shall acknowledge such in a writing reasonably acceptable to Seller prior to the consummation of the Reorganizations.  Purchaser's indemnification of Seller and its employees, officers, directors, shareholders or holders of claims against the Seller shall be full and complete and shall not be subject to any limitations, holdbacks, baskets, offsets or similar adjustments under this Agreement, and shall not be applied against the maximum amount of Transfer Taxes for which Purchaser has agreed to be liable under Section 5.12 hereunder.

If any such Reorganization requires the approval of the Bankruptcy Court, the Parties shall cooperate and use their respective commercially reasonable efforts to obtain such approval and any such Reorganization shall be subject to the receipt of such Bankruptcy Court approval.

Section 5.12.  Transfer Taxes.

(a)     In addition to and not in limitation of the provisions of Section 5.11, Purchaser agrees that it will be liable for, and shall hold Seller harmless from, any and all Transfer Taxes incurred pursuant to the transactions contemplated by this Agreement and the Ancillary Agreements, including any transfer of property requested by Purchaser to facilitate such transactions, up to the amount of Seven Hundred Fifty Thousand Dollars ($750,000).  Seller agrees that it will be liable for, shall promptly pay when due and shall hold Purchaser harmless from, any and all Transfer Taxes incurred pursuant to the transactions contemplated by this Agreement and the Ancillary Agreements, including any transfers of property requested by Purchaser to facilitate such transactions, to the extent such Transfer Taxes exceed Seven Hundred Fifty Thousand Dollars ($750,000).  Seller shall make reasonable efforts to obtain a ruling in an Order from the Bankruptcy Court finding that the transactions contemplated by this Agreement are exempt from Transfer Taxes to the extent permitted by applicable Law.  Any interest paid or owed with respect to Transfer Taxes shall be paid by Purchaser or Seller based on which of such Parties was liable for the underlying Tax hereunder.  For the avoidance of doubt, the Parties agree that any income Tax or similar Tax incurred by the Tower Group or any Tax on capital gain arising out of the transactions contemplated by this Agreement shall not be a Transfer Tax for the purposes of this Agreement.

(b)     Purchaser shall reimburse Seller by wire transfer of immediately available funds within thirty (30) days of Seller's written notice of payment of (i) any Transfer Taxes for which Purchaser is liable under Section 5.12(a) and (ii) any other Taxes assumed by Purchaser as a Working Capital Obligation and Purchaser shall not assert any right of offset with respect to such reimbursement obligations.  Purchaser shall have the right to withhold such amounts from the amounts to be paid pursuant to this Section 5.12 in accordance with applicable Law.

(c)     Purchaser and Seller agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Revenue Procedure 2004-53 with respect to wage reporting.

Section 5.13.  Name Change.

At Closing, Seller shall deliver to Purchaser executed certificates and other instruments for filing and promptly following the Closing, such certificates and instruments as filed in each jurisdiction where a Seller entity is formed and in each jurisdiction where such Seller entity is registered as a Foreign Entity that shall effect a change of Seller entity's name ("**Name Change Filings**") to any name Seller reasonably selects provided such name does not contain the words "Tower", "Automotive", "Algoods" or "Trylon" and any derivation thereof. Notwithstanding the foregoing, Purchaser hereby grants to Seller a royalty-free, non-transferable license to use the name "Tower Automotive, Inc." in connection with the Chapter 11 cases (the "**Chapter 11 Cases**") and post-confirmation administrative and wind-down related activities.

Section 5.14.   Certain Contract Matters.

(a)     With respect to the negotiation, execution and delivery of (i) a new Collective Bargaining Agreement between the Company or any Company Subsidiary with The International Union, United Automobile, Aerospace & Agricultural Implement Workers of America as the recognized representative for the hourly workforce at the Seller's Bellevue, Ohio facility, or (ii) a new Collective Bargaining Agreement or an extension or modification of the existing Collective Bargaining Agreement, in respect of Seller's Chicago, Illinois facility, with the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, and its Local No. 3212, Seller shall not enter into any such agreement without first informing Purchaser of all of the material terms and provisions thereof.

(b)     Neither the Company nor any Company Subsidiary shall consummate or complete any joint venture agreement with Rasandik Engineering Industries India Ltd, without the prior written consent of Purchaser, consent not to be unreasonably withheld or delayed.

Section 5.15.   Certain Tax Matters.

Seller shall permit Purchaser to review and comment on each Tax Return (a) of any Seller that is filed after the date of this Agreement if that Tax Return is filed with respect to any period that includes, or any event that occurs on, any date between February 2, 2005 and the Closing Date, and (b) of any Foreign Entity that is filed after the date of this Agreement, regardless of the period covered by the Tax Return.  Seller shall provide to Purchaser for its review and comment all income Tax Returns, including German federal and German trade Tax Returns and any similar returns to be filed in any jurisdiction, as soon as they become available, even prior to May 15, 2007.  Seller and Purchaser shall work to compile by May 15, 2007 a list of all other applicable Tax Returns which will be made available to Purchaser; provided, however, that Purchaser shall make the final determination as to which Tax Returns it shall be permitted to review and comment on.  Purchaser shall review such Tax Returns promptly such that they can be timely filed, and Seller shall make such revisions to such Tax Returns as are reasonably requested by Purchaser.  Seller shall promptly give written notice to Purchaser of any inquiry, audit, or other proceeding by any Taxing authority of (x) any Seller if such inquiry, audit, or other proceeding is with respect to any period that includes, or any event that occurs on, any date between February 2, 2005 and the Closing Date or (y) any Foreign Entity for any period.  Seller and Purchaser shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with any such inquiry, audit, or other proceeding, and Purchaser shall have the sole right to direct the response to the inquiry, audit, or other proceeding if the Tax at issue is a Working Capital Obligation or is with respect to any Foreign Entity.

Section 5.16.   Assumed Contracts and Cure Amounts.

Seller shall cooperate with Purchaser and use commercially reasonable efforts to assemble a comprehensive list of all of Seller's executory contracts and unexpired leases of real and personal property together with Cure Amounts (the "**Assumed Contract List**") and Seller shall provide a final Assumed Contract List (including its good faith determination of Cure Amounts) to Purchaser on or before May 14, 2007.  A preliminary list, without cure amounts, is

attached as Schedule 5.16.  On or before June 4, 2007, Seller shall file, pursuant to section 365 of the Bankruptcy Code, one or more motions (the "**365 Motions**") with the Bankruptcy Court seeking authorization to (a) assume and assign to Purchaser any of the executory contracts or unexpired leases designated by Purchaser to be included in the 365 Motions and (b) to fix the maximum amount of any Cure Amount, provided, however, notwithstanding the provisions contained in the definition of Excluded Assets or otherwise, Purchaser shall have the unfettered right to remove any executory contract or unexpired lease from the Assumed Contracts in its discretion at any time through Closing.  In the event Purchaser identifies any executory contract or unexpired lease that it wants to be included as an Assumed Contract after the filing of the 365 Motions and that was not previously on the final Assumed Contract List or identified to Purchaser in writing a reasonable period of time prior to the filing of the 365 Motions and deleted by Purchaser, Seller shall use its reasonable best efforts, and in compliance with section 365 of the Bankruptcy Code, to assume and assign such executory contract or unexpired lease to Purchaser.

## ARTICLE 6.

## EMPLOYEE MATTERS

Section 6.1.    Employee Matters.

(a)    Purchaser shall offer employment to Seller's union-represented employees at purchased facilities, and to other active Seller Employees on an at will basis, on such terms and conditions as Purchaser deems appropriate (subject to Section 6.1(c) below). Except as otherwise provided by Section 6.1(b) below, such offers of employment shall be for employment with Purchaser effective upon the Closing Date.

(b)    All Seller Employees who accept Purchaser's offer of employment (by reporting to work or otherwise), or, in the case of a Seller Employee on an approved leave of absence with the Tower Group as of the Closing Date who returns to work by no later than the date that such Seller Employee's approved leave of absence expires, shall become employees of Purchaser as of the later of the Closing Date or the date he or she returns to work ("**Hired Employees**"). Seller hereby releases all Seller Employees from any employment, noncompete and/or confidentiality agreement (or similar agreement) previously entered into between Seller, to the extent necessary to allow such Seller Employees to serve Purchaser.

(c)    For all non-union Hired Employees, Purchaser shall employ such individuals on an at-will basis on terms that provide (i) the same or greater base salary, wages and bonus and incentive compensation opportunity (including, for Seller Employees with employment offer letters disclosed on Schedule 3.14, the same economic terms and conditions of employment as described therein, without regard to any equity awards or any amounts that would be duplicative of other payments made to the employee) and (ii) employee benefit packages that are substantially similar in the aggregate to the current benefits provided such Seller Employees including, but not limited to, medical and dental coverage and a 401(k) plan (such 401(k) plan to be implemented by Purchaser on the Closing Date).  For all non-union Hired Employees who remain employed by Purchaser during the period, Purchaser will maintain the requisite level of salary and wages for a minimum of one (1) year from the Closing Date and

such benefits through the end of the applicable plan year ending after the Closing Date. Terms and conditions of unionized Hired Employees will be as determined by applicable Collective Bargaining Agreements.

(d)     Effective upon the Closing Date, Purchaser shall assume sponsorship of each Assumed Plan (including all related assets and benefit Liabilities thereunder). Effective upon the Closing Date, Seller shall transfer to Purchaser any and all trusts, insurance contracts, accounts or other funding arrangements with respect to the Assumed Plans. Seller and Purchaser shall cooperate in good faith in obtaining all consents, authorizations and approvals of any third party or Governmental Authority required to effect the transfer of the sponsorship of each Assumed Plan. Seller shall, on or prior to the Closing Date, transfer to Purchaser all Assumed Plan Documents and Records in the possession of, or under the direct or indirect control of, Seller, any Affiliate of Seller or any fiduciary or administrator of an Assumed Plan. Seller shall also use commercially reasonable efforts to cause each third party who performs services with respect to an Assumed Plan, including trustees, actuaries, accountants, consultants, investment managers and advisors, and attorneys, to transfer to Purchaser or its designee such Assumed Plan Documents and Records as Purchaser may reasonably require to maintain and administer each Assumed Plan and any related trusts, accounts or other funding arrangements. To the extent that any Assumed Plan Documents and Records are in electronic format, Seller and Purchaser shall cooperate and use good faith efforts to have such Assumed Plan Documents and Records transferred to Purchaser or its designee(s) electronically.

(e)     Except as set forth in Section 6.1(c), nothing contained in this Agreement shall restrict Purchaser from changing any benefit plan, policy or arrangement of Purchaser, after the Closing Date.

(f)     No past, present or future employees of Seller or Purchaser, no labor organization, and no employee benefit plan shall be treated as third-party beneficiaries of the provisions contained in this Agreement.

(g)     Purchaser acknowledges that the consummation of the transactions contemplated hereby shall constitute a "Change in Control" as defined in the Change in Control Agreements; provided, that Seller represents that (except with respect to one individual previously disclosed to Purchaser who had a "Qualifying Termination") no payment rights are triggered solely by the Change in Control and any payment owed thereunder shall only be paid in the event that a "Qualifying Termination" (having the meaning contained in the Change in Control Agreements) occurs pursuant to the terms of such Change in Control Agreements. Seller shall furnish, upon the reasonable request of Purchaser, any prepared reports pertaining to the Change in Control Agreements.

(h)     Purchaser shall continue Seller's leave of absence policies for Seller Employees who are on leave of absence as of the Closing Date (including leave of absence due to disability) for the balance of their leave, subject to such changes, if any, as Purchaser may make that are consistent with any leave of absence policy that is applicable to similarly situated Hired Employees following the Closing Date generally.

(i)    Purchaser shall permit its 401(k) or other tax-qualified defined contribution plan to accept rollovers of distributions (or direct rollovers) from Seller's 401(k) plan, including rollovers of loans in kind.

(j)    Each Hired Employee shall, to the extent permitted by Law and applicable tax qualification requirements, and subject to any applicable break in service or similar rule, receive credit (for eligibility to participate, for vesting and for vacation and severance entitlement, but not for other benefit accrual purposes) under Purchaser employee benefit plans for years of service with the Tower Group prior to the Closing Date that were recognized under a similar employee benefit plan of the Tower Group for such Hired Employee (except to the extent that doing so would cause a duplication of benefits).

Section 6.2.   Management Incentive Plan.

On or after the Closing Date, Purchaser shall implement a management incentive plan (the "**Management Incentive Plan**") for the benefit of the members of Purchaser's management team (the "**Senior Management**"). The type and manner of awards pursuant to the Management Incentive Plan, and the Management Incentive Plan's other terms and conditions shall be determined in the sole discretion of Purchaser in consultation with Senior Management. The Management Incentive Plan may provide, among other things, for the availability to Senior Management, restricted common stock grants, phantom options for the purchase of common stock or other equity equivalents for such common stock and shall be approximately equivalent to ten percent (10%) of Purchaser's common stock on a fully diluted basis on the Closing Date. Purchaser agrees to grant, at a minimum, fifty percent (50%) of such awards to Senior Management within ninety (90) days of the Closing Date.

## ARTICLE 7.

## CONDITIONS TO CLOSING

Section 7.1.   Mutual Conditions to Closing.

The respective obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing, of each of the following conditions:

(a)    The Bankruptcy Court shall have entered the (i) Sale Order and (ii) the Confirmation Order, and each such Order shall be a Final Order on the Closing Date;

(b)    no statute, rule, regulation, executive order, decree, ruling, injunction or other Order (whether temporary, preliminary or permanent) shall have been enacted, entered, promulgated or enforced by any Governmental Authority and (ii) no claim, suit action, investigation, litigation or proceeding shall be pending or threatened in or before any Governmental Authority, in either case, which prohibits or seeks to prohibit the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements; provided, however, that prior to invoking this condition each Party agrees to comply with Section 5.6;

-62-

(c)　　(i) the waiting period (and any extension thereof) applicable to the transactions contemplated by this Agreement under the HSR Act shall have been terminated or shall have expired, and (ii) all other material authorizations, consents, Orders or approvals of, or declarations or filings with, or expiration of waiting periods imposed by, any Governmental Authority necessary for the consummation of the transactions contemplated by this Agreement shall have been filed or been obtained; and

(d)　　each Ancillary Agreement shall have been executed by the applicable Party to such agreement.

Section 7.2.　　<u>Conditions to Obligations of Purchaser.</u>

The obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be further subject to the satisfaction or waiver at or prior to the Closing, of each of the following conditions:

(a)　　The representations and warranties of Seller set forth in this Agreement including, without limitation, the representations contained within each Monthly Representation Report, shall be true and correct in all respects, on and as of the Closing Date (unless any such representation or warranty is made only as of a specific date, in which event such representation and warranty shall be true and correct in all respects as of such specified date) with the same effect as though such representations and warranties had been made or given on and as of the Closing Date, except where the failure of any such representations and warranties to be so true and correct, in the aggregate, has not had and would not reasonably be likely to have a Material Adverse Effect;

(b)　　Seller shall have performed and complied with, in all material respects, the obligations, agreements and covenants, required to be performed by or complied with by it under this Agreement at or prior to the Closing Date;

(c)　　Purchaser shall have received a certificate of an executive officer of the Seller, on behalf of the Seller and not in such executive officer's individual capacity (the "**Seller Certificate**"), certifying that, to the best of such executive officer's knowledge, the conditions set forth in <u>Section 7.2</u> have been satisfied;

(d)　　Seller shall have delivered to Purchaser all items set forth in <u>Section 2.8</u> of this Agreement;

(e)　　Seller shall have assumed and assigned to Purchaser all of the Assumed Contracts that constitute material customer and vendor agreements as reasonably identified by Purchaser on <u>Schedule 5.16</u> and substantially all other Assumed Contracts on <u>Schedule 5.16</u>, as <u>Schedule 5.16</u> is modified by Purchaser through the Closing;

(f)　　If requested by Purchaser, Seller shall have received or obtained all third party consents in respect (i) of any joint venture, partnership, operating or shareholder agreement (other than Metalsa), (ii) of the transfer of the direct or indirect ownership of any Foreign Entity, or (iii) any contract to the extent such default would reasonably be likely to cause at least Two Million Dollars ($2,000,000) of Liabilities or damages for Purchaser, unless as a

result of the Sale Order or other Final Order of the Bankruptcy Court, no third party consent is required for Purchaser to receive the full benefits of the agreements, ownership interests or contracts referred to above without default or damage thereto, which consents may be set forth, from time to time, on Schedule 7.2(f), as modified by Purchaser, from time to time, until five (5) Business Days prior to the Closing;

(g)     Since January 1, 2007, no event or events shall have occurred which has or would reasonably be expected to have a Material Adverse Effect;

(h)     The amount of the DIP Payment shall not exceed Six Hundred Eighty Million Dollars ($680,000,000) net of Seller's domestic entities' unrestricted cash;

(i)     The amount of Net Foreign Financial Indebtedness shall not exceed the equivalent of One Hundred Five Million Dollars ($105,000,000) (and Purchaser shall have received a certificate of the Chief Financial Officer of Seller on behalf of Seller and not in his personal capacity calculating Net Foreign Financial Indebtedness in accordance with this Agreement in reasonable detail);

(j)     the amount of the Second Lien Payment plus the amount of the IRB Payment shall not exceed Eighty Four Million Eight Hundred Thousand Dollars ($84,800,000).

Section 7.3.     Conditions to Obligations of Seller.

The obligations of Seller to consummate the transactions contemplated by this Agreement shall be further subject to the satisfaction or waiver at or prior to the Closing Date of the following conditions:

(a)     Purchaser shall have delivered to, or on behalf of, Seller, the portion of the Purchase Price required to be delivered at Closing in the manner required herein;

(b)     The representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date as though made on and as of such date (unless any such representation or warranty is made only as of a specific date, in which event such representation and warranty shall be true and correct in all material respects as of such specified date);

(c)     Purchaser shall have performed in all material respects the material obligations (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects as required under this Agreement), and complied in all material respects with the agreements and covenants, required to be performed by or complied with by it pursuant to this Agreement at or prior to the Closing Date;

(d)     Seller shall have received a certificate of an authorized representative of Purchaser (on behalf of Purchaser and not in such authorized officer's individual capacity), certifying that, to the best of such authorized officer's knowledge, the conditions set forth in Section 7.3 have been satisfied;

-64-

(e)        Purchaser shall have delivered to Seller all items set forth in Section 2.9 hereto; and

(f)        all conditions set forth in the Plan to have been satisfied prior to effectiveness of the Plan shall have been satisfied.

## ARTICLE 8.

## TERMINATION, AMENDMENT AND WAIVER

Section 8.1.    Termination.

This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)        by mutual written consent of each Party hereto;

(b)        by any Party hereto if any court of competent jurisdiction or other Governmental Authority located or having jurisdiction within the United States shall have issued a Final Order or taken any other final action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Order, or other action is or shall have become final and nonappealable; provided, however, that neither Seller nor Purchaser shall have the right to terminate this Agreement pursuant to this Section 8.1(b) if such Party or any of its Affiliates has sought entry of, or has failed to use all commercially reasonable efforts to oppose entry of, such Order;

(c)        by Purchaser if the Closing Date shall not have occurred on or before July 31, 2007 (the "**Termination Date**"); provided, however, the right to terminate this Agreement pursuant to this Section 8.1(c) shall not be available to Purchaser if any action of Purchaser or the failure of Purchaser to perform any of its obligations pursuant to this Agreement required to be performed at or prior to the Closing Date has been the cause of, or resulted in, the failure of the Closing Date to occur on or before the Termination Date and such action or failure to perform constitutes a breach of this Agreement;

(d)        by Seller if the Closing Date shall not have occurred on or before August 31, 2007; provided, however, the right to terminate this Agreement pursuant to this Section 8.1(d) shall not be available to Seller if any action of Seller or the failure of Seller to perform any of its obligations pursuant to this Agreement required to be performed at or prior to the Closing Date has been the cause of, or resulted in, the failure of the Closing Date to occur on or before the Termination Date and such action or failure to perform constitutes a breach of this Agreement;

(e)        by Seller if there shall have been a material breach of any covenant or agreement on the part of Purchaser contained in this Agreement such that the condition set forth in Section 7.3 would not be satisfied and which shall not have been cured prior to the earlier of (A) ten (10) Business Days following notice of such breach and (B) the Termination Date;

(f)    by Purchaser if there shall have been a material breach of any covenant or agreement on the part of Seller contained in this Agreement such that the condition set forth in Section 7.2 would not be satisfied and which shall not have been cured prior to the earlier of (i) ten (10) Business Days following notice of such breach and (ii) the Termination Date;

(g)    by Purchaser if the:

(i)    Seller shall fail to file the Plan and an accompanying disclosure statement with the Bankruptcy Court on or before May 1, 2007; provided that Purchase must exercise the termination right of this Section 8.1(g)(i) prior to the date that is five (5) Business Days following the date that Seller shall file the Plan and an accompanying disclosure statement with the Bankruptcy Court;

(ii)    Bankruptcy Court shall fail to enter, on or before June 5, 2007, an Order approving Seller's disclosure statement; provided that Purchaser must exercise the termination right of this Section 8.1(g)(ii) prior to the date that is five (5) Business Days following the date that the Bankruptcy Court shall enter an Order approving Seller's disclosure statement;

(iii)    Bankruptcy Court shall fail to enter on or before July 11, 2007 the Confirmation Order; provided that Purchaser must exercise the termination right of this Section 8.1(g)(iii) prior to the date that is five (5) Business Days following the date that the Bankruptcy Court shall enter the Confirmation Order;

(iv)    Confirmation Order does not become a Final Order on or before July 23, 2007; provided that Purchaser must exercise the termination right of this Section 8.1(g)(iv) prior to the date that is five (5) Business Days following the date that the Confirmation Order shall become a Final Order;

(v)    Seller shall fail to hold an Auction on or before June 25, 2007;

(vi)    Bankruptcy Court shall fail to enter, on or before July 11, 2007, an Order designating Purchaser as the successful bidder;

(vii)    Seller's 2006 Audited Statements are not completed and delivered to Purchaser in final form by July 5, 2007; provided, however, Purchaser must exercise the termination right set forth in this Section 8.1(g)(vii) within ten (10) Business Days of receiving such 2006 Audited Statements;

(viii)    Seller's 2006 Audited Statements are not materially consistent with the information Seller disclosed or made available to Purchaser prior to the execution of the Agreement, including information disclosed in the SEC Reports filed prior to the date of this Agreement, disclosed in the bankruptcy filings, or disclosed on the Company Disclosure Schedule; provided, however, Purchaser must exercise the termination right set forth in this Section 8.1(g)(viii) within ten (10) Business Days of receiving such 2006 Audited Statements;

        (ix)     if an examiner with expanded powers is appointed in one or more of Seller's Chapter 11 Cases;

        (x)     if the Bankruptcy Case is converted to Chapter 7 of the Bankruptcy Code;

        (xi)     if a trustee is appointed for Seller; or

        (xii)     if Purchaser's meetings with Ford, Volkswagen, DaimlerChrysler, BMW and/or Hyundai/Kia shall disclose to Purchaser information that individually or in the aggregate is materially adverse to Seller's business or that could reasonably be expected to be materially adverse to Seller's business as a whole and is not materially consistent with the information Seller disclosed or made available to Purchaser prior to the execution of the Agreement, provided, however, the termination right set forth in this Section 8.1(g)(xii) shall only be exercisable if Purchaser (A) uses its reasonable efforts (Seller also being required to use its reasonable efforts) to hold the Purchaser Customer Meetings as soon as reasonably practicable after the date hereof; and (B) exercises the termination right set forth in this Section 8.1(g)(xii) on or prior to June 1, 2007.

        (h)     by any Party hereto if (i) Seller executes an agreement which contemplates an Alternative Transaction or (ii) Seller consummates an Alternative Transaction or a Partial Acquisition;

        (i)     by Purchaser, if a payment default (whether or not waived by the DIP Lender) with respect to the DIP Revolver or the DIP Term Loan (as defined in the DIP Loan Credit Agreement) occurs or if there is any acceleration of the amounts due under the DIP Loan Credit Agreement.

        (j)     by Purchaser if the amount of the DIP Loan exceeds Six Hundred Eighty Million Dollars ($680,000,000) net of Seller's domestic entities' unrestricted cash for any three (3) consecutive days; provided that Purchaser must exercise the termination right contained in this Section 8.1(j) prior to the date that is ten (10) calendar days after the date that Purchaser is notified in writing that the amount of the DIP Loan net of Seller's domestic entities' unrestricted cash is again less than Six Hundred Eighty Million Dollars ($680,000,000), which notice shall also identify the amount of the borrowing in excess of the limits set forth in this Section 8.1(j).

        Section 8.2.    Effect of Termination.

        (a)     In the event of the termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability or obligation on the part of any Party hereto, except with respect to Sections 3.23, 4.6, 5.2(b), 5.6, this Section 8.2 and Article 9, which shall survive such termination; provided, however, that, subject to the provisions of this Section 8.2, nothing herein shall relieve any Party from Liability for any breach hereof. Notwithstanding the foregoing, it is understood and agreed that if this Agreement is properly terminated by Seller pursuant to Section 8.1(e), then Seller shall be entitled to receive, as liquidated damages and not as a penalty, the sum of Fifteen Million Dollars ($15,000,000) subject to the procedures contained in the Escrow Agreement. In addition, upon such a termination pursuant to Section 8.1(e), Seller shall be entitled to prove that its actual

contractual damages arising directly from the breach by Purchaser exceeded Fifteen Million Dollars ($15,000,000), and in such event, it may recover up to a maximum of Twenty Five Million Dollars ($25,000,000) (inclusive of the liquidated damages amount set forth in this Section 8.2). The Deposit shall be the exclusive source of funds for recovery by Seller of liquidated damages and/or any additional damages arising from this Agreement, so that in no event shall Purchaser have any liability under this Agreement in excess of the Deposit. In addition to, and not in limitation of the foregoing, Purchaser shall under no circumstances be liable for punitive damages.

      (b)     In the event that this Agreement is terminated for any reason other than pursuant to Section 8.1(e), Seller shall promptly following such termination instruct the Escrow Agent to return the Deposit to Purchaser.

      (c)     Notwithstanding anything herein to the contrary, in the event this Agreement is terminated pursuant to Section 8.1(g), Purchaser shall have the rights granted to it in the Marketing Protocol Order.

No provision herein shall affect or modify the rights of the Parties under the Marketing Protocol Order.

      Section 8.3.     Amendment.

      This Agreement may not be amended except by a written instrument executed and delivered by the Parties hereto.

      Section 8.4.     Waiver.

      (a)     At any time prior to the Closing Date, any Party hereto may in writing:

      (i)     extend the time for the performance of any of the obligations or other acts of the other Parties hereto;

      (ii)     waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and

      (iii)     subject to the requirements of applicable Law, waive compliance with any of the agreements or conditions contained herein.

      (b)     Any such extension or waiver shall be valid if set forth in an instrument in writing signed by the Party or Parties to be bound thereby.

# ARTICLE 9.

## GENERAL PROVISIONS

Section 9.1.    <u>Non-Survival of Representations, Warranties and Agreements.</u>

None of the representations, warranties, covenants and agreements in this Agreement or in any instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants and agreements, shall survive the Closing Date, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing Date and (ii) this <u>Article 9</u>.

Section 9.2.    <u>Materiality; Company Disclosure Schedule.</u>

(a)    As used in this Agreement, unless the context would require otherwise, the terms "material" and the concept of the "material" nature of an effect upon Seller shall be measured relative to the entire business of the Tower Group taken as a whole.  There have been, however, included in the Company Disclosure Schedule and may be included elsewhere in this Agreement items which are not "material" within the meaning of the immediately preceding sentence in order to avoid any misunderstanding, and such inclusion shall not be deemed to be an agreement by Seller that such items are "material" or to further define the meaning of such term for purposes of this Agreement.  Disclosures included in any Schedule of the Company Disclosure Schedule shall be considered to be made for purposes of all other sections of the Company Disclosure Schedule to the extent that the relevance of any such disclosure to any other section of the Company Disclosure Schedule is reasonably apparent from the text of such disclosure.

(b)    From time to time prior to the Closing, Seller may supplement or amend the Company Disclosure Schedule.  No supplement or amendment of a Company Disclosure Schedule shall cure any breach of any representation or warranty.

Section 9.3.    <u>Notices.</u>

(a)    Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this <u>Section 9.3</u> prior to 5:00 p.m. (Eastern Standard Time) on a Business Day, (ii) the Business Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Agreement later than 5:00 p.m. (Eastern Standard Time) on any date and earlier than 11:59 p.m. (Eastern Standard Time) on such date, (iii) when received, if sent by nationally recognized overnight courier service, or (iv) upon actual receipt by the Party to whom such notice is required to be given.

(b)    The address for such notices and communications shall be as follows:

-69-

if to Seller or the Company:

        Tower Automotive, Inc.
        27275 Haggerty Road
        Novi, Michigan 48377
        Facsimile:     (248) 675-6459
        Attention:     Ms. Kathleen Ligocki

with a copy to (which shall not constitute notice):

        Kirkland & Ellis LLP
        200 East Randolph Drive
        Chicago, Illinois 60601
        Facsimile:     (312) 861-2200
        Attention:     Jeffrey C. Hammes P.C.
                     Anup Sathy, P.C.

if to Purchaser:

        TA Acquisition Company, LLC
        c/o Cerberus Capital Management, L.P.
        299 Park Avenue
        New York, New York 10171
        Facsimile:     (212) 891-1541
        Attention:     Mr. Dev B. Kapadia, Managing Director
                     Mr. Seth Gardner, Managing Director

with a copy to (which shall not constitute notice):

        Lowenstein Sandler PC
        1251 Avenue of the Americas
        New York, New York 10020
        Facsimile:     (973) 597-2425
        Attention:     Robert G. Minion, Esq.

Section 9.4.    Severability.

     If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 9.5.    Entire Agreement.

This Agreement, the Company Disclosure Schedule, the Confidentiality Agreement, the Marketing Protocol Order and the Ancillary Agreements constitute the entire agreement of the Parties hereto with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, between the Parties hereto with respect to the subject matter hereof including, without limitation, that certain Term Sheet for the Sale of Tower Automotive, Inc., dated as of March 28, 2007 by and between the Company and Cerberus Capital Management, L.P.

Section 9.6.    Assignment.

(a)    This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns (including, with respect to the Seller, the Post-Consummation Trust). No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided, however, Purchaser may, without Seller's consent:

(i)    assign any or all of its rights and interests hereunder to one or more of its Affiliates;

(ii)    designate one or more of its Affiliates to perform its obligations hereunder; or

(iii)    assign its rights hereunder to its lenders as collateral for indebtedness.

(b)    In the event Purchaser assigns its rights as set forth in this Section 9.6, Purchaser and any of its United States Affiliates that acquire any Acquired Assets, other than interests in any Foreign Entities, shall be jointly and severally responsible for the performance of all of its obligations pursuant to this Agreement.

Section 9.7.    No Third Party Beneficiaries.

This Agreement is not intended, and shall not be deemed, to:

(a)    confer any rights or remedies upon any Person other than Parties hereto and their respective successors and permitted assigns;

(b)    to create any agreement of employment with any Person; or

(c)    to otherwise create any third party beneficiary hereto.

Section 9.8.    Governing Law.

This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of New York (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such state are superseded by the

Bankruptcy Code; provided that, the validity and enforceability of all conveyance documents or instruments executed and delivered pursuant to this Agreement insofar as they affect title to real property shall be governed by and construed in accordance with the Laws of the jurisdiction in which such property is located.

Section 9.9.    Jurisdiction.

In addition, each of the parties hereto (i) consents to submit itself to the personal jurisdiction of the Bankruptcy Court in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from such court, (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the Bankruptcy Court and (iv) to the fullest extent permitted by Law, consents to service being made through the notice procedures set forth in Section 9.3. Each party hereto hereby agrees that, to the fullest extent permitted by Law, service of any process, summons, notice or document by U.S. registered mail to the respective addresses set forth in Section 9.3 shall be effective service of process for any suit or proceeding in connection with this Agreement or the transactions contemplated hereby.

Section 9.10.    Waiver of Jury Trial.

EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, OR THE ANCILLARY AGREEMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE, IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT ANCILLARY AGREEMENTS AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (III) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

Section 9.11.    Counterparts; Electronic Transmission.

This Agreement may be executed and delivered:

(a)    in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same Agreement and binding on all of the Parties hereto, notwithstanding that all of the Parties are not signatory to the original or to the same counterpart; and

(b)     via (i) facsimile transmission or (ii) other electronic transmission which provides an accurate copy of this Agreement (collectively, the "**Electronic Copy**"), which such Electronic Copy shall be deemed an original.

Section 9.12.   Interpretation.

(a)     When reference is made in this Agreement to a Section or Schedule, such reference shall be to a Section or Schedule of this Agreement unless otherwise indicated.

(b)     The table of contents and headings contained in this Agreement are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(c)     Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

Section 9.13.   Expenses.

Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the transactions contemplated hereby.

Section 9.14.   Currency.

All references to currency amounts or "$" or "Dollars" set forth in this Agreement shall be deemed United States of America legal tender unless expressly stated otherwise.  To the extent the context requires, all foreign currencies shall be translated at the Budgeted Exchange Rate, if stated, or the spot rate as set forth in *The Wall Street Journal* on May 1, 2007.

Section 9.15.   Preparation of this Agreement.

Purchaser and Seller hereby acknowledge that:

(a)     Purchaser and Seller jointly and equally participated in the drafting of this Agreement and the Ancillary Agreements;

(b)     Purchaser and Seller have been adequately represented and advised by legal counsel with respect to this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby; and

(c)     No presumption shall be made that any provision of this Agreement shall be construed against either Party by reason of such role in the drafting of this Agreement and the Ancillary Agreements.

Section 9.16. <u>Releases.</u>

(a)     Effective as of the Closing, Seller and, to the extent Seller has the authority to bind such Person, each of its past and present stockholders, officers, directors, attorneys, successors, assigns, employees, agents, servants, parent companies, subsidiaries, affiliates, related corporations, partners, representatives, predecessors, insurers, indemnitors, and creditors, hereby release, covenant not to sue, acquit and forever discharge Purchaser and its Affiliates including all Foreign Entities and each of their respective stockholders, officers, directors, attorneys, successors, assigns, employees, agents, servants, attorneys, parent companies, subsidiaries, Affiliates related corporations, partners, representatives, predecessors, insurers, indemnitors, and any and all persons acting by, through, under or in concert with any of them, from any claims arising prior to the Closing; <u>provided</u>, <u>however</u> that this release shall not include a release of any rights under this Agreement.

(b)     Effective as of the Closing, Purchaser and, to the extent Purchaser has the authority to bind such Person, and each of its past and present stockholders, officers, directors, attorneys, successors, assigns, employees, agents, servants, parent companies, subsidiaries, affiliates, related corporations, partners, representatives, predecessors, insurers, indemnitors, and creditors, hereby release, covenant not to sue, acquit and forever discharge Seller and its Affiliates and each of their respective stockholders, officers, directors, attorneys, successors, assigns, employees, agents, servants, attorneys, parent companies, subsidiaries, affiliates, related corporations, partners, representatives, predecessors, insurers, indemnitors, and any and all Persons acting by, through, under or in concert with any of them, from any claims arising prior to the Closing; <u>provided</u>, <u>however</u> that this release shall not include a release of any rights under this Agreement.

<i>(signatures follow on the next page)</i>

IN WITNESS WHEREOF, each Seller and Purchaser have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective authorized officers or signatories.

**SELLER**

TOWER AUTOMOTIVE, INC.
ALGOODS, USA, INC.
R.J. TOWER CORPORATION
TOWER AUTOMOTIVE BARDSTOWN, INC.
TOWER AUTOMOTIVE BOWLING GREEN, LLC
TOWER AUTOMOTIVE CHICAGO, LLC
TOWER AUTOMOTIVE FINANCE, INC.
TOWER AUTOMOTIVE GRANITE CITY, LLC
TOWER AUTOMOTIVE GRANITE CITY SERVICES, LLC
TOWER AUTOMOTIVE INTERNATIONAL, INC.
TOWER AUTOMOTIVE INTERNATIONAL HOLDINGS, INC.
TOWER AUTOMOTIVE INTERNATIONAL YOROZU HOLDINGS, INC.
TOWER AUTOMOTIVE LANSING, LLC
TOWER AUTOMOTIVE MADISON, LLC
TOWER AUTOMOTIVE MICHIGAN, LLC
TOWER AUTOMOTIVE MILWAUKEE, LLC
TOWER AUTOMOTIVE PLYMOUTH, INC.
TOWER AUTOMOTIVE PRODUCTS COMPANY, INC.
TOWER AUTOMOTIVE RECEIVABLES COMPANY, INC.
TOWER AUTOMOTIVE SERVICES AND TECHNOLOGY, LLC
TOWER AUTOMOTIVE TECHNOLOGY, INC.
TOWER AUTOMOTIVE TECHNOLOGY PRODUCTS, INC.
TOWER AUTOMOTIVE TOOL, LLC
TOWER SERVICES, INC.
TRYLON CORPORATION

By: _____
   Name: Kathleen Ligocki
   Title: President & CEO

TOWER AUTOMOTIVE, S.R.O.

By: _____
   Name:
   Title:

IN WITNESS WHEREOF, each Seller and Purchaser have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective authorized officers or signatories.

SELLER

TOWER AUTOMOTIVE, INC.
ALGOODS, USA, INC.
R.J. TOWER CORPORATION
TOWER AUTOMOTIVE BARDSTOWN, INC.
TOWER AUTOMOTIVE BOWLING GREEN, LLC
TOWER AUTOMOTIVE CHICAGO, LLC
TOWER AUTOMOTIVE FINANCE, INC.
TOWER AUTOMOTIVE GRANITE CITY, LLC
TOWER AUTOMOTIVE GRANITE CITY SERVICES, LLC
TOWER AUTOMOTIVE INTERNATIONAL, INC.
TOWER AUTOMOTIVE INTERNATIONAL HOLDINGS, INC.
TOWER AUTOMOTIVE INTERNATIONAL YOROZU HOLDINGS, INC.
TOWER AUTOMOTIVE LANSING, LLC
TOWER AUTOMOTIVE MADISON, LLC
TOWER AUTOMOTIVE MICHIGAN, LLC
TOWER AUTOMOTIVE MILWAUKEE, LLC
TOWER AUTOMOTIVE PLYMOUTH, INC.
TOWER AUTOMOTIVE PRODUCTS COMPANY, INC.
TOWER AUTOMOTIVE RECEIVABLES COMPANY, INC.
TOWER AUTOMOTIVE SERVICES AND TECHNOLOGY, LLC
TOWER AUTOMOTIVE TECHNOLOGY, INC.
TOWER AUTOMOTIVE TECHNOLOGY PRODUCTS, INC.
TOWER AUTOMOTIVE TOOL, LLC
TOWER SERVICES, INC.
TRYLON CORPORATION


By:_____
    Name:
    Title:

TOWER AUTOMOTIVE, S.R.O.

By:_____
    Name:    KoHERMAN
    Title:   MD Tower automotive S.R.O.

**PURCHASER**

TA ACQUISITION COMPANY, LLC

By: _____

Name:

Title: Dev Kapadia

President



e10vq

http://www.sec.gov/Archives/edgar/data/925548/000095012407005591...

10-Q 1 k20151e10vq.htm FORM 10-Q

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2007

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 1-12733

# TA DELAWARE, INC.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **41-1746238** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **27175 Haggerty Road** | **48377** |
| **Novi, Michigan** | |
| (Address of principal executive offices) | (Zip Code) |

**(248) 675-6000**

(Registrant's telephone number, including area code)

Tower Automotive, Inc., 27175 Haggerty Road, Novi, MI 48377
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑  No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12(b)-2 of the Securities and Exchange Act.

Large Accelerated Filer ☐    Accelerated Filer ☐    Non-Accelerated Filer ☑

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12(b)-2 of the Securities and Exchange Act).

Yes ☐  No ☑

The number of shares outstanding of the Registrant's Common Stock, par value $0.01 per share, at July 31, 2007 was 58,755,341 shares.

**TA Delaware, Inc.**
**Form 10-Q**

**Table of Contents**

| | | | Page |
|---|---|---|---|
| **PART I. Financial Information** | | | |
| Item 1. | Financial Statements (unaudited): | | |
| | Condensed Consolidated Balance Sheets at June 30, 2007 and December 31, 2006 | | 1 |
| | Condensed Consolidated Statements of Operations for Three and Six Months Ended June 30, 2007 and 2006 | | 2 |
| | Condensed Consolidated Statements of Cash Flows for Six Months Ended June 30, 2007 and 2006 | | 3 |
| | Notes to Condensed Consolidated Financial Statements | | 4 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 31 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | | 38 |
| Item 4. | Controls and Procedures | | 39 |
| **PART II. Other Information** | | | |
| Item 1. | Legal Proceedings | | 40 |
| Item 1A. | Risk Factors | | 40 |
| Item 6. | Exhibits | | 40 |
| Signatures | | | |
| Certification of Post-Consummation Trust Administrator Pursuant to Rules 13a-15(e) and 15d-15(e) | | | |
| Certification Pursuant to Section 906 | | | |
| Certification of the Post-Communication Trust Administrator Pursuant to Section 302 | | | |
| Certification of the Post-Communication Trust Administrator Pursuant to Section 906 | | | |

Table of Contents

## PART 1 — FINANCIAL INFORMATION

**ITEM 1. Financial Statements.**

### TA DELAWARE, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED BALANCE SHEETS
### (Amounts in thousands — unaudited)

|  | June 30, 2007 | December 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 87,235 | $ 64,275 |
| Accounts receivable | 406,336 | 339,650 |
| Inventories | 110,665 | 107,186 |
| Prepaid tooling and other | 93,854 | 94,018 |
| Assets of discontinued operations | — | 24,738 |
| Total current assets | 698,090 | 629,867 |
| Property, plant and equipment, net | 915,237 | 952,942 |
| Investments in joint ventures | 262,167 | 253,170 |
| Goodwill | 173,902 | 169,617 |
| Other assets, net | 85,833 | 101,398 |
| Total assets | $ 2,135,229 | $ 2,106,994 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Current maturities of long-term debt and capital lease obligations | $ 86,423 | $ 82,849 |
| Current portion of debtor-in-possession borrowings | 651,000 | 595,000 |
| Accounts payable | 368,021 | 345,296 |
| Accrued liabilities | 174,453 | 166,754 |
| Liabilities of discontinued operations | — | 20,503 |
| Total current liabilities | 1,279,897 | 1,210,402 |
| Liabilities subject to compromise | 1,282,648 | 1,284,782 |
| Non-current liabilities not subject to compromise: | | |
| Long-term debt, net of current maturities | 132,304 | 133,610 |
| Capital lease obligations, net of current maturities | 28,733 | 29,852 |
| Other non-current liabilities | 131,589 | 111,020 |
| Total non-current liabilities | 292,626 | 274,482 |
| Stockholders' deficit: | | |
| Common stock | 666 | 666 |
| Additional paid-in-capital | 682,084 | 682,031 |
| Accumulated deficit | (1,374,719) | (1,308,906) |
| Accumulated other comprehensive income | 21,351 | 12,861 |
| Treasury stock | (49,324) | (49,324) |
| Total stockholders' deficit | (719,942) | (662,672) |
| Total liabilities and stockholders' deficit | $ 2,135,229 | $ 2,106,994 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

1

Table of Contents

### TA DELAWARE, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
#### (Amounts in thousands, except per share amounts — unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2007 | 2006 |
| Revenues | $663,353 | $677,473 | $1,281,804 | $1,348,231 |
| Cost of sales | 587,528 | 620,926 | 1,172,199 | 1,242,791 |
| Gross profit | 75,825 | 56,547 | 109,605 | 105,440 |
| Selling, general and administrative expenses | 33,267 | 33,044 | 65,226 | 67,081 |
| Restructuring and asset impairment charges, net | 18,324 | 28,342 | 24,151 | 30,864 |
| Other operating income | — | — | — | (520) |
| Operating income (loss) | 24,234 | (4,839) | 20,228 | 8,015 |
| Interest expense (contractual interest of $48,835 and $95,798 in 2007 and $40,605 and $79,162 in 2006) | 30,256 | 22,340 | 58,770 | 42,822 |
| Interest income | (1,099) | (756) | (1,557) | (1,212) |
| Chapter 11 and related reorganization items | 11,804 | 43,662 | 20,779 | 55,271 |
| Loss before provision for income taxes, equity in earnings of joint ventures, and minority interest | (16,727) | (70,085) | (57,764) | (88,866) |
| Provision for income taxes | 8,265 | 11,885 | 11,653 | 9,730 |
| Loss before equity in earnings of joint ventures, and minority interest | (24,992) | (81,970) | (69,417) | (98,596) |
| Equity in earnings of joint ventures, net of tax | 5,471 | 7,533 | 8,997 | 14,217 |
| Minority interest, net of tax | (2,559) | (2,206) | (4,748) | (3,172) |
| Loss from continuing operations | (22,080) | (76,643) | (65,168) | (87,551) |
| Income (loss) from discontinued operations | — | 1,258 | (306) | 1,829 |
| Net loss | $ (22,080) | $(75,385) | $ (65,474) | $ (85,722) |
| | | | | |
| Basic and diluted loss per share | | | | |
| Loss from continuing operations | $ (0.38) | $ (1.31) | $ (1.10) | $ (1.49) |
| Income (loss) from discontinued operations | — | 0.02 | (0.01) | 0.03 |
| Net loss | $ (0.38) | $ (1.29) | $ (1.11) | $ (1.46) |
| | | | | |
| Weighted average basic and diluted shares outstanding | 58,866 | 58,661 | 58,778 | 58,657 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

2

Table of Contents

## TA DELAWARE, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
#### (Amounts in thousands — unaudited)

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **OPERATING ACTIVITIES:** | | |
| Net loss | $ (65,474) | $ (85,722) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Non-cash Chapter 11 and related reorganization items, net | 5,782 | 38,682 |
| Non-cash restructuring and impairment, net | 23,351 | 26,313 |
| Depreciation | 77,957 | 81,405 |
| Deferred income tax benefit | 6,525 | (7,448) |
| Equity in earnings of joint ventures, net | (8,997) | (14,217) |
| Non-cash minority interest | 3,082 | 81 |
| Change in working capital and other operating items | (26,649) | (10,075) |
| Net cash provided by operating activities | 15,577 | 29,019 |
| | | |
| **INVESTING ACTIVITIES:** | | |
| Cash disbursed for purchases of property, plant and equipment | (47,666) | (60,359) |
| Cash proceeds from asset disposal | — | 32,664 |
| Net cash used in investing activities | (47,666) | (27,695) |
| | | |
| **FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings | 17,677 | 20,894 |
| Repayments of borrowings | (18,628) | (43,886) |
| Proceeds from DIP credit facility | 423,000 | 345,500 |
| Repayments of DIP credit facility | (367,000) | (269,500) |
| Net cash provided by financing activities | 55,049 | 53,008 |
| | | |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | 22,960 | 54,332 |
| | | |
| Cash and cash equivalents, beginning of period | 64,275 | 65,791 |
| | | |
| **CASH AND CASH EQUIVALENTS, END OF PERIOD** | $ 87,235 | $ 120,123 |
| | | |
| **Supplemental Cash Flow Information:** | | |
| Interest paid, net of amounts capitalized | $ 52,534 | $ 37,981 |
| Income taxes paid (refunded) | $ 6,102 | $ 4,140 |
| Reorganization payments | $ 14,996 | $ 16,601 |
| Non-cash investing activities: | | |
| Net decrease in liabilities for purchases of property, plant and equipment | $ (16,420) | $ (12,321) |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

3

Table of Contents

## TA DELAWARE, INC. AND SUBSIDIARIES
## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
### (UNAUDITED)

**Note 1. Basis of Presentation**

The accompanying Condensed Consolidated Financial Statements have been prepared by TA Delaware, Inc. (the "Company" or the "Registrant"), without audit, pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC"). Effective July 31, 2007, the registrant changed its name to TA Delaware, Inc. The information furnished in this report is used in conjunction with the predecessor, Tower Automotive, Inc. The information furnished in the Condensed Consolidated Financial Statements includes primarily normal recurring adjustments and reflects all adjustments, which are, in the opinion of management, necessary for a fair presentation of such financial statements. Certain information and disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") have been condensed or omitted pursuant to the rules and regulations of the SEC. Although the Company believes that the disclosures are adequate to make the information presented not misleading, these Condensed Consolidated Financial Statements should be read in conjunction with the financial statements and the notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2006. The interim results for the periods presented are not indicative of the Company's actual annual results.

As indicated in Note 2, the Company along with 25 of its United States ("U.S.") subsidiaries (collectively, the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code ("Bankruptcy Code") in the U.S. Bankruptcy Court Southern District of New York (the "Court"). On July 11, 2007, the Court confirmed the Chapter 11 Reorganization Plan of the Debtors (the "Plan") and approved the sale of substantially all of the Debtors' assets to Tower Automotive, LLC, an affiliate of Cerberus Capital Management, L.P. The Plan became effective on July 31, 2007 (the "Effective Date"), and, in connection therewith, the Debtors completed the sale of substantially all of their assets to Tower Automotive, LLC. Upon the effectiveness of the Plan, all of the remaining assets of the Debtors were transferred to a Post-Consummation Trust. As a result of the foregoing, the Debtors collectively have no assets and have ceased all operations.

Subsequent to the bankruptcy filing date, the provisions in Statement of Position 90-7, *"Financial Reporting by Entities in Reorganization Under the Bankruptcy Code"* ("SOP 90-7"), applies to the Debtors' financial statements while the Debtors operate under the provisions of Chapter 11. SOP 90-7 does not change the application of U.S. GAAP in the preparation of financial statements. However, SOP 90-7 does require that the financial statements, for periods including and subsequent to the filing of the Chapter 11 petition, distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the Company.

Where necessary, prior years information has been reclassified to conform to the current year presentation. Operations classified as discontinued at June 30, 2007 have been excluded from the discussions of continuing operations and are discussed separately in Note 3.

***Change in Accounting Principle***

As previously reported in our 2006 Annual Report on Form 10-K, the Company recognized the funded status of its benefit plans at December 31, 2006 in accordance with the recognition provisions of Statement of Financial Accounting Standards ("SFAS") No. 158, *"Employers' Accounting for Defined Pension and Other Postretirement Plans"*, ("SFAS No. 158").

In July 2006, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 48 ("FIN 48"), *"Accounting for Uncertainty in Income Taxes"*, which clarifies the accounting for uncertainty in income taxes recognized in the financial statements in accordance with SFAS No. 109, *"Accounting for Income Taxes"*. FIN 48 provides guidance on the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosures and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. We adopted FIN 48 on January 1, 2007. See Note 11 for additional information

4

Table of Contents

## Note 2. Chapter 11 Reorganization Proceedings

On February 2, 2005 (the "Petition Date"), the Debtors filed a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court Southern District of New York ("Bankruptcy Court"). The cases were consolidated for administrative purposes. The filing was made necessary by: customer pricing pressures, North American automotive production cuts, significantly higher material costs (primarily steel) and the termination of accelerated payment programs of certain customers adversely affecting the Debtors' liquidity and financial condition, all of which raised substantial doubt as to the Company's ability to continue as a going concern. The Debtors operated their businesses as debtors-in-possession ("DIP") pursuant to the Bankruptcy Code. An official committee of unsecured creditors was appointed.

Pursuant to the provisions of the Bankruptcy Code, all actions to collect upon any of the Debtors' liabilities as of the Petition Date or to enforce pre-petition date contractual obligations were automatically stayed. As a general rule, absent approval from the Bankruptcy Court, the Debtors were prohibited from paying pre-petition obligations. In addition, as a consequence of the Chapter 11 filing, pending litigation against the Debtors was generally stayed, and no party could take any action to collect pre-petition claims except pursuant to an order of the Bankruptcy Court. However, the Debtors requested that the Bankruptcy Court approve certain pre-petition liabilities, such as employee wages and benefits and certain other pre-petition obligations. Since the filing, all orders sufficient to enable the Debtors to conduct normal business activities, including the approval of the Debtors' DIP financing, were entered by the Bankruptcy Court. See Note 9 for a description of the DIP financing.

The objectives of the Chapter 11 filing were to protect and preserve the value of assets and to restructure and improve the Debtors' operational and financial affairs in order to return to profitability. On July 11, 2007, the Court confirmed the Chapter 11 Reorganization Plan of the Debtors (the "Plan") and approved the sale of substantially all of the Debtors' assets to Tower Automotive, LLC, an affiliate of Cerberus Capital Management, L.P. The Plan became effective on July 31, 2007 (the "Effective Date"), and, in connection therewith, the Debtors completed the sale of substantially all of their assets to Tower Automotive, LLC. Upon the effectiveness of the Plan, all of the remaining assets of the Debtors were transferred to a Post-Consummation Trust. As a result of the foregoing, the Debtors collectively have no assets and have ceased all operations. The name of the Company was also changed to TA Delaware, Inc. as of the Effective Date.

*Financial Statement Classification*

The majority of the Debtors' pre-petition debt is in default and is classified as "Liabilities Subject to Compromise" in the accompanying Consolidated Balance Sheets at June 30, 2007 and December 31, 2006. (See Note 9.)

In addition to the Debtors' pre-petition debt which is in default, liabilities subject to compromise reflect the Debtors' other liabilities incurred prior to the commencement of the bankruptcy proceedings. These amounts represent the Company's estimate of known or potential pre-petition claims to be resolved in connection with the bankruptcy proceedings. Such claims remain subject to future adjustments. Future adjustments may result from: (i) negotiations; (ii) actions of the Bankruptcy Court; (iii) further developments with respect to disputed claims; (iv) rejection of executory contracts and leases; (v) the determination of value of any collateral securing claims; (vi) proofs of claims; or (vii) other events. Payment terms for these claims will be established in connection with the plan of reorganization.

Liabilities subject to compromise consist of the following (in thousands):

|  | June 30, 2007 | December 31, 2006 |
|---|---|---|
| Debt: |  |  |
| 5.75% Convertible senior debentures | $   124,999 | $   124,999 |
| 6.75% Subordinated debentures | 258,750 | 258,750 |
| 9.25% Senior Euro notes | 203,115 | 197,940 |
| 12% Senior notes | 258,000 | 258,000 |
| Total debt | 844,864 | 839,689 |
| Pension and other post-retirement benefits | 139,878 | 142,841 |
| Pre-petition accounts payable and accruals | 160,857 | 165,203 |
| Accrued interest on debt subject to compromise | 21,343 | 21,343 |
| Executory contracts | 115,706 | 115,706 |
| Total liabilities subject to compromise | $1,282,648 | $1,284,782 |

5

Table of Contents

The Debtors have incurred certain professional and other expenses directly associated with the bankruptcy proceedings. The Company disbursed cash of approximately $9.6 million and $11.0 million relating to these expenses during the three months ended June 30, 2007 and 2006, respectively and $15.0 million and $16.6 for the six months ended June 30, 2007 and 2006, respectively. In addition, the Debtors have made certain provisions to adjust the carrying value of certain pre-petition liabilities to reflect the Debtors' estimate of allowed claims. Such costs are classified as Chapter 11 and related reorganization items in the accompanying Statements of Operations for the three months ended June 30, 2007 and 2006 and for the six months ended June 30, 2007 and 2006 and consist of the following (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|
| Professional fees directly related to the filing | $ 13,309 | $12,556 | $23,110 | $21,136 |
| Key employee retention costs | — | 875 | — | 3,836 |
| Estimated executory contract rejection damages | (6) | 30,231 | (6) | 30,299 |
| Other reversals directly attributable to the Company's reorganization | (1,499) | — | (2,325) | — |
| Total | $ 11,804 | $43,662 | $20,779 | $55,271 |

Pursuant to the Bankruptcy Code, the Debtors have filed schedules with the Bankruptcy Court setting forth the assets and liabilities of the Debtors as of the Petition Date. The Debtors have issued proof of claim forms to current and prior employees, known creditors, vendors and other parties with whom the Debtors have previously conducted business. To the extent the recipients disagree with the claims quantified on these forms, the recipient may file discrepancies with the Bankruptcy Court. Differences between the amounts recorded by the Debtors and claims filed by creditors will be investigated and resolved as part of the bankruptcy proceedings. The Bankruptcy Court ultimately will determine liability amounts that will be allowed for these claims. The Company is in the process of receiving, cataloging and reconciling claims received in conjunction with this process. Because the Debtors have not received all claims and have not completed the evaluation of the claims received in connection with this process, the ultimate number and allowed amount of such claims is not presently known. The resolution of such claims could result in a material adjustment to the Company's Condensed Consolidated Financial Statements.

6

e10vq

**Table of Contents**

*Debtors' Financial Statements*

Presented below are the Condensed Combined Consolidated Financial Statements of the Debtors. These statements reflect the financial position, results of operations and cash flows of the combined Debtors, including certain transactions and resulting assets and liabilities between the Debtors and non-Debtor subsidiaries of the Company, which are eliminated in the Company's Condensed Consolidated Financial Statements. Results of operations classified as discontinued are shown separately. For additional information on discontinued operations see Note 3.

**Debtors' Condensed Combined Balance Sheet**
**Debtors- in-Possession**
(Amounts in thousands)

|  | June 30, 2007 | December 31, 2006 |
|---|---|---|
| **ASSETS** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ 1,778 | $ 5,705 |
| Accounts receivable | 125,698 | 81,713 |
| Inventories | 39,850 | 43,438 |
| Prepaid tooling and other | 13,597 | 23,408 |
| Assets of discontinued operations | — | 24,738 |
| Total current assets | 180,923 | 179,002 |
| Property, plant and equipment, net | 445,691 | 474,897 |
| Investments in and advances to non-debtor subsidiaries | 919,749 | 868,374 |
| Other assets, net | 16,308 | 32,360 |
| Total assets | $1,562,671 | $1,554,633 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** |  |  |
| Current liabilities not subject to compromise: |  |  |
| Current maturities of long-term debt and capital lease obligations | $ — | $ 4 |
| Current portion of debtor-in-possession borrowings | 651,000 | 595,000 |
| Accounts payable | 116,234 | 101,804 |
| Accrued liabilities | 94,569 | 92,322 |
| Liabilities of discontinued operations | — | 20,503 |
| Total current liabilities | 861,803 | 809,633 |
| Liabilities subject to compromise | 1,299,011 | 1,301,145 |
| Non-current liabilities not subject to compromise: |  |  |
| Long-term debt, net of current maturities | 84,751 | 84,751 |
| Other non-current liabilities | 37,048 | 21,776 |
| Total non-current liabilities | 121,799 | 106,527 |
| Total stockholders' deficit | (719,942) | (662,672) |
| Total liabilities and stockholders' deficit | $1,562,671 | $1,554,633 |

7

Table of Contents

**Debtors' Condensed Combined Statement of Operations**
**Debtors-in-Possession**
(Amounts in thousands)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Revenues | $279,619 | $318,958 | $542,595 | $651,646 |
| Cost of sales | 250,780 | 297,585 | 511,458 | 615,776 |
| Gross profit | 28,839 | 21,373 | 31,137 | 35,870 |
| Selling, general and administrative expenses | 15,452 | 18,229 | 30,078 | 39,487 |
| Restructuring and asset impairment charges, net | 22,410 | 7,853 | 27,527 | 10,264 |
| Other operating (income) loss | 1,137 | (810) | 2,287 | (2,115) |
| Operating loss | (10,160) | (3,899) | (28,755) | (11,766) |
| Interest expense | 27,165 | 19,693 | 53,113 | 37,389 |
| Interest income | (354) | (638) | (791) | (959) |
| Inter-company interest income | (8,245) | (6,436) | (16,271) | (12,530) |
| Chapter 11 and related reorganization items | 11,804 | 43,662 | 20,779 | 55,271 |
| Loss before provision for income taxes, equity in earnings (loss) of joint ventures and equity in earnings from non-Debtor subsidiaries | (40,530) | (60,180) | (85,585) | (90,937) |
| Provision for income taxes | 1,104 | 1,166 | 485 | 2,104 |
| Loss before equity in earnings of joint ventures and equity in earnings (loss) of non-Debtor subsidiaries | (41,634) | (61,346) | (86,070) | (93,041) |
| Equity in earnings (loss) of joint ventures, net of tax | (67) | 68 | (118) | 136 |
| Equity in earnings (losses) of non-Debtor subsidiaries | 19,621 | (15,365) | 21,020 | 5,354 |
| Loss from continuing operations | (22,080) | (76,643) | (65,168) | (87,551) |
| Income (loss) from discontinued operations | — | 1,258 | (306) | 1,829 |
| Net loss | $ (22,080) | $ (75,385) | $ (65,474) | $ (85,722) |

8

Table of Contents

**Debtors' Condensed Combined Statements of Cash Flows**
**Debtors- in-Possession**
**(Amounts in thousands)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **OPERATING ACTIVITIES:** | | |
| Net loss | $ (65,474) | $ (85,722) |
| Adjustments required to reconcile net loss to net cash used in operating activities: | | |
| Non-cash Chapter 11 and related reorganization items, net | 5,782 | 38,682 |
| Non-cash restructuring and impairment, net | 23,979 | 10,986 |
| Depreciation | 42,660 | 46,463 |
| Equity in earnings of joint ventures and subsidiaries, net | (20,902) | (5,490) |
| Change in working capital and other operating items | (25,835) | (4,929) |
| Net cash used in operating activities | (39,790) | (10) |
| | | |
| **INVESTING ACTIVITIES:** | | |
| Cash disbursed for purchases of property, plant and equipment | (20,137) | (24,963) |
| Net cash used in investing activities | (20,137) | (24,963) |
| | | |
| **FINANCING ACTIVITIES:** | | |
| Repayments of borrowings | — | (6) |
| Proceeds from DIP credit facility | 423,000 | 345,500 |
| Repayments of DIP credit facility | (367,000) | (269,500) |
| Net cash provided by financing activities | 56,000 | 75,994 |
| | | |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | (3,927) | 51,021 |
| | | |
| Cash and cash equivalents, beginning of period | 5,705 | 858 |
| | | |
| **CASH AND CASH EQUIVALENTS, END OF PERIOD** | $ 1,778 | $ 51,879 |

9

Table of Contents

## Note 3. Discontinued Operations

In accordance with SFAS No. 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets,"* discontinued operations include components of entities or entire entities that, through disposal transactions, were eliminated from ongoing operations of the Company.. Through the Company's various restructuring plans, management disposed of Tower Automotive Lansing LLC, which is classified as discontinued as of December 31, 2006.

The following summary balance sheet information is derived from the business that is classified as discontinued, which management believes is representative of the residual net assets of the business disposed as of December 31, 2006: (in thousands)

|  | December 31, 2006 |
|---|---|
| **ASSETS** | |
| Current assets: | |
| Accounts receivable | $ 24,692 |
| Prepaid tooling and other | 46 |
| Total current assets | $ 24,738 |
| **LIABILITIES** | |
| Current liabilities | |
| Accounts payable | $ 16,013 |
| Accrued liabilities | 4,490 |
| Total current liabilities | $ 20,503 |

As of June 30, 2007, there were no assets or liabilities associated with discontinued operations.

The following summary results of operations information is derived from the business that was sold during 2006 (in thousands):

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
| Revenues | $  — | $89,434 | $  — | $188,396 |
| Cost of sales | — | 87,852 | 42 | 185,919 |
| Gross profit | — | 1,582 | (42) | 2,477 |
| Other expense | — | — | 264 | — |
| Operating income (loss) | — | 1,582 | (306) | 2,477 |
| Interest expense | — | 324 | — | 648 |
| Net income (loss) | $  — | $ 1,258 | $ (306) | $ 1,829 |

In accordance with Emerging Issues Task Force 87-24, *"Allocation of Interest to Discontinued Operations"*, the Company has elected to allocate interest expense to discontinued operations based on debt that can be identified as specifically attributed to this operation. At June 30, 2006, the amount of interest expense allocated was $0.6 million.

## Note 4. New Accounting Pronouncements Not Yet Adopted

SFAS No. 157, *"Fair Value Measurements"*
("SFAS No. 157") — In September 2006, the FASB issued SFAS No. 157, which establishes a framework for reporting fair value and expands disclosures about fair value measurements. SFAS No. 157 becomes effective beginning with our first quarter 2008 period. In accordance with SOP 90-7, early adoption is required when an entity emerges from bankruptcy at the time fresh-start reporting is adopted. We are currently evaluating the impact of this standard on the Company's Condensed Consolidated Financial Statements.

10

Table of Contents

SFAS No. 159, "*The Fair Value Option for Financial Assets and Financial Liabilities including an Amendment to FASB Statement No. 115*"

("SFAS No. 159") — In February 2007, the FASB issued SFAS No. 159, which permits an entity to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. Most of the provisions in SFAS No. 159 are elective, however, the amendment to SFAS No. 115, "*Accounting for Certain Investments in Debt and Equity Securities,*" applies to all entities with available-for-sale and trading securities. The fair value option established by SFAS No. 159 permits companies to choose to measure eligible items at fair value at specified election dates. A business entity that elects the fair value option will report unrealized gains and losses on items for which the fair value option has been elected in earnings at each subsequent reporting date. SFAS No. 159 is effective as of the beginning of an entity's first fiscal year that begins after November 15, 2007. We are currently evaluating the impact of this standard on the Company's Condensed Consolidated Financial Statements.

## Note 5. Inventories

Inventories are valued at the lower of first-in-first-out ("FIFO") cost or market, and consist of the following (in thousands):

|  | June 30, 2007 | December 31, 2006 |
|---|---|---|
| Raw materials | $ 46,986 | $ 49,657 |
| Work in process | 30,528 | 26,127 |
| Finished goods | 33,151 | 31,402 |
|  | $110,665 | $ 107,186 |

## Note 6. Goodwill

The change in the carrying amount of goodwill for the international segment is as follows (in thousands):

| | |
|---|---|
| Balance at December 31, 2006 | $169,617 |
| Currency translation adjustment | 4,285 |
| Balance at June 30, 2007 | $173,902 |

## Note 7. Investments in Joint Ventures

The Company is a 40% joint venture partner in Metalsa S. de R.L. ("Metalsa"), which is the largest supplier of vehicle frames and structures in Mexico. Metalsa is headquartered in Monterrey, Mexico and has manufacturing facilities located in Apodaca, Saltillo and San Luis Potosi, Mexico and Roanoke, Virginia. Promotora de Empresa Zano, S.A. de C.V. ("Proeza") is a 60% joint venture partner in Metalsa. The Company has a technology sharing arrangement with Metalsa, whereby Metalsa agrees to pay for administrative services and technical assistance provided. During 2004, production of the frame assembly for the Dodge Ram light truck was moved from the Company's Milwaukee, Wisconsin facility, which was expected to run production through 2009 to Metalsa. Production at the Milwaukee facility related to this program ceased in June 2005. The Company recognized no material revenue associated with the Dodge Ram frame program during the three and six months ended June 30, 2007 and 2006.

## Note 8. Restructuring and Asset Impairment Charges

The Company has executed various restructuring plans and may execute additional plans in the future to respond to its bankruptcy proceedings, customer sourcing decisions, realignment of manufacturing capacity to prevailing global automotive production and to improve the utilization of remaining facilities. Estimates of restructuring charges are based on information available at the time such charges are recorded. Due to the inherent uncertainty involved in estimating restructuring expenses, actual amounts paid for such activities may differ from amounts initially recorded. Accordingly, the Company may record revisions of previous estimates by adjusting previously established reserves.

11

Table of Contents

The table below summarizes the accrual, reflected in accrued liabilities, for the Company's various restructuring actions for the six months ended June 30, 2007 (in thousands):

|  | Asset Impairments | Severance and Outplacement Costs | Lease and Other Exit Costs | Total |
|---|---|---|---|---|
| Balance at December 31, 2006 | $ — | $ 9,423 | $ — | $ 9,423 |
| Provision | 21,747 | 8,380 | 9,427 | 39,554 |
| Cash usage | — | (13,549) | (6,983) | (20,532) |
| Non-cash charges | (21,747) | — | (2,444) | (24,191) |
| Balance at June 30, 2007 | $ — | $ 4,254 | $ — | $ 4,254 |

Except as disclosed above, the Company does not anticipate incurring additional material cash charges associated with these actions.

The restructuring and asset impairment charges caption in the accompanying Condensed Consolidated Statements of Operations are comprised of both restructuring and non-restructuring related asset impairments. The components of that caption are as follows for the six months ended June 30, 2007 (in thousands):

| | |
|---|---|
| Restructuring and related asset impairments, net | $ 39,554 |
| Revision of estimate | — |
| Other asset impairments, net | (15,403) |
| Total | $ 24,151 |

At June 30, 2007, the $15.4 million of other asset impairments, net is primarily related to asset sales of $7.3 million and $7.2 million of ongoing recoveries of a cancellation claim of a customer program and $0.9 million of other impairments.

## Note 9. Debt

### Chapter 11 Impact

Under the terms of the Company's pre-petition credit agreement, the Chapter 11 filing created an event of default. Upon the Chapter 11 filing, the lenders' obligation to loan additional money to the Company terminated, the outstanding principal of all obligations became immediately due and payable and the Debtors were required to immediately deposit funds into a collateral account to cover the outstanding amounts under the letters of credit issued pursuant to the credit agreement. Outstanding obligations under the credit agreement amounted to $425 million, which were refinanced through the DIP financing described below.

In addition, the Chapter 11 filing created an event of default under the Convertible Debentures, Senior Notes, Senior Euro Notes and the Subordinated Debentures (see Note 2).

Pursuant to SOP 90-7, the Company ceased recognizing interest expense on the Convertible Debentures, Senior Notes, Senior Euro Notes and the Subordinated Debentures effective February 2, 2005. Contractual interest not accrued during the period from January 1, 2007 through June 30, 2007 was $37.0 million. Contractual interest not accrued during the period from January 1, 2006 through June 30, 2006 was $36.3 million.

The debt of the Company's foreign subsidiaries is not subject to compromise in the bankruptcy proceedings as the Company's operating foreign subsidiaries are not included in the Chapter 11 filing.

### DIP Financing

In February 2005, the Bankruptcy Court approved a Revolving Credit, Term Loan and Guaranty Agreement, as amended, ("DIP Agreement") between the Company and a national banking institution as agent for the lenders ("Lenders") and each of the Lenders.

The DIP Agreement provides for a $725 million commitment of debtor-in-possession financing comprised of a revolving credit and letter of credit facility in an aggregate principal amount not to exceed $300 million and a term loan in the aggregate principal amount of $425 million. The proceeds of the term loan have been used to refinance the Debtors' obligations of amounts outstanding under the

12

pre-petition credit agreement. The proceeds of the revolving credit loans shall be used to fund the working capital requirements of the Debtors during the Chapter 11 proceedings. Obligations under the DIP Agreement are secured by a lien on the assets of the Debtors (such lien shall have first priority with respect to a significant portion of the Debtors' assets) and by a super-priority administrative expense claim in each of the bankruptcy cases. The Company believes that the existing DIP Agreement along with cash generated from operations are adequate to provide for its future liquidity needs through the Debtors' Chapter 11 bankruptcy.

Advances under the DIP Agreement bear interest at a fixed rate per annum equal to (x) the greatest (as of the date the advance is made) of the prime rate, the Base CD Rate (as defined in the DIP Agreement) plus 1%, or the Federal Funds Effective Rate (as defined in the DIP Agreement) plus 0.5%, plus (y) 1.75% prior to the amendment and 2.75%, as amended, in the case of a loan under the revolving facility, or 2.25% prior to the amendment and 3.5%, as amended, in the case of the term loan. Alternatively, the Debtors may request that advances be made at a variable rate equal to (x) the Adjusted LIBO Rate (as defined in the DIP Agreement), for a one-month, three-month, six-month, or nine-month period, at the election of the Debtors, plus (y) 2.75% prior to the amendment and 3.75%, as amended, in the case of a loan under the revolving facility, or 3.25% prior to the amendment and 4.5%, as amended in the case of the term loan. In addition, the DIP Agreement obligates the Debtors to pay certain fees to the Lenders as described in the DIP Agreement. At June 30, 2007, $40.8 million was available for borrowing under the revolving credit and letter of credit facility. At June 30, 2007, the weighted average interest rate associated with borrowings pertaining to the DIP Agreement was 9.82%. The DIP Agreement matured on August 2, 2007 and the Debtors' paid all borrowings pertaining to the DIP Agreement on July 31, 2007 as part of the sale transaction to Cerberus Capital Management, L.P. as discussed further in Note 1.

The DIP Agreement contains various representations, warranties and covenants by the Debtors that are customary for transactions of this nature, including (without limitation) reporting requirements and maintenance of financial covenants. On September 22, 2006, the Company circulated for approval by the lenders under its DIP Agreement the seventh amendment to the DIP Agreement (the "Amendment"). On October 6, 2006, the DIP Agreement was amended by the lenders. The Amendment amends certain covenants contained in the DIP Agreement. In addition, the Amendment amends certain provisions to allow for dividends to be declared and paid by less than wholly-owned subsidiaries of the Company and waives any existing covenant technical breaches related to previously declared and paid dividends by less than wholly-owned subsidiaries of the Company. The Amendment also amended certain interest rates based on the current economic environment. On January 30, 2007, the Company obtained approval by the lenders under its DIP Agreement the eighth amendment to the DIP Agreement. The eighth amendment extends the maturity date from February 2, 2007 to August 2, 2007, amends certain covenants contained in the DIP Agreement, and amends certain interest rates based on the current economic environment. In addition, the DIP Agreement was amended by the lenders on March 28, 2007 and was effective March 9, 2007. The amendment amends Section 5.01(a) of the Credit Agreement.

The Debtors' obligations under the DIP Agreement may be accelerated following certain events of default, including (without limitation) any breach by the Debtors of any of the representations, warranties, or covenants made in the DIP Agreement or the conversion of any of the bankruptcy cases to a case under Chapter 7 of the Bankruptcy Code or the appointment of a trustee pursuant to Chapter 7 of the Bankruptcy Code.

**Back-Stop Agreement**

The Debtors have entered into a Back-Stop Agreement with a finance company ("Finance Company"). Under the Back-Stop Agreement, in the event any second lien lender under the pre-petition credit agreement wished to assign its deposits, rights and obligations after the Chapter 11 filing, the Finance Company agreed to take by assignment any such second lien holder's deposits, rights and obligations in an aggregate amount not to exceed $155 million.

Draws were made against the issued second lien letters of credit in the amount of $41 million as of June 30, 2007. The Debtors' paid all borrowings pertaining to the Back-Stop Agreement on July 31, 2007 as part of the sale transaction to Cerberus Capital Management, L.P. as discussed further in Note 1.

**Debt Classified as Not Subject to Compromise**

The Company's industrial development revenue bonds of $43.8 million are classified as liabilities not subject to compromise on the Company's Condensed Consolidated Balance Sheet at June 30, 2007. The Company's foreign subsidiary indebtedness of $162.7 million at June 30, 2007, is also not subject to compromise as the Company's operating foreign subsidiaries are not included in the bankruptcy proceedings.

13

Table of Contents

## Note 10. Comprehensive Loss

The following table presents comprehensive loss, net of tax (in thousands):

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|
| Net loss | $(22,080) | $(75,385) | $(65,474) | $(85,722) |
| Change in cumulative translation adjustment | 5,985 | 11,598 | 8,490 | 18,930 |
| Comprehensive loss | $(16,095) | $(63,787) | $(56,984) | $(66,792) |

## Note 11. Income Taxes

During the three and six months ended June 30, 2007, the Company recognized income tax expense of $8.3 million and $11.7 million, respectively, in relation to a pre-tax net loss of $16.7 million and $57.8 million, respectively. This income tax provision resulted primarily from the recognition of foreign income taxes and state taxes. Full valuation allowances were provided for U.S. Federal income tax benefits generated during the 2007 period.

During the three and six months ended June 30, 2006, the Company recognized an income tax expense of $11.9 million and $9.7 million, respectively, in relation to a pre-tax loss of $70.1 million and $88.9 million, respectively. The Company recorded income tax expense that resulted from foreign income taxes related to the Company's international operations and U.S. state taxes. Full valuation allowances were provided for U.S. Federal income tax benefits generated during the 2006 period. The 2006 income tax provision was offset by an $8.1 million tax benefit related to the reversal of a valuation allowance for certain tax loss carry-overs during the six months ended June 30, 2006. The reversal of the valuation allowance resulted from the reorganization, completed in the first quarter of 2006, at certain of the Company's international operations. Such reorganization resulted in the ability to utilize tax loss carry-overs in future periods over a sufficiently long carry-forward period to cause the probability of their realization to be considered more likely than not.

We adopted FIN 48 as of January 1, 2007. FIN 48 clarified the accounting for uncertainty in income taxes recognized in companies' financial statements in accordance with SFAS No. 109. Unrecognized tax benefits are the difference between a tax position taken, or expected to be taken in a tax return, and the benefits recognized for accounting purposes pursuant to FIN 48. The Company applies a more-likely-than-not recognition threshold for all tax uncertainties. FIN 48 only allows the recognition of those tax benefits that have a greater than 50% likelihood of being sustained upon examination by the taxing authorities. As a result of implementing FIN 48, the Company recognized a $0.3 million decrease in retained earnings as of January 1, 2007.

## Note 12. Stockholders' Deficit

### Loss Per Share

Basic loss per share is computed by dividing net loss by the weighted average number of common shares outstanding during the period. The average number of common shares was 58,865,780 and 58,660,940 for the three months ended June 30, 2007 and 2006.

There was a loss attributable to common stock for all periods presented, therefore, options to purchase shares of common stock were excluded from the calculations of diluted loss per share, as inclusion of these securities would have been anti-dilutive. Additionally, no shares potentially issuable to satisfy the in-the-money amount of the convertible debentures have been included in diluted earnings per share as of June 30, 2007 and 2006, as the convertible debentures have not met the requirements for conversion.

14

e10vq

Table of Contents

## Stock-Based Compensation

### Stock Option Plans

Pursuant to the 1994 Key Employee Stock Option Plan (the "Stock Option Plan"), which was approved by stockholders, any person who is a full-time, salaried employee of the Company (excluding non-management directors) is eligible to participate (a "Colleague Participant") in the Stock Option Plan. A committee of the Board of Directors selects the Colleague Participants and determines the terms and conditions of the options.

The Stock Option Plan provides for the issuance of options to purchase up to 3,000,000 shares of common stock at exercise prices equal to the market price of the common stock on the date of grant, subject to certain adjustments reflecting changes in the Company's capitalization. As of June 30, 2007, 1,169,660 shares of common stock were available for issuance under the Stock Option Plan.

Summarized information pertaining to the Stock Option Plan follows:

|  | Shares Under Option | Exercise Price | Weighted Average Exercise Price | Exercisable |
|---|---|---|---|---|
| Outstanding, December 31, 2006 | 91,500 | $17.13 — $22.97 | $18.23 | 91,500 |
| Forfeited | (1,000) | — | 19.25 | |
| Expired | (2,000) | — | 18.94 | |
| Outstanding, June 30, 2007 | 88,500 | 17.13 — 22.97 | 18.21 | 88,500 |

The aggregate intrinsic value is zero as the fair value of the underlying stock was less than the exercise price.

A summarization of stock options outstanding related to the Stock Option Plan at June 30, 2007 follows:

| Range of Exercisable Options | Number Outstanding At 6/30/07 | Options Outstanding | | Options Exercisable | |
|---|---|---|---|---|---|
| | | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable 6/30/07 | Weighted-Average Exercise Price |
| $17.13 — $22.97 | 88,500 | 1.19 yrs. | $18.21 | 88,500 | $18.21 |

### Incentive Plan

The Tower Automotive Inc. Long Term Incentive Plan ("Incentive Plan"), which was approved by stockholders and adopted in 1999, is designed to promote the long-term success of the Company through stock based compensation by aligning the interests of participants with those of its stockholders. Eligible participants under the Incentive Plan include key company colleagues, directors, and outside consultants. Awards under the Incentive Plan may include stock options, stock appreciation rights, performance shares and other stock based awards. The option exercise price must be at least equal to the fair value of the Common Stock at the time the option is granted. The Company's Board of Directors determines vesting at the date of grant, which in no event can be less than six months from the date of grant. The Incentive Plan provides for the issuance of up to 3,000,000 shares of common stock. As of June 30, 2007, 1,703,833 shares of common stock were available for issuance under the Incentive Plan. The Compensation Committee of the Board of Directors is responsible for administration, participant selection and determination of terms and conditions of the Incentive Plan. Summarized information pertaining to the Incentive Plan follows:

|  | Shares Under Option | Exercise Price | Weighted Average Exercise Price | Weighted Average Fair Value of Options Granted | Exercisable |
|---|---|---|---|---|---|
| Outstanding, December 31, 2006 | 1,388,880 | $1.99 — $26.81 | $ 9.88 | $5.45 | 1,388,880 |
| Forfeited | (112,850) | 3.16 — 13.75 | 10.64 | | |
| Outstanding, June 30, 2007 | 1,276,030 | 1.99 — 26.81 | 9.81 | 5.43 | 1,276,030 |

15

Table of Contents

The following table summarizes certain information pertaining to stock options outstanding under the Incentive Plan:

| Range of Exercisable Options | Number Outstanding At 6/30/07 | Options Outstanding | | Options Exercisable | |
|---|---|---|---|---|---|
| | | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable 6/30/07 | Weighted-Average Exercise Price |
| $1.99 — $7.08 | 581,200 | 6.69 yrs. | $ 3.40 | 581,200 | $ 3.40 |
| 11.33 – 15.56 | 573,340 | 3.70 yrs. | 12.70 | 573,340 | 12.70 |
| 26.81 | 121,490 | 1.81 yrs. | 26.81 | 121,490 | 26.81 |
| | 1,276,030 | 4.88 yrs. | 9.81 | 1,276,030 | 9.81 |

Information on shares of restricted stock into which options granted under this plan have been converted is set forth below under the caption "Restricted Stock".

### Director Option Plan

In February 1996, the Company's Board of Directors approved the Tower Automotive, Inc. Independent Director Stock Option Plan (the "Director Option Plan") that provides for the grant of options to independent directors, as defined in the plan, to acquire up to 200,000 shares of the Company's Common Stock, subject to certain adjustments reflecting changes in the Company's capitalization. As of June 30, 2007, 84,800 shares of common stock were available for issuance under the Director Option Plan. The option exercise price must be at least equal to the fair value of the Common Stock at the time the option is granted. The Company's Board of Directors determines vesting at the date of grant, which in no event can be less than six months from the date of grant. Summarized information pertaining to the Director Plan follows:

| | Shares Under Option | Exercise Price | Weighted Average Exercise Price | Weighted Average Fair Value of Options Granted | Exercisable |
|---|---|---|---|---|---|
| Outstanding, December 31, 2006 | 85,200 | $18.94 — $22.97 | $19.63 | $10.33 | 85,200 |
| Expired | (40,000) | 18.94 | 18.94 | | |
| Outstanding, June 30,2007 | 45,200 | 19.25 — 22.97 | 20.24 | 10.27 | 45,200 |

The following table summarizes certain information pertaining to stock options outstanding under the Director Option Plan follows:

| Range of Exercisable Options | Number Outstanding At 6/30/07 | Options Outstanding | | Options Exercisable | |
|---|---|---|---|---|---|
| | | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable 6/30/07 | Weighted-Average Exercise Price |
| $19.25 — $22.97 | 45,200 | 1.40 yrs. | $ 20.24 | 45,200 | $ 20.24 |

16

Table of Contents

## Note 13. Retirement Plans

The following table provides the components of net periodic pension benefit cost and other post-retirement benefit cost for the three months ended June 30, (in thousands):

|  | Pension Benefits | | Other Benefits | |
|  | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|
| Service cost | $ 29 | $ 1,065 | $ — | $ 32 |
| Interest cost | 3,581 | 3,771 | 1,212 | 2,084 |
| Expected return on plan assets | (3,425) | (3,238) | (134) | — |
| Amortization of prior service cost | 75 | 315 | (627) | — |
| Amortization of net losses | 515 | 764 | 982 | 1,951 |
| Net periodic benefit cost | $ 775 | $ 2,677 | $ 1,433 | $ 4,067 |

The following table provides the components of net periodic pension benefit cost and other post-retirement benefit cost for the six months ended June 30, (in thousands):

|  | Pension Benefits | | Other Benefits | |
|  | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|
| Service cost | $ 58 | $ 2,130 | $ — | $ 64 |
| Interest cost | 7,162 | 7,542 | 2,424 | 4,133 |
| Expected return on plan assets | (6,850) | (6,476) | (268) | — |
| Amortization of prior service cost | 150 | 630 | (1,287) | — |
| Amortization of net losses | 1,030 | 1,528 | 1,964 | 4,098 |
| Net periodic benefit cost | $ 1,550 | $ 5,354 | $ 2,833 | $ 8,295 |

The Company previously disclosed in its Consolidated Financial Statements for the year ended December 31, 2006 that it expects its minimum pension funding requirements to be $10.0 million during 2007. During the three and six months ended June 30, 2007, the Company made contributions of $3.5 million and $3.6 million to its pension plans. The Company presently anticipates contributing an additional $6.4 million to fund its pension plans in 2007 for a total of $10.0 million based upon the Company's most recent estimate. The Company's obligations under these retirement plans may be subject to compromise in the Company's bankruptcy proceedings.

The Company contributed $2.9 million and $5.5 million during the three and six months ended June 30, 2007 to its defined contribution employee savings plans.

In April 2006, the Company submitted for approval to the Bankruptcy Court settlement agreements with two groups representing current and future retirees. Both settlements include modifications of retiree health care benefits for both retired salaried employees as well as current and future retirees of the Company's Milwaukee, WI facility.

In May 2006, the Bankruptcy Court approved the agreements with the official committee representing the Company's salaried retirees (the "Retiree Committee Stipulation") and with the unions representing retirees at the Company's Milwaukee, WI facility (the "Milwaukee Stipulation"). Pursuant to the Retiree Committee Stipulation, salaried retirees continued to receive current benefits through June 30, 2006. The salaried retirees established a Voluntary Employee Benefit Association ("VEBA") trust to administer benefits after June 30, 2006. The Company will also provide certain cash and equity consideration to the VEBA upon emergence from bankruptcy. Such consideration will total approximately $5 million. The Company will also provide certain supplemental cash payments to the VEBA, until such time as the Company emerges from bankruptcy.

Under the Milwaukee Stipulation, the Company continued current benefit payments through June 30, 2006 for hourly retirees. A separate VEBA was established and began administering benefits for retirees and their dependents beginning July 1, 2006. The Company contributed cash of approximately $2.5 million on June 30, 2006. The Company will also contribute additional amounts until emergence from bankruptcy. In addition, the Company may make additional cash contributions to the VEBA if the reorganized

17

Table of Contents

Company meets certain financial targets. In addition, the Company will make payments totaling approximately $3.5 million in settlement of all other outstanding matters with the impacted employees.

The Official Committee of Unsecured Creditors in the Company Chapter 11 cases has appealed the Bankruptcy Court's approval of the Retiree Committee Stipulation and the Milwaukee Stipulation (the "1114 Appeal"). The appeal is currently pending in the United States Court of Appeals for the Second Circuit.

In August 2006, the Company submitted for approval to the Bankruptcy Court settlement agreements (the "UAW/IUE-CWA Stipulation") with two groups representing current retirees at certain closed plants (the "Closed Plant Retirees") which were represented by the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") and with retirees from the Company's Greenville, MI facility (the "Greenville Retirees"), which were represented by the IUE, the Industrial Division of the Communication Workers of America, AFL-CIO (the "IUE-CWA").

In August 2006, the Bankruptcy Court approved the UAW/IUE-CWA Stipulation. Under the UAW/IUE-CWA Stipulation, the Company continued current benefit payments for the Greenville Retirees through August 31, 2006 and for the Closed Plant Retirees through September 30, 2006. A VEBA was established and began administering benefits for Greenville Retirees and their dependents beginning September 1, 2006. The Company contributed a cash payment of approximately $0.5 million to the VEBA on September 1, 2006. The Company made a cash payment to a trust for the benefit of the Closed Plant Retirees on October 1, 2006.

The Official Committee of Unsecured Creditors in the Company's Chapter 11 cases has appealed the Bankruptcy Court's approval of the UAW/IUE-CWA Stipulation, which appeal is pending and has been consolidated with the 1114 Appeal.

For accounting purposes, the Company has concluded that the postretirement medical benefits to be paid by the VEBAs and the Company's related contribution obligations should be treated as defined benefit postretirement plans. As such, while the Company's only obligation to the VEBAs is to contribute additional amounts, which are predetermined, the Company must account for net periodic postretirement benefit costs in accordance with SFAS No. 106, *"Employers' Accounting for Postretirement Benefits other than Pensions,"*
and record any difference between the assets of each VEBA and its accumulated postretirement obligation ("APBO") in the Company's financial statements. As of September 30, 2006, the Milwaukee Union and Non-Union VEBAs were included in the APBO. The Greenville Union VEBA was included during the fourth quarter of 2006.

18

Table of Contents

## Note 14. Segment Information

The Company produces a broad range of assemblies and modules for vehicle body structures and suspension systems for the global automotive industry. The Company's operations have similar characteristics including the nature of products, production processes and customers. The Company's products include body structures and assemblies, lower vehicle frames and structures, chassis modules and systems and suspension components. Management reviews the operating results of the Company and makes decisions based upon two operating segments: North America and International. The following is a summary of selected data for each of our segments, excluding discontinued operations, expect for total assets (in thousands):

| | North America | International | Total |
|---|---|---|---|
| **Three months ended June 30, 2007:** | | | |
| Revenues | $ 279,575 | $ 383,778 | $ 663,353 |
| Restructuring and asset impairment charges | 16,882 | 1,442 | 18,324 |
| Operating income (loss) | (3,084) | 27,318 | 24,234 |
| Total assets | $ 906,317 | $1,228,912 | $2,135,229 |
| **Three months ended June, 2006:** | | | |
| Revenues | $ 326,390 | $ 351,083 | $ 677,473 |
| Restructuring and asset impairment charges | 25,213 | 3,129 | 28,342 |
| Operating income (loss) | (22,520) | 17,681 | (4,839) |
| Total assets | $1,129,299 | $1,172,412 | $2,301,711 |
| **Six months ended June 30, 2007:** | | | |
| Revenues | $ 542,670 | $ 739,134 | $1,281,804 |
| Restructuring and asset impairment charges | 22,542 | 1,609 | 24,151 |
| Operating income (loss) | (21,235) | 41,463 | 20,228 |
| Total assets | $ 906,317 | $1,228,912 | $2,135,229 |
| **Six months ended June 30, 2006:** | | | |
| Revenues | $ 668,815 | $ 679,416 | $1,348,231 |
| Restructuring and asset impairment charges | 27,624 | 3,240 | 30,864 |
| Operating income (loss) | (32,271) | 40,286 | 8,015 |
| Total assets | $1,129,299 | $1,172,412 | $2,301,711 |

Inter-segment revenues are not significant for any period presented.

## Note 15. Commitments and Contingencies

### Key Employee Retention Plan Agreements

On March 30, 2005, the Bankruptcy Court entered an order approving the execution and implementation of a Key Employee Retention Program ("KERP") by the Company and the assumption of certain executive contracts. Under the order, three separate retention funds were made available, including specific retention incentives for approximately 100 Key Employees ("the Core KERP Agreements"). Under the Core KERP Agreements, the Company agreed to pay the applicable employee a retention incentive. The total amount of the retention incentive (which varies by employee from 40% to 110% of base salary) is payable in four installments of 25% each, conditioned upon the employee's continued employment by the Company through each of the scheduled payment dates. The four scheduled payment dates are (1) May 2, 2005; (2) November 2, 2005; (3) the effective date of emergence in the Company's Chapter 11 proceedings; and (4) six months after the effective date of emergence in the Company's Chapter 11 proceedings. In addition, a transition incentive pool was established for Key Employees whose roles are being phased out, but whose employment during such phase out remains critical and a discretionary fund was made available to address unanticipated retention needs. The cost of the Key Employee Retention program and the assumption of certain executive contracts is approximately $13.2 million. The Company did not recognize any expense during the three and six months ended June 30, 2007 in relation to this plan.

Pursuant to each KERP Agreement, if the employee's employment by the Company is voluntarily terminated by the employee (other than upon retirement) or is terminated by the Company for cause (as defined in the KERP Agreement) prior to a scheduled payment date, the employee forfeits all unpaid amounts of the retention incentive. If an employee's employment by the Company is terminated

19

Table of Contents

by the Company other than for cause or is terminated as a result of retirement, disability or death, the Company is obligated to pay the employee (or his or her estate) a prorated portion of the unpaid amount of the retention incentive, based upon the date of termination of employment.

## Environmental Matters

The Company owns properties which have been impacted by environmental releases. The Company is liable for costs associated with investigation and/or remediation of contamination in one or more environmental media at some of these properties. The Company is actively involved in investigation and/or remediation at several of these locations. At certain of these locations, costs incurred for environmental investigation/remediation are being paid partly or completely out of funds placed into escrow by previous property owners. Nonetheless, total costs associated with remediation of environmental contamination at these properties could be substantial and may have an adverse impact on the Company's financial condition, results of operations or cash flows.

Accruals for environmental matters are recorded when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. The established liability for environmental matters is based upon management's best estimates of expected investigation/remediation costs related to environmental contamination. It is possible that actual costs associated with these matters will exceed the environmental reserves established by the Company. Inherent uncertainties exist in the estimates, primarily due to unknown conditions, changing governmental regulations and legal standards regarding liability and evolving technologies for handling site remediation and restoration. As of June 30, 2007 and December 31, 2006, the Company had accrued approximately $5.3 million and $10.2 million, respectively, for environmental remediation.

## Litigation

The Company is subject to various legal actions and claims incidental to its business. Litigation is subject to many uncertainties and the outcome of individual litigated matters is not predictable with assurance. After discussions with counsel, it is the opinion of management that the outcome of such matters will not have a material adverse impact on the Company's financial position, results of operations or cash flows.

On February 2, 2005, the Debtors filed a voluntary petition for relief under the Bankruptcy Code. The cases of each of the Debtors were consolidated for the purpose of joint administration (see Note 2). As a result of the commencement of the Chapter 11 proceedings by the Debtors, an automatic stay has been imposed against the commencement or continuation of legal proceedings, pertaining to claims existing as of February 2, 2005, against the Debtors outside of the Bankruptcy Court. Claimants against the Debtors may assert their claims in the Chapter 11 proceedings by filing a proof of claim, to which the Debtors may object and seek a determination from the Bankruptcy Court as to the allowability of the claim. Claimants who desire to liquidate their claims in legal proceedings outside of the Bankruptcy Court will be required to obtain relief from the automatic stay by order of the Bankruptcy Court. If such relief is granted, the automatic stay will remain in effect with respect to the collection of liquidated claim amounts. Generally, all claims against the Debtors that seek a recovery from assets of the Debtors' estates will be addressed in the Chapter 11 proceedings and paid only pursuant to the terms of a confirmed plan of reorganization. The Company filed its plan of reorganization on May 1, 2007.

Following the above-referenced February 2, 2005 filing, certain claims were filed against certain current and former officers and directors of the Company, alleging various (1) violations of the federal securities laws (the "Securities Litigation"), and (2) breaches of fiduciary duties to participants in and beneficiaries of the Company's various 401(k) retirement plans in connection with the availability of the common stock of Tower Automotive, Inc. as an investment option under the plans (the "ERISA Litigation"). Defendants have moved to dismiss the claims in each of the cases, and those motions remain pending in the federal court in New York. The Company and the parties to the ERISA Litigation have reached an agreement to settle the ERISA Litigation, which motion remains subject to final district court approval.

On November 29, 2005, the Company's joint venture partner in Metalsa, Grupo, S.A. de C.V. ("Proeza") filed a lawsuit in Mexico against Tower Mexico, Metalsa, and certain of Tower Mexico's directors. Proeza's lawsuit alleges certain breaches of Tower Mexico's obligations under the governing documents of the joint venture and asserts certain rights in connection with the alleged change in control of Tower Mexico. As a result of these allegations, Proeza sought either the rescission of the joint venture relationship or the redemption of Tower Mexico's investment in Metalsa. The Company believes that Proeza's claims and assertions are without merit and has been vigorously defending this matter, including the venue of the litigation.

20

c10vq                                                    http://www.sec.gov/Archives/edgar/data/925548/000095012407005591...

Table of Contents

The Nuevo León Supreme Court ruled upholding the jurisdiction of the Monterrey state court (Third Civil Court). Tower Mexico filed a constitutional appeal in federal court relating to the jurisdiction ruling. The federal court (Fourth District Court) ruled also upholding the jurisdiction of the Monterrey court.

On December 21, 2006, the Monterrey state court ruled as to the substance of the case and ruled in favor of Proeza but did not rule that Proeza has the right to rescind the joint venture relationship but did rule that Proeza has the right to redeem Tower Mexico's investment in Metalsa. Tower Mexico appealed the ruling of the Monterrey state court to the Nuevo León appellate court. On September 13, 2007, the Nuevo León appellate court (Seventh Court of Appeals) ruled confirming almost all aspects of the ruling of the Monterrey state court. Tower Mexico is filing its federal constitutional appeal against the ruling of the Monterrey state court.

In addition, the Company has also filed with the International Chamber of Commerce a request for arbitration of the disputes raised in the Mexico lawsuits. That arbitration proceeding is pending.

**Note 16. Subsequent Events**

On July 31, 2007 (the "Effective Date"), the Registrant's Plan of Reorganization (the "POR") became effective and, in connection therewith, the Registrant completed the sale of substantially all of its assets to Tower Automotive, LLC, an affiliate of Cerberus Capital Management, L.P. The sale concludes the Company's restructuring process and finalizes its emergence from Chapter 11. The aggregate consideration paid by the purchaser in connection with the asset sale was approximately $1.0 billion, which was used to fund the POR. In particular, the POR provides for the repayment in full of all of the allowed secured claims of the Debtors, including obligations under the Debtor-in-Possession credit facility and second lien loan facility, as well as payment in full of allowed administrative and priority claims; the assumption of the Debtors' pension plan by the purchaser; and partial recovery for holders of certain allowed unsecured claims. Upon effectiveness of the POR, all of the remaining assets (other than certain causes of action brought under Chapter 5 of the Bankruptcy Code which, pursuant to the POR, were transferred to the Unsecured Creditors Trust) of the Debtors, including the Registrant were transferred to a Post-Consummation Trust. As a result of the foregoing, the Debtors collectively have no assets and have ceased all operations.

On the Effective Date, all of the outstanding common stock, par value $0.01 per share (the "Common Stock"), of the Registrant was cancelled for no consideration pursuant to the POR. In addition, all of the Tower Automotive Capital Trust's 6-3/4% Convertible Trust Preferred Securities (liquidation preference of $50 per share) and the related guarantee by the Registrant were each cancelled for no consideration pursuant to and upon effectiveness of the POR. All of the outstanding securities issued by the Debtors were also canceled pursuant to the POR, including the 5.75% Convertible Senior Debentures due 2024 issued by the Registrant and the 12% Senior Notes due 2013 and 9.25% Senior Notes due 2010 issued by R.J. Tower Corporation, a direct wholly owned subsidiary of the Registrant.

On the Effective Date, the Registrant is now controlled by the Post-Consummation Trust Administrator pursuant to the terms of the POR. Jeffery J. Stegenga, a Managing Director of Alvarez & Marsal North America, LLC, was appointed as Post-Consummation Trust Administrator pursuant to the terms of the POR.

As of the Effective Date, control of the Registrant was vested in the Post-Consummation Trust pursuant to the terms of the POR. Accordingly, all of the existing directors and executive officers of the Registrant were deemed to have effectively resigned as of the Effective Date.

On the Effective Date, the certificate of incorporation of the Registrant was amended pursuant to the POR to change the corporate name of the Registrant to TA Delaware, Inc.

Furthermore, as part of the bankruptcy process, the Company may undertake additional actions in the future to rationalize and consolidate its operations.

21

Table of Contents

### Note 17. Consolidating Guarantor and Non-Guarantor Financial Information

The following consolidating financial information presents balance sheets, statements of operations and cash flow information related to the Company's business. Certain foreign subsidiaries of R.J. Tower Corporation are subject to restrictions on their ability to pay dividends or otherwise distribute cash to R. J. Tower Corporation because they are subject to financing arrangements that restrict them from paying dividends. Each Guarantor, as defined, is a direct or indirect 100% owned subsidiary of the Company and has fully and unconditionally guaranteed the 9.25% senior unsecured Euro notes issued by R. J. Tower Corporation in 2000, the 12% senior unsecured notes issued by R. J. Tower Corporation in 2003 and the DIP financing entered into by R. J. Tower Corporation in February 2005. Tower Automotive, Inc. (the parent company) has also fully and unconditionally guaranteed the notes and the DIP financing and is reflected as the Parent Guarantor in the consolidating financial information. The Non-Guarantor Restricted Companies are the Company's foreign subsidiaries except for Seojin Industrial Company Limited, which is reflected as the Non-Guarantor Unrestricted Company in the consolidating financial information. As a result of the Chapter 11 filing by the Debtors, the above-mentioned notes are subject to compromise pursuant to the bankruptcy proceedings. Separate financial statements and other disclosures concerning the Guarantors have not been presented because management believes that such information is not material to investors.

22

c10vq

**Table of Contents**

**TA DELAWARE, INC.**
**Consolidating Balance Sheet at June 30, 2007**
**(Amounts in thousands)**

| | R.J. Tower Corporation | Parent Guarantor | Guarantor Companies | Non-Guarantor Restricted Companies | Non-Guarantor Unrestricted Companies | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ 1,778 | $ ... | $ ... | $ 85,257 | $ 200 | $ ... | $ 87,235 |
| Accounts receivable | 2,352 | 4,276 | 119,070 | 259,067 | 21,571 | — | 406,336 |
| Inventories | — | | 39,850 | 58,856 | 11,959 | | 110,665 |
| Prepaid tooling and other | 2,273 | — | 11,324 | 55,679 | 24,578 | — | 93,854 |
| Total current assets | 6,403 | 4,276 | 170,244 | 458,859 | 58,308 | | 698,090 |
| Property, plant and equipment, net | 561 | | 445,130 | 314,508 | 155,038 | — | 915,237 |
| Investments in and advances to (from) affiliates | 507,019 | (332,630) | (832,608) | 19,991 | (23,440) | 923,835 | 262,167 |
| Goodwill | — | — | | 173,902 | — | | 173,902 |
| Other assets, net | 3,112 | | 13,196 | 54,032 | 15,493 | — | 85,833 |
| | $ 517,095 | $(328,354) | $(204,038) | $ 1,021,292 | $ 205,399 | $ 923,835 | $2,135,229 |
| **Liabilities and Stockholders' Investment (Deficit)** | | | | | | | |
| Current liabilities not subject to compromise: | | | | | | | |
| Current maturities of long-term debt and capital lease obligations | $ — | $ ... | $ ... | $ 16,470 | $ 69,953 | $ — | $ 86,423 |
| Current portion debtor-in-possession borrowings | 651,000 | — | | — | — | — | 651,000 |
| Accounts payable | 17,416 | — | 98,818 | 196,398 | 55,389 | — | 368,021 |
| Accrued liabilities | 29,085 | | 65,484 | 73,316 | 6,568 | — | 174,453 |
| Total current liabilities | 697,501 | — | 164,302 | 286,184 | 131,910 | — | 1,279,897 |
| Liabilities subject to compromise | 628,168 | 391,588 | 279,255 | ... | — | (16,363) | 1,282,648 |
| Non-current liabilities not subject to compromise: | | | | | | | |
| Long-term debt, net of current maturities | 40,986 | — | 43,765 | 3,346 | 44,207 | — | 132,304 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Obligations under capital leases, net of current maturities | — | — | | 28,733 | | — | 28,733 |
| Other non-current liabilities | 3,703 | — | 33,345 | 82,559 | 11,982 | | 131,589 |
| Total non-current liabilities | 44,689 | — | 77,110 | 114,638 | 56,189 | — | 292,626 |
| Stockholders' investment (deficit) | (853,263) | (719,942) | (724,705) | 620,470 | 17,300 | 940,198 | (719,942) |
| | $ 517,095 | $(328,354) | $(204,038) | $ 1,021,292 | $ 205,399 | $ 923,835 | $2,135,229 |

23

http://www.sec.gov/Archives/edgar/data/925548/000095012407005591...

Table of Contents

**TA DELAWARE, INC.**
**Consolidating Statement of Operations for the Three Months Ended June 30, 2007**
**(Amounts in thousands)**

| | R.J. Tower Corporation | Parent Guarantor | Guarantor Companies | Non-Guarantor Restricted Companies | Non-Guarantor Unrestricted Companies | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| Revenues | $ — | $ — | $279,619 | $ 304,197 | $ 79,537 | $ — | $ 663,353 |
| Cost of sales | 173 | — | 250,607 | 262,965 | 73,783 | — | 587,528 |
| Gross profit | (173) | — | 29,012 | 41,232 | 5,754 | — | 75,825 |
| Selling, general and administrative expenses | (5,198) | — | 20,650 | 14,585 | 3,230 | — | 33,267 |
| Restructuring and asset impairment charges, net | 2,440 | (7,226) | 27,196 | (4,086) | — | — | 18,324 |
| Other operating expense/(income) | (4,582) | — | 5,719 | (62) | (1,075) | — | — |
| Operating income (loss) | 7,167 | 7,226 | (24,553) | 30,795 | 3,599 | — | 24,234 |
| Interest expense | 26,299 | — | 866 | 899 | 2,192 | — | 30,256 |
| Interest income | (354) | — | — | (635) | (110) | — | (1,099) |
| Intercompany interest expense/(income) | (8,245) | — | — | 8,480 | (235) | — | — |
| Chapter 11 and related reorganization items | 11,804 | — | — | — | — | — | 11,804 |
| Income (loss) before provision for income taxes, equity in earnings (losses) of joint ventures, and minority interest | (22,337) | 7,226 | (25,419) | 22,051 | 1,752 | — | (16,727) |
| Provision (benefit) for income taxes | 923 | 181 | — | 6,680 | 481 | — | 8,265 |
| Income (loss) before equity in earnings (losses) of joint ventures and | (23,260) | 7,045 | (25,419) | 15,371 | 1,271 | — | (24,992) |

3/4/2008 5:15 PM

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| subsidiaries and minority interest | | | | | | | | | | | | | |
| Equity (losses) earnings in joint ventures and subsidiaries, net | | (5,865) | | (29,125) | | — | | 5,538 | | — | | 34,923 | 5,471 |
| Minority interest, net of tax | | — | | — | | — | | (2,559) | | — | | | (2,559) |
| Net income (loss) | $ | (29,125) | $ | (22,080) | $ | (25,419) | $ | 18,350 | $ | 1,271 | $ | 34,923 | $ (22,080) |

24

e10vq

**Table of Contents**

**TA DELAWARE, INC.**
**Consolidating Statement of Operations for the Six Months Ended June 30, 2007**
**(Amounts in thousands)**

|  | R.J. Tower Corporation | Parent Guarantor | Guarantor Companies | Non-Guarantor Restricted Companies | Non-Guarantor Unrestricted Companies | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| Revenues | $   — | $ | $542,595 | $   589,256 | $   149,953 | $   — | $1,281,804 |
| Cost of sales | (366) | --- | 511,824 | 518,301 | 142,440 | — | 1,172,199 |
| Gross profit | 366 | — | 30,771 | 70,955 | 7,513 | --- | 109,605 |
| Selling, general and administrative expenses | (12,211) | --- | 42,289 | 28,932 | 6,216 | — | 65,226 |
| Restructuring and asset impairment charges, net | 2,916 | (9,666) | 34,277 | (3,376) | — | — | 24,151 |
| Other operating expense/(income) | (8,187) | — | 10,474 | 517 | (2,804) | — | — |
| Operating income (loss) | 17,848 | 9,666 | (56,269) | 44,882 | 4,101 | — | 20,228 |
| Interest expense | 51,448 | — | 1,665 | 1,373 | 4,284 | — | 58,770 |
| Interest income | (791) | — | — | (563) | (203) | --- | (1,557) |
| Intercompany interest expense/(income) | (16,271) | — | — | 16,848 | (577) | — | |
| Chapter 11 and related reorganization items | 20,779 | — | .... | — | — | — | 20,779 |
| Income (loss) before provision for income taxes, equity in earnings (losses) of joint ventures, and minority interest | (37,317) | 9,666 | (57,934) | 27,224 | 597 | — | (57,764) |
| Provision (benefit) for income taxes | 304 | 181 | — | 11,004 | 164 | — | 11,653 |
| Income (loss) before equity in earnings (losses) of joint ventures and subsidiaries and | (37,621) | 9,485 | (57,934) | 16,220 | 433 | --- | (69,417) |

minority interest

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Equity (losses) earnings in joint ventures and subsidiaries, net | (37,338) | (74,959) | — | 9,115 | - | 112,179 | 8,997 |
| Minority interest, net of tax | — | | — | (4,748) | — | — | (4,748) |
| Income (loss) from continuing operations | (74,959) | (65,474) | (57,934) | 20,587 | 433 | 112,179 | (65,168) |
| Loss from discontinued operations | — | | (306) | — | . | — | (306) |
| Net income (loss) | $ (74,959) | $(65,474) | $(58,240) | $ 20,587 | $ 433 | $ 112,179 | $ (65,474) |

25

e10vq

Table of Contents

**TA DELAWARE, INC.**
**Consolidating Statement of Cash Flows for the Six Months Ended June 30, 2007**
**(Amounts in thousands — unaudited)**

| | R. J. Tower Corporation | Parent Guarantor | Guarantor Companies | Non-Guarantor Restricted Companies | Non-Guarantor Unrestricted Companies | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| OPERATING ACTIVITIES: | | | | | | | |
| Net income (loss) | $ (74,959) | $(65,474) | $(58,240) | $ 20,587 | $ 433 | $ 112,179 | $ (65,474) |
| Adjustments required to reconcile net income (loss) to net cash provided by (used in) operating activities Non-cash chapter 11 and related reorganization items, net | 5,782 | — | — | | | | 5,782 |
| Non-cash restructuring and impairment, net | — | — | 23,979 | (628) | — | — | 23,351 |
| Depreciation | (180) | — | 42,840 | 24,394 | 10,903 | — | 77,957 |
| Deferred income tax provision (benefit) | 1,729 | — | — | 4,650 | 146 | — | 6,525 |
| Equity in earnings (losses) of joint ventures and subsidiaries, net | 37,338 | 74,959 | — | (9,115) | — | (112,179) | (8,997) |
| Non-cash minority interest | — | — | — | 3,082 | — | — | 3,082 |
| Changes in working capital and other operating items | (29,623) | (9,485) | 11,544 | (5,688) | 6,603 | — | (26,649) |
| Net cash provided by (used in) operating activities | (59,913) | — | 20,123 | 37,282 | 18,085 | — | 15,577 |

http://www.sec.gov/Archives/edgar/data/925548/000095012407005591...

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **INVESTING ACTIVITIES:** | | | | | | | |
| Cash disbursed for purchases of property, plant and equipment | — | — | (20,137) | (13,587) | (13,942) | — | (47,666) |
| Cash proceeds from asset disposal | — | — | — | — | — | — | — |
| Net cash used in investing activities | — | — | (20,137) | (13,587) | (13,942) | — | (47,666) |
| **FINANCING ACTIVITIES:** | | | | | | | |
| Proceeds from borrowings | — | | | 8,799 | 8,878 | — | 17,677 |
| Repayments of borrowings | — | — | | (5,657) | (12,971) | — | (18,628) |
| Proceeds from DIP credit facility | 423,000 | — | | | — | | 423,000 |
| Repayments of DIP credit facility borrowings | (367,000) | — | — | — | — | — | (367,000) |
| Net cash provided by (used in) financing activities | 56,000 | — | — | 3,142 | (4,093) | — | 55,049 |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | (3,913) | — | (14) | 26,837 | 50 | — | 22,960 |
| **CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD** | 5,691 | — | 14 | 58,420 | 150 | — | 64,275 |
| **CASH AND CASH EQUIVALENTS, END OF PERIOD** | $ 1,778 | $ — | $ — | $ 85,257 | $ 200 | $ — | $ 87,235 |

26

Table of Contents

**TA DELAWARE, INC.**
**Consolidating Balance Sheet at December 31, 2006**
**(Amounts in thousands)**

| | R.J. Tower Corporation | Parent Guarantor | Guarantor Companies | Non-Guarantor Restricted Companies | Non-Guarantor Unrestricted Companies | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ 5,691 | $ — | $ 14 | $ 58,420 | $ 150 | $ — | $ 64,275 |
| Accounts receivable | 2,072 | 2,812 | 76,829 | 234,137 | 23,800 | — | 339,650 |
| Inventories | — | — | 43,438 | 53,810 | 9,938 | — | 107,186 |
| Prepaid tooling and other | 2,929 | — | 20,479 | 43,069 | 27,541 | — | 94,018 |
| Assets of discontinued operations | — | — | 24,738 | — | — | — | 24,738 |
| Total current assets | 10,692 | 2,812 | 165,498 | 389,436 | 61,429 | — | 629,867 |
| Property, plant and equipment, net | 381 | — | 474,516 | 317,585 | 160,460 | — | 952,942 |
| Investments in and advances to (from) affiliates | 493,126 | (273,896) | (808,881) | 20,898 | (5,028) | 826,951 | 253,170 |
| Goodwill | — | — | — | 169,617 | — | — | 169,617 |
| Other assets, net | 9,357 | — | 23,003 | 53,654 | 15,384 | — | 101,398 |
| | $ 513,556 | $(271,084) | $(145,864) | $ 951,190 | $ 232,245 | $ 826,951 | $2,106,994 |
| **Liabilities and Stockholders' Investment (Deficit)** | | | | | | | |
| Current liabilities not subject to compromise: | | | | | | | |
| Current maturities of long-term debt and capital lease obligations | $ — | $ — | $ 4 | $ 10,261 | $ 72,584 | $ — | $ 82,849 |
| Current portion debtor-in-possession borrowings | 595,000 | — | — | — | — | — | 595,000 |
| Accounts payable | 11,670 | — | 90,134 | 182,203 | 61,289 | — | 345,296 |
| Accrued liabilities | 32,647 | — | 59,675 | 67,768 | 6,664 | — | 166,754 |
| Liabilities of discontinued operations | — | — | 20,503 | — | — | — | 20,503 |
| Total current liabilities | 639,317 | — | 170,316 | 260,232 | 140,537 | — | 1,210,402 |
| Liabilities subject to compromise | 624,238 | 391,588 | 285,319 | — | — | (16,363) | 1,284,782 |
| Non-current liabilities not subject to compromise: | | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Long-term debt, net of current maturities | 40,986 | — | 43,765 | 4,023 | 44,836 | — | 133,610 |
| Obligations under capital leases, net of current maturities | — | — | — | 29,852 | — | —– | 29,852 |
| Other non-current liabilities | 559 | — | 21,217 | 78,138 | 11,106 | — | 111,020 |
| Total non-current liabilities | 41,545 | — | 64,982 | 112,013 | 55,942 | — | 274,482 |
| Stockholders' investment (deficit) | (791,544) | (662,672) | (666,481) | 578,945 | 35,766 | 843,314 | (662,672) |
| | $ 513,556 | $(271,084) | $(145,864) | $ 951,190 | $ 232,245 | $ 826,951 | $2,106,994 |

c10vq

http://www.sec.gov/Archives/edgar/data/925548/000095012407005591...

Table of Contents

**TA DELAWARE, INC.**
**Consolidating Statement of Operations for the Three Months Ended June 30, 2006**
**(Amounts in thousands)**

| | R.J. Tower Corporation | Parent Guarantor | Guarantor Companies | Non-Guarantor Restricted Companies | Non-Guarantor Unrestricted Companies | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| Revenues | $ — | $ — | $318,958 | $ 269,277 | $ 89,238 | $ — | $ 677,473 |
| Cost of sales | (2,081) | | 299,666 | 233,860 | 89,481 | — | 620,926 |
| Gross profit | 2,081 | | 19,292 | 35,417 | (243) | — | 56,547 |
| Selling, general and administrative expenses | (11,349) | | 29,578 | 12,109 | 2,706 | — | 33,044 |
| Restructuring and asset impairment charges, net | (65) | (4,416) | 12,334 | 20,489 | — | — | 28,342 |
| Other operating expense/(income) | (8,891) | — | 8,081 | 810 | | — | — |
| Operating income (loss) | 22,386 | 4,416 | (30,701) | 2,009 | (2,949) | — | (4,839) |
| Interest expense | 19,093 | | 600 | 712 | 1,935 | — | 22,340 |
| Interest income | (640) | — | 2 | 32 | (150) | — | (756) |
| Intercompany interest expense/(income) | (6,436) | | — | 6,778 | (342) | | |
| Chapter 11 and related reorganization items | 13,437 | — | 30,225 | | — | | 43,662 |
| Income (loss) before provision for income taxes, equity in earnings of joint ventures, and minority interest | (3,068) | 4,416 | (61,528) | (5,513) | (4,392) | | (70,085) |
| Provision (benefit) for income taxes | 763 | 78 | 325 | 11,928 | (1,209) | — | 11,885 |
| Income (loss) before equity in earnings (losses) of joint ventures and subsidiaries and minority | (3,831) | 4,338 | (61,853) | (17,441) | (3,183) | — | (81,970) |

interest

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Equity (losses) earnings (losses) in joint ventures and subsidiaries, net | (75,892) | (79,723) | — | 7,465 | — | 155,683 | 7,533 |
| Minority interest, net of tax | — | .. | | (2,206) | — | — | (2,206) |
| Income (loss) from continuing operations | (79,723) | (75,385) | (61,853) | (12,182) | (3,183) | 155,683 | (76,643) |
| Income from discontinued operations | — | . | 1,258 | — | — | — | 1,258 |
| Net income (loss) | $ (79,723) | $(75,385) | $(60,595) | $ (12,182) | $ (3,183) | $ 155,683 | $ (75,385) |

28

Table of Contents

**TA DELAWARE, INC.**
**Consolidating Statement of Operations for the Six Months Ended June 30, 2006**
**(Amounts in thousands)**

| | R.J. Tower Corporation | Parent Guarantor | Guarantor Companies | Non-Guarantor Restricted Companies | Non-Guarantor Unrestricted Companies | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| Revenues | $ — | $ — | $651,646 | $ 515,291 | $ 181,294 | $ — | $1,348,231 |
| Cost of sales | (4,180) | — | 619,956 | 449,384 | 177,631 | — | 1,242,791 |
| Gross profit | 4,180 | — | 31,690 | 65,907 | 3,663 | — | 105,440 |
| Selling, general and administrative expenses | (21,225) | — | 60,712 | 22,325 | 5,269 | — | 67,081 |
| Restructuring and asset impairment charges, net | (60) | (8,558) | 18,882 | 20,792 | (192) | — | 30,864 |
| Other operating expense/(income) | (16,839) | — | 14,724 | 1,595 | — | — | (520) |
| Operating income (loss) | 42,304 | 8,558 | (62,628) | 21,195 | (1,414) | — | 8,015 |
| Interest expense | 36,258 | — | 1,131 | 1,455 | 3,978 | — | 42,822 |
| Interest income | (958) | . . . | (1) | 79 | (332) | — | (1,212) |
| Intercompany interest expense/(income) | (12,530) | — | . . . | 13,205 | (675) | — | |
| Chapter 11 and related reorganization items | 24,978 | 68 | 30,225 | — | — | — | 55,271 |
| Income (loss) before provision for income taxes, equity in earnings (losses) of joint ventures, and minority interest | (5,444) | 8,490 | (93,983) | 6,456 | (4,385) | | (88,866) |
| Provision (benefit) for income taxes | 1,509 | 140 | 455 | 8,832 | (1,206) | — | 9,730 |
| Income (loss) before equity in earnings (losses) of joint ventures and subsidiaries and | (6,953) | 8,350 | (94,438) | (2,376) | (3,179) | — | (98,596) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| minority interest | | | | | | | |
| Equity earnings (losses) in joint ventures and subsidiaries, net | (87,119) | (94,072) | — | 14,081 | — | 181,327 | 14,217 |
| Minority interest, net of tax | | — | - | (3,172) | — | — | (3,172) |
| Income (loss) from continuing operations | (94,072) | (85,722) | (94,438) | 8,533 | (3,179) | 181,327 | (87,551) |
| Income from discontinued operations | — | — | 1,829 | — | - | — | 1,829 |
| Net income (loss) | $ (94,072) | $(85,722) | $(92,609) | $ 8,533 | $ (3,179) | $ 181,327 | $ (85,722) |

29

**TA DELAWARE, INC.**
**Consolidating Statement of Cash Flows for the Six Months Ended June 30, 2006**
**(Amounts in thousands — unaudited)**

|  | R. J. Tower Corporation | Parent Guarantor | Guarantor Companies | Non-Guarantor Restricted Companies | Non-Guarantor Unrestricted Companies | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|
| OPERATING ACTIVITIES: |  |  |  |  |  |  |  |
| Net income (loss) | $ (94,072) | $(85,722) | $ (92,609) | $ 8,533 | $ (3,179) | $ 181,327 | $ (85,722) |
| Adjustments required to reconcile net income (loss) to net cash provided by (used in) operating activities |  |  |  |  |  |  |  |
| Non-cash chapter 11 and related reorganization items, net | 8,389 | 68 | 30,225 | --- | — | --- | 38,682 |
| Non-cash restructuring and impairment, net | — | --- | 10,986 | 15,327 | — | — | 26,313 |
| Depreciation | 166 | — | 46,297 | 22,216 | 12,726 | ... | 81,405 |
| Deferred income tax provision (benefit) | — | --- | (2) | (11,605) | 4,159 | — | (7,448) |
| Equity in earnings (losses) of joint ventures and subsidiaries, net | 87,119 | 94,072 | ---- | (14,081) | .. | (181,327) | (14,217) |
| Non-cash minority interest | — | — |  | 81 | . | --- | 81 |
| Changes in working capital and other operating items | (26,442) | (8,418) | 29,933 | (663) | (4,485) | — | (10,075) |
| Net cash provided by (used in) operating activities | (24,840) | — | 24,830 | 19,808 | 9,221 | .... | 29,019 |

e10vq

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| **INVESTING ACTIVITIES:** |  |  |  |  |  |  |  |
| Cash disbursed for purchases of property, plant and equipment | (10) | — | (24,953) | (21,231) | (14,165) |  | (60,359) |
| Cash proceeds from asset disposal | — | - | — | .. | 32,664 | — | 32,664 |
| Net cash provided by (used in) investing activities | (10) | — | (24,953) | (21,231) | 18,499 | — | (27,695) |
| **FINANCING ACTIVITIES:** |  |  |  |  |  |  |  |
| Proceeds from borrowings | — | — | ... | 11,295 | 9,599 |  | 20,894 |
| Repayments of borrowings | — | ... | (6) | (6,547) | (37,333) | — | (43,886) |
| Proceeds from DIP credit facility | 345,500 | — | — | — | — | ... | 345,500 |
| Repayments of DIP credit facility borrowings | (269,500) | — | — | ---- | — | ... | (269,500) |
| Net cash provided by (used in) financing activities | 76,000 | ... | (6) | 4,748 | (27,734) | ... | 53,008 |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | 51,150 | — | (129) | 3,325 | (14) |  | 54,332 |
| **CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD** | 702 |  | 156 | 64,790 | 143 | --- | 65,791 |
| **CASH AND CASH EQUIVALENTS, END OF PERIOD** | $ 51,852 | $ ... | $ 27 | $ 68,115 | $ 129 | $ — | $ 120,123 |

30

Table of Contents

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

### Overview

Tower Automotive, Inc. and its subsidiaries ("the Company" or the "Registrant") is a global designer and producer of vehicle structural components and assemblies used by every major automotive original equipment manufacturer. Products include body structures and assemblies, lower vehicle frames and structures, chassis modules and systems and suspension components. Including both 100% owned subsidiaries and investments in joint ventures, the Company has facilities in the United States, Mexico, Germany, Belgium, Italy, Slovakia, Poland, Spain, Brazil, India, South Korea, Japan and China.

Since February 2, 2005, the Company and 25 of its U.S. subsidiaries (collectively, the "Debtors") are operating pursuant to Chapter 11 under the Bankruptcy Code. The Debtors sought protection as a result of a deterioration in liquidity early in 2005. This deterioration was the result of the following factors, among others:

- Significant capital expenditures and spending on product launch activities;

- High interest costs;

- Declining gross margins;

- Termination of accelerated payment programs by key customers;

- Lower production volumes at the Company's largest customers; and

- Significant raw material price increases (primarily steel).

Continuation of the Company as a going concern was contingent upon, among other things, the Debtors' ability to:

- Restructure the Company's North American operations;

- Comply with the terms and conditions of the DIP financing agreement described in Note 9 to the Condensed Consolidated Financial Statements;

- Obtain confirmation of a plan of reorganization under the Bankruptcy Code;

- Reduce unsustainable debt and simplify the Company's complex and restrictive capital structure through the bankruptcy process; and

- Obtain financing sources to meet the Debtors' future obligations.

Details regarding the Company's plans to restructure its North American operations are included in "Restructuring and Asset Impairments." See Notes 1, 2 and 8 to the accompanying Condensed Consolidated Financial Statements for additional information. These matters raise substantial doubt regarding the Company's ability to continue as a going concern.

On July 31, 2007 (the "Effective Date"), the Registrant's Plan of Reorganization (the "POR") became effective and, in connection therewith, the Registrant completed the sale of substantially all of its assets to Tower Automotive, LLC, an affiliate of Cerberus Capital Management, L.P. The sale concludes the Company's restructuring process and finalizes its emergence from Chapter 11. The aggregate consideration paid by the purchaser in connection with the asset sale was approximately $1.0 billion, which was used to fund the POR. In particular, the POR provides for the repayment in full of all of the allowed secured claims of the Debtors, including obligations under the Debtor-in-Possession credit facility and second lien loan facility, as well as payment in full of allowed administrative and priority claims; the assumption of the Debtors' pension plan by the purchaser; and partial recovery for holders of certain allowed unsecured claims. Upon effectiveness of the POR, all of the remaining assets (other than certain causes of action brought under Chapter 5 of the Bankruptcy Code which, pursuant to the POR, were transferred to the Unsecured Creditors Trust) of the Debtors, including the Registrant were transferred to a Post-Consummation Trust. As a result of the foregoing, the Debtors collectively have no assets and have ceased all operations.

On the Effective Date, all of the outstanding common stock, par value $0.01 per share (the "Common Stock"), of the Registrant was cancelled for no consideration pursuant to the POR. In addition, all of the Tower Automotive Capital Trust's 6-3/4% Convertible Trust Preferred Securities (liquidation preference of $50 per share) and the related guarantee by the Registrant were each cancelled for no consideration pursuant to and upon effectiveness of the POR. All of the outstanding securities issued by the Debtors were also canceled pursuant to the POR, including the 5.75% Convertible Senior Debentures due 2024 issued by the Registrant and the 12% Senior Notes due 2013 and 9.25% Senior Notes due 2010 issued by R.J. Tower Corporation, a direct wholly owned subsidiary of the Registrant.

31

Table of Contents

On the Effective Date, the Registrant is now controlled by the Post-Consummation Trust Administrator pursuant to the terms of the POR. Jeffery J. Stegenga, a Managing Director of Alvarez & Marsal North America, LLC, was appointed as Post-Consummation Trust Administrator pursuant to the terms of the POR.

As of the Effective Date, control of the Registrant was vested in the Post-Consummation Trust pursuant to the terms of the POR. Accordingly, all of the existing directors and executive officers of the Registrant were deemed to have effectively resigned as of the Effective Date.

On the Effective Date, the certificate of incorporation of the Registrant was amended pursuant to the POR to change the corporate name of the Registrant to TA Delaware, Inc.

Furthermore, as part of the bankruptcy process, the Company may undertake additional actions in the future to rationalize and consolidate its operations.

**Results of Operations**

**Three Months Ended June 30, 2007 Compared to the Three Months Ended June 30, 2006**

*Revenues.* Sales decreased by $14.1 million, or 0.2%, during the three months ended June 30, 2007 to $663.4 million from $677.5 million during the three months ended June 30, 2006. The decrease is primarily due to lower volume and unfavorable product mix, which decreased revenue by $66.0 million during the 2007 period compared to the 2006 period. These impacts were partially offset by an increase in steel price recoveries from certain customers, favorable foreign exchange and other factors, which increased revenue by $14.8 million, $27.7 million and $9.4 million, respectively, during the 2007 period compared to the 2006 period.

*Gross Profit and Gross Margin.*
Gross margin for the quarter ended June 30, 2007 was 11.4% compared to 8.3% for the comparable period of 2006. Gross profit increased by $19.3 million, or 34.1%, to $75.8 million during the 2007 period compared to $56.5 million during the 2006 period. The increase in gross profit was primarily the result of positive impacts of improved operating and purchasing efficiencies, customer accommodations, ongoing restructuring activities and other factors in the amounts of $11.2 million, $4.8 million, $11.2 million, $6.0 million and $4.2 million, respectively. These impacts were partially offset by lower volume and unfavorable product mix and raw material steel prices, which decreased gross profit by $12.2 million and $5.9 million, respectively.

*Selling, General and Administrative Expenses.*
Selling, general and administrative expenses increased by $0.2 million, or 0.7%, to $33.3 million during the three months ended June 30, 2007 from $33.0 million for the corresponding period of 2006. Selling, general and administrative expenses represented 5.0% of revenues during the 2007 period in comparison to 4.9% in the 2006 period. The $0.2 million increase resulted primarily from higher workers compensation expenses, director fees and other expenses in the amount of $0.9 million, $0.7 million and $0.4 million, respectively. These expenses were partially offset by lower compensation costs and outside service costs of $0.8 million and $0.9 million, respectively.

*Interest Expense.*
Interest expense increased by $7.9 million, or 35.4%, to $30.3 million during the 2007 period in comparison to $22.3 million in the 2006 period. The $7.9 million increase was primarily attributable to increased interest of $5.4 million related to the Company's DIP financing facilities; and increased amortization expenses of $1.9 million related to the amendments to these DIP financing facilities.

In accordance with SOP 90-7, "Reorganization Under the Bankruptcy Code," interest expense during the Company's bankruptcy has been recognized only to the extent that it will be paid during the Company's bankruptcy proceedings or that it is probable that it will be an allowed priority, secured or unsecured claim. Interest expense recognized by the Company is lower than the Company's stated contractual interest for the three months ended June 30, 2007 and 2006 by $18.6 million and $18.3 million.

*Chapter 11 and Related Reorganization Items.*
Chapter 11 and related reorganization expense decreased by $31.9 million to $11.8 million during the 2007 period compared to $43.7 million in the 2006 period. These costs primarily related to professional fees related to the Company's bankruptcy proceedings, write-offs of deferred financing costs and lease rejection costs. See Notes 1 and 2 to the Condensed Consolidated Financial Statements.

*Provision for Income Taxes.*
During the three months ended June 30, 2007, the Company recognized an income tax expense of $8.3 million related to a pre-tax net loss of $16.7 million. The Company recorded income tax expense that resulted from foreign income

32

**Table of Contents**

taxes related to the Company's international operations and U.S. state taxes. Full valuation allowances were provided for U.S. Federal income tax benefits generated during the 2007 period.

During the three months ended June 30, 2006, the Company recognized an income tax expense of $11.9 million related to a pre-tax net loss of $70.1 million. The Company recorded income tax expense that resulted from foreign income taxes related to the Company's international operations and U.S. state taxes. Full valuation allowances were provided for U.S. Federal income tax benefits generated during the 2006 period. These collective income tax provisions were offset by an $8.1 million tax benefit related to the reversal of a valuation allowance for certain tax loss carry-overs. The reversal of the valuation allowance resulted from the reorganization, completed in the 2006 period, of certain of the Company's international operations. Such reorganization resulted in the ability to utilize tax loss carry-overs in future periods.

*Equity in Earnings of Joint Ventures, Net of Tax.*
Equity in earnings of joint ventures, net of tax decreased by $2.1 million, or 27.4%, to $5.5 million during the three months ended June 30, 2007 from $7.5 million during the three months ended June 30, 2006. The decrease primarily resulted from the Company's share of earnings from its joint venture interest in Metalsa.

*Minority Interest, Net of Tax.* Minority interest, net of tax, increased by $0.4 million, or 16.0%, to $2.6 million during the three months ended June 30, 2007 from $2.2 million during the three months ended June 30, 2006. The increase resulted primarily from higher earnings at the Company's joint ventures in China, Tower Golden Ring, of $0.4 million.

**Six Months Ended June 30, 2007 Compared to the Six Months Ended June 30, 2006**

*Revenues.* Sales decreased by $66.4 million, or 4.9%, during the six months ended June 30, 2007 to $1.3 billion from $1.3 billion during the six months ended June 30, 2006. The decrease is primarily due to lower volume and unfavorable product mix, which decreased revenue by $134.9 million during the 2007 period compared to the 2006 period. These impacts were partially offset by an increase in steel price recoveries from certain customers, favorable foreign exchange and other factors, which increased revenue by $6.0 million, $53.1 million and $9.4 million, respectively, during the 2007 period compared to the 2006 period.

*Gross Profit and Gross Margin.*
Gross margin for the six months ended June 30, 2007 was 8.6% compared to 7.8% for the comparable period of 2006. Gross profit increased by $4.2 million, or 4.0%, to $109.6 million during the 2007 period compared to $105.4 million during the 2006 period. The increase in gross profit was primarily due to the positive impacts of improved operating and purchasing efficiencies, customer accommodations and ongoing restructuring activities in the amounts of $17.1 million, $9.8 million, $11.2 million, and $13.4 million, respectively. These impacts were partially offset by lower volume and unfavorable product mix, raw material steel prices and other factors in the amounts of $31.2 million, $15.2 million and $0.9 million, respectively, for the six months ended June 30, 2007 compared to the 2006 period.

*Selling, General and Administrative Expenses.*
Selling, general and administrative expenses decreased by $1.9 million, or 2.8%, to $65.2 million during the six months ended June 30, 2007 from $67.1 million for the corresponding period of 2006. Selling, general and administrative expenses represented 5.1% of revenues during the 2007 and 5.0% during the 2006 period. The $1.9 million decrease resulted primarily from lower compensation costs, outside service costs and other expenses of $0.9 million, $1.8 million and $0.3 million, respectively. These decreases were partially offset by higher workers compensation expenses and director fees, in the amount of $0.5 million and $0.6 million, respectively.

*Interest Expense.*
Interest expense increased by $15.9 million, or 37.2%, to $58.8 million during the 2007 period in comparison to $42.8 million in the 2006 period. The increase was primarily attributable to increased interest of $10.6 million related to the Company's DIP financing facilities; and increased amortization expenses of $4.9 million related to the amendments to these DIP financing facilities.

*Chapter 11 and Related Reorganization Items.*
Chapter 11 and related reorganization expense decreased by $34.5 million to $20.8 million during the 2007 period compared to $55.3 million in the 2006 period. These costs primarily related to professional fees related to the Company's bankruptcy proceedings, write-offs of deferred financing costs and lease rejection costs. See Notes 1 and 2 to the Condensed Consolidated Financial Statements.

*Provision for Income Taxes.*
During the six months ended June 30, 2007, the Company recognized an income tax expense of $11.7 million related to a pre-tax net loss of $57.8 million. The Company recorded income tax expense that resulted from foreign income taxes related to the Company's international operations and U.S. state taxes. Full valuation allowances were provided for U.S. Federal income tax benefits generated during the 2007 period. These collective income tax provisions were offset by an $8.1 million tax

Table of Contents

benefit related to the reversal of a valuation allowance for certain tax loss carry-overs. The reversal of the valuation allowance resulted from the reorganization, completed in the 2006 period, at certain of the Company's international operations. Such reorganization resulted in the ability to utilize tax loss carry-overs in future periods.

We adopted the provisions of FIN 48 on January 1, 2007, and decreased retained earnings by approximately $0.3 million. For further discussion, see Note 11 of the Condensed Consolidated Financial Statements.

During the six months ended June 30, 2006, the Company recognized income tax expense of $9.7 million in relation to a pre-tax net loss of $88.9 million. This income tax provision resulted primarily from the recognition of foreign income taxes and state taxes. Full valuation allowances were provided for U.S. Federal income tax benefits generated during the 2006 period.

*Equity in Earnings of Joint Ventures, Net of Tax.*
Equity in earnings of joint ventures, net of tax decreased by $5.2 million, or 36.7%, to $9.0 million during the six months ended June 30, 2007 from $14.2 million during the six months ended June 30, 2006. The increase primarily resulted from the Company's share of earnings from its joint venture interest in Metalsa.

*Minority Interest, Net of Tax.*
Minority interest, net of tax increased by $1.6 million, or 49.7%, to $4.7 million during the six months ended June 30, 2007 from $3.2 million for the corresponding period of 2006. The increase resulted from higher earnings at the Company's joint ventures in China, Tower Golden Ring and WuHu, and the Company's joint venture in Germany, Dr. Meleghy, of $0.8 million, $0.4 million and $0.3 million, respectively.

## Restructuring and Asset Impairment

The Company has executed various restructuring plans and may execute additional plans in the future to respond to its bankruptcy proceedings, customer sourcing decisions, realignment of manufacturing capacity to prevailing global automotive production and to improve the utilization of remaining facilities. Estimates of restructuring charges are based on information available at the time such charges are recorded. Due to the inherent uncertainty involved in estimating restructuring expenses, actual amounts paid for such activities may differ from amounts initially recorded. Accordingly, the Company may record revisions of previous estimates by adjusting previously established reserves.

See Note 8 to the accompanying Condensed Consolidated Financial Statements for further information regarding these actions.

During the three and six months ended June 30, 2007, the Company recognized expense of $18.3 million and $24.2 million, respectively, related to restructuring and asset impairments compared to an expense of $28.3 million and $30.9 million for the three and six months ended June 30, 2006, respectively. The decrease of $10.0 million and $6.7 million is primarily the result of additional, previously disclosed, plant closure activities during the 2006 period, which did not occur during the comparable 2007 period.

34

Table of Contents

**Liquidity and Capital Resources**

During the first six months of 2007, the Company's cash requirements were met through operations and a $725 million commitment of debtor-in-possession financing ("DIP Financing"). At June 30, 2007, the Company had available liquidity in the amount of $128.0 million, which consisted of $87.2 million of cash on hand and the availability of $40.8 million for borrowing under facilities that expired upon the Company's emergence from bankruptcy.

Net cash provided by operating activities was $15.6 million during the six months ended June 30, 2007 compared to net cash provided by operating activities of $29.0 million during the six months ended June 30, 2006. The change was due to a decrease of $0.1 million in the net loss after excluding non-cash charges, related to Chapter 11 and reorganization items, restructuring and asset impairment charges, depreciation expenses, deferred income tax expenses, and equity in earnings of joint ventures. Working capital items (accounts receivable, inventory, pre-paid tooling and other, accounts payable and accrued liabilities) decreased cash flow by $34.6 million. The decrease was offset by improved cash utilization from other assets and liabilities of $21.1 million.

Net cash used in investing activities was $47.7 million during the first six months of 2007 compared to net cash used in investing activities of $27.7 million in the corresponding period of 2006. During the first quarter of 2006, the Company sold its Gunpo, South Korea facility and received cash proceeds of approximately $32.7 million. The Company disbursed cash of $47.7 million for purchases of property, plant and equipment during the six months ended June 30, 2007 as compared to $60.4 million in the comparable 2006 period.

Net cash provided by financing activities was $55.0 million during the first six months of 2007 compared to net cash provided of $53.0 million during the comparable period of 2006. During the six months ended June 30, 2007, borrowings related to the DIP facility more than offset repayments by $56.0 million. Borrowings related to the Company's non-DIP debt offset repayments associated with that debt by $1.0 million.

As disclosed in the Company's Annual Report for the year ended December 31, 2006, the Company's business has significant liquidity requirements. In addition, a summary of the liquidity factors which forced the Company to seek Chapter 11 bankruptcy protection is included as well as the Company's plans regarding these matters related to improving liquidity and operating results. On September 22, 2006, the Company circulated for approval by the lenders under its DIP Agreement the seventh amendment to the DIP Agreement (the "Amendment"). On October 6, 2006, the DIP Agreement was amended by the lenders. The Amendment amends certain covenants contained in the DIP Agreement. In addition, the Amendment amends certain provisions to allow for dividends to be declared and paid by less than wholly-owned subsidiaries of the Company and waives any existing covenant technical breaches related to previously declared and paid dividends by less than wholly-owned subsidiaries of the Company. The Amendment also amended certain interest rates based on the current economic environment. On January 30, 2007, the Company obtained approval by the lenders under its DIP Agreement of the eighth amendment to the DIP Agreement. The eighth amendment extends the maturity date from February 2, 2007 to August 2, 2007, amends certain covenants contained in the DIP Agreement, and amends certain interest rates based on the current economic environment. The Company believes that funds generated by operations, together with cash on hand and amounts available for borrowing under its DIP Financing, should it be able to obtain appropriate modifications or waivers, provide sufficient liquidity and capital resources to pursue its business strategy while operating under Chapter 11 bankruptcy protection. The DIP Agreement matured on August 2, 2007 and the Debtors' paid all borrowings pertaining to the DIP Agreement on July 31, 2007 as part of the sale transaction to Cerberus Capital Management, L.P. as discussed further in Note 1.

**Chapter 11 Impact**

Under the terms of the Company's then-existing credit agreement, the Chapter 11 filing created an event of default. Upon the Chapter 11 filing, the lenders' obligation to loan additional money to the Company terminated, the outstanding principal of all obligations became immediately due and payable and the Debtors were required to immediately deposit funds into a collateral account to cover the outstanding amounts under the letters of credit issued pursuant to the credit agreement. Outstanding obligations under the credit agreement amounted to $425 million, which was refinanced through the DIP financing described below.

In addition, the Chapter 11 filing created an event of default under the Convertible Debentures, Senior Notes, Senior Euro Notes, and the amount due for the Subordinated Debentures. As a result, such indebtedness became immediately due and payable (see Note 2).

The ability of the creditors of the Debtors to seek remedies to enforce their rights under the credit facilities described above is stayed as a result of the Chapter 11 filing, and the creditors' rights of enforcement are subject to the applicable provisions of the Bankruptcy Code.

35

Table of Contents

The debt of the Company's foreign subsidiaries is not subject to compromise in the bankruptcy proceedings as the Company's operating foreign subsidiaries are not included in the Chapter 11 filing.

## DIP Financing

In February 2005, the Bankruptcy Court approved a Revolving Credit, Term Loan and Guaranty Agreement, as amended, ("DIP Agreement") between the Company and a national banking institution as agent for the lenders ("Lenders") and each of the Lenders.

The DIP Agreement provides for a $725 million commitment of debtor-in-possession financing comprised of a revolving credit and letter of credit facility in an aggregate principal amount not to exceed $300 million and a term loan in the aggregate principal amount of $425 million. The proceeds of the term loan have been used to refinance the Debtors' obligations of amounts outstanding under the pre-petition credit agreement. The proceeds of the revolving credit loans shall be used to fund the working capital requirements of the Debtors during the Chapter 11 proceedings. Obligations under the DIP Agreement are secured by a lien on the assets of the Debtors (such lien shall have first priority with respect to a significant portion of the Debtors' assets) and by a super-priority administrative expense claim in each of the bankruptcy cases. The Company believes that the existing DIP Agreement along with cash generated from operations are adequate to provide for its future liquidity needs through the Debtors' Chapter 11 bankruptcy.

Advances under the DIP Agreement bear interest at a fixed rate per annum equal to (x) the greatest (as of the date the advance is made) of the prime rate, the Base CD Rate (as defined in the DIP Agreement) plus 1%, or the Federal Funds Effective Rate (as defined in the DIP Agreement) plus 0.5%, plus (y) 1.75% prior to the amendment and 2.75%, as amended, in the case of a loan under the revolving facility, or 2.25% prior to the amendment and 3.5%, as amended in the case of the term loan. Alternatively, the Debtors may request that advances be made at a variable rate equal to (x) the Adjusted LIBO Rate (as defined in the DIP Agreement), for a one-month, three-month, six-month, or nine-month period, at the election of the Debtors, plus (y) 2.75% prior to the amendment and 3.75%, as amended, in the case of a loan under the revolving facility, or 3.25% prior to the amendment and 4.5%, as amended in the case of the term loan. In addition, the DIP Agreement obligates the Debtors to pay certain fees to the Lenders as described in the DIP Agreement. At June 30, 2007, $40.8 million was available for borrowing under the revolving credit and letter of credit facility. At June 30, 2007, the weighted average interest rate associated with borrowings pertaining to the DIP Agreement was 9.82%. The DIP Agreement matured on August 2, 2007 and the Debtors' paid all borrowings pertaining to the DIP Agreement on July 31, 2007 as part of the sale transaction to Cerberus Capital Management, L.P. as discussed further in Note 1.

The DIP Agreement contains various representations, warranties and covenants by the Debtors that are customary for transactions of this nature, including (without limitation) reporting requirements and maintenance of financial covenants. On September 22, 2006, the Company circulated for approval by the lenders under its DIP Agreement the seventh amendment to the DIP Agreement (the "Amendment"). On October 6, 2006, the DIP Agreement was amended by the lenders. The Amendment amends certain covenants contained in the DIP Agreement. In addition, the Amendment amends certain provisions to allow for dividends to be declared and paid by less than wholly-owned subsidiaries of the Company and waives any existing covenant technical breaches related to previously declared and paid dividends by less than wholly-owned subsidiaries of the Company. The Amendment also amended certain interest rates based on the current economic environment. On January 30, 2007, the Company obtained approval by the lenders under its DIP Agreement the eighth amendment to the DIP Agreement. The eighth amendment extends the maturity date from February 2, 2007 to August 2, 2007, amends certain covenants contained in the DIP Agreement, and amends certain interest rates based on the current economic environment. In addition, the DIP Agreement was amended by the lenders on March 28, 2007 and was effective March 9, 2007. The amendment amends Section 5.01(a) of the Credit Agreement.

The Debtors' obligations under the DIP Agreement may be accelerated following certain events of default, including (without limitation) any breach by the Debtors of any of the representations, warranties, or covenants made in the DIP Agreement or the conversion of any of the bankruptcy cases to a case under Chapter 7 of the Bankruptcy Code or the appointment of a trustee pursuant to Chapter 7 of the Bankruptcy Code.

36

Table of Contents

**Back-Stop Agreement**

The Debtors have entered into a Back-Stop Agreement with a finance company ("Finance Company"). Under the Back-Stop Agreement, in the event any second lien lender under the pre-petition credit agreement wished to assign its deposits, rights and obligations after the Chapter 11 filing, the Finance Company agreed to take by assignment any such second lien holder's deposits, rights and obligations in an aggregate amount not to exceed $155 million.

Draws were made against the issued second lien letters of credit in the amount of $41 million as of June 30, 2007. The Debtors' paid all borrowings pertaining to the Back-Stop Agreement on July 31, 2007 as part of the sale transaction to Cerberus Capital Management, L.P. as discussed further in Note 1.

**Stock Options**

Effective January 1, 2006, the Company accounts for stock-based compensation utilizing the fair value approach described in SFAS No. 123 (R) – *"Shared-Based Payment"* ("SFAS No. 123 (R)"). On September 20, 2005, the Company fully vested the entire unvested portion of its outstanding stock options. The Company accelerated the vesting of these options because it is the Company's opinion that expensing the remaining unvested portion of the options in accordance with SFAS No 123 (R) does not represent the economic cost to the Company given the Company's Chapter 11 status. Therefore, the adoption of SFAS No. 123 (R) had no material impact on the Company's financial statements.

SFAS No. 157, *"Fair Value Measurements"*
("SFAS No. 157") — In September 2006, the FASB issued SFAS No. 157, which establishes a framework for reporting fair value and expands disclosures about fair value measurements. SFAS No. 157 becomes effective beginning with our first quarter 2008 period. In accordance with SOP 90-7, early adoption is required when an entity emerges from bankruptcy at the time fresh-start reporting is adopted. We are currently evaluating the impact of this standard on the Company's Condensed Consolidated Financial Statements.

SFAS No. 159, *"The Fair Value Option for Financial Assets and Financial Liabilities – including an Amendment to FASB Statement No. 115"*
("SFAS No. 159") - - In February 2007, the FASB issued SFAS No. 159, which permits an entity to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. Most of the provisions in SFAS No. 159 are elective, however, the amendment to SFAS No. 115, *"Accounting for Certain Investments in Debt and Equity Securities,"* applies to all entities with available-for-sale and trading securities. The fair value option established by SFAS No. 159 permits companies to choose to measure eligible items at fair value at specified election dates. A business entity that elects the fair value option will report unrealized gains and losses on items for which the fair value option has been elected in earnings at each subsequent reporting date. SFAS No. 159 is effective as of the beginning of an entity's first fiscal year that begins after November 15, 2007. We are currently evaluating the impact of this standard on the Company's Condensed Consolidated Financial Statements.

**Market Risk**

The Company is exposed to various market risks, which is the potential loss arising from adverse changes in market rates and prices, such as foreign currency exchange rates, interest rates, steel prices and scrap steel prices. The Company's policy is to not enter into derivatives or other financial instruments for trading or speculative purposes. The Company periodically enters into derivative instruments to manage and reduce the impact of changes in interest rates.

At June 30, 2007, the Company had total debt not subject to compromise in the bankruptcy proceedings of $898.5 million. The debt is composed of fixed rate debt of $114.5 million and floating rate debt of $784.0 million. The pre-tax earnings and cash flow impact for the next year resulting from a one percentage point increase in interest rates on variable rate debt not subject to compromise would be approximately $8.0 million, holding other variables constant. A one-percentage point increase in interest rates would not materially impact the fair value of the fixed rate debt not subject to compromise.

A portion of the Company's revenues are derived from manufacturing operations in Europe, Asia and South America. The results of operations and financial position of the Company's foreign operations are principally measured in their respective currency and translated into U.S. dollars. The effects of foreign currency fluctuations in Europe, Asia and South America are somewhat mitigated by the fact that expenses are generally incurred in the same currency in which revenues are generated. The reported income of these subsidiaries will be higher or lower depending on a weakening or strengthening of the U.S. dollar against the respective foreign currency.

37

e10vq

Table of Contents

A portion of the Company's assets are based in its foreign operations and are translated into U.S. dollars at foreign currency exchange rates in effect as of the end of each period, with the effect of such translation reflected as a separate component of stockholders' investment (deficit). Accordingly, the Company's consolidated stockholders' investment (deficit) will fluctuate depending upon the weakening or strengthening of the U.S. dollar against the respective foreign currency.

The Company's strategy for management of currency risk relies primarily upon conducting its operations in a country's respective currency and may, from time to time, also involve hedging programs intended to reduce the Company's exposure to currency fluctuations. Management believes the effect of a 100 basis point movement in foreign currency rates versus the dollar would not materially affect the Company's financial position, results of operations or cash flows for the periods presented.

The majority of the Company's product offerings are produced from steel. A byproduct of the production process is scrap steel, which is sold. Steel prices and scrap steel prices rose significantly during the first six months of 2007 compared to 2006. The adverse impact of higher steel prices is expected to continue in 2007. The Company is pursuing several initiatives to mitigate the impact of such raw material price increases on its results of operations. Such initiatives include moving more steel purchases to customer repurchase programs, pursing selling price increases from customers and reducing other operating costs, among other initiatives. The Company can provide no assurance that such initiatives will be successful.

## Opportunities

The Company's operations are geographically diverse including a significant presence in Europe, South America and Asia. The Company has a strategic customer portfolio strategy to leverage relationships with key customers across geographic boundaries to diversify its customer base and increase penetration with existing key customers, including the "New Domestics" (Nissan, Toyota and Honda).

## Disclosure Regarding Forward-Looking Statements

All statements, other than statements of historical fact, included in this Form 10-Q or incorporated by reference herein, are, or may be deemed to be, forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). When used in this Form 10-Q, the words "anticipate," "believe," "estimate," "expect," "intends", "project", "plan" and similar expressions, as they relate to the Company, are intended to identify forward-looking statements. Such forward-looking statements are based on the beliefs of the Company's management as well as on assumptions made by and information currently available to the Company at the time such statements were made. Various economic and competitive factors could cause actual results to differ materially from those discussed in such forward-looking statements, including factors which are outside the control of the Company, such as risks relating to: (i) the Company's reliance on major customers and selected vehicle platforms; (ii) the cyclicality and seasonality of the automotive market; (iii) the failure to realize the benefits of acquisitions and joint ventures; (iv) the Company's ability to obtain new business on new and redesigned models; (v) the Company's ability to achieve the anticipated volume of production from new and planned supply programs; (vi) the general economic or business conditions affecting the automotive industry (which is dependent on consumer spending), either nationally or regionally, being less favorable than expected; (vii) the Company's failure to develop or successfully introduce new products; (viii) increased competition in the automotive components supply market; (ix) unforeseen problems associated with international sales, including gains and losses from foreign currency exchange; (x) implementation of or changes in the laws, regulations or policies governing the automotive industry that could negatively affect the automotive components supply industry; (xi) changes in general economic conditions in the United States, Europe and Asia; and (xii) various other factors beyond the Company's control. All subsequent written and oral forward-looking statements attributable to the Company or persons acting on behalf of the Company are expressly qualified in their entirety by such cautionary statements.

## Item 3. Quantitative and Qualitative Disclosures About Market Risk.

See "Market Risk" section of Management's Discussion and Analysis of Financial Condition and Results of Operations in Part I, Item 2.

e10vq

<u>Table of Contents</u>

**Item 4. Controls and Procedures.**

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES. The Company's Chief Executive Officer (the "CEO") and the Company's Chief Financial Officer (the "CFO") have reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act") as of the end of the period covered by this report. Based upon this review and evaluation, the CEO and CFO have concluded that the Company's disclosure controls and procedures were not effective as of March 31, 2007. This determination was based upon the identification of material weaknesses as of December 31, 2006, in the Company's internal control over financial reporting, which the Company views as an integral part of its disclosure controls and procedures. The effect of such weaknesses on the Company's disclosure controls and procedures and remedial actions taken and planned are described in Item 9A. Controls and Procedures of the Company's Form 10-K for the year ended December 31, 2006.

CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING.

During the six months ended June 30, 2007, the Company implemented changes in internal controls over financial reporting activities. Such changes included:

- Enhanced monthly and quarterly financial reviews with regional finance departments and senior management;

- Enhanced account reconciliations at the corporate headquarters;

- Enhanced quarterly tax provision methodology; and

- Invested in financial personnel in the international operations.

No other changes occurred during the most recent fiscal quarter that had a material effect or are reasonable likely to have a material effect on internal control over financial reporting.

39

**Table of Contents**

# PART II — OTHER INFORMATION

**Item 1. Legal Proceedings.**

A description of the Company's proceedings under Chapter 11 of the United States Bankruptcy Code is described in Part I, Item 3 of the Company's Form 10-K for the year ended December 31, 2006.

**Item 1A. Risk Factors.**

See Part I, Item 1A. of the Company's Annual Report on Form 10-K for the year ended December 31, 2006.

**Item 6. Exhibits.**

31.1     Certification of the Post-Consummation Trust Administrator pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1     Certification of the Post-Consummation Trust Administrator pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

40

**Table of Contents**

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

TA DELAWARE, INC.
Registrant

Date: November 6, 2007

/s/ Jeffery Stegenga
Jeffery Stegenga
Post-Consummation Trust Administrator

41



# VIANALE & VIANALE LLP

2499 GLADES ROAD
SUITE 112
BOCA RATON, FLORIDA 33431

KENNETH J. VIANALE*
JULIE PRAG VIANALE*

*ADMITTED TO THE BARS OF
FLORIDA AND NEW YORK

TELEPHONE (561) 392-4750
FACSIMILE (561) 392-4775

www.vianalelaw.com

September 7, 2007

**VIA FAX TO (312) 861-2200 AND REGULAR MAIL**

Michael A. Duffy, Esq.
Kirkland & Ellis LLP
Aon Center
200 East Randolph Dr.
Chicago, IL 60601

> Re: ***Tower Automotive Securities Litigation***
> **Subpoena to Tower Automotive, Inc.**

Dear Michael:

I write as a follow up to our discussion on September 5th regarding Tower's compliance with the subpoena *duces tecum* served in the *Tower Securities Litigation.*

We amend paragraph 11 of the revised Schedule A to require production of all contracts (including all contract modifications and revisions) setting out the terms of all Early Payment Programs or programs which resulted in the accelerated collection of receivables, that were in effect at any time during the Class Period, including but not limited to contracts applicable to the models listed in paragraph 11.

We amend paragraph 12 to require production of all correspondence discussing, analyzing, or modifying the terms of all Early Payment Programs or programs which resulted in the accelerated collection of receivables, that were in effect at any time during the Class Period.

With respect to our subpoenas to Tower's outside auditors, we have found no basis for the assertion of any state-law accountant-client privilege. This action alleges claims based solely on federal law. Rule 501, Fed. R. Evid., states that in cases arising under federal law, the privilege of a witness shall be governed by the principles of the federal common law. *Id.; see* advisory committee note ("In nondiversity jurisdiction civil cases, federal privilege law will generally apply."). It is well-settled that there is no accountant-client privilege recognized under federal common law. *See Couch v. U.S.*, 409 U.S. 322, 335 (1973). *See also U.S. v. Arthur Young & Co.*, 465 U.S. 805 (1984) (no accountant work product privilege under federal common

September 7, 2007
Page 2

law). Courts have also expressly rejected the assertion of a state law accountant-client privilege in a federal securities fraud case. *See, e.g., Lewis v. Capital Mortgage Investments*, 78 F.R.D. 295, 313 (D. Md. 1978) (in civil 10b-5 case, Maryland Accountant-Client Privilege statute held inapplicable because there is no accountant-client privilege at federal common law). Many other authorities could be cited. Accordingly, we intend to continue to pursue document production from the auditors.

Regarding Tower's production of e-mails and other electronic media, please obtain the following information from Tower's IT department so that we can plan a strategy for efficiently managing the electronic document production:

Computer
- What is the operating system
- What computer programs are used, including e-mail (business and personal)
  - Are files stored on the computer or on the server
  - Are e-mails stored on the computer or on the server
- Is there a personal computer that could hold evidence
- Backup processes used
  - CD, DVD, Rev, thumb drive, etc.
  - Private server storage (mapped drives)
  - Web based backup programs (Google, AOL)
- Are there any passwords. If so, are they available
- Is encryption used. If so, is the encryption key available

Server
- Where is the server that hosts the custodian(s) e-mails and documents
- What is the server OS
- What is the e-mail program, including version number (Exchange or POP3)
- Is there a Blackberry (or similar technology)
- Make arrangements to acquire
  - Custodian e-mails
  - Backup files

Backup
- What are the backup procedures in detail
- Type of backup media
  - Hardware used
  - Software used including version number
  - What type of media is used, including the capacity
- Frequency of backup
  - Daily, weekly, monthly, quarterly, annually
  - Is there a policy to replace old tapes. If so, how are old tapes handled and stored

September 7, 2007
Page 3

Storage
- Onsite or Offsite -- Obtain location with contact name

Once you and we have this information, we will be able to implement a strategy for completing this phase of your client's subpoena compliance.

I will advise you as soon as the parties to the litigation agree to the Protective Order. I would hope that you will agree to commence production upon the parties' signing the Order, without waiting for it to be So Ordered by the Court.

Feel free to call me with any questions.

Sincerely,

Julie Prag Vianale

cc:   Kenneth J. Vianale
      Lee Shalov
      Robert Kravitz



# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Michael A. Duffy
To Call Writer Directly:
312-861-2252
mduffy@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200

Dir. Fax: 312 861-2200

September 26, 2007

**VIA EMAIL AND UPS OVERNIGHT**

Ms. Julie Prag Vianale
Vianale & Vianale
2499 Glades Road
Suite 112
Boca Raton, FL 33431

Re:     *Tower Automotive Securities Litigation*
        *Subpoena to Tower Automotive*

Dear Julie:

Pursuant to the subpoena *duces tecum* served upon Tower Automotive, and subject to the various limitations agreed upon in conference calls between plaintiffs and counsel for Tower, we are producing responsive documents and other media.   Pursuant to the protective order entered in the case, Tower Automotive designates the enclosed material "confidential."

Tower continues to review its files and reserves the right to supplement this production. Tower will produce responsive documents as they become available. Furthermore, in producing documents, Tower does not agree with or assent to the statements and characterizations contained in plaintiffs' subpoena.

With respect to the specific issues raised in your September 7, 2007 letter regarding electronic discovery, Tower's operating system (OS) and e-mail program were not standardized until 2003, at which time Tower adopted Windows 2000 as an operating system and Microsoft Outlook as an e-mail program on all company computers.

The following three employees or former employees of Tower may currently have information responsive to the subpoena on their company-owned computers:

- *Kathy Ligocki*:  Former Tower employee Kathleen Ligocki's computer was reimaged when her employment ended, but a

Hong Kong          London          Los Angeles          Munich          New York          San Francisco          Washington, D.C.

# KIRKLAND & ELLIS LLP

Ms. Julie Prag Vianale
September 26, 2007
Page 2

complete backup of that computer exists on a Tower server on a restricted drive.

- *Chris Hatto*: Former employee Chris Hatto's computer has also been reimaged, but data on his computer was archived at the time of his resignation in late 2006, and is also in Tower's possession.

- *Jim Mallak*: Jim Mallak remains a Tower employee and is in possession of a laptop computer that may hold relevant data.

Tower's current backup strategy for File and Print Exchange is to retain monthly snapshots for a period of 13 months, and year-end snapshots indefinitely through an outside company called Iron Mountain. This policy was not put in place until 2003, however, so annual snapshots do not exist for the years 2000-2002. Because monthly snapshots are retained on Tower's server for only 13 months, no such monthly records would exist for the time period relevant to the subpoena. Backup hardware varies between F&P and Exchange.

Tower believes Iron Mountain may retain relevant backup data in the form of annual, year-end snapshots of network drives only (not e-mail drives), for the following individuals and the following years:

- *Dugald Campbell*: 2003, 2004, 2005 (no longer employed by Tower in 2005)

- *Tony Barone*: 2003, 2004, 2005 (no longer employed by Tower in 2005)

- *Chris Hatto*: 2004, 2005

- *Jim Mallak*: 2004, 2005

Annual, year-end snapshots of e-mail files which may relate to the above individuals are not in catalogued format.

Tower employs network logon IDs, but does not use encryption, therefore no encryption key will be necessary. Tower's server, which employs a Windows OS, was housed from 2003-2005 at an EDS Center in Auburn Hill, Michigan. That server is currently located at the Infocrossing datacenter in Omaha, nebraska. The e-mail program on the server is Exchange 2003, and the previous program was Exchange 2000. Tower began using Blackberries after the subpoena period, in 2006, therefore no data responsive to the subpoena is on employee Blackberries.

## KIRKLAND & ELLIS LLP

Ms. Julie Prag Vianale
September 26, 2007
Page 3

Please let me know if you have any questions or concerns.

Best regards,

Michael A. Duffy

MAD:cpl
Enclosure

cc:    Robert N. Kravitz, Esq. (w/enclosures)
       Daniel Condict Moore
       Frank Sramek



# VIANALE & VIANALE LLP

2499 GLADES ROAD
SUITE 112
BOCA RATON, FLORIDA 33431

KENNETH J. VIANALE*
JULIE PRAG VIANALE*

*ADMITTED TO THE BARS OF
FLORIDA AND NEW YORK

TELEPHONE (561) 392-4750
FACSIMILE (561) 392-4775

www.vianalelaw.com

November 20, 2007

**VIA FAX (312-861-2200)**
**AND EMAIL (mduffy@kirkland.com)**

Michael A. Duffy, Esq.
Kirkland & Ellis LLP
Aon Center
200 East Randolph Dr.
Chicago, IL 60601

Re:     *Tower Automotive Sec. Litig.* (S.D.N.Y)
        **Subpoena to Tower Automotive, Inc.**
        **(Electronic Discovery)**

Dear Michael:

I write to follow up on your letter of September 26, 2007 regarding electronic discovery.

According to your letter, there are several sources of electronically stored documents that Tower should be in a position to produce shortly. For example, your letter states that Kathy Ligocki, Chris Hatto and Jim Mallak "may have information responsive to the subpoena on their company-owned computers." You mentioned that the data on both Kathy Ligocki and Chris Hatto's computer was reimaged and that Jim Mallak has a laptop computer that may hold relevant data. Would you please let us know when we can expect production of documents responsive to our subpoena, including e-mails, that can be produced from these electronic sources.

Your letter also states that Iron Mountain may have relevant backup data (annual, year-end snapshots of network drives (not e-mail drives)) for Dugald Campbell (2003-2005); Tony Barone (2003-2005); Chris Hatto (2004-2005); and Jim Mallak (2004-2005). Would you please let us know when we can expect production of responsive documents from these individuals.

November 20, 2007
Page 2


        If there is information you need from us in order to search these data sources, please let us
know immediately.  With respect to Tower's other electronic sources for production of
documents, we will be in contact with you to discuss how and when the documents may be
retrieved.

                                        Sincerely,


                                        Kenneth J. Vianale

KJV/pw

cc:     Robert Kravitz, Esq. (by email)
        Lee Shalov, Esq. (by email)
        Thomas Ciarlone, Esq. (by email)



# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Michael A. Duffy
To Call Writer Directly:
312-861-2252
mduffy@kirkland.com

200 East Randolph Drive
Chicago, Illinois 60601

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200

December 21, 2007

Kenneth J. Vianale
2499 Glades Road
Suite 112
Boca Raton, FL 33431

Re:     *Tower Automotive Securities Litigation*
        Subpoena to Tower Automotive

Dear Kenneth:

I write in response to your November 20, 2007 letter regarding electronic discovery in response to the subpoena *duces tecum* issued to Tower in the *Tower Securities Litigation.*

Kathy Ligocki, Jim Mallak and Chris Hatto had their network drive files, and the contents of the "My Documents" folders on their computer hard drives backed up at the end of their respective employments with Tower. We are currently working to recover these network drive and hard drive documents from end of employment for all three individuals. Once the data is gathered, we will review it and produce to you any non-privileged documents responsive to the subpoena, subject to the "confidentiality" restrictions in the applicable protective order.

Your letter also requests backup data from the network drives of Dugald Campbell and Tony Barone, as well as Mr. Mallak and Mr. Hatto, for 2005 and various preceding years within the subpoena period. As stated in my letter of September 26, 2007, these year-end snapshots are on backup tapes that are not in catalogued format. Therefore considerable time and expense would be required for Tower to extract any relevant data. It would take an estimated 240 man hours for Tower employees to extract the requested annual backup data. This estimate does not include the attorney hours that would be required to review any recovered data prior to production, which would be substantial.

Recovery of the annual snapshot data from backup tapes would impose an undue burden on Tower. The Southern District of New York has recognized that backup tapes are among the least accessible of electronic formats. *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 319 (S.D.N.Y. 2003). The six weeks of eight hour days that would be required for Tower employees to restore the requested annual data from the backup tapes, and the substantial additional hours that would be required for attorneys to review any restored data, would clearly impose an undue burden on Tower under the Federal Rules.

Hong Kong          London          Los Angeles          Munich          New York          San Francisco          Washington, D.C.

Kenneth J. Vianale
December 21, 2007
Page 2

**KIRKLAND & ELLIS LLP**

Further, Tower is not even a party to this litigation. Courts have consistently held that "non-party status" is a significant factor in assessing undue burden, and should be given "special weight" in evaluating the balance of competing needs. *U.S. v. Amerigroup Illinois, Inc.*, 2005 WL 3111972 at *4-5 (N.D.Ill. Oct. 21, 2005) (noting that "defendants have not cited [] a single case in which a non-party was subjected to the significant burden of restoring electronic data in backup tapes"); *See also North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49 (D.D.C. 2005); *In re Automotive Refinishing Paint*, 229 F.R.D. 482, 495 (E.D.Pa.2005). Federal Rule 45 states that a court "must protect a person who is neither a party nor the party's officer from significant expense resulting from compliance." F.R.C.P. 45(c)(2)(B)(ii); *Johnson v. Bryco Arms*, 226 F.R.D. 441, 444 (E.D.N.Y. 2005) (noting that Federal Rule 45(c) provides "additional protection to non-parties").

For these reasons, Tower objects to production of any annual electronic data from backup tapes for the individuals and years requested as unduly burdensome under the Federal Rules. We will produce the network and e-mail snapshots from end of employment for Ms. Ligocki, Mr. Hatto and Mr. Mallak as soon as it has been recovered and reviewed.

Best regards,

Michael A. Duffy        /DM

MAD



| From: | Susan Davies |
|---|---|
| To: | "Daniel C Moore"; |
| cc: | Michael Duffy; Frank Sramek; |
| Subject: | RE: Tower Automotive |
| Date: | Tuesday, January 08, 2008 3:40:00 PM |

Dear Dan:

Thank you for your e-mail message. Plaintiffs' proposal – which is made in response to Mr. Duffy's December 21, 2007 letter to my co-counsel Ken Vianale and in light of prior correspondence – is to open a dialogue regarding Tower's electronically stored documents with a view to enabling both sides to pinpoint the most likely and most accessible locations of the documents Plaintiffs seek, and to agree upon an efficient method for retrieving and producing those documents. For this purpose, Plaintiffs have engaged consultants with expertise in electronic data discovery and, in the first instance, we propose a telephonic meet and confer among our consultants, Tower's information technology professionals, and attorneys representing both sides.

The objective of this meeting would be for our consultants to gain a comprehensive understanding of the status of all of Tower's active, offline and archive data sources and related systems, including but not limited to email servers, file servers, database servers, desktops/laptops, backup tapes, and other archival systems. Among other things, our consultants would like information concerning the location, configuration and software of Tower's email servers prior to Tower's adoption of Microsoft Outlook in 2003; how the "year-end snapshots" of network drives and email files were created (hardware and software used); and when the snapshots of email files were created. It is particularly important for us to understand how targeted employees managed data between their PCs and the servers. With such additional information, Plaintiffs would be able to formulate a specific proposal to Tower regarding both where and how the search for responsive electronic documents should be conducted in the most reasonable, cost-effective manner.

Based on the information that we have obtained from Mr. Duffy to date, we are not in a position to agree that the limited retrieval of electronic documents proposed in Mr. Duffy's December 21, 2007 letter (i.e. retrieval

of electronic documents from the network drives and "My Documents" folders on the computers of Kathy Ligocki, Jim Mallack, and Chris Hatto as of their respective dates of termination of employment) satisfies Tower's discovery obligations. Nor are we able to assess Tower's assertion that retrieval and review of responsive electronic documents from other locations would be unduly burdensome.

During our telephone conversation on Thursday, January 3, 2008, you asked me whether Plaintiffs propose to reimburse Tower for the cost of electronic discovery. This is certainly an appropriate subject for a discussion among Tower, Plaintiffs and Defendants after Plaintiffs formulate the specific electronic discovery proposal referenced above. However, any discussion of cost-shifting is premature until we have complete information about Tower's electronic document storage systems and their contents. Plaintiffs' objective in engaging electronic document consultants is to minimize the expense and maximize the efficiency of this process for the benefit of all concerned.

We look forward to receiving your prompt response.

Sincerely,
Susan M. Davies
Shalov Stone Bonner & Rocco LLP
485 Seventh Avenue, Suite 1000
New York, New York 10018
Telephone (212) 239-4340 xtn 25
Fax (212) 239-4310
sdavies@lawssb.com


**From:** Daniel C Moore [mailto:dmoore@kirkland.com]
**Sent:** Friday, January 04, 2008 1:44 PM
**To:** Susan Davies
**Cc:** Michael Duffy; Frank Sramek
**Subject:** Tower Automotive


Dear Susan,

I spoke with my co-counsel Michael Duffy this morning regarding our phone conversation yesterday relating to electronic discovery in the Tower matter.  Please reduce your proposal to writing and we will consider it in due course.

Best regards,
Dan

Daniel C. Moore
Kirkland & Ellis LLP
200 East Randolph Dr.
Chicago, IL 60601
(312) 469-7046
dmoore@kirkland.com

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *



# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Michael A. Duffy
To Call Writer Directly:
312-861-2252
maduffy@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200

January 15, 2008

Susan M. Davies
Shalov Stone Bonner & Rocco LLP
485 Seventh Avenue, Suite 1000
New York, NY 10018

Dear Susan:

I write in response to plaintiff's proposal regarding electronic discovery as outlined in your January 8, 2008 e-mail.

Tower's position has not changed since my December 21 letter, which described in detail the potential locations of all electronic data sought by the plaintiffs. We continue to object to production of electronic data from the annual backup tapes for 2005 and preceding years as unduly burdensome and excessive of Tower's obligations as a non-party responding to a subpoena. *See U.S. v. Amerigroup Illinois, Inc.*, 2005 WL 3111972 at *4-5 (N.D.Ill. Oct. 21, 2005) (quashing subpoena calling for non-party to restore backup tapes); *Johnson v. Bryco Arms*, 226 F.R.D. 441, 444 (E.D.N.Y. 2005) (noting that Federal Rule 45(c) provides "additional protection to non-parties"). Further, Tower is under no obligation to open its doors and allow plaintiffs unfettered access to our technical staff and electronic data, as your proposal suggests.

As stated in my previous letter, Tower's Global IT Manager and her team estimate that it will take approximately 240 man hours to recover the data you request from the annual backup tapes, with no guarantee of success. This estimate does not include the substantial time that would be required for attorneys to review the data. The e-mail files for the years that you request were created by an earlier version of e-mail software that is no longer in use, therefore any recovery of e-mail files from 2005 and preceding years will require Tower to rebuild an environment based on that earlier software. The files will then have to be converted into a media format for review by attorneys.

Restoration of the data on the backup tapes would be further complicated by the fact that the tapes are not labeled or catalogued. In the summer of 2006 Tower changed its Exchange (e-mail) outsourcers, and at that time the company was given boxes of backup tapes by its former vendor. These tapes were unmarked, so there is no way to determine what the individual tapes contain without searching the entire collection. Some of these tapes have been found to be

Hong Kong        London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

## KIRKLAND & ELLIS LLP

Susan M. Davies
January 15, 2008
Page 2

corrupted and unreadable during other searches, so there is no guarantee that any particular data from backup tapes created before the summer of 2006 will be salvageable.

We are in the process of collecting electronic data from computers used by Jim Mallak, Kathleen Ligocki and Chris Hatto, all of whom had their network drive files, and the contents of the "My Documents" folders on their computer hard drives backed up at the end of their respective employments with Tower. Once that data has been collected and reviewed by attorneys for responsiveness and privilege, we will produce it to you.

We are open to discussing the format of that production, and welcome you to contact us with your preferences in that regard, however we will consider any proposals in light of minimizing the already substantial burden on Tower.

Best regards,

Michael A. Duffy

DCM



# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois  60601

Michael A. Duffy
To Call Writer Directly:
(312) 861-2252
maduffy@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: (312) 861-2200

January 31, 2008

Susan M. Davies
Shalov Stone Bonner & Rocco LLP
485 Seventh Avenue, Suite 1000
New York, New York  10018

      Re:    *In re Tower Automotive Securities Litigation*, 05-Civ.-1926

Dear Susan:

      I write in response to the deposition subpoena and subpoena *duces tecum* you served on Tower Automotive LLC ("New Tower") on January 25, 2008 ("the subpoena"), and your e-mail to me of the same day.

      New Tower objects to the subpoena on the following grounds: (1) the subpoena fails to allow a reasonable time for compliance; (2) the subpoena is overbroad; and (3) the subpoena places an undue burden on New Tower, a company that is in the process of emerging from bankruptcy and is a non-party to the above-captioned litigation.

      As an initial matter, while the subpoena states that New Tower is not required to produce documents that have already been produced in response to the August 24, 2007 subpoena ("the original subpoena"), the subpoenas name different entities.  The original subpoena named Tower Automotive Inc. ("Old Tower"), an entity which no longer exists.  To the extent New Tower has produced documents in response to that original subpoena (and is in the process of reviewing documents for additional production) it has done so out of a spirit of cooperation.  New Tower's burden in responding to the new subpoena is compounded by the efforts it has expended, and continues to expend in responding to the original subpoena to Old Tower.  In that light, I move on to address our objections under Rule 45.

      First, with respect to timing, the subpoena commands New Tower to appear at a deposition on February 12, less than three weeks from the date of service, to testify regarding numerous highly technical issues involving computer usage, electronic backup data, and computer-related policies at each "location and division" of Old Tower dating back to 2000.  It is unreasonable to expect New Tower to be able to prepare for such a deposition in the limited time period allowed.  Further, the subpoena commands New Tower to respond to document requests

Hong Kong      London      Los Angeles      Munich      New York      San Francisco      Washington, D.C.

# KIRKLAND & ELLIS LLP

January 31, 2008
Page 2

(relating solely to Old Tower) by February 8, only two weeks from the date of service. Two weeks in which to collect thousands of obscure technical and human-resources-related documents from a now-defunct entity, dating back eight years, review them for responsiveness and privilege, and produce them, is not a "reasonable time for compliance" as required by the federal rules. *See* Fed. R. Civ. P. 45(c)(3)(A)(i).

Second, the subpoena is overbroad. The subpoena seeks documents sufficient to demonstrate multiple obscure, and arguably irrelevant facts and details relating to computer usage by Old Tower's employees dating back to 2000, Old Tower's policies, practice and procedures within "each location and division" for fifteen different technical issues, and the names of all employees of Old Tower at its corporate headquarters between 2000 and 2005, their job titles, department affiliations, and tenures. *See* Subpoena at 94-96. These requests are clearly overbroad and of dubious relevance to the surviving issues in your case relating to the early payment program and Old Tower's integration of acquisitions. Further, compliance with the requests as written would require New Tower to hand over highly sensitive human resources files for every single employee at Old Tower's corporate headquarters over a 5 year period.

As stated in my e-mail to you of January 25, we are happy to confer regarding the outstanding issues relating to the electronic data you have requested pursuant to the original subpoena.

Best regards,

Michael A. Duffy



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHAN F. BRAND, DOROTHEA C. BRAND, BRAND
FAMILY FOUNDATION, TOMBSTONE LIMITED
PARTNERSHIP, ELSA S. IENATSCH, TRUSTEE U/A/D        No. _____
3/23/2000 BY ELSE S. IENATSCH LIVING TRUST,
FREDERIC E. MOHS and PAULA A. MOHS, on behalf of
themselves, and all others similarly situated,

                                        Movants,

v.

TOWER AUTOMOTIVE LLC
                                        Respondent.

_____

DECLARATION OF SUSAN M. DAVIES IN SUPPORT OF MOTION OF
LEAD PLAINTIFFS IN *IN RE TOWER AUTOMOTIVE SECURITIES LITIGATION*
TO COMPEL TOWER AUTOMOTIVE LLC TO RESPOND TO SUBPOENA

Pursuant to 28 U.S.C. § 1746, SUSAN M. DAVIES hereby declares as follows:

1.        I am an attorney admitted to practice in the State of New York and in the

United States District Court for the Southern District of New York where the consolidated

class actions captioned *In re Tower Automotive Securities Litigation* are pending under Civil

Action No. 05-Civ.-1926(RWS) (the "S.D.N.Y. Action"). My application for admission to

the bar of the United States District Court for the Eastern District of Michigan is pending. I

am of counsel to the New York law firm of Shalov Stone Bonner & Rocco LLP which is co-

lead counsel to the Lead Plaintiffs in the S.D.N.Y. Action. Pursuant to E.D. Mich. LR

83.20(f), Lead Plaintiffs are also represented in this Court by Barry D. Adler, Esq., Adler Stilman, PLLC, 30300 Northwestern Highway, 3d Floor, Farmington Hills, Michigan, 48334.

    2.    I make this declaration in support of Lead Plaintiffs' motion to compel Tower Automotive LLC ("Respondent") to respond to a subpoena issued by this Court for discovery in the S.D.N.Y. Action. A copy of the subpoena is annexed to the accompanying Brief in Support of Motion of Lead Plaintiffs in *In re Tower Automotive Securities Litigation* to Compel Tower Automotive LLC to Respond to Subpoena (the "Brief") at **Exhibit 1**. The subpoena seeks, *inter alia*, production of documents and electronically stored information originally belonging to Tower Automotive, Inc. ("Tower").

    3.    Lead Plaintiffs served the subpoena that is annexed at **Exhibit 2** to the Brief on Tower on or about June 16, 2007 (the "Tower Subpoena"). Thereafter, Lead Plaintiffs' counsel, Kenneth Vianale and Lee Shalov, met and conferred with Tower's counsel, Michael A. Duffy, Esq. of Kirkland & Ellis LLP, and agreed to substantially narrow the scope of the document requests in the Tower Subpoena. On August 24, 2007, Lead Plaintiffs served a revised set of document requests on Tower that reflected the agreement reached by counsel. The revised document requests are also attached at **Exhibit 2** to the Brief.

    4.    Kirkland & Ellis LLP, apparently acting on behalf of Tower, produced documents, audio tapes, and a privilege log in response to the Tower Subpoena on September 26, 2007, September 27, 2007, and October 18, 2007. Tower's document production contained very few electronic mail messages.

5.     Thereafter, counsel for Lead Plaintiffs and Kirkland & Ellis LLP had a series of exchanges of correspondence concerning Tower's sources of electronically stored information. Copies of this correspondence are attached at **Exhibits 6-9** to the Brief. As the correspondence reflects, Tower agreed to make a limited production of data from backup copies of the network drives and "My Documents" hard drive folders of its former President and CEO Kathleen Ligocki, its former CFO James Mallak, and its former Controller Christopher T. Hatto – all of whom are defendants to the S.D.N.Y. Action. Tower objected to providing discovery from backup tapes containing "year-end snapshots" of its network drives and e-mail files for 2003, 2004 and 2005, on the grounds that retrieving this data, and reviewing it for purposes of production, would be unduly burdensome.

6.     In January 2008, Lead Plaintiffs engaged DOAR Litigation Consulting ("DOAR") to assist counsel in connection with obtaining discovery of Tower's electronically stored information. DOAR advised Lead Plaintiffs' counsel that it would need more detailed information concerning the Tower backup tapes and the method Tower proposed to use to extract data in order to evaluate the burden involved. Lead Plaintiffs' counsel proposed to obtain the necessary information, and to make DOAR's expertise available to Tower, by means of a meet and confer including counsel, DOAR representatives, and Tower's information systems professionals. Lead Plaintiffs' counsel's proposal to Tower is annexed at **Exhibit 10** to the Brief. Tower rejected Lead Plaintiffs' proposal, by a letter dated January 15, 2008 that is annexed as **Exhibit 11** to the Brief.

7.      In light of Tower's refusal to provide information concerning the sources of its electronically stored information, Lead Plaintiffs' counsel determined to subpoena Tower for a Rule 30(b)(6) deposition on this topic. In connection with serving this subpoena, Lead Plaintiffs' counsel had occasion to review the status of Tower's Chapter 11 bankruptcy proceeding in the United States District Court for the Southern District of New York. Upon reviewing the Joint Plan of Reorganization approved by the Bankruptcy Court on or about May 31, 2007 (annexed as **Exhibit 3** to the Brief) and an Asset Purchase Agreement between Tower and Respondent that was approved by the Bankruptcy Court in connection with the reorganization (annexed as **Exhibit 4** to the Brief), Lead Plaintiffs' counsel determined that a substantial number of Tower's business records had been transferred to Respondent on or about May 31, 2007. This fact was confirmed by the SEC Form 10-Q filed by Tower on November 6, 2007, a copy of which is annexed at **Exhibit 5** to the Brief.

8.      On January 25, 2008, Lead Plaintiffs served on Respondent a document subpoena that included the revised document requests served on Tower on August 24, 2007 together with a subpoena for a Rule 30(b)(6) deposition of Respondent concerning Tower's electronically stored information and, in particular, the actions necessary to retrieve data from Tower's backup tapes. (*See* **Exhibit 1** to the Brief.)

9.      On January 31, 2008, Kirkland & Ellis LLP as counsel for Respondent, served the written objections to the subpoena that are annexed at **Exhibit 12** to the Brief.

10.     On February 1, 2008, in compliance with Fed.R.Civ.P. 37(2)(A) and E.D. Mich. LR 7.1(a)(2), I met and conferred by telephone with Mr. Duffy and other attorneys

from Kirkland & Ellis LLP representing Tower and Respondent to discuss, *inter alia*, Tower's refusal to produce data from the backup tapes of network servers and e-mail files. During this conference, Mr. Duffy indicated that Tower no longer existed as a corporate entity. Mr. Duffy indicated that Respondent would not agree to make its information systems personnel available to speak with Lead Plaintiff's electronic discovery consultants, but would consider allowing personnel to respond informally to written questions. Lead Plaintiffs' counsel did not pursue this option because we anticipated deposing Respondent's Rule 30(b) witness pursuant to the subpoena served on January 25, 2008.

11.     On February 14, 2008, in compliance with Fed.R.Civ.P. 37(2)(A) and E.D. Mich. LR 7.1(a)(2), I met and conferred by telephone with Mr. Duffy and other attorneys from Kirkland & Ellis LLP representing Respondent to discuss, *inter alia*, Respondent's written objections to the deposition subpoena served on January 25, 2008 and Respondent's refusal to produce Tower's electronically stored information other than the limited production from the computers of Ligocki, Mallack and Hatto previously agreed to by Tower. During this conference, Mr. Duffy indicated that in addition to the objections stated in his letter dated January 31, 2008 (**Exhibit 12**), Respondent objected to the deposition subpoena on the grounds of relevance and undue burden. Mr. Duffy indicated that Respondent would not designate a Rule 30(b)(6) witness to be examined on Respondent's behalf.

12.     On February 21, 2008, in compliance with Fed. R. Civ. P. 37(2)(A) and E.D. Mich. LR 7.1(a)(2), I met and conferred by telephone with Mr. Duffy and other attorneys

from Kirkland & Ellis LLP representing Respondent to discuss, *inter alia*, Respondent's assertion of attorney-client privilege with respect to documents and electronically stored information transferred to Respondent by Tower. Mr. Duffy indicated that it was Respondent's position that Tower's attorney-client privilege with respect to the transferred business records was assigned to Respondent as part of the acquisition of substantially all of Tower's assets. During this conference, Mr. Duffy confirmed that Tower and Respondent had not, as of that date, produced any electronically stored information and that, other than the Ligocki/Mallak/Hatto network drives and "My Documents" folders, had not attempted to search Tower's electronically stored information for responsive documents. Mr. Duffy indicated that Respondent's review of Tower's other electronically stored information had been limited to assessing the burden of extracting the data for production. Mr. Duffy further indicated that Respondent aspired to produce the responsive documents retrieved from the Ligocki/Mallack/Hatto network drives and "My Documents" folders on or about March 15, 2008.

13. As of the date of this declaration, Respondent has not produced to Lead Plaintiffs any documents from the Ligocki/Mallack/Hatto network drives and "My Documents" folders.

14. Pursuant to the current scheduling order in the S.D.N.Y. Action, the deadline for the parties to complete fact discovery is May 15, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 4, 2008, New York, New York

Susan M. Davies



# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

NATHAN F. BRAND, DOROTHEA C. BRAND, BRAND
FAMILY FOUNDATION, TOMBSTONE LIMITED
PARTNERSHIP, ELSA S. IENATSCH, TRUSTEE U/A/D      No._____
3/23/2000 BY ELSE S. IENATSCH LIVING TRUST,
FREDERIC E. MOHS and PAULA A. MOHS, on behalf of
themselves, and all others similarly situated,

                                       Movants,

v.

```
Case: 2:08-x -50179
Judge: Edmunds, Nancy G
Referral MJ: Scheer, Donald A
Filed: 03-06-2008 At 12:04 PM
PE BRAND, ET AL V TOWER AUTOMOTIVE,
LLC (EW)
```

TOWER AUTOMOTIVE LLC

                                 Respondent.

---

| | |
|---|---|
| Attorneys for Movants, Lead Plaintiffs in<br>*In re Tower Auto. Sec. Litig.* (S.D.N.Y.)<br>Barry D. Adler (P30557)<br>ADLER STILMAN, PLLC<br>30300 Northwestern Highway, 3d Floor<br>Farmington Hills, Michigan 48334<br>Telephone: 248-855-5090 | Attorneys for Respondent<br>Automotive LLC<br>Michael A. Duffy<br>KIRKLAND& ELLIS LLP<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br>Telephone: 312-861-2000 |

Lee S. Shalov
Thomas C. Ciarlone
Susan M. Davies
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue, Suite 1000
New York, New York 10018
Telephone: 212-239-4340

Kenneth J. Vianale
Julie Prag Vianale
VIANALE & VIANALE LLP
2499 Glades road, Suite 112
Boea Raton, Florida 33431
Telephone: 561-392-4750

---

## **APPEARANCE**

## APPEARANCE

TO:   **Clerk of the Court**

PLEASE TAKE NOTICE that BARRY D. ADLER does hereby enter his Appearance as co-counsel on behalf of the Movants, Lead Plaintiffs in *In re Tower Auto. Sec. Litig.* (S.D.N.Y.) in the within cause.

Respectfully submitted,
ADLER STILMAN, PLLC

By: _____
BARRY D. ADLER  (P30557)
30300 Northwestern Hwy., 3rd Floor
Farmington Hills, MI  48334
(248) 855-5090
badler@adlerfirm.com

Dated:  March 5, 2008

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

NATHAN F. BRAND, ET AL,

                Plaintiff(s),              Case Number:  08-50179

v.                                      Honorable Nancy G. Edmunds

TOWER AUTOMOTIVE LLC,          Magistrate Judge Donald A. Scheer

                Defendant(s),

_____/

## ORDER OF REFERENCE TO UNITED STATES MAGISTRATE JUDGE

     **IT IS ORDERED** that this matter is referred to United States Magistrate Judge

Donald A. Scheer for the following purpose(s):

    ■ **Hearing and Determination pursuant to (28 USC 636 (B)(1)(A)) on:**

MOTION OF LEAD PLAINTIFF IN IN RE AUTOMOTIVE SECURITIES LITIGATION TO
COMPEL TOWER AUTOMOTIVE LLC TO RESPOND TO SUBPOENA [1]

                    s/Nancy G. Edmunds_____
                    Nancy G. Edmunds
                    United States District Judge

Dated:  March 7, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on March 7, 2008, by electronic and/or ordinary mail.

                    s/Carol A. Hemeyer_____
                    Case Manager

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**NATHAN F. BRAND, DOROTHEA C. BRAND, BRAND FAMILY FOUNDATION, TOMBSTONE LIMITED PARTNERSHIP, ELSA S. IENATSCH, TRUSTEE U/A/D 3/23/2000 BY ELSE S. IENATSCH LIVING TRUST, FREDERIC E. MOHS and PAULA A. MOHS, on behalf of** themselves, and all others similarly situated,

**Movants,**

**v.**

**TOWER AUTOMOTIVE, LLC,**

**Respondent.**

**Case No. 2:08-x-50179**
**District Judge Edmunds**
**Magistrate Judge Scheer**

---

Barry D. Adler (P30557)
ADLER STILMAN, PLLC
30300 Northwestern Highway, 3d Floor
Farmington Hills, Michigan  48334
Telephone:  248-855-5090

Lee S. Shalov
Thomas G. Ciarlone
Susan M. Davies
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue, Suite 1000
New York, New York  10018
Telephone:  212-239-4340

Kenneth J. Vianale
Julie Prag Vianale
VIANALE & VIANALE LLP
2499 Glades Road, Suite 112
Boca Raton, Florida  33431
Telephone:  561-392-4750

*Attorneys for Movants, Lead Plaintiffs in*
*In re Tower Auto Sec. Litig. (S.D.N.Y.)*

Michael A. Duffy
Daniel C. Moore
Jess M. Krannich
KIRKLAND.& ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:  312-861-2000

*Attorneys for Respondent,*
*Tower Automotive, LLC*

## STIPULATED ORDER OF TRANSFER

Before the Court is the Motion of Lead Plaintiffs in *In re Tower Automotive Securities Litigation* to Compel Tower Automotive, LLC to Respond to Subpoena ("Motion to Compel"), which was filed with the Court on March 6, 2008. The parties have jointly requested that this Court transfer the Motion to Compel to the United States District Court for the Southern District of New York, where the underlying litigation—*In re Automotive Securities Litigation*, Case No. 1:05-civ-01926 (RWS) (S.D.N.Y.)—is pending before District Judge Robert W. Sweet. The parties have stipulated to Judge Sweet's jurisdiction over the Motion to Compel and have indicated their wish to have the Motion to Compel adjudicated by Judge Sweet given his familiarity with the relevancy of the information sought and the complexity and scope of the underlying litigation.

A federal court whose only connection with a case is the supervision of discovery ancillary to an action pending elsewhere must be cautious in ruling on the relevancy of evidence. *See, e.g.*, *E.I. DuPont de Nemours & Co. v. Deering Millikin Research Co.*, 72 F.R.D. 440, 443 (D. Del. 1976) (local courts supervising discovery "should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder"). In its discretion, a court may transfer a motion to compel compliance with a subpoena to the court where the underlying action is pending. *See, e.g.*, *Stanziale v. Pepper Hamilton LLP*, No. M8-85 (Part I) (CSH), 2007 WL 473703, at *3-5 (S.D.N.Y. Feb. 9, 2007) (transferring motion to compel compliance with document subpoena); *United States v. Star Scientific, Inc.*, 205 F. Supp. 2d 482, 484-88 (D. Md. 2002) (finding that district court has inherent power pursuant to Rule 26(c) of Federal Rules of Civil Procedure to transfer motions to compel brought under Rule 37); *Devlin v. Transp. Commc'ns Int'l Union,* 2000 WL 249286, at *1 (S.D.N.Y. 2000) ( "There is substantial support in the caselaw, among the commentators, and in the Advisory Committee Note to Rule 26(c) . . .

2

for the proposition that the court from which a subpoena has issued has the authority to transfer any motion to quash or for a protective order to the court in which the action is pending."); *In re Subpoena Duces Tecum to Schneider Nat'l Bulk Carriers, Inc.*, 918 F. Supp. 272, 273-74 (E.D. Wis. 1996) (transferring subpoena enforcement action to district where underlying suit was pending based on matters of judicial economy and convenience); *Pactel Pers. Commc'ns v. JMB Realty Corp.*, 133 F.R.D. 137, 138-39 (E.D. Mo. 1990) (transferring motion to compel subpoena compliance pursuant to non-parties' request). This is particularly true where—as here—the underlying litigation is complex and the parties prefer to have the discovery dispute resolved by a court which is already familiar with the subject matter. *See Stanziale*, 2007 WL 473703, at *5; *Star Scientific*, 205 F. Supp. 2d at 487.

Accordingly, because this Court finds that transfer of the Motion to Compel to the United States District Court for the Southern District of New York will best serve the interests of justice and judicial efficiency, pursuant to Rules 26(c) and 45(c) of the Federal Rules of Civil Procedure this Court hereby refers the Motion to Compel to United States District Judge Sweet. The Clerk is directed to send the motion file to the Clerk of the United States District Court for the Southern District of New York. Unless modified by Judge Sweet, the parties shall adhere to the same briefing schedule that applied before this Court: Respondent's response shall be filed by March 20, 2008, and Movants' reply shall be filed by March 27, 2008.

**IT IS SO ORDERED**

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: March 12, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 12, 2008, by electronic and/or ordinary mail.

3

s/Carol A. Hemeyer
Case Manager

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN


Nathan F Brand, et al.,

                        Plaintiff(s),

v.                                          Case No. 2:08–x–50179–NGE–DAS
                                            Hon. Nancy G Edmunds
Tower Automotive, LLC,

                        Defendant(s).
_____

## NOTICE OF TRANSFER TO OTHER DISTRICT

TO:  U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

    Enclosed are certified copies of the Order of Transfer and the docket sheet.  The case record is electronic and can be viewed at our Court's Intranet website via the J–Net.

    Please acknowledge receipt of this record by returning a time–stamped copy of this notice to:

                    Clerk's Office
                    U.S. District Court for the Eastern District of Michigan
                    231 W. Lafayette Blvd., 5th Floor
                    Detroit, MI
                    48226
                    (313) 234–5005



### Certification

    I hereby certify that this Notice was electronically filed, and the parties and/or counsel of record were served.

                            DAVID J. WEAVER, CLERK OF COURT


                        By: s/ R. Hutchins_____
                            Deputy Clerk

Dated:  March 14, 2008